**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

CARMILLA TATEL, individually and as
parent and natural guardian of her children;
STACY DUNN, individually and as parent
and natural guardian of her children; and
GRETCHEN MELTON, individually and as
parent and natural guardian of her children.

       Plaintiffs

           v.

MT. LEBANON SCHOOL DISTRICT; THE
MT. LEBANON SCHOOL BOARD;
MEGAN WILLIAMS; DR. TIMOTHY
STEINHAUER; DR. MARYBETH D.
IRVIN; BRETT BIELEWICZ; JACOB W.
WYLAND; VALERIE M. FLEISHER;
TODD W. ELLWEIN; ANDREW D.
FREEMAN; ERIN C. GENTZEL; CLAIRE
B. GUTH; DR. JUSTIN D. HACKETT;
ANAMARIA A. JOHNSON; and SARAH L.
OLBRICH.

       Defendants

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Docket No.:   2:22-cv-837


**COMPLAINT**


**JURY TRIAL DEMANDED**


## I.     INTRODUCTION

1.     Parents have a Constitutionally protected liberty interest in the care, custody, and control of their children, including their education. This is one of the oldest fundamental liberty interests recognized under the Constitution. Nearly a century ago, the U.S. Supreme Court held that the "liberty" protected by the Due Process Clause includes the right of parents "**to control the education of their [children]**." *Meyer v. Nebraska,* 262 U.S. 390, 399 (1923) (emphasis added). The Supreme Court has subsequently held (and repeatedly reaffirmed) that the "liberty of parents and guardians" includes the right "**to direct the upbringing and education of children under**

**their control**." *Pierce v. Society of Sisters,* 268 U.S. 510, 534–535 (1925) (emphasis added); *Troxel v. Granville*, 530 U.S. 57, 65-67 (2000). In contravention of their proper role as public educators and leaders of the District, the Defendants are violating Plaintiffs' Constitutional rights to control the education of their children by teaching gender dysphoria and transgender transitioning in the District, **including to first graders**.

2.     While schools and teachers serve an *in loco parentis* function while a child is at school, "[p]ublic schools must not forget that '*in loco parentis*' does not mean 'displace parents.'" *Gruenke v. Seip*, 225 F.3d 290, 307 (3d Cir. 2000).

3.     Consistent with parents' fundamental Constitutional rights, the Mt. Lebanon School District (the "District") – **until recently** – had a history, in both policy and practice, of providing parental notification and "opt out" rights when topics that some might consider sensitive, complex or even controversial were to be taught in a given class. Topics for which notice and opt out rights have been provided include, the Holocaust, slavery, the 9/11 terrorist attacks, reproductive education, sex education, Black Lives Matter, and Planned Parenthood. While these topics can be seen as sensitive and families may have divergent views on them, they are all historical and/or scientific in nature. These topics fall far short in magnitude to the topics of gender dysphoria and transgender transitioning.

4.     Even as to these historical and scientific topics, the District's historical policy and practice stem from parents' Constitutional rights and – **until recently** – properly recognized that different parents may have different approaches and views about **how and when** to educate their children on such topics. For example, while one parent may decide their twelve year-old is mature enough to understand the tragedy, gruesomeness and moral depravity of the Holocaust, another may decide that their child is not yet ready for such learning. Decisions about **how and when**

parents elect to broach such subjects with their children are at the core of parents' fundamental right "to direct the upbringing and education of children under their control."

5.      Unfortunately, when it comes to the classroom of Defendant Megan Williams ("Williams"), a first-grade teacher at Jefferson Elementary in the District, the "School Board Defendants" (as defined below) and the "Administration Defendants" (as defined below) have utterly and unconstitutionally failed to recognize parents' fundamental rights and to adhere to the District's own historical policies and practices derived from those rights.

6.      In contravention of the U.S. Constitution, Pennsylvania law and the District's own historical policies and procedures, the School Board Defendants and the Administration Defendants have permitted Williams to teach, and have condoned her teaching, **six and seven year-old children** about gender dysphoria and transgender transitioning. These are not subjects appropriate for in-class instruction in a public school – let alone in elementary school, let alone in first grade, let alone when taught by an instructor who lacks professional training (as opposed to life experiences) in the subjects. *See* 22 Pa.Code §4.11. Defendants have permitted and condoned this instruction even though this instruction is contrary to the District's published curriculum. They have done so in direct disregard of one set of parents' express request that such topics **not** be taught to their seven- year-old child. The instruction includes Williams teaching these young children that "sometimes parents make mistakes" about a child's gender and encouraging children not to tell their parents about her instruction. Particularly with their children being of such a tender age, Plaintiffs assert that teaching of this subject matter, particularly without following appropriate procedures, is a clear derogation of their Constitutional right "to control the education of their own" and related rights, as well as Plaintiffs' First Amendment beliefs and Equal Protection rights.

While these topics should not be taught at all, at a minimum, parents should be provided adequate notice and an opportunity to opt out.

7.    Defendants' conduct violates their role as, and abdicates their responsibility as, public educators and leaders of the District. If a neighbor or acquaintance, without solicitation and without your consent, approached your child and suggested to him/her that he/she should think about changing sexes and that it might be a mistake by you as a parent if he/she remained his/her current sex, not only would that violate your parental and family rights and your privacy rights, it might be a crime.[1] That Williams did just that to her students (*see infra* pp. 22-31) who are taught to respect, believe and trust their teacher is an unconscionable abuse of trust and a breach of her role as a public school teacher. That the Administrative Defendants and the School Board Defendants support and agree with her conduct is equally unconscionable. Defendants have permitted Plaintiffs' children to be used as part of an unconsented to social/thought experiment conducted by a teacher without the appropriate training or background to do so.

8.    As explained in detail herein, when the issue arose with Williams' instruction on the topic(s), certain of the Plaintiffs complained to the Administration Defendants, but to no avail – they were told that Williams could conduct this instruction both now and in the future and without even a commitment to providing parental notification and opt out rights. The issue was then raised at three Mt. Lebanon School Board meetings without any real recognition of Plaintiffs' parental rights by the School Board Defendants – and with the Board President, Defendant Wyland, giving a roughly five-minute prepared monologue during the public comment section of one of the meetings in favor of Williams' instruction, including indicating that he believed it was consistent with the District's strategic plan and without any commitment to or mention of

---

[1] *See* 18 Pa.C.S.A. §6301(a)(1)(i).

providing parental notification and opt out rights. The conduct of the Administration Defendants and the School Board Defendants constitutes, at a minimum, a *de facto* policy permitting the teaching of gender dysphoria and transgender transitioning in the District, including in elementary school and including doing so without parental notification and opt out rights.

9.      Williams has told parents that she "has an agenda" and intends to continue to teach "right on the edge." Williams, in her capacity as a public school teacher, has no First Amendment right to teach her "agenda" to six- and seven-year-olds.[2] The Administration Defendants and School Board Defendants, in abdication of their responsibilities as public educators and District leaders, have, nonetheless, allowed her to do so. As a result of this abdication, this lawsuit seeks to prevent instruction in the District on gender dysphoria and transgender transitioning now and in the future, particularly at the elementary school level. In the alternative and at a minimum, it seeks to require the District to provide parental notice and opt out rights if the District continues its present express and/or *de facto* policy permitting the teaching of gender dysphoria and transgender transitioning in the District, including in elementary school. It also seeks compensatory damages, to be proven, *inter alia*, via expert mental health testimony, for permitting Plaintiffs' children to be used as part of an unconsented to social/thought experiment conducted by a teacher without the appropriate training or background to do so, as well as punitive damages.

10.      Plaintiffs have both family and friends who are members of the LBGT community and have been intimately involved in diversity efforts in their own workplaces. This lawsuit is not about politics. It is not anti-transgender. It is not about censorship. It is not about banning books.

---

[2]      *E.g., Mayer v. Monroe Cnty. Cmt. Sch. Corp.*, 474 F.3d 477 (7th Cir. 2007) (upholding decision not to renew teacher's contract because of her expression of political views in classroom) *citing, inter alia, Pickering v. Board of Education*, 391 U.S. 563 (1968). *See generally,* Teacher Speech Inside and Outside of Classrooms in the United States: Understanding the First Amendment (2007) available at https://www.mdpi.com/2075-471X/10/4/88.

It is not about precluding **appropriate** DEI initiatives. Rather, it is about Plaintiffs' parental rights and each of their respective decisions not to want their **six- or seven-year-old** child to receive first-grade classroom instruction on gender dysphoria or transgender transitioning from their first-grade teacher.

11.     Accordingly, what this lawsuit asks for is that the Court prohibit the District from teaching the subjects of gender dysphoria and transgender transitioning, including in elementary school or, in the alternative and at a minimum, to require the District to allow Plaintiffs (and via the relief sought other District parents) to control (via, *inter alia*, notice and opt out rights) the decisions of **how and when** to teach this sensitive subject to their children, as well as damages for the already committed Constitutional violations. This relief is consistent with the U.S. Constitution as interpreted by the U.S. Supreme Court, Pennsylvania law, and the District's own policies and procedures – all of which are presently being ignored by Williams, the Administration Defendants, the School Board Defendants and the District. The relief requested herein should be granted.

## II.     THE PARTIES

12.      Plaintiff Carmilla Tatel is a resident of the District and the parent of 3 children who go to school in the District, including a child who was in Williams' class in the 2021-22 school year. She brings this case on her own behalf and as parent and natural guardian of her children.

13.     Plaintiff Stacy Dunn is/was a resident of the District and the parent of 3 children, two of whom go/went to school in the District, including a child who was in Williams' class in the 2021-22 school year before Mrs. Dunn removed him from the class because of Williams' inappropriate conduct toward her son as described in detail below in Section IV(C)(4)(a) and ¶106. She brings this case on her own behalf and as parent and natural guardian of her children.

14.     Plaintiff Gretchen Melton is/was a resident of the District and the parent of 3 children who go/went to school in the District, including a child who was in Williams' class in the 2021-22 school year. She brings this case on her own behalf and as parent and natural guardian of her children.

15.     Defendant Megan Williams is an elementary school teacher in the District and was the first-grade teacher of certain of the children of Plaintiffs. She is sued in her individual and official capacities.

16.     Defendant Mt. Lebanon School District is a public school district serving approximately 5500 students in kindergarten through 12th grade who reside in Mt. Lebanon. It is organized under Pennsylvania law and operates seven elementary schools, two middle schools and a high school. The District is governed by a Board of School Directors ("School Board"), a nine-member elected body that sets policy for the District and delegates responsibility for the administration of the District to its Superintendent of Schools, who oversees a number of lower-level administrators. The School Board as an elected body is also sued as a Defendant.

17.     Defendant Dr. Timothy Steinhauer ("Steinhauer") is the current Superintendent of the District and is sued in his individual and official capacity. At all times relevant to the events described herein, Steinhauer acted within the scope of his employment as an employee, agent, and representative of the School Board and the District. In such capacity, he oversaw and permitted the objected to instruction by Williams in violation of Plaintiffs' Constitutional rights, Pennsylvania law, and the District's historical policies and procedures thereby creating new policies and procedures either express or *de facto*, and did so with the consent, encouragement, knowledge, and ratification of the School Board; under the School Board's authority, control, and supervision; and with the actual or apparent authority of the School Board. Upon information and

belief, Steinhauer has final policymaking authority for the District in circumstances not otherwise provided for in the School District Bylaws and Policies.

18.     Defendant Dr. Marybeth D. Irvin is the Assistant Superintendent for the District in charge of Elementary Education and is sued in her individual and official capacity. At all times relevant to the events described herein, Irvin acted within the scope of her employment as an employee, agent, and representative of the School Board and the District. In such capacity, she oversaw and permitted the objected to instruction by Williams in violation of Plaintiffs' Constitutional rights, Pennsylvania law, and the District's historical policies and procedures thereby creating new policies and procedures either express or *de facto*, and did so with the consent, encouragement, knowledge, and ratification of the School Board; under the School Board's authority, control, and supervision; and with the actual or apparent authority of the School Board. Upon information and belief, Irvin has final policymaking authority in the area of Elementary Education in the District, including day-to-day enforcement of District policies at the elementary school level.

19.     Defendant Principal Brett Bielewicz is the current Principal of Jefferson Elementary in the District  and is sued in his individual and official capacity. At all relevant times herein, Principal Bielewicz acted within the scope of his employment as an employee, agent, and representative of the School Board and the District. In such capacity, he oversaw and permitted the objected to instruction by Williams in violation of Plaintiffs' Constitutional rights, Pennsylvania law, and the District's historical policies and procedures thereby creating new policies and procedures either express or *de facto*, and did so with the consent, encouragement, knowledge, and ratification of Irvin and Steinhauer and the School Board; under the School Board's authority, control, and supervision; and with the actual or apparent authority of the School

Board. Upon information and belief, Bielewicz has final policymaking authority for Jefferson Elementary with respect to the day-to-day enforcement of District policies.

20.     Collectively Defendants Bielewicz, Irvin and Steinhauer are referred to herein as the Administration Defendants and at all relevant times were acting in their individual and official capacities and under color of state law. In condoning and supporting Williams' instruction, which was in violation of Plaintiffs' Constitutional rights, Pennsylvania law, and the District's historical policies and procedures, the Administration Defendants thereby created new policies and procedures either express or *de facto*.

21.     Jacob W. Wyland is the President of the School Board and is sued in his individual and official capacity.

22.     Defendant Valerie M. Fleisher is the School Board Vice President and is sued in her individual and official capacity.

23.     Defendant Todd W. Ellwein is a School Board member and is sued in his individual and official capacity.

24.     Defendant Andrew D. Freeman is a School Board Member and is sued in his individual and official capacity.

25.     Defendant Erin C. Gentzel is a School Board member and is sued in her individual and official capacity.

26.     Defendant Claire B. Guth is a School Board member and is sued in her individual and official capacity.

27.     Defendant Dr. Justin D. Hackett is a School Board member and is sued in his individual and official capacity.

28.     Defendant Anamaria A. Johnson is a School Board member and is sued in her individual and official capacity.

29.     Defendant Sarah L. Olbrich is a School Board member and is sued in her individual and official capacity.

30.     Collectively Defendants Wyland, Fleisher, Ellwein, Freeman, Gentzel, Guth, Hackett, Johnson and Olbrich are herein referred to as the School Board Defendants and at all relevant times were acting in their individual and official capacities and under color of state law. In condoning and supporting Williams' instruction, which was in violation of Plaintiffs' Constitutional rights, Pennsylvania law, and the District's historical policies and procedures, the School Board Defendants thereby created new policies and procedures either express or *de facto*.

## III.     SUBJECT MATTER JURISDICTION AND VENUE

31.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343 and, to the extent applicable, 1367.  The Court has the authority to enter a declaratory judgment and to provide preliminary and permanent injunctive relief pursuant to Federal Rules of Civil Procedure 57 and 65 and 28 U.S.C. §§ 2201 and 2202.

32.     Under 28 U.S.C. § 1391(b), *inter alia*, venue is proper in this District because the conduct alleged herein occurred in this District.

## IV.     FACTUAL ALLEGATIONS

### A.     The Pennsylvania School Code's Recognition of Parents' Constitutional Rights

33.     In recognition of and clearly derived from parents' Constitutional right to "direct the upbringing and education of children under their control" the Pennsylvania School Code requires, *inter alia,* parental access to information about a school's curriculum including **instructional materials***, a process for parents to review instructional materials, and "opt out"

rights from specific instruction based on beliefs covered by the First Amendment. 22 Pa.Code §4.4(d).

34.     School Districts, by law, are required to adopt policies recognizing these parental rights. *Id.*

**B.     The District's Historical Policies and Practices Recognizing Parents' Constitutional Rights, the DEI Curriculum, and the DEI Taskforce and DEI Committee of the Board**

35.     At least on paper, the District has made an effort to comply with the above Pennsylvania laws and regulations that are derived from parents' Constitutional rights.

36.     District Policy I(J) concerns selection of "Instructional Materials," which includes digital media, video and audio materials. Under this Policy, "Subject to final approval by the Board where required by law, the responsibility of selecting instructional materials and resources rests with the Superintendent and, the appropriate administrators, who may delegate the responsibility for recommending selections to professional personnel employed by the District." Policy I(J) further requires that "Instructional materials and resources on controversial issues shall be selected to maintain a balanced collection representing various views" and mandates that "Instructional materials and resources shall be appropriate for the subject area and for the age, emotional development, ability level, learning styles and social development of the students for whom the materials are selected."

37.     District Policy I(F) is titled "Curriculum and Parental Rights." It expressly recognizes that parents "have a stake in the learning programs of the District." It expressly acknowledges that "parents and guardians of students have the right to access and review **information** concerning the instruction, assessment and academic progress of their children." (emphasis added). A stated "Objective" of the Policy is "to assure that parents and guardians of

students can **access and review information** concerning the instruction, assessment, and academic progress of their children."

38.     Policy I(F) further provides that the parental rights from the Pennsylvania School Code should be adhered to by, *inter alia*, providing "access to **information** about the curriculum, including academic standards to be achieved, **instructional materials**, and assessment techniques[,]" "a process for the review of **instructional materials**[,]" and opt out rights related to instruction that conflicts with First Amendment beliefs. (emphasis added). The Policy also guarantees that "Parents and guardians of students enrolled in the District have the **right to access and review instructional materials** for courses in which their children are enrolled and all assessment materials that have been administered to their children." (emphasis added).

39.     The Administration is responsible for developing "the procedures necessary to implement [Policy I(F)], including [by] making available to parents and guardians information regarding the academic standards to be achieved, **instructional materials**, and assessment techniques, **including instructional materials for courses in which their children are enrolled** and all assessment materials that have been administered to their children and **developing a process for parents/guardians to access and/or review such instructional materials** and assessments administered to their children" and "**notifying** parents and guardians of their **right** to have their child(ren) excused from specific instruction which conflicts with their [First Amendment] beliefs." (emphasis added).

40.     Recognizing the parental rights underlying these policies, as noted above, historical and scientific topics for which notice and opt out rights have been provided in the District include the Holocaust, slavery, the 9/11 terrorist attacks, reproductive education, sex education, Black Lives Matter, and Planned Parenthood.

41.     Additionally, in recognition of the parental rights underlying these policies, the District publishes and makes available on its website the "Mt. Lebanon School District Elementary Curriculum Grade 1 Curriculum" (hereinafter Grade 1 Curriculum). Not surprisingly, on its face, the published Grade 1 Curriculum does not mention or discuss teaching gender dysphoria and transgender transitioning to first graders.

42.     The Curriculum contains a "Counseling" section and indicates:

> All first-grade students participate in the school counseling program through regular classroom guidance lessons. This curriculum consists of structured lessons, delivered by the school counselor in the classroom, designed to help students attain the academic, career and social/emotional competencies and to provide all students with the knowledge, attitudes and skills appropriate for their developmental level. The first-grade classroom lessons are designed to further develop school success skills such as accepting mistakes and setting goals, friendship and social problem solving skills, feeling identification, communication and self-management skills, **diversity, inclusion** and career awareness.

(emphasis added). This reference to diversity and inclusion is the only reference to this subject in the Grade 1 Curriculum.

43.     The District further publishes a detailed breakout of each subject that is generally described in the Grade 1 Curriculum. This detailed breakout is only accessible by parents via a parent portal that is password protected. In these detailed breakouts, the teaching of Diversity and Inclusion is mentioned in only one subject, "School Counseling Classroom Lessons (D)". The detailed Counseling curriculum does not mention or discuss teaching gender dysphoria and transgender transitioning to first graders. The lessons covered by the Counseling curriculum breakout indicate that these lessons will be taught by professional school counselors.

44.     Teaching DEI issues or initiatives in first grade is not mentioned in any other curriculum detail for any subject.

45.     In late 2020, the District formed a DEI Taskforce, as well as a DEI Committee of the Board. Defendants Williams and Irvin are both on the Taskforce and Defendants Irvin and Hackett are on the DEI Committee. It appears that the first DEI Taskforce meeting was in December 2020 and, according to published agendas, the Taskforce last met in May 2021. Based on meeting agendas published by the District, **teaching gender dysphoria and transgender transitioning, let alone to first graders, has never been on a meeting agenda for the Taskforce**. A Community Forum was held by the Taskforce in May 2021. **Teaching gender dysphoria and transgender transitioning, let alone to first graders, was not discussed at the Community Forum**.

46.     The DEI Committee of the Board has met monthly since October of 2020. Prior to Defendant Williams teaching gender dysphoria and transgender transitioning to her first-grade class in late March 2022, **the DEI Committee had not discussed, let alone approved, teaching gender dysphoria and transgender transitioning to first graders**. There was no discussion of books or videos to be used with first graders by the DEI Committee. In fact, there appears to have been no discussion about DEI instruction in first grade at all by the DEI Committee.

47.     Given these District publications and resources, the District in substance told parents that, to the extent DEI initiatives would be taught to first graders, it would be done by professional counsellors, not the first-grade teachers. No notice or information was provided to parents indicating that gender dysphoria and transgender transitioning would be taught to first graders.

48.     Unfortunately, what the District told parents was false as to the students in Defendant Williams' class.

C.    **The Rules Do Not Apply in Defendant Williams' Classroom: Defendants' Violation of Plaintiffs' Constitutional Rights**

49.    Parents' Constitutional rights, as embodied in the Pennsylvania School Code and the District's own, at least on paper, policies and procedures, can only have meaning if these policies and procedures are followed. If they are not followed, then the Constitutional rights they are designed to protect are jeopardized.

50.    For example, if the District produces and provides parental access to a curriculum and describes how and what will be taught, but then disregards what it has provided to parents, the legal structure put in place to ensure protection of Constitutional rights is rendered meaningless.

51.    That is exactly what has happened in Defendant Williams' classroom where the rules apparently do not apply and the District has not, and has indicated that in the future it will not, enforce the rules. In Defendant Williams' classroom, parents' Constitutional rights have been disregarded as she teaches her "agenda." The Administration Defendants and the School Board Defendants have not only knowingly and intentionally allowed this to happen but, as described herein, have condoned it and indicated, in substance, that they will not prevent it in the future.

52.    As an elementary school teacher, Williams could in any given year teach any of kindergarten through fifth grade and has, in fact, taught several different grades. Thus, a student in Williams' class for the 2021-22 school year could have her again for a different grade level. Further, since the District, including the Administration Defendants and the School Board Defendants, has indicated that it approves of Williams' teaching gender dysphoria and transgender transitioning to young children, including teaching such without any parental notification and opt out rights, there is a real likelihood that other teachers in the District may now choose to do the same.

15

53.     A classroom of six and seven-year-old children is a classic example of a captive and malleable audience. The students in a classroom cannot leave and are subject to the authority of their teacher and school administrators and, at the first grade level and similar lower grade levels, students do not have the capacity or ability to voice their own independent objections to a course of instruction chosen by their teacher. It is in such captive audience situations that the individual Constitutional liberties of students and parents are ripe for infringement by both subtle and direct compulsion and must be protected. If not,  a teacher or school official can impose his/her own will and personal views on the captive audience – here, an audience of six- and seven-year-old children who see their teacher as an authority figure that they trust and believe. *E.g., Lee v. Wiseman*, 505 U.S. 577, 592-93 (1992); *Arnold v. Bd. of Educ. of Escambia County Ala.*, 880 F.2d 305, 309 *overruled on other grounds* 507 U.S. 163 (1993) (cited in *Anspach v. Philadelphia Dept. of Pub. Ed.,* 503 F.3d 256 (3d Cir. 2007)); *Mayer,* 474 F.3d at479 ("[P]upils are a captive audience. Education is compulsory, and children must attend public schools unless their parents are willing to incur the cost of private education or the considerable time commitment of home schooling. Children who attend school because they must ought not be subject to teachers' idiosyncratic perspectives." ).

54.     Defendant Williams is the mother of a transgender child who, like her students, is in the first grade. While that may give her unique perspectives and views on gender dysphoria and transgender transitioning, it does not give her the right to impose those views on a captive audience of six and seven-year-old children. This is particularly true given that the scope of the Grade 1 Curriculum which is published to parents includes no such instruction, let alone such instruction that is not given by a professional counselor.

55.     Williams' unrequested and unconsented to teaching of these topics is in large manner no different than, and as equally improper as, an unsolicited approach by a neighbor that raises these topics with a young child.  On another level, however, it is far worse – because her role as a teacher gives her a unique ability to influence the young children in her class. She used Plaintiffs' children as part of an unconsented to social/thought experiment to fulfill her own personal agenda.

56.     As she told one Plaintiff, "as long as I am on this earth, I am going to teach children what **I feel** they need to learn."  This voiced attitude by Williams, which has been condoned by the Administration and School Board Defendants," flies in the face of U.S. Supreme Court and Third Circuit law establishing that  "[p]ublic schools must not forget that '*in loco parentis*' does not mean 'displace parents.'"

### 1.   Refusal to Recite the Pledge of Allegiance

57.     Like most, if not all, schools in the country, the day at Jefferson Elementary begins with students reciting the Pledge of Allegiance.[3] But, not in Defendant Williams' class.

58.     For the first fifty-two days of the 2021-22 school year, while their fellow students in other classrooms recited the Pledge of Allegiance, Williams had her students remain seated and silent.

59.     Several students raised with their parents, including Plaintiffs, why they were the only class that did not say the Pledge – with some having siblings in other classes that did say the Pledge. Some wondered if they had done something wrong or were being punished. Their concern and confusion was heightened when they would say the Pledge when they had a substitute teacher.

---

[3]    The School Board also begins its meetings with the Pledge of Allegiance.

60.     One Plaintiff is a proud veteran and when her child informed her that they did not say the Pledge of Allegiance, the day before Veterans Day, she sent an email to Defendant Bielewicz inquiring why the Pledge was not being recited in Williams' class.

61.     Defendant Bielewicz acknowledged in response that "the expectation of a daily pledge of allegiance has always been a standing practice." He further explained that "sometimes the morning gets away from Williams" and she forgets to have her class recite the Pledge.

62.     This is nonsense and an afront to Plaintiffs' intelligence. Anyone who has been in a school knows when the Pledge is recited and you can hear other classes reciting it.  This was not an occasional failure by Williams. It was an intentional act for fifty-two straight days and an intentional act that Defendant Bielewicz condoned through his false, excuse-filled response. It would not be his last such response in his efforts to defend Williams' conduct at the expense of parents' and students' rights.

63.     On Veterans Day, the class said the Pledge but not before Defendant Williams sarcastically explained to her first graders, "can you believe I forgot to say the pledge for fifty-two straight days?" Williams' captive audience of six and seven-year-olds may not have understood the sarcasm and "nose thumbing" embedded in this comment, but Plaintiffs did when their children reported it to them.

64.     After the Veterans Day complaint, the class has since recited the Pledge daily, but the Pledge boycott by Williams for the first fifty-two days of school is telling and emblematic. Defendant Williams has an "agenda" – as she would later tell one Plaintiff – and she will choose to express her agenda to the detriment of her students when she is able to get away with it.

### 2.  **Williams' Strident Emphasis on Race Has Negatively Impacted Students**

65.     While Plaintiffs support efforts at exposing their children to age-appropriate racial and cultural diversity and teaching that everyone should be treated fairly, Defendant Williams' strident emphasis on race and racial justice has, arguably, had an opposite effect.

66.     Williams' regularly wears Black Live Matter clothing and has instilled her own personal beliefs in racial justice and equality into her classroom. The emphasis on this issue has been strident and, when addressed to very impressionable six and seven-year-olds, for some of them, has caused confusion.  For example, one student who is of Asian-Pacific ethnicity, has begun to question if she is black or brown or if her skin is dark enough. A student has asked her parents, in substance, why there are no playgrounds where children of all colors can play together and has said "Justice" is now her favorite word.

67.     While exposing children to age-appropriate racial and cultural diversity and teaching that everyone should be treated fairly is laudable, it is clear that Williams' instruction has gone beyond that and that she is imposing her own political beliefs on her captive audience of first graders. Ironically, as explained below in Paragraphs 75 to 107, Williams' disrespect for parental rights would ultimately drive the parents of one of the few African American children in her class to remove the student from her class and enroll the child in cyber-school. Her insistence on teaching her agenda ultimately injured the classroom diversity.

### 3.  **The Cartoon and Williams' Disregard of Parental Rights**

68.     One Plaintiff does not permit her child to watch a particular cartoon because of some of the content in the cartoon. This is a clear parental choice she has made because she does not think some of the content is age appropriate for her child. This Plaintiff's child is well aware that she is not permitted to watch this cartoon.

69.    On Valentine's Day, Defendant Williams planned on playing an episode of the cartoon for the class. Aware of her Mother's rules, the child notified Williams that she was not allowed to watch the cartoon.

70.    Rather than find another video to play by doing a simple Google search or permitting this child to engage in another activity, Williams forged ahead essentially telling the child, "I will tell your mom that I told you it was ok to watch it." This directly undermines, and is a direct affront to, Plaintiff's parental rights and relationship with her child.

71.    As the Third Circuit has declared, "[p]ublic schools must not forget that '*in loco parentis*' does not mean 'displace parents.'" But, displace the rules of this Plaintiff for her child with knowledge of those rules is exactly what Williams did.

72.    Williams did email Plaintiff to let her know that she had allowed her daughter to watch the cartoon and that the little girl had told Williams she was not allowed to watch it at home. What she did not say, and what was not immediately brought to light, is that the little girl had told Williams *before* she played the cartoon that she was not allowed to watch it and Williams ignored this.

73.    Eventually, when the mother questioned her child as to why she had not told her teacher that she was not allowed to watch the cartoon, the child indicated that she had done so *before* they watched it but that Williams told her it was "OK."

74.    This was a clear and blatant violation of Plaintiff's parental rights. It exemplifies Williams' willingness and ability to impose her agenda on the six and seven-year-olds in her classroom and to disregard parental rights. It would get worse.

4. **Williams Classroom Instruction on Gender Dysphoria and Transgender Transitioning and Her Inappropriate Actions Toward One Particular Student**

    a. **Williams' actions throughout the school year and her inappropriate conduct toward a particular student**

75.    Slowly and subtly, throughout the school year, Williams brought gender dysphoria and transgender transitioning into her classroom teachings.

76.    Early in the fall, she played a video of "Jacob's New Dress" to the class. This video can be accessed on-line at https://www.youtube.com/watch?v=oVahZSbammE and has subtle undertones related to gender dysphoria, as well as messaging about bullying.  While not the version played to the students, one website where the book is narrated is titled "Story Time w/ Drag Queens at Home – Jacob's New Dress."

77.    In playing this story book to her first-grade class, Williams also began the process of interjecting her own personal life and views into the classroom, explaining that her child had worn an "Elsa dress" for Halloween.

78.    The child of one of the Plaintiffs explained to his mother that Williams had told him, "I can wear a dress and have hair like my mom." When Plaintiff raised this with Williams at a parent-teacher conference, Williams deflected, contending that it must have been a misunderstanding and indicating that maybe it was confusion about Halloween. Plaintiff refuted this assertion, letting Williams know that what her son had told her was "very clear" and expressing her displeasure with what Williams had said to her son.

79.    Despite knowing this Plaintiff's objections, or upon information and belief because of them, Williams appears to have targeted this child for repeated approaches about gender dysphoria. Although Plaintiff did not discover Williams' invasion of her parental and family rights until the spring, throughout the school year, Williams had private conversations with this young boy, discussing with him the similarities between the boy and her transgender child again

suggesting that the boy might want to wear a dress, at other times commenting to him how the boy and her transgender child had similar interest and the same favorite color, and telling the child that he could be like her transgender child. Williams explained to this young boy that "doctors can get it wrong sometimes." In the course of these private discussions, Williams also told this young boy that "she would never lie to him" and, if the subjects they were discussing came up at home, to say that "I heard it from a little birdie." In other words, upon information and belief, while having private discussions with this young boy about topics related to gender dysphoria, she told the child not to tell his parents about the discussions. Williams' "grooming" of this young student is unconscionable. It is a gross breach of trust and an abuse of her position as a public school teacher.

      **b. March 31, 2022 (Transgender Day of Visibility) and Williams' Express Classroom Instruction on Gender Dysphoria and Transgender Transitioning**

80.     Historically, the District has **not** permitted teachers to bring their children to work, even for "Take Your Child to Work Day."

81.     This historical practice has been confirmed by certain of the Administration Defendants.

82.     Despite no announced change to this historical policy, in order to more overtly teach gender dysphoria and transgender transitioning to her first-grade class, under the ruse that she would be bringing her transgender child to school on Take Your Child to Work Day (which was to be at the end of April), in March 2022, Williams began to discuss with her class her child's gender dysphoria and explain to them that her child was once a boy but now is a girl.

83.     These discussions intensified and hit a height on March 31, 2022 (Transgender Day of Visibility).  On that day – in contravention of the District's public curriculum which does not mention gender dysphoria or transgender transitioning (or any similar topic) and which indicated that DEI topics would, if at all, be covered in first grade only by trained, professional school

22

counselors – Williams provided direct classroom instruction on gender dysphoria and transgender transitioning to her six and seven-year-old captive audience of children. In the course of doing so, she explained to her students that sometimes "parents are wrong" and parents and doctors "make mistakes" when they bring a child home from the hospital.

84.     As part of that direct classroom instruction, Williams played two videos and/or read two books while video illustrations played: (1) When Aiden Became a Brother (https://www.youtube.com/watch?v=8F2_UR4y0iw)       and       (2)       Introducing       Teddy (https://www.youtube.com/watch?v=ddRmNpLYgCM). While Introducing Teddy addresses the topics more subtly then When Aiden Became a Brother, the clear and obvious subject matter of each of these books is gender dysphoria and transgender transitioning.

85.     Neither of these books is listed on any curriculum or book list for first grade instruction in the District or part of any instructional materials made available to parents by the District. In clear violation of Pennsylvania law and District policy, parents had no notice that these books/videos would be played, nor were they provided an opt out right.

86.     Realizing that she needed some sort of permission to use these books/videos, the morning of the day when she played them, Williams sought permission from Defendant Bielewicz to do so.  Bielewicz approved them on an ad hoc basis even though there is no basis for these instructional materials or for Williams to be teaching the subjects of gender dysphoria and transgender transitioning in the Grade 1 Curriculum that he oversees at Jefferson Elementary. Upon information and belief, Bielewicz was fully aware that his permission would cause an uproar among certain parents but he provided it anyway and did so without any notice to parents. His conduct was a gross dereliction of his role as a public educator and principal and a direct and clear infringement of Plaintiffs' parental, family and privacy rights protected by the Constitution.

87.     This not only violated Plaintiffs' Constitutional rights, as well as Pennsylvania law and the District's written policy, as to one group of parents, it violated their express direction as to what they as parents did not want taught to their child.

88.     In October 2021, in response to some information in the Jefferson Elementary Newsletter to parents, these parents expressly told Defendant Bielewicz that they were not comfortable with their child "learning about gender identity at this age."  Bielewicz advised that "there is no formal introduction or lessons surrounding [gender identity] at JES, **especially in the 1ˢᵗ grade**." That indeed was true based on the public information the District had provided to parents.  That is until Bielewicz decided to make up his own policy on March 31, 2022 and permit Williams to teach gender dysphoria and transgender transitioning to her first grade class.

89.     Despite having previously told these parents that their child would not receive instruction on gender identity issues "especially in the 1ˢᵗ grade," Bielewicz gave his ad hoc approval to Williams and gave no notice to these parents or any other parents.

90.     With Bielewicz approval, Williams seized her opportunity to further spread and impose her personal agenda.  She sent an email to all of her fellow elementary school teachers at Jefferson and, upon information and belief to certain teachers District-wide, encouraging them to play the videos. Upon information and belief, at least two other teachers played the videos to their elementary school students without any parental notification based on Williams' prompting.

91.     Upon information and belief, several staff members at Jefferson were appalled that gender dysphoria and transgender transitioning would be taught to first graders and that the Administration Defendants approved and condoned the instruction. Upon information and belief, when they raised their concerns with Bielewicz, he ignored them.

92.     After Williams' direct instruction on gender dysphoria and transgender transitioning some of her six and seven-year-old students were rightfully confused. One child expressed to her mother that she was confused by the videos and wondered if the child's favorite stuffed animal (a pink teddy bear) that she had always treated as a boy should now be treated as a girl. Another child asked her mom, "how do you know that I am a girl." One child who was confused by the books/videos politely approached Williams privately in class and, showing the child's confusion, asked her if she (Williams) had ever changed her own child's diaper because that would, to this child's understanding, solve the issue of whether the child was a boy or a girl. These reactions show the inappropriateness of teaching these topics in a public school; in particular, the inappropriateness of teaching them in elementary school, let alone the first grade.

93.     With their children asking these types of questions, upon learning of Williams' instruction on gender dysphoria and transgender transitioning including telling their children that "sometimes parents are wrong," Plaintiffs were upset and went to the Administration Defendants looking for answers. Plaintiff Dunn removed her son from the class enrolling him in cyber-school. Instead of answers, Plaintiffs and other parents got excuses and got stonewalled by the Administration Defendants and the School Board.

94.     One Plaintiff met with Williams about the instruction and voiced her objections informing Williams that she would like to be the one responsible for having these conversations with her child, not Williams, and that she felt this was outside the scope of Williams' job and role. In response, Williams informed her that they would "need to agree to disagree," that "100% I have an agenda," that she teaches "right on the edge" and that she had no intent of stopping her instruction.  Williams also claimed that Bielewicz and the School Board had approved the videos.

95.     Upon information and belief, several parents requested to meet with Defendant Bielewicz but, when they advised that it was about the videos that Williams had played, Bielewicz never arranged meetings with them. March 31 was a Thursday, but Bielewicz did not meet with any parents until the following week and, upon information and belief, only took those meetings because the parents did not expressly say what they wanted to meet with him about. Originally, Bielewicz indicated to a Plaintiff that he intended to hold a group meeting with concerned parents but he never followed through on that commitment.

96.     Plaintiff Tatel requested to meet with Bielewicz on March 31 via an email. She also went to the school on Friday and requested a meeting but was told Bielewicz was not available. On information and belief, this was false. What was really happening, upon information and belief, was the Administration Defendants and the School Board Defendants were buying time to put together their "party line."

97.     Mrs. Tatel was finally able to meet with Bielewicz on Tuesday April 5. In that meeting, he confirmed that he had approved the videos on the morning of March 31, stating that he thought they were appropriate and that Williams was qualified because of her own personal experience to provide instruction on gender dysphoria and transgender transitioning to first graders. He analogized the instruction on gender dysphoria and transgender transitioning to teaching the class about a child with autism or downs syndrome – neither of which are in the Grade 1 Curriculum either. He indicated that, after the fact, Defendants Steinhauer and Irvin and the School Board agreed that the instruction was appropriate. Mrs. Tatel explained and emphasized to Bielewicz that "it is my right [as a parent] to have this discussion with my child." The meeting ended with Bielewicz advising that they would need to "agree to disagree." He indicated that

Williams might teach on the subjects in the future and that he could not (or would not) stop her from doing so.

98.     On April 5, the parents who had previously received representations from Bielewicz that "there is no formal introduction or lessons surrounding [gender identity] at JES, especially in the 1ˢᵗ grade," met with Bielewicz in person. Bielewicz confirmed that he had approved the videos on an ad hoc basis the morning of and that he should "take a mark" for not notifying these parents despite their prior request. He affirmed that he approved the videos and indicated that, after the fact, Steinhauer and Irvin and the Board approved of the videos and felt they were appropriate. The parents told him that they felt like he and Williams were exploiting their child's innocence. When they asked, "what about [our] rights as parents, then?," Bielewicz responded, he did not know.

99.     In this meeting, Bielewicz also confirmed one important fact – there had been no change to the District's Bring Your Child to Work Day policy – teachers were not permitted to bring their kids to work. What this admission revealed was that Williams' basis for bringing up the purported need to discuss the topics of gender dysphoria and transgender transitioning was a purposefully deceptive ruse.

100.     Then, as part of the District's on-going efforts to attempt to justify Williams' conduct after the fact (or cover it up), in April, it was announced that teachers could bring their children to work this year. The timing of that change in policy is indeed suspect – coming weeks after Williams used Bring Your Child to Work Day as a ruse to raise gender dysphoria and transgender transitioning with her class of six- and seven-year-old children. Upon information and belief, teachers were initially told by Bielewicz at a staff meeting in April that they could **not** bring their children to work, but this was changed based on an objection from Williams. Upon

information and belief, the great majority of Williams' students ended up being absent on Take Your Child to Work Day, after she informed parents that she would be bringing her transgender child to school and did so.

101.    The parents who had previously told the District in writing that they did not want their child to receive any instruction related to gender identity, which parental decision was ignored, ultimately met with Defendant Steinhauer about Williams' instruction. While he defended the instruction, he admitted that it should have been handled differently, that approval for the materials should have occurred at a higher level of administration, and that he thought it was reasonable for parents to have a choice. Despite these conciliatory statements, even though Steinhauer has final policymaking authority for the District in circumstances not otherwise provided for in the School District Bylaws and Policies, he has not made a public announcement or issued any policy that would be consistent with his comments in the meeting with these parents. Particularly in light of statements that the material was appropriate, by not announcing any new policy or confirming that these subjects will not be taught or that, at a minimum, notice and opt out rights will be given in the future, Steinhauer is agreeing that the instruction, as well as the lack of parental notice, was proper, thereby, establishing, at a minimum, a *de facto* policy for the District on this topic. Based on her public comments, this express and/or *de facto* District policy is also approved by Defendant Irvin, who has direct responsibility over Elementary education in the District.

102.    As further evidence of this express and/or *de facto* policy, at a public meeting on April 19, 2022, Irvin defended Williams' instruction. In doing so, Irvin disingenuously described When Aiden Became a Brother as being primarily about a "child gaining a new sibling." This is nonsense. While the transgender child in the book does gain a new sibling, that is not the thrust of

28

the book – the book is clearly about gender dysphoria and transgender transitioning, just watch the video (https://www.youtube.com/watch?v=8F2_UR4y0iw). At the same meeting, Irvin commented that the videos were consistent with Policy I(J) related to curriculum. She did not comment or explain how Williams' instruction could be considered to be within the actual published Grade 1 Curriculum, nor did she address the Parental Rights spelled out in Policy I(F) that were ignored.

103.    As further evidence of this express and/or *de facto* policy, this issue has been discussed at, at least, three School Board meetings. The Board, including Defendant Wyland, has expressed opinions favorable to the instruction. The Board has issued no new Policy, announcement or guidance indicating that Policy I(F) and other District policies will be followed in the future as to this instruction, thereby confirming, at a minimum, the express and/or *de facto* policy of permitting instruction on gender dysphoria and transgender transitioning in the District, including permitting such instruction in elementary school, and of not providing parental notice and opt out rights related to the teaching of these topics in the District, including in elementary school.

104.    As further evidence of this express and/or *de facto* policy, one Plaintiff, as part of the process of removing her child from Williams' class, emailed Steinhauer directly, writing:

> Hello Dr. Steinhauer — I am the parent of a first grader at Jefferson Elementary; and it has come to my attention that a teacher there is having adult teachings about transgender with children. Education about all walks of life is essential, however this topic is clearly being expressed with no regard to parental consent. This isn't a conversation to be had amongst a child's teacher (especially from a personal subjective view), and the last time I checked it also wasn't a part of the curriculum plan that was submitted to the district. I send my child to school to be a kid and to learn the fundamentals of reading, writing, arithmetic, and socializing; not to have my child told that he can wear dresses, make- up etc.

At this point, I don't feel comfortable sending him back into the classroom and would like asynchronous instruction for the remainder of the school year. Could you be so kind in helping me to get this accomplished?

105.    Despite this Plaintiff appropriately pointing out that Williams' instruction implicated (and trampled on) parental rights and that it was not part of the curriculum, **Steinhauer never responded to the email**. Avoiding problems often makes them worse. Here, it did.

106.    Weeks after this Plaintiff had removed her child from Williams' class, she received a call from a private number (not a District number). Although she did not recognize the number, she answered the call. Remarkably and shockingly, it was Williams calling this parent. This student was no longer in Williams' class. She had no professional (or other) basis for calling Plaintiff. Obviously emboldened by the support from the Administration and School Board Defendants, Williams first sarcastically said to Plaintiff that she "wanted to applaud her." Williams then voiced to Plaintiff that she did not understand why her instruction [on gender dysphoria and transgender transitioning] was a problem. Plaintiff not so politely told her of her strong parental viewpoint to the contrary. Williams then said to Plaintiff, "as long as I am on this earth, I am going to teach children what **I feel** they need to know" and hung up. Under no circumstances was this call appropriate for Williams to make.

107.    As this phone call exemplifies, in Williams' classroom, there is absolutely zero recognition of parental rights if the expression of those rights is at odds with her own agenda ("I am going to teach children what **I feel** they need to know"). Contrary to the Constitution, in Williams' classroom, with her captive audience of six and seven-year-olds, unfortunately *in loco parentis*' **does** mean displace parents. And, the express and/or *de facto* policy resulting from the conduct of the Administration Defendants and the School Board Defendants condones of and approves of that Constitutionally infirm position in the District. This lawsuit seeks to protect and restore the Plaintiffs' Constitutional rights as parents.

108.    The subjects of gender dysphoria and transgender transitioning, particularly how and when to teach the subjects to young children, are a current topic of public and political debate. This lawsuit is not about that public and political debate. It is about personal, private parental rights to control **how and when** they introduce these topics to their very young children. Certain experts believe that it can be harmful to teach these topics to young children and that this is fundamentally an issue that should be decided by parents. Defendants knowingly exposed Plaintiffs' children to this harm using them as part of an unconsented to social/thought experiment conducted by a teacher without the appropriate training or background to do so. As one expert psychologist has written:

> Bottom line: I prefer that schools not presume to know better than individual children's parents when to expose those children's minds to the concept of transgenderism — certainly with any degree of specificity. I encourage educators of preteens to teach their children that it's right to be decent, and wrong to be bullies to anyone. But specific lessons on transgender issues? **That's a parent's call**.

https://www.the74million.org/article/keeping-transgender-issues-out-of-grade-schools-why-teachers-should-leave-specifics-to-parents/ (emphasis added). Unfortunately, in violation of Plaintiffs' Constitutional rights, it is presently not the "parent's call" in the Mt. Lebanon School District.

## V.    CAUSES OF ACTION

### COUNT I:    VIOLATION OF CIVIL RIGHTS, 42 U.S.C. § 1983
**(Violation of Plaintiffs' Substantive Due Process Fundamental Parental Right to Direct the Education and Upbringing of Their Children under the U.S. Constitution)
(By All Plaintiffs Against all Defendants)**

109.    Plaintiffs incorporate the preceding allegations by reference as if set forth in full.

110.    The Due Process Clause in the 14th Amendment to the United States Constitution protects the fundamental right of parents to direct the education, upbringing and the care, custody, and control of their children. *Pierce v. Society of Sisters*, 268 U.S. 510 (1925); *Troxel v. Granville*,

530 U.S. 57, 68 (2000). This right was well-established based on U.S. Supreme Court and Third Circuit precedent at the time of the offending conduct alleged herein.

111.    Defendants have violated, are violating, and will continue to violate Plaintiffs' fundamental right to make decisions regarding the upbringing, education, custody, care, and control of their children by, *inter alia*, (i) teaching gender dysphoria and transgender transitioning in the District, including to elementary students, and, in violation of District policies and Pennsylvania law, (ii) by not providing an accurate curriculum and information related to instructional materials to parents on the topic of teaching gender dysphoria and transgender transitioning in the District, including in elementary school, and/or by approving materials for instruction that are contrary to the information that they make publicly available to parents related to teaching gender dysphoria and transgender transitioning in the District, including in elementary school, (iii) by not providing parents notice and opt out rights based on First Amendment protected beliefs related to teaching gender dysphoria and transgender transitioning in the District, including in elementary school, (iv) by adopting and implementing an express and/or *de facto* policy that embraces teaching gender dysphoria and transgender transitioning in the District, including in elementary school, as well as doing so without providing proper notice and opt out rights to parents, and (v) by permitting instruction on gender dysphoria and transgender transitioning in the District, including in elementary school, by personnel other than professional trained counsellors contrary to the District's publicly available curriculum and instruction documents.

112.    Defendants' unconstitutional conduct involves affirmative, coercive, compelled conduct by the Defendants including but not limited to Williams' in-class instruction related to gender dysphoria and transgender transitioning in elementary school to a captive audience of grade school students and the other Defendants' express and/or *de facto* policy in favor of this teaching,

as well as doing so without any parental notice and opt out rights.  The students were required to participate in this instruction as part of their first grade class activities conducted by their public school teacher.

113.    There does not exist a compelling state interest in teaching gender dysphoria and transgender transitioning in the District, including in elementary school, including doing so without providing appropriate notice and opt out rights, that outweighs the Plaintiffs' Constitutional right to direct the education, upbringing and the care, custody, and control of their children. This is self-evident from, *inter alia*, the published curriculum provided to Plaintiffs and the availability of notice and opt out rights related to certain historical and scientific subjects of less magnitude.

114.    Defendants have acted and are acting with reckless disregard for Plaintiffs' fundamental parental rights by purposefully and intentionally doing the actions alleged herein, including as to one group of parents doing so in the face of a written acknowledgment not to do so. In so doing, Defendants are explicitly and intentionally excluding Plaintiffs from significant decision-making directly related to their children's care and education.

115.    Defendants' reckless disregard for Plaintiffs' rights has resulted in, is resulting in, and will continue to result in deprivation of their fundamental constitutional rights.

116.    Defendants' violation of Plaintiffs' fundamental constitutional rights has caused and continues to cause Plaintiffs undue hardship and irreparable harm.

117.    Plaintiffs have no adequate remedy at law to correct the continuing and threatened deprivation of their fundamental rights, although they have suffered legal damages as well.

**COUNT II:    VIOLATION OF CIVIL RIGHTS, 42 U.S.C. § 1983**
**(Violation of Plaintiffs' Procedural Due Process Rights Regarding Their Fundamental
Parental Right to Direct the Education and Upbringing of Their Children under the U.S.
Constitution)**
**(By All Plaintiffs Against all Defendants)**

118.    Plaintiffs incorporate the preceding allegations by reference as if set forth in full.

119.    The Due Process Clause in the 14th Amendment to the United States Constitution
protects infringement of the fundamental right of parents to direct the education, upbringing and
the care, custody, and control of their children without adequate procedural due process. *Pierce v.
Society of Sisters*, 268 U.S. 510 (1925); *Troxel v. Granville*, 530 U.S. 57, 68 (2000). This right was
well-established based on U.S. Supreme Court and Third Circuit precedent at the time of the
offending conduct alleged herein.

120.    Defendants have violated, are violating, and will continue to violate Plaintiffs'
procedural due process right to have proper procedural safeguards in order to protect their right to
make decisions regarding the upbringing, education, custody, care, and control of their children
by, *inter alia*, (i) teaching gender dysphoria and transgender transitioning in the District, including
to elementary students, and, in violation of District policies and Pennsylvania law, (ii) by not
providing an accurate curriculum and information related to instructional materials to parents on
the topic of teaching gender dysphoria and transgender transitioning in the District, including in
elementary school, and/or by approving materials for instruction that are contrary to the
information that they make publicly available to parents related to teaching gender dysphoria and
transgender transitioning in the District, including in elementary school, (iii) by not providing
parents notice and opt out rights based on First Amendment protected beliefs related to teaching
gender dysphoria and transgender transitioning in the District, including in elementary school, (iv)
by adopting and implementing an express and/or *de facto* policy that embraces teaching gender

34

dysphoria and transgender transitioning in the District, including in elementary school, without providing proper notice and opt out rights to parents, and (v) by permitting instruction on gender dysphoria and transgender transitioning in the District, including in elementary school, by personnel other than professional trained counsellors contrary to the District's publicly available curriculum and instruction documents.

121.   Defendants' unconstitutional conduct involves affirmative, coercive, compelled conduct by the Defendants including but not limited to Williams' in-class instruction related to gender dysphoria and transgender transitioning in elementary school to a captive audience of grade school students and the other Defendants express and/or *de facto* policy in favor of this teaching, as well as doing so without any parental notice and opt out rights.  The students were required to participate in this instruction as part of their first-grade class activities conducted by their public school teacher and their parents had no notice of it.

122.   There does not exist a compelling state interest in teaching gender dysphoria and transgender transitioning in the District, including elementary school, including doing so without providing appropriate notice and opt out rights that outweighs the Plaintiffs' Constitutional right to direct the education, upbringing and the care, custody, and control of their children. This is self-evident from, *inter alia*, the published curriculum provided to Plaintiffs and the availability of notice and opt out rights related to certain historical and scientific subjects of less magnitude.

123.   Defendants have acted and are acting with reckless disregard for Plaintiffs' fundamental parental rights by purposefully and intentionally doing the actions alleged herein, including in one instance, doing so in the face of a written acknowledgment not to do so. In so doing, Defendants are explicitly and intentionally excluding Plaintiffs from significant decision-

making directly related to their children's care and education without proper procedural protections.

124.    Defendants' reckless disregard for Plaintiffs' rights has resulted in, is resulting in, and will continue to result in deprivation of their fundamental constitutional rights.

125.    Defendants' violation of Plaintiffs' fundamental constitutional rights has caused and continues to cause Plaintiffs undue hardship and irreparable harm.

126.    Plaintiffs have no adequate remedy at law to correct the continuing and future deprivation of their fundamental rights, although they have suffered legal damages as well.

### COUNT III: VIOLATION OF CIVIL RIGHTS 42 U.S.C. § 1983
**(Violation of Plaintiffs' Right to Familial Privacy Under the U.S. Constitution)**
**(By All Plaintiffs Against all Defendants)**

127.    Plaintiffs incorporate the preceding allegations as if set forth in full.

128.    The Due Process Clause in the 14th Amendment to the United States Constitution protects the sanctity of the family as an institution and this is deeply rooted in this Nation's history and tradition through which moral and cultural values are passed down. *Moore v. East Cleveland*, 431 U.S. 494, 503-04 (1977). The Constitution protects the private realm of the family from interference by the state. *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944). This right was well-established based on U.S. Supreme Court and Third Circuit precedent at the time of the offending conduct alleged herein.

129.    In substituting their own judgment about when and how to teach gender dysphoria and transgender transitioning to Plaintiffs' children, including doing so without parental notice and opt out rights, Defendants have impermissibly inserted themselves into the private realm of Plaintiffs' families by usurping Plaintiffs' rights to make decisions regarding, *inter alia*, their children's upbringing and education. Defendants have, likewise, infringed Plaintiffs' right to

family privacy by informing children that their parents can get it wrong when it comes to their gender.

130.    Defendants have acted and are acting with reckless disregard for Plaintiffs' rights to family privacy by their actions. Defendants' deliberate indifference to Plaintiffs' rights has resulted in, continues to result in, and will in the future result in deprivation of their constitutional rights to family privacy.

131.    Plaintiffs' constitutionally protected rights to familial privacy were violated as the plainly obvious consequence of Defendants' actions alleged herein.

132.    There does not exist a compelling state interest in teaching gender dysphoria and transgender transitioning in the District, including in elementary school, including doing so without providing appropriate notice and opt out rights that outweighs the Plaintiffs' Constitutional right to familial privacy. This is self-evident from, *inter alia*, the published curriculum provided to Plaintiffs and the availability of notice and opt out rights related to certain historical and scientific subjects of less magnitude.

133.    Defendants have acted and are acting with reckless disregard for Plaintiffs' right to familial privacy by purposefully and intentionally doing the actions alleged herein, including in one instance doing so in the face of a written acknowledgment not to do so. In so doing, Defendants are explicitly and intentionally invading Plaintiffs' rights to familial privacy.

134.    Defendants' reckless disregard for Plaintiffs' rights has resulted in, is resulting in, and will continue to result in deprivation of their fundamental constitutional rights.

135.    Defendants' violation of Plaintiffs' fundamental constitutional rights has caused and continues to cause Plaintiffs undue hardship and irreparable harm.

136.     Plaintiffs have no adequate remedy at law to correct the continuing and future deprivation of their fundamental rights, although they have suffered legal damages as well.

**COUNT IV: VIOLATION OF CIVIL RIGHTS, 42 U.S.C. § 1983**
**(Violation of Plaintiffs' Right to Free Exercise of Religion Under the U.S. Constitution and Violation of Equal Protection)**
**(By All Plaintiffs Against all Defendants)**

137.     Plaintiffs incorporate the preceding allegations as if set forth in full.

138.     The Free Exercise Clause of the First Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment, prohibits Defendants from abridging Plaintiffs' right to free exercise of religion. This right was well-established based on U.S. Supreme Court and Third Circuit precedent at the time of the offending conduct alleged herein.

139.     Likewise, the Equal Protection Clause of the 14th Amendment provides protection for citizens against unequal application or enforcement of laws. This right was well-established based on U.S. Supreme Court and Third Circuit precedent at the time of the offending conduct alleged herein.

140.     Plaintiffs have sincerely held religious and moral beliefs including that human beings are created male or female and that the natural created order regarding human sexuality cannot be changed regardless of individual feelings, beliefs, or discomfort with one's identity, and biological reality, as either male or female.

141.     Plaintiffs have sincerely held religious and moral beliefs that parents have the non-delegable duty to direct the upbringing and beliefs and religious training of their children and any intrusion of the District into that realm infringes upon the free exercise of their religion.

142.     Defendants' actions have caused a direct and immediate conflict with Plaintiffs' religious and moral beliefs by prohibiting them from being able to control the instruction and teaching of their children regarding gender dysphoria and transgender transitioning, particularly

with their children at such a young age, in a manner that is consistent with the beliefs sincerely held by their family instead of the District and Williams and the other Defendants and which conduct also implicates the Constitutional rights related to Counts I through III.

143.    Defendants' actions are coercive in that they deliberately supplant Plaintiffs' role as advisors of the moral and religious development of their children so that they are not able to control the instruction and teaching of their children regarding gender dysphoria and transgender transitioning, particularly with their children at such a young age, in accordance with their values because Defendants have substituted their perspective on these issues for the perspective of Plaintiffs in violation of Plaintiffs' free exercise and equal protection rights.

144.    Defendants' actions are neither neutral nor generally applicable, but rather, specifically and discriminatorily target the religious speech, beliefs, and viewpoint of Plaintiffs and thus expressly constitute a substantial burden on sincerely held religious and moral beliefs that are contrary to Plaintiffs' viewpoint regarding the instruction and teaching of their children regarding gender dysphoria and transgender transitioning, particularly with their children at such a young age.

145.    Defendants' refusal – embodied in the express and/or *de facto* policy now in place in the District – to provide opt out rights to Plaintiffs (and other parents) related to teaching gender dysphoria and transgender transitioning in the District, including in elementary school, while providing it with regard to certain historical and scientific subjects of less magnitude, including but not limited to the Holocaust, slavery, the 9/11 terrorist attacks, reproductive education, sex education, Black Lives Matter, and Planned Parenthood, violates the Equal Protection Clause.

146.    There does not exist a compelling state interest in teaching gender dysphoria and transgender transitioning in the District, including in elementary school, including doing so

without providing appropriate notice and opt out rights that outweighs the Plaintiffs' First Amendment and Equal Protection rights. This is self-evident from, *inter alia*, the published curriculum provided to Plaintiffs and the availability of notice and opt out rights related to certain historical and scientific subjects of less magnitude.

147.    Defendants' actions are not the least restrictive means to accomplish any permissible government purpose Defendants seek to serve and are an arbitrary and irrational use of power.

148.    Defendants' violation of Plaintiffs' rights to free exercise of religion and equal protection has caused, is causing, and will continue to cause Plaintiffs to suffer undue and actual hardships.

149.    Defendants' violation of Plaintiffs' rights to free exercise of religion and equal protection has caused, is causing, and will continue to cause Plaintiffs to suffer irreparable injury. Plaintiffs have no adequate remedy at law to correct the continuing and future deprivation of their constitutional liberties, although they have suffered legal damages as well.

### COUNT V: VIOLATION OF CIVIL RIGHTS, 42 U.S.C. § 1983
**(Violation of Right to Privacy Under the U.S. Constitution)**
**(By All Plaintiffs, as Parents and Natural Guardians of Their Children, Against all Defendants)**

150.    Plaintiffs incorporate the preceding allegations as if set forth in full.

151.    The Due Process Clause in the 14th Amendment to the United States Constitution protects the right of individuals to have independence in making individual decisions regarding fundamental rights, including education. *See Seip*, 225 F.3d at 302. This right was well-established based on U.S. Supreme Court and Third Circuit precedent at the time of the offending conduct alleged herein.

152.    In substituting their own judgment about when and how to teach gender dysphoria and transgender transitioning, Defendants have violated Plaintiffs' children's rights to individual decision making related to, *inter alia*, their right to control their own education.

153.    Defendants have acted and are acting with reckless disregard for Plaintiffs' children's rights. Defendants' deliberate indifference to Plaintiffs' children's rights has resulted in, continues to result in, and will in the future result in deprivation of their constitutional rights.

154.    Plaintiffs' children's constitutionally protected rights were violated as the plainly obvious consequence of Defendants' actions alleged herein.

155.    There does not exist a compelling state interest in teaching gender dysphoria and transgender transitioning in the District, including in elementary school, particularly without providing appropriate notice and opt out rights, that outweighs the Plaintiffs' children's Constitutional rights. This is self-evident from, *inter alia*, the published curriculum provided to Plaintiffs and the availability of notice and opt out rights related to certain historical and scientific subjects of less magnitude.

156.    Defendants have acted and are acting with reckless disregard for Plaintiffs' children's fundamental rights by purposefully and intentionally doing the actions alleged herein. This is particularly true as to Plaintiff Dunn's child who, as a captive first-grade student, was improperly and repeatedly subjected to Williams' unsolicited inquiries, harassment and grooming conduct related to gender dysphoria.

157.    Defendants' reckless disregard for Plaintiffs' children's rights has resulted in, is resulting in, and will continue to result in deprivation of their fundamental constitutional rights.

158.    Defendants' violation of Plaintiffs' children's fundamental constitutional rights has caused and continues to cause undue hardship and irreparable harm.

159.    Plaintiffs' children have no adequate remedy at law to correct the continuing deprivation of their fundamental rights, although they have suffered legal damages as well.

### COUNT VI: DECLARATORY JUDGEMENT

160.    Plaintiffs incorporate the preceding allegations as if set forth in full.

161.    A real and actual controversy exists, *inter alia*, as to whether the teaching of gender dysphoria and transgender transitioning is appropriate or inappropriate in a public school, in particular at the elementary grade level, as well as, in the alternative, whether Plaintiffs were and are required to receive proper notice and opt out rights before the District teaches gender dysphoria and transgender transitioning in the District, including to elementary students, in contravention of the District's published curriculum and related information provided to parents.

162.    A declaratory judgment would be useful in resolving this case or controversy. By clarifying the District's obligations under the U.S. Constitution and Pennsylvania law, a declaratory judgment will guide the parties moving forward and be effective in settling the instant controversy.

163.    Accordingly, Plaintiffs respectfully request that the Court enter a Declaratory Judgment, declaring the following:

a.    Defendants violated 22 Pa.Code 44.4(d)(1) and (2) by permitting Williams to provide in-class instruction on gender dysphoria and transgender transitioning when the District's published curriculum and related information did not provide for such subjects to be taught in first grade and, to the extent related subjects were to be taught, they were to be taught by trained professional counselors;

b.      Defendants violated 22 Pa.Code 44.4(d)(4) by permitting Williams to provide in-class instruction on gender dysphoria and transgender transitioning and permitting such without providing appropriate notice and opt out rights to parents;

c.      Defendants violated Plaintiffs' Fourteenth Amendment substantive due process rights by permitting Williams to provide in-class instruction on gender dysphoria and transgender transitioning, including permitting such without providing appropriate notice and opt out rights to parents;

d.      Defendants violated Plaintiffs' Fourteenth Amendment procedural due process rights by permitting Williams to provide in-class instruction on gender dysphoria and transgender transitioning, including permitting such without providing appropriate notice and opt out rights to parents;

e.      Defendants violated Plaintiffs' First Amendment Free Exercise and Fourteen Amendment Equal Protection rights by permitting Williams to provide in-class instruction on gender dysphoria and transgender transitioning without providing appropriate notice and opt out rights to parents;

f.      Defendants violated Plaintiffs' children's Fourteenth Amendment substantive due process rights through Williams' unwelcome imposition on them of her own thoughts and beliefs on the propriety of teaching gender dysphoria and transgender transitioning to these young children;

g.      In order to adhere to the Pennsylvania School Code and to avoid violating Plaintiffs' Constitutional rights in the future, the District is prohibited from conducting instruction on gender dysphoria and transgender transitioning and/or, in the alternative, the District is required to provide parental notice and opt out rights if the subjects of gender dysphoria and transgender

transitioning or topics related thereto are to be taught in the District, including in elementary school in the District.

### VI.    REQUESTED RELIEF

WHEREFORE, Plaintiffs respectfully requests the following:

1.     Preliminary and Permanent injunctive relief in the form of an injunction, *inter alia*, prohibiting the District from conducting instruction on gender dysphoria and transgender transitioning and/or, in the alternative, requiring the District to provide parental notice and opt out rights if the subjects of gender dysphoria and transgender transitioning or topics related thereto are to be taught in the District, including in elementary school; that, if taught, these topics be taught only by qualified and trained professionals based on qualifications made available to the public by the District; and that all materials to be used in any such instruction be provided and/or accessible in advance to parents through appropriate technological means (i.e., parent portal) reasonably in advance of any instruction so as to make the notice and opt out rights meaningful.

2.     A Declaratory Judgment as provided for in Count VI including a declaration that "In order to adhere to the Pennsylvania School Code and to avoid violating Plaintiffs' Constitutional rights in the future, the District is prohibited from conducting instruction on gender dysphoria and transgender transitioning and/or, in the alternative, the District is required to provide parental notice and opt out rights if the subjects of gender dysphoria and transgender transitioning or topics related thereto are to be taught in the District, including in elementary school"

3.     Compensatory damages to be proven at trial via, *inter alia*, expert mental health testimony arising from use of Plaintiffs' children as part of a social/thought experiment and/or, in the alternative, nominal damages;

4.      Punitive damages for using Plaintiffs' children as part of an unconsented to social/thought experiment conducted by a teacher without the appropriate training or background to do so;

5.      Reasonable attorneys' fees and costs incurred in prosecuting this litigation.

6.      Any and all other relief that the Court deems appropriate.


Dated:  June 8, 2022                                    Respectfully submitted,

                                        By:    s/ David J. Berardinelli
                                        David J. Berardinelli
                                        DEFOREST KOSCELNIK & BERARDINELLI
                                        436 Seventh Ave., 30th Fl.
                                        Pittsburgh, PA  15219
                                        Phone:  412-227-3100
                                        Fax:       412-227-3130
                                        Email:     berardinelli@deforestlawfirm.com
                                        *Counsel for Plaintiffs*