IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **CARMILLA TATEL, STACY DUNN and GRETCHEN MELTON,** individually and as parents and natural guardians of their children, | CIVIL ACTION NO.   22-837 |
| Plaintiffs, | |
| v. | |
| **MT. LEBANON SCHOOL DISTRICT, et al.,** | |
| Defendants. | |

**<u>OPINION</u>**

I.      **<u>Introduction</u>**

This case involves the extent of parents' constitutional rights when a public school permits a teacher to inculcate the teacher's beliefs about transgender topics in first-grade students over the objections of their parents.  As noted in this court's October 27, 2022 opinion (the "first motion to dismiss opinion") (ECF No. 38), this case is not about treating all students with kindness, tolerance and respect.  Here, the parents allege that their children's first-grade teacher pursued her own transgender agenda outside the curriculum, which included: (1) instructing the children in her first-grade class that their parents might be wrong about their children's gender; (2) telling a student that the child could dress like a different gender and be like the teacher's transgender child (who was also in first grade in a different school); (3) telling a student that she, the teacher, would never lie (implying that the parents may lie about their child's gender identity); and (4) instructing students not to tell their parents about the transgender discussions.

The teacher allegedly targeted the children's own gender identity and their parents' beliefs about the gender identity of their own children. When the parents complained, the school district supported the teacher and allegedly adopted a policy (the "de facto policy") that the teacher's conduct could continue in the future without notice to the parents or the opportunity to opt their children out of that kind of agenda (despite providing broad parental notice and opt out rights for other topics). At this stage of the case, these averments must be accepted as true and construed in the light most favorable to Plaintiffs. *Lasche v. New Jersey*, No. 20-2325, 2022 WL 604025, at *3–4 (3d Cir. Mar. 1, 2022) (discussing applicable standard for resolving a motion to dismiss in vacating dismissal of foster parents' First Amendment claim that the state retaliated against them for sharing their religious beliefs about same-sex marriage with their foster child).

The defendants do not challenge the averments about the existence of the de facto policy. Instead, citing *Parker v. Hurley*, 514 F.3d 87 (1st Cir. 2008), a decision from the First Circuit Court of Appeals, they argue that in a public school, parents have **no** constitutional right to notice or to opt their children out of any kind of instruction, regardless of the content of that instruction, the age of the children, or whether the instruction is part of the published school curriculum. *See* ECF No. 42 at 8 ("Parents have no constitutional right to exempt their children from classroom lessons, including those on transgender issues"). In other words, the defendants argue that parents simply have no constitutional right to notice or to object to any information a public school may present to their children.

The defendants' argument is contrary to Third Circuit Court of Appeals precedent, which recognizes that a public school's actions may conflict with parents' fundamental constitutional rights and when conflicts occur on matters of the greatest importance, the parents' rights prevail unless the public school can demonstrate a compelling interest for its actions. *C.N. v. Ridgewood*

*Bd. Of Educ.*, 430 F.3d 159, 184 (3d Cir. 2005) ("*C.N.*")[1]; *Gruenke v. Seip*, 225 F.3d 290, 305 (3d Cir. 2000).  The court adheres to its original decision that the parents' constitutional rights at issue here (forming the identity of their young children) are matters of the greatest importance and takes this opportunity to further explain and clarify its analysis.[2]

## II.     Procedural History

On October 27, 2022, the court issued the initial motion to dismiss opinion, which after a thorough analysis of each claim and each defendant, granted in part and denied in part defendants' motions to dismiss the complaint (the "Complaint") and the individual defendants' motion for qualified immunity.  As the court explained, the alleged conduct went far beyond instructing students that someone who differs from that student must be treated with kindness, tolerance and respect.  Here, the school district allegedly supports the teacher's ability to pursue her own agenda, outside the curriculum, to inculcate the teacher's beliefs about transgender topics in first-grade students over the objections of their parents and contrary to the beliefs of their parents.

A motion for reconsideration pursuant to Rule 54(b) (ECF No. 41) and a motion to amend judgment pursuant to Rule 59(e) (ECF No. 44), with briefs in support, were filed by the remaining defendants:   Mt. Lebanon School District (the "District"), Megan Williams ("Williams"), Dr. Timothy Steinhauer (Steinhauer), Dr. Marybeth Irvin ("Irvin"), Brett Bielewicz ("Bielewicz"), and Jacob W. Wyland ("Wyland") (collectively, "Defendants").  Plaintiffs Carmilla Tatel, Stacy Dunn and Gretchen Melton (collectively, "Plaintiffs" or the

---

[1] In the initial motion to dismiss opinion, this decision was referred to as "*Ridgewood,*" but in this opinion and hereafter, it will be referred to as "*C.N.*"

[2] The analysis in the court's initial motion to dismiss opinion (ECF No. 38) must be read in full in conjunction with this opinion.

"Parents") filed a response in opposition to the motions (ECF No. 51) and the motions are ripe for disposition.

### III.   Standard for reconsideration

A.   Interlocutory orders – Rule 54(b)

District courts possess discretion to reconsider interlocutory orders under Rule 54(b). *Gay v. A.O. Smith Corp.*, No. 2:19-CV-1311, 2022 WL 2829887, at *1 (W.D. Pa. Apr. 21, 2022) (citing *Foster v. Westchester Fire Ins. Co.*, 2012 WL 2402895, at *4 n.1 (W.D. Pa. June 26, 2012)).   A court may reconsider an interlocutory order even if the movant cannot show one of the particular grounds permitting reconsideration of final orders.   *Id.*   The movant, however, must establish good cause for the court to revisit its prior decision.   Pursuant to the law of the case doctrine, courts should only grant motions for reconsideration in extraordinary circumstances.   *Id.*   "The extraordinary circumstances permitting reconsideration of prior decisions [under Rule 54(b)] align neatly with the three grounds justifying reconsideration under Rule 59(e)."   *Id.*

B.   Qualified immunity – Rule 59(e)

A district court's denial of qualified immunity at the motion to dismiss stage is considered to be a "final decision" within the meaning of 28 U.S.C. § 1291.   *Ashcroft v. Iqbal*, 556 U.S. 662, 672-75 (2009).   The scope of a motion for reconsideration of a final decision under Rule 59(e) is extremely limited.   *Blystone v. Horn*, 664 F.3d 397, 415 (3d Cir. 2011).   The purpose of a motion for reconsideration is "to correct manifest errors of law or fact or to present newly discovered evidence."   *Max's Seafood Café v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999).   A motion for reconsideration must rely on one of three grounds: (1) an intervening change in the law; (2) the availability of new evidence; or (3) the need to correct clear error of law or fact or prevent

4

manifest injustice. *N. River Ins. Co. v. CIGNA Reinsurance Co.*, 52 F.3d 1194, 1218 (3d Cir. 1995).  A motion for reconsideration should not be used to ask a district court to rethink a decision it has already rightly or wrongly made. *Williams v. Pittsburgh*, 32 F. Supp.2d 236, 238 (W.D. Pa. 1998).  Motions for reconsideration should not be used to relitigate issues already resolved by the court and should not be used to advance additional arguments which could have been made by the movant before judgment. *Reich v. Compton*, 834 F. Supp. 753, 755 (E.D. Pa. 1993), *aff'd in part, rev'd in part*, 57 F.3d 270 (3d Cir. 1995).

The pending motions will be addressed together and each remaining claim will be discussed.


IV.   **Discussion**

**A. Summary of the parties' arguments**

Defendants' motions are intertwined.  Defendants do not point to new evidence or an intervening change of law.  Instead, they posit clear errors of law.  Defendants argue that Plaintiffs did not assert cognizable constitutional rights and the Complaint should be dismissed as a matter of law for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).  The individual Defendants argue, in the alternative, they are entitled to qualified immunity.  The first step of a qualified immunity analysis, i.e., whether Plaintiffs articulated cognizable constitutional rights, is similar to the motion to dismiss analysis.  The individual Defendants assert at the second step of the qualified immunity analysis that because the constitutional rights at issue are not clearly established, they are entitled to qualified immunity. Plaintiffs maintain that the court's analysis of their constitutional rights and its denial of qualified immunity to the remaining individual Defendants in the initial motion to dismiss opinion were

correct.

Defendants seek dismissal of the entire Complaint with prejudice as a matter of law.  In other words, Defendants contend that parents have no constitutional rights with respect to <u>any</u> of the conduct alleged in the Complaint.  Plaintiffs vigorously disagree.

### B.  <u>Factual allegations in the Complaint</u>

In their arguments, Defendants minimize the factual allegations in the Complaint and failed to consider all those allegations (and the reasonable inferences therefrom) in the light most favorable to Plaintiffs, as required at this stage of the case.  *Lasche*, 2022 WL 604025 at *3–4. Defendants do not address the full scope of the factual allegations in the Complaint, but narrowly construe Plaintiffs' claims as "premised on Williams' classroom instruction on gender identity issues." (ECF No. 42 at 8-9).  Defendants assert the Complaint contains "extraneous allegations" about Williams' repeated approaches to one child about becoming like her transgender child. Defendants argue that conduct may be ill-advised or offensive, but does not strike at the heart of parental decision-making.  (ECF No. 42 at 8-9).

As this court explained in its initial motion to dismiss opinion, Williams' alleged conduct went far beyond instructing students that someone who differs from that student must be treated with kindness, tolerance and respect.  Transgender topics were not part of the published first-grade curriculum.  Plaintiffs allege that Williams pursued her own non-curricular agenda in which Williams attempted to inculcate in the first-grade children in her class the teacher's beliefs about a child's gender identity and to initiate and engage in discussions with the first-graders in her class about the children's <u>own</u> gender identity without the permission of their parents and in contravention of the parents' beliefs.  Williams' alleged conduct included "teaching these young

children that 'sometimes parents make mistakes' about a child's gender and encouraging children not to tell parents about her instruction."  Complaint ¶ 6.[3]  Williams brought transgender topics into her classroom teachings "throughout the school year."  Complaint ¶ 75.  Williams told all her students that sometimes "parents are wrong" and parents and doctors "make mistakes" when they bring a child home from the hospital.  Complaint ¶ 83.

The Complaint alleges that Williams engaged in "grooming" conduct toward one Plaintiff's child despite (or because of) that Plaintiff's objections, as follows:

> 78. The child of one of the Plaintiffs explained to his mother that Williams had told him, "I can wear a dress and have hair like my mom." **When Plaintiff raised this with Williams** at a parent-teacher conference, Williams deflected, contending that it must have been a misunderstanding and indicating that maybe it was confusion about Halloween. Plaintiff refuted this assertion, letting Williams know that what her son had told her was "very clear" and **expressing her displeasure with what Williams had said to her son.**[4]

> 79. **Despite knowing this Plaintiff's objections, or upon information and belief because of them**, Williams appears to have **targeted this child for repeated approaches about gender dysphoria**. Although Plaintiff did not discover Williams' invasion of her parental and family rights until the spring, **throughout the school year**, Williams had private conversations with this young boy, discussing with him the similarities between the boy and her transgender child again suggesting that the boy might want to wear a dress, at other times commenting to him how the boy and her transgender child had similar interest[s] and the same favorite color, and telling the child that he could be like her transgender child. Williams explained to this young boy that "doctors can get it wrong sometimes." In the course of these private discussions, Williams also told this young boy that "she would never lie to him" and, if the subjects they were discussing came up at home, to say that "I heard it from a little birdie." In other words, upon information and belief, **while having private discussions with this young boy about topics related to gender dysphoria, she told the child not to tell his parents about the discussions**. Williams' "grooming" of this young student is unconscionable. It is a gross breach of trust and an abuse of her position as a public school teacher.

---

[3] Contrary to Defendants' argument (ECF No. 42 at 11 n.12), the Complaint alleges that Williams encouraged multiple children not to tell their parents about the transgender discussions.  Complaint ¶ 6.
[4] In their Answer, Defendants disclaimed knowledge about what the child told his parent.  (ECF No. 49 ¶ 78).  Defendants (which include Williams), however, did not specifically deny that Williams made these comments to the child.

Complaint ¶¶ 78, 79 (emphasis added).[5]

Contrary to Defendants' contention, Plaintiffs' Due Process claims are not solely premised on Williams' "classroom instruction." (ECF No. 42 at 8). The averments about Williams' broader agenda and conduct are not "extraneous allegations," but must be accepted as true and construed in the light most favorable to Plaintiffs at this stage of the case. *Mack v. Yost*, 63 F.4th 211, 234 (3d Cir. 2023) (denying qualified immunity and commenting that defendants are not entitled to "their preferred framing of the facts").

In addition, Plaintiffs' claims are premised on the de facto policy, which eliminated Plaintiffs' rights to notice and opt out of Williams' agenda. Transgender topics were not part of the first-grade curriculum and no notice was given to the Parents that transgender topics would be presented to their children. Plaintiffs allege that when they objected to Williams' agenda, Defendants adopted a de facto policy that the teacher's conduct could continue in the future without notice or opt out rights for the Parents on transgender topics. The de facto policy was in derogation of the District's published parental rights policy, District Policy I(F), which provides parents with broad access to instructional materials and the District's practices to permit opt out rights for many other topics, such as the Holocaust, slavery, the 9/11 terrorist attacks, reproductive education, sex education, Black Lives Matter and Planned Parenthood. Complaint ¶¶ 8, 37-40. To repeat, at this stage of the case all factual allegations in the Complaint must be accepted as true and construed together with all reasonable inferences in the light most favorable to Plaintiffs in evaluating the constitutional rights asserted. *Lasche*, 2022 WL 604025 at *3–4.

---

[5] The court denied Defendants' motion to strike these averments and Defendants do not seek reconsideration of that decision. Due to the sensitivity of the "grooming" allegations, the court did not quote these portions of the Complaint in its earlier opinion. Defendants put them at issue because they argue in their motion for reconsideration that these allegations are "extraneous" and that the court's reference that Defendants provided the instruction over the objection of the Plaintiffs was a clear error of fact (ECF No. 42 at 3 n. 1). As reflected in the Complaint, Williams allegedly targeted this child despite, or perhaps because of, a Plaintiff's objections. Complaint ¶ 79. There was no clear error of fact.

C.  **Sufficiency of allegations of violations of constitutional rights**

The court turns now to Defendants' contentions about the remaining claims.

    1.  Due Process claims

        a.  The parties' arguments

Defendants contend that parents have **no** Substantive or Procedural Due Process rights to notice of instruction or to exempt (i.e., opt out) their children from any or all school instruction. Defendants argue: (1) "the parental rights to control the upbringing of a child <u>must</u> give way to a school's ability to control curriculum and the school environment" (ECF No. 42 at 3) (emphasis in original); (2) "constitutional violations do not occur when parents are able to discuss the objected to topics with their children and to place them in the family's moral or religious context" (ECF No. 42 at 5); and (3) there is no circuit split on the issues facing this court because the holding in *Parker v. Hurley*, 514 F.3d 87 (1st Cir. 2008), is consistent with Third Circuit Court of Appeals precedent.[6]  Plaintiffs contend that parents, not public schools, have the primary right to control the education of their children and that their constitutional rights were violated by Williams' agenda and the de facto policy.

---

[6] Defendants argue in their motion for reconsideration, for the first time, that certain Plaintiffs may not have provided proper notice to the school about their opposition to Williams' agenda.  The court will not address this argument because it should have been raised in the initial motion to dismiss.  *Reich*, 834 F. Supp. at 755 (reconsideration is not a forum to raise arguments that could have been raised in the initial motion).  In any event, that argument implicates a defense and the merits of the claims, which must be resolved on a fully developed record.  *See Lasche*, 2022 WL 604025 at *3–4 (at motion to dismiss stage, allegations must be construed in the light most favorable to the plaintiffs).  The court recognizes that the parental objections pled in paragraphs 87 and 88 of the Complaint were not made by a named Plaintiff. (ECF No. 51 at 10 & n.6).  To the extent those parents want relief, the Complaint will need to be amended to include them as plaintiffs.  What the allegations taken as true show, however, is that Defendants were on notice that there were parental objections being made.

b.   No parental notice or opt out rights argument

Defendants' primary argument is that "parents have **no** constitutional right to remove their child from instruction."  (ECF No. 42 at 3) (emphasis added); (ECF No. 42 at 8) ("Parents have **no** constitutional right to exempt their children from classroom lessons, including those on transgender issues") (emphasis added).  According to Defendants, the age of the child, the topic and whether the information is part of the official curriculum are irrelevant – parents simply have no constitutional right to notice or to object to any information a public school may present to their children.

Defendants' refusal to recognize any parental rights in a public school setting is contrary to clear, binding Supreme Court and Third Circuit Court of Appeals authority.  The court's initial motion to dismiss opinion quoted numerous Supreme Court decisions which emphasized the fundamental nature of the parental rights at issue.  (ECF No. 38 at 20-23). In *Gruenke*, the court cautioned:  "Public schools must not forget that 'in loco parentis'[7] does not mean 'displace parents.'"  *Gruenke*, 225 F.3d at 307.  In *C.N.*, the Third Circuit Court of Appeals reaffirmed that "**parents, not schools, have the primary responsibility** to inculcate moral standards, religious beliefs, and elements of good citizenship."  *C.N.*, 430 F.3d at 185 (emphasis added).  In *C.N.*, the court recognized that "introducing a child to sensitive topics before a parent might have done so herself can complicate and even undermine parental authority."  *Id.*

Parents' fundamental constitutional rights have been recognized as superior to the interests of a public school.  *Mahanoy*, 141 S. Ct. at 2053 (Alito, J., concurring) ("In our society,

---

[7] *See Mahanoy Area Sch. Dist. v. B. L. by & through Levy*, 141 S. Ct. 2038, 2052 (June 23, 2021) (Alito, J., concurring) (explaining that under in loco parentis doctrine, "parents are treated as having relinquished the measure of authority that the schools must be able to exercise in order to carry out their state-mandated educational mission").

parents, not the State, have the primary authority and duty to raise, educate, and form the character of their children."); *C.N.*, 430 F.3d at 185.  The institution of the family predates the Constitution and was recognized as fundamental from the beginning of the nation.  *See Moore v. East Cleveland,* 431 U.S. 494, 503, (1977) ("[T]he Constitution protects the sanctity of the family precisely because the institution of the family is deeply rooted in this Nation's history and tradition").[8]

Public schools must perform their duties within the bounds of the Constitution.  *Board of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 864 (1982) ("the discretion of the States and local school boards in matters of education must be exercised in a manner that comports with the transcendent imperatives of the First Amendment").  In *West Virginia Board of Education v. Barnette*, 319 U.S. 624 (1943), the Supreme Court held a board of education could not compel a student to salute the flag or recite the pledge of allegiance. Justice Jackson, writing for the majority, noted:

> The Fourteenth Amendment, as now applied to the States, protects the citizen against the State itself and all of its creatures—Boards of Education not excepted. These have, of course, important, delicate, and highly discretionary functions, but none that they may not perform within the limits of the Bill of Rights. That they are educating the young for citizenship is reason for scrupulous protection of Constitutional freedoms of the individual, if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes.

*Id.* at 637.

Defendants' argument that parental rights must always yield to public school preferences

---

[8] Compulsory public education, by comparison, only became prevalent in the early 1900s.  The first compulsory education law was enacted in 1852 in Massachusetts.  Amanda McNelly, Truancy, Secure Detention, and the Right to Liberty, 24 Suffolk J. Trial & App. Advoc. 112, 113 (2019).  It was not until the late 1800s that public elementary schools were available to children in nearly all parts of the country. History and Evolution of Public Education in the US, Center on Education Policy (2020), available at https://files.eric.ed.gov/fulltext/ED606970.pdf, last visited April 21, 2023.  In 1910, just 14% of Americans aged 25 and older had completed high school. *Id.*

is directly contrary to binding Third Circuit Court of Appeals precedent.  In *Gruenke*, the court

held exactly the opposite:  "when such collisions occur, the **primacy of the parents' authority**

**must be recognized** and should yield only where the school's action is tied to a compelling

interest."  *Gruenke*, 225 F.3d at 305 (emphasis added).[9]  In *Gruenke*, the court explained:

> It is not educators, but parents who have primary rights in the upbringing of
> children. School officials have only a secondary responsibility and must respect
> these rights. State deference to parental control over children is underscored by
> the Court's admonitions that "[t]he child is not the mere creature of the State,"
> *Pierce*, 268 U.S. at 535, 45 S.Ct. 571, and that it is the parents' responsibility to
> inculcate "moral standards, religious beliefs, and elements of good citizenship."
> *Yoder*, 406 U.S. at 233, 92 S.Ct. 1526.

*Id.*

As the court explained in its initial motion to dismiss opinion, Defendants' position

follows the approach taken in *Fields v. Palmdale School District*, 427 F.3d 1197 (9th Cir. 2005),

amended on denial of rehearing, 447 F.3d 1187 (9th Cir. 2006), in which the Ninth Circuit Court

of Appeals held that parents forfeit any right to control their child's education if they choose to

send their children to public school.  In *C.N.*, the Third Circuit Court of Appeals specifically

rejected the reasoning in *Fields* and explained:

> In reaching this conclusion, we do not hold, as did the panel in *Fields v. Palmdale*
> *School District*, 427 F.3d 1197 (9th Cir. 2005), that the right of parents under the
> *Meyer–Pierce* rubric "does not extend beyond the threshold of the school door."
> *Id.* at 1207. Nor do we endorse the categorical approach to this right taken by the
> *Fields* court, wherein it appears that a claim grounded in *Meyer–Pierce* will now
> trigger only an inquiry into whether or not the parent chose to send their child to
> public school and if so, then the claim will fail. Instead, guided by *Gruenke*,
> wherein this Court stressed that it is primarily the parents' right "to inculcate
> moral standards, religious beliefs and elements of good citizenship," 225 F.3d at
> 307, we have determined only that, on the facts presented, the parental decisions
> alleged to have been usurped by the School Defendants are not of comparable
> gravity to those protected under existing Supreme Court precedent.

---

[9] Defendants made no effort to identify a compelling interest in this case.  There are no inferences from
the Complaint that a failure to include transgender topics in the classroom placed any child at risk of
physical or emotional harm.

*C.N.*, 430 F.3d at 185 n.26.

Defendants distort decisions holding that parental rights are not <u>absolute</u> to argue that parents have no rights at all.  The quotation from *C.N.* in Defendants' brief (ECF No. 42 at 3) illustrates the flaw in their reasoning.   The court explained in *C.N.* that "**in certain circumstances** the parental right to control the upbringing of a child must give way to a school's ability to control curriculum and the school environment." *Id.* at 182 (emphasis added).  In the Third Circuit, unlike in *Fields*, parental rights **<u>do</u>** extend beyond the school door "in certain circumstances," although – as this court has already recognized -- the parental rights are not unlimited (ECF No. 38 at 28-30).  In *Mahanoy* (involving a school's regulation of off-campus speech), Justice Alito explained that the decision to enroll a student in a public school confers some authority to the school, but "cannot be treated as a complete transfer of parental authority." 141 S. Ct. at 2053.  Plaintiffs do not lose, as Defendants suggest, simply because their claims implicate a public school.

In the Third Circuit, courts (and school officials) must distinguish "between actions that strike at the heart of parental decision-making authority on matters of the greatest importance and other actions that, although perhaps unwise and offensive, are not of constitutional dimension." *C.N.*, 430 F.3d at 184.  In *J.S. ex rel. Snyder v. Blue Mountain School District*, 650 F.3d 915 (3d Cir. 2011), the court explained that "the threshold for finding a conflict will not be as high when the school district's actions "strike at the heart of parental decision-making authority on matters of the greatest importance." *Id.* at 933-34.  Under *Gruenke*, if a conflict occurs on a matter of greatest importance, the primacy of the parental rights must be respected.

The court, therefore, must determine whether the claims in this case implicate a matter of great importance with respect to parental authority.  Defendants argue, conclusorily, that

Williams' alleged conduct may be ill-advised and offensive, but does not strike at the heart of parental decision-making. (ECF No. 42 at 9). The court adheres to its conclusions in its initial opinion that the issues in this case plausibly rise to constitutional importance:

> Teaching a child how to determine one's gender identity at least plausibly is a matter of great importance that goes to the heart of parenting. *See, e.g., Doe by & through Doe v. Boyertown Area Sch. Dist*., 897 F.3d 518, 522 (3d Cir. 2018) (gender identity implicates a person's "deep-core sense of self").

Opinion, ECF No. 38 at 30; and

> [i]ntroducing and teaching a child about complex and sensitive gender identity topics before the parent would have done so can undermine parental authority. [*C.N.*], 430 F.3d at 185. A teacher instructing first graders that the child's parents' beliefs about gender identity may be wrong and the teacher's beliefs are correct directly repudiates parental authority.

*Id.* at 31-32; *see Ricard v. USD 475 Geary Cnty., KS Sch. Bd*., No. 522CV04015, 2022 WL 1471372, at *8 (D. Kan. May 9, 2022) ("It is difficult to envision why a school would even claim—much less how a school could establish—a generalized interest in withholding or concealing from the parents of minor children, information fundamental to a child's identity, personhood, and mental and emotional well-being such as their preferred name and pronouns."). Defendants, allegedly, are interfering with the Parents' right to form their young children's identities. In this case, allegedly, young children are being instructed by their first-grade teacher that their parents may be wrong about the children's gender; one boy was secretly groomed to change his identity to be like the teacher's transgender child; and (in response to the parents' complaints) Defendants adopted a de facto policy that such conduct could continue in the future without parental notice or opt out rights. That kind of conduct implicates the heart of parental decision-making on matters of the greatest importance, i.e., rises to constitutional importance.

c. *Parker*

Defendants rely heavily on the decision in *Parker*, 514 F.3d at 87, in which the First Circuit Court of Appeals addressed a challenge to a statewide curriculum teaching tolerance of gay marriage, which had recently been legalized in Massachusetts.  This court agrees with the discussion in *Parker* about the impressionability of young children.  In *Parker, id.* at 100, the court quoted *Lee v. Weisman*, 505 U.S. 577, 592 (1992), to identify concerns about the "subtle coercive pressure [of state endorsement of religion] in the elementary and secondary public schools"; and noted the concurrence in *School District of Abington Township v. Schempp*, 374 U.S. 203, 307 (1963) (Goldberg, J., concurring), for expressing concern about the impact of school prayer and Bible reading on "young impressionable children."  *Lee*, 505 U.S. at 592. Concerns about sensitive subjects are heightened when the children are in first grade and the person trying to influence them is their teacher.  *See Edwards v. Aguillard*, 482 U.S. 578, 584 (1987) (public schools wield great power "because of the students' emulation of teachers as role models").

Defendants rely on *Parker* to support their argument that no constitutional rights are implicated in this case and criticize this court's prior discussion of *Parker* (ECF No. 42 at 6-8). *Parker*, however, did not endorse the constitutionality of the kind of conduct alleged in this case and this court must be mindful of the precedential decisions of the Third Circuit Court of Appeals.  In addition, *Parker* did not specifically evaluate the limited relief of notice and opt out rights for a parent's own children against the school's interest.  *See Fulton v. City of Phila.*, 141 S. Ct. 1868, 1881 (2021) (involving a First Amendment challenge to foster care regulations) ("Rather than rely on 'broadly formulated interests,' courts must scrutinize [ ] the asserted harm of granting specific exemptions to particular religious claimants.").

15

1.   The factual situation in *Parker* was different

The parents in *Parker* objected to a public school's refusal to provide notice and opt out rights with respect to certain reading assignments, including: two books in kindergarten and first-grade about diverse families, including same gender parents; and a second-grade book that depicted and celebrated a gay marriage.  *Id.* at 90.  The parents were concerned that the books were an effort to indoctrinate their children.[10]   The court in *Parker* commented: "The fact that a school **promotes tolerance** of different sexual orientations and gay marriage when such tolerance is anathema to some religious groups does not constitute targeting."   *Id.* at 96 (emphasis added).   The court explained that "[t]he school was not singling out plaintiffs' particular religious beliefs or targeting its tolerance lessons to only those children from families with religious objections to gay marriage."  *Id.*

The curriculum at issue in *Parker* was designed to increase children's tolerance of families that may not be like a child's own family.  *See id.* at 106 ("these books do not endorse gay marriage or homosexuality, or even address these topics explicitly, but merely describe how **other** children might come from families that look different from one's own.") (emphasis added).[11]   In *Parker*, the court recognized "a continuum along which an intent to influence could become an attempt to indoctrinate, however, [the *Parker*] case is firmly on the influence-toward-

---

[10] Defendants argue that this court made two errors about the factual background in *Parker*, when this court noted that: (1) the parents in *Parker* had notice about the books; and (2) the books did not endorse gay marriage or homosexuality (ECF No. 42 at 7). This court's statements were supported by quotations from the *Parker* opinion.  *See Parker, id.* at 106 ("The parents here did in fact have notice, if not prior notice, of the books and of the school's overall intent to promote toleration of same-sex marriage."); *id.* (concerning one student, the pertinent "books do not endorse gay marriage or homosexuality" and with respect to the other student, one book "was precisely intended to influence the listening child toward tolerance of gay marriage."). In other words, in *Parker* two of the three books did not endorse gay marriage and one book was intended to promote tolerance (not endorsement) of gay marriage.

[11] The court recognized in *Parker* that Massachusetts has a statute requiring notice and opt out rights for parents to exempt their children from curriculum that primarily involves human sexuality issues.  *Id.* at 90.  The school district refused to provide parental notice and opt out rights to the plaintiffs under that statute because it determined that the materials at issue did not fall within that category.  *Id.*

16

tolerance end."[12]  *Id.*  The lengthy discussion in *Parker* about indoctrination shows the court's concern that conduct beyond encouraging tolerance may intrude into the family relationship and be actionable.  The court in *Parker* did not reach the issue whether indoctrination could violate parental constitutional rights, because it concluded that indoctrination was not factually alleged, i.e., there was no constant stream of like materials or required reading of many like books.

This case, by stark contrast, involves not merely instruction to influence tolerance of other children or families, but efforts to inculcate a teacher's beliefs about transgender topics in Plaintiffs' own children.  Unlike in *Parker*, the allegations in this case go beyond mere reading of a few books.  Here, the teacher allegedly pursued her agenda throughout the school year, including teaching first-graders that their parents may be wrong about their gender, telling one boy could dress like his mother, and telling the children to keep the teacher's discussions about gender topics secret from their parents. Williams allegedly encouraged her first-grade students that they might be a different gender than their own parents told them.  In other words, it was the children's own family and their own gender identity that Williams targeted.  Plaintiffs allege that Williams targeted one child for repeated approaches about gender dysphoria despite, or because of, the parents' beliefs.  Complaint ¶ 79.  It is reasonable to infer that Williams intended to influence the children's own gender identity and to have at least one child become like the teacher's transgender child.

---

[12] The court in *Parker* assumed that one book was intended to influence the children toward tolerance of gay marriage, but found "no **evidence** of systemic indoctrination."  *Parker*, 514 F.3d at 106 (emphasis added).  A court, however, may not require a party to produce "evidence" at the motion to dismiss stage. *See, e.g. Grondin v. Fanatics, Inc.*, No. CV 22-1946, 2023 WL 2957474, at *5 (E.D. Pa. Apr. 14, 2023) (an allegation suffices at the motion to dismiss stage; "whether a plaintiff will be able to adduce valid evidence [ ] is a matter reserved for discovery.").

Construed in the light most favorable to Plaintiffs, the Complaint sufficiently alleges that, on the continuum, Williams' conduct went beyond influencing children toward tolerance and she attempted to indoctrinate first-grade students about how to form the students' own gender identity, contrary to the values or beliefs of their Parents. These allegations, in contrast to the situation in *Parker*, support a reasonable inference of an attempt to indoctrinate young children on matters that strike at the heart of parental decision-making. *C.N.*, 430 F.3d at 184.

### 2. Discussion of *Parker* in *Combs*

Defendants argue that *Parker* is consistent with Third Circuit Court of Appeals precedent and point to *Combs v. Homer-Center School District*, 540 F.3d 231 (3d Cir. 2008), in which the Third Circuit Court of Appeals cited *Parker* for three matters. This court discussed *Combs* in its initial motion to dismiss opinion and adheres to that discussion. *Combs* was decided at the summary judgment stage on a full evidentiary record. The specific citations to *Parker* in *Combs* do not impact this court's analysis in this case at the motion to dismiss stage.

First, in *Combs* the court of appeals recognized that the court in *Parker* (a) interdependently analyzed the Due Process and Free Exercise rights; (b) ultimately found that the plaintiffs did not state "a constitutional burden on their rights"; and (c) chose not to enter the fray about a hybrid-rights situation. *Combs*, 540 F.3d at 245 n. 21 (citing *Parker*, 514 F.3d at 98-99). *Combs,* likewise, concluded that the hybrid-rights theory is dicta. *id*. at 245 & n.21. This court followed *Combs* in concluding the hybrid rights theory would not be followed. (ECF No. 38 at 47 n.22).

Second, in *Combs* the appellate court cited *Parker* in a footnote for a proposition "that parents have no right to exempt their child from certain subjects, reading assignments, community-service requirements or assembly programs they find objectionable. *See, e.g.,*

*Parker*, 514 F.3d at 107 (reading assignment) . . . ." *Combs*, 540 F.3d at 248 n.24.  Here, this

court concluded the Complaint's factual allegations go far beyond mere reading assignments.

Third, in *Combs* the court was concerned with homeschooling parents' request to

completely opt out of all state reporting requirements and noted *Parker's* interpretation that the

"mode of life" reference in *Wisconsin v. Yoder*, 406 U.S. 205 (1972), refers to a distinct

community and way of life, not the centrality of one's belief to his or her faith.  *Combs*, 540 F.3d

at 250 n. 27.  The parents in *Combs* challenged home schooling regulations requiring reporting

that implicated core educational topics, not the kind of non-curricular transgender agenda at issue

here.[13]  This case does not present a parental request to opt out of all educational instruction and

is not like *Combs* where a complete opt out would require a "mode of life" analysis.  Here, the

parents seek relief from a teacher's noncurricular transgender agenda, not the published

curriculum.

*Combs* does not support Defendants' argument that parents have no constitutional rights

at all.  Instead, the court in *Combs* explained that parents "do not have a constitutional right to

control each and every aspect of their children's education," *id.* at 248 (emphasis added), which

this court recognized in its initial opinion (ECF No. 38 at 29).  *Combs* quoted the discussion in

*C.N.* about the "distinction between actions that strike at the heart of parental decision-making

authority on matters of the greatest importance and other actions that ... are not of constitutional

dimension," *Combs*, 540 F.3d at 249 (quoting *C.N.*, 430 F.3d at 184).  Notably, *Combs* did not

---

[13] The state regulations required reporting for home schools students at the elementary school level about a minimum of 900 hours of instruction per year and the following courses: "English, to include spelling, reading and writing; arithmetic; science; geography; history of the United States and Pennsylvania; civics; safety education, including regular and continuous instruction in the dangers and prevention of fires; health and physiology; physical education; music; and art.  *Id.* at 237 & n.11; 24 Pa. Stat. §§ 13.1327(a), (b) and 13-1327.1.  The Pennsylvania regulations do not require instruction on transgender topics in elementary school.

overrule *C.N.* or *Gruenke*.[14]  Nothing in *Combs'* discussion of *Parker* justifies reconsideration of the court's decision in this case.


### 3.  Consideration of the relief sought by the parents

The Supreme Court has explained that courts must consider the specific opt out request in balancing the competing interests.  In *Fulton*, the unanimous Supreme Court stated: "Rather than rely on 'broadly formulated interests,' courts must scrutinize [ ] the asserted harm of granting specific exemptions to particular religious claimants."  *Fulton*, 141 S. Ct. at 1881 (involving a First Amendment challenge to foster care regulations).

In *Combs*, the home schooling parents asserted that they should be <u>entirely</u> exempt from the review and reporting requirements in the state's compulsory education law.  *Combs*, 540 F.3d at 234.  Similarly, in *Yoder*, the Amish parents sought a complete exemption from compulsory public education after eighth grade.  406 U.S. at 207.

Plaintiffs in this case, unlike the plaintiffs in *Combs* and *Yoder*, do not seek such sweeping relief, but instead seek to protect only their own young children from being subject to Williams' non-curricular agenda about transgender topics.  Plaintiffs do not challenge the official curriculum and do not seek to limit the information provided to other students.  *See Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2431 (June 27, 2022) ("permitting private speech is not the same thing as coercing others to participate in it").  Williams' alleged agenda about transgender topics goes far beyond merely reading one or three books in an objective manner, is not part of the school curriculum, and Defendants did not assert a compelling interest for that conduct.  Plaintiffs assert they are not trying to impose their religious or moral views on <u>others</u>,

---

[14] Indeed, only an en banc decision could do so.  *United States v. Hoover*, 857 F. App'x 721, 722 (3d Cir. 2021) ("we are bound by previous precedential panel decisions absent en banc review. 3d Cir. I.O.P. 9.1.").

but want to prevent Williams from abusing her position as a role model to impose the teacher's views upon the Parents' children that contradict the Parents' religious or moral views.

In *Parker*, the court recognized that the parents sought similarly limited relief. The court noted the parents "specifically disclaim[ed] any intent to seek control of the school's curriculum or to impose their will on others" and sought only notice and opt out rights for their own children. *Id.* at 102. In *Parker*, the court did not attempt to balance the competing interests in light of this limited relief, as now required by *Fulton*. The court did not address the theory that where a school has a system for exemptions, "it may not refuse to extend that system to cases of 'religious hardship' without compelling reason" because the plaintiffs did not raise that argument. *Id.* at 96 & n.8 (noting that the school did not put on evidence that exemptions would impose a burden).[15]

The court in *Parker* concluded that the parents' only remedy was to engage in political action to change the curriculum for all students. *Id.* at 107 ("If the school system has been insufficiently sensitive to such religious beliefs, the plaintiffs may seek recourse to the normal political processes for change in the town and state."). The suggestion that parents must engage in politics to protect their constitutional rights is contrary to law. As Justice Jackson stated in *Barnette*:

> The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts. One's right to life, liberty, and property, to free speech, a free press, freedom of worship and assembly, and other fundamental rights may not be submitted to vote; they depend on the outcome of no elections.

*Barnette*, 319 U.S. at 638.

---

[15] It is unknown whether the Massachusetts school district provided broad parental notice and opt out rights on other topics, similar to those available under the District's Policy I(F) and the District's practices.

4.  Circuit split

The court adheres to its conclusion that there is a fundamental circuit split between decisions like *Parker* and *Fields* and Third Circuit Court of Appeals' precedents like *Gruenke*, *C.N.* and *Combs*. *Parker's* narrow interpretation of the Supreme Court precedents about parental rights is problematic. In the initial motion to dismiss opinion, this court quoted numerous decisions in which the Supreme Court repeatedly emphasized the fundamental nature of the parental rights to custody, control and nurture of their children. *Parker* acknowledged those decisions, but narrowly construed "the schooling cases cited in *Troxel* [to] evince the principle that the state cannot prevent parents from choosing a specific educational program." *Id.* at 101 (citation omitted). *Parker* distinguished *Yoder* on the basis that "plaintiffs have chosen to place their children in public schools and do not live, as the Amish do, in a largely separate culture." *Id.* at 100. *Parker* described the proposition that "while parents can choose between public and private schools, they do not have a constitutional right to 'direct *how* a public school teaches their child'" as "well recognized." *Id.* at 102 (emphasis in original, citation omitted). *Parker* cited *Fields* with approval. *Id.* *Parker* quoted *C.N.'s* distinction between school actions that strike at the heart of parental decision-making and lesser actions that are not constitutionally protected, *id.*, but did not apply that standard. *Parker* did not address *C.N.'s* rejection of *Fields* (as discussed *supra* at 13-14). In *Parker,* the court concluded (consistent with *Fields*) that parents do not have a fundamental right to tell a public school what a child will, or will not, be taught. *Id.* (citation omitted).

*Parker* and *Fields* represent a "school-primacy" view, under which parents whose children attend a public school have no constitutional rights. *See Foote v. Town of Ludlow*, No. CV 22-30041-MGM, 2022 WL 18356421, at *9 (D. Mass. Dec. 14, 2022) (involving

transgender middle school students) ("Plaintiffs' right to direct the upbringing of their children allows them to 'choose between public and private schools,' but does not give them a right 'to interfere with the general power of the state to regulate education.'") (quoting *Parker*, 514 F.3d at 102). In *Foote*, the parents notified school officials that they were getting their child professional mental health help and requested that school officials not have private conversations with the student. *Id.* at *2. The parents alleged that their parental rights were violated when school officials disregarded that request, supported the child's request to use alternate names and pronouns, and failed to notify the parents about that request. *Id.* The court – bound by *Parker* -- dismissed the parental rights claims even though the court found it "disconcerting that school administrators or a school committee adopted and implemented a policy requiring school staff to actively hide information from parents about something of importance regarding their child." *Id.* at * 7.

The Third Circuit Court of Appeals, by contrast, adopts a "parent-primacy" approach. In *Gruenke*, the court explained: "It is not educators, but parents who have primary rights in the upbringing of children." *Gruenke*, 225 F.3d at 305. Under the Third Circuit Court of Appeals' approach, when conflicts on matters of greatest importance implicating parental rights occur, "the primacy of the parents' authority must be recognized and should yield only where the school's action is tied to a compelling interest." *Id.* In *C.N.*, the Third Circuit Court of Appeals specifically rejected the "school-primacy" approach in *Parker* and *Fields* in favor of the "parent-primacy" approach in *Gruenke*. *C.N.*, 430 F.3d at 185 n.26.

In sum, the decision in *Parker* and the limited references to *Parker* by the Third Circuit Court of Appeals in *Combs* (which, as discussed, is factually different from this case and cited *C.N.* as precedent) cannot be read to endorse Defendants' position that parents have no

constitutional rights after their children cross the threshold of the schoolhouse door.  Defendants' position is contrary to Supreme Court and Third Circuit Court of Appeals precedent.

### d.   Conclusion about Due Process claims

The court adheres to its determination that Plaintiffs pled plausible Due Process claims against all remaining Defendants.   The parental rights raised by Plaintiffs are plausibly fundamental, as explained in numerous Supreme Court and Third Circuit Court of Appeals decisions.   Defendants' alleged conduct implicates the violation of parental interests of the greatest importance about forming the gender identity of their children.   Plaintiffs plausibly alleged that throughout the school year Bielewicz was on notice that Williams' transgender agenda violated parental rights.   Complaint ¶ 88.  Steinhauer, Irvin and Wyland adopted a de facto policy that violated the District's own parental rights policy, District Policy I(F), and District practices, by eliminating parental notice and opt out rights with respect to Williams' transgender agenda.  *See Hope v. Pelzer*, 536 U.S. 730, 743-44 (2002) (policy showed that officials had fair warning that their conduct violated the Constitution).


### 2.   Free Exercise claims

Defendants argue that Plaintiffs' rights to free exercise of their religion were not burdened.  Defendants contend there were no allegations that any Defendant coerced any student into violating their religious beliefs or that any student was punished for exercising their religious freedom and that Williams' "instruction does not amount to indoctrination."  (ECF No. 42 at 12.)  Defendants also argue that the parents' Free Exercise claims should be dismissed as duplicative of their Due Process claims.  Plaintiffs respond that Defendants did not raise the "burden" argument in their original motion and point out that recent Supreme Court cases

establish that a non-neutral policy to the detriment of a religious belief is a per se burden on Free Exercise rights.   Plaintiffs also contend they are being coerced to submit to Williams' transgender agenda and the de facto policy contrary to their religious beliefs.  *See* Complaint ¶¶ 53, 121, 143.

The court explained in its initial opinion that Plaintiffs' Free Exercise claims[16]  are intertwined with their Due Process claims because the alleged conduct intrudes on the parents' ability to inculcate their children about their religious beliefs concerning gender identity.[17] Plaintiffs allege that Williams' agenda about gender dysphoria and transgender transitioning conflicts with their sincerely held religious and moral beliefs that "human beings are created male or female and that the natural created order regarding human sexuality cannot be changed regardless of individual feelings, beliefs, or discomfort with one's identity, and biological reality, as either male or female."  *Id.* ¶ 140. Plaintiffs contend that Defendants deliberately supplanted the parents' role to control the instruction of their young children about their gender identity in accordance with their religious values, *Id.* ¶ 143, and adopted a de facto policy that Williams could continue to advocate her agenda to first-graders in the future without notice or opt out rights for the parents.  *Id.* ¶ 8.  As noted, this case is not about teaching kindness or tolerance, but about a teacher's agenda to instruct first-graders that their parents' religious beliefs about their own children's gender are or may be wrong.  The Complaint's factual allegations and the reasonable inferences therefrom about Williams' attempt to indoctrinate the Plaintiffs' children concerning the children's gender identity must be construed in the light most favorable to

---

[16] In *Barnette*, the Supreme Court noted the importance of distinguishing between the Due Process clause of the Fourteenth Amendment when "it is applied for its own sake" and when it serves as "an instrument for the First Amendment."  *Barnette*, 319 U.S. at 639.  States may restrict First Amendment rights raised by way of the Fourteenth Amendment "only to prevent grave and immediate danger to interests which the state may lawfully protect."  *Id.* Defendants did not articulate any such interests in this case.

[17] Pursuant to Federal Rule of Civil Procedure 8(d), a party may plead duplicative claims in the alternative.  *Gaines v. Krawczyk*, 354 F. Supp. 2d 573, 580 (W.D. Pa. 2004).

Plaintiffs at this stage of the case.

Defendants argue that Plaintiffs failed to plead coercion. In *Kennedy*, the Supreme Court did not require coercion.[18] The Supreme Court explained "a plaintiff may carry the burden of proving a free exercise violation in various ways, including by showing that a government entity has burdened his sincere religious practice pursuant to a policy that is not neutral or generally applicable." *Kennedy*, 142 S. Ct. at 2421-22.

In *Fulton*, the Supreme Court explained that a law "lacks general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton*, 141 S. Ct. at 1877; *accord Ricard,* 2022 WL 1471372 at *5 (school district policy not generally applicable where it exempts conduct for secular reasons, but is unwilling to exempt plaintiff for religious reasons). In this case, Defendants allegedly adopted a de facto policy that prohibits Plaintiffs from notice and the ability to opt their children out of Williams' transgender agenda based on their religious beliefs, while allowing parental notice and opt out for numerous other secular or religious reasons, such as the Holocaust, slavery, the 9/11 terrorist attacks, reproductive education, sex education, Black Lives Matter and Planned Parenthood. Complaint ¶ 3.[19] The court adheres to its conclusion that Plaintiffs pled plausible Free Exercise claims against all remaining Defendants.[20]

### 3. Familial Privacy claims

Defendants seek to characterize the familial privacy claims against the District and

---

[18] To the extent that coercion is necessary, it is fairly pled. Under the de facto policy, Plaintiffs must either withdraw their children from the public school or submit to Williams' advocacy. *See Edwards*, 482 U.S. at 584 (recognizing that for many, public school is effectively mandatory); *see* initial motion to dismiss pinion (ECF No. 38 at 38) (not all parents can afford private school or provide adequate home schooling).

[19] The court did not apply the "hybrid rights" doctrine. (ECF No. 38 at 47 n. 22).

[20] Defendants seek qualified immunity only for Williams on the Free Exercise claim (ECF No. 42 at 13).

Williams as "based on the Defendants teaching lessons on transgender issues without providing notice and opt out rights." (ECF No. 42 at 10). Defendants argue that the Complaint does not "plausibly allege a scenario where Plaintiffs were deprived of their ability to discuss this matter with their children." *Id.* Defendants contend that Williams (the lone remaining individual Defendant with respect to the familial privacy claim) is entitled to qualified immunity because the court acknowledged that the contours of this claim are not well-defined. Plaintiffs respond that the court properly recognized a familial privacy claim based on Williams' intrusion into the values being conveyed within the family and the instruction that children not tell their parents about the gender identity discussions.

The court dismissed Plaintiffs' familial privacy claims against all Defendants except Williams and the District. The familial privacy claim recognized by the court is <u>not</u> based on Williams "teaching lessons," as Defendants argue (ECF No. 42 at 10). This court explained that the cognizable familial privacy claim is based on the factual allegations that Williams had "an agenda to encourage young children to believe their parents could be wrong about their gender and an intrusion by Williams, with the permission of the District, into the values being conveyed within the family (particularly with respect to the "grooming" allegations and the instruction that children not tell their parents about the gender identity discussions)." (ECF No. 38 at 44-46). The court adheres to its conclusion that the right to familial privacy may be implicated by a teacher's agenda to inculcate her values in young children, as opposed to the parents' values, and a teacher's instruction to first-grade children that their parents may be wrong about their gender. *See Gruenke,* 225 F.3d at 303-04 (discussing "right of parents to raise their children without undue state interference"); *id.* at 307 ("School-sponsored counseling and psychological testing that pry into private family activities can overstep the boundaries of school authority and

impermissibly usurp the fundamental rights of parents to bring up their children, as they are guaranteed by the Constitution.").  The court dismissed the familial privacy claim against all other individual Defendants.

Defendants argue, citing *C.N.*, that a parent whose "child is exposed to sensitive topics or information [at school] remains free to discuss these matters and to place them in the family's moral or religious context, or to supplement the information with more appropriate materials." *C.N.*, 430 F.3d at 185.  This case in not about mere exposure to sensitive topics or information. It is about a teacher's attempts to inculcate her beliefs in the first grade students contrary to the beliefs or values of their parents.  Defendants' argument also rings hollow (or, at a minimum, is premature) in the context of this case.  Transgender topics were not part of the published first-grade curriculum and Plaintiffs allege that Williams told the children not to discuss her transgender agenda with their parents.  Complaint ¶¶ 6, 79.  Plaintiffs allege they did not learn about the grooming behavior until the spring.  Complaint ¶ 79.  The alleged de facto policy would allow Williams' conduct to continue in the future without notice to the parents.  Without notice to parents about the sensitive information provided to their children, that information could not be placed by parents in the family's moral or religious context.

The court adheres to its determination that Plaintiffs stated plausible familial privacy claims against Williams and the District.

### 4. Equal Protection claims

Defendants argue that Plaintiffs failed to allege intentional discrimination to support an Equal Protection "class of one" claim.  Defendants also contend that Plaintiffs were treated exactly the same as other parents with respect to transgender topics.  The individual Defendants

assert they are entitled to qualified immunity because the court recognized there are no decisions with similar facts.    Plaintiffs respond that Defendants failed to raise the "intentional discrimination" argument in their initial motion and, in any event, they sufficiently pled intent, particularly with respect to the de facto policy.

The court dismissed the Equal Protection claims against all individual Defendants except Steinhauer, Irvin and Wyland (ECF No. 38 at 53-54 & n.23).    It is not a defense to the Equal Protection claims to argue that Defendants violated the constitutional rights of <u>all</u> parents by not providing notice or opt out rights for transgender issues (ECF No. 42 at 14-15).    The proper comparators for the Equal Protection analysis plausibly are the parents who are given notice and opt out rights under District Policy I(F) or by practice on numerous other sensitive secular or religious topics.    Defendants did not articulate any basis (let alone a compelling basis) for adopting a de facto policy that eliminates notice and opt out rights for parents affected by Williams' transgender agenda while permitting notice and opt out rights for other secular or religious topics.

Plaintiffs allege, plausibly, that the disparate treatment was intentional (i.e., the de facto policy was adopted in response to their complaints) and was done to prevent the exercise of their fundamental rights.  *See Harvard v. Cesnalis*, 973 F.3d 190, 205 (3d Cir. 2020) (to establish a selective enforcement claim, plaintiffs must demonstrate that they were (1) treated differently from other, similarly situated persons and (2) this selective treatment was based on an unjustifiable standard, such as race, or religion, or some other arbitrary factor or to prevent the exercise of a fundamental right).    Plaintiffs must be similarly situated in all relevant respects, but need not be identically situated.  *Id.*    The court adheres to its determination that Plaintiffs asserted cognizable Equal Protection claims against the District, Steinhauer, Irvin and Wyland.

5.   Declaratory Judgment

With respect to the Declaratory Judgment claim in count VI, Defendants argue (for the first time) that if the federal claims are dismissed, count VI does not provide a standalone basis for jurisdiction.  Because the federal constitutional claims are not being dismissed, the court need not resolve this issue.

**D. Qualified Immunity**

1.   Consideration of qualified immunity at the motion to dismiss stage

A district court's denial of a motion to dismiss on qualified immunity grounds is a pure question of law, which is subject to de novo review.  *Dennis v. City of Phila.*, 19 F.4th 279, 284 (3d Cir. 2021).   At the motion to dismiss stage, the court must accept Plaintiffs' factual allegations as true and draw all reasonable inferences in their favor.   *Id.*   Qualified immunity involves two questions: (1) whether the plaintiff sufficiently alleged the violation of a constitutional right, and (2) whether the right was clearly established at the time of the official's conduct.  *Id.* at 286.

In *Clark v. Coupe*, 55 F.4th 167 (3d Cir. 2022) (involving an inmate's Eighth Amendment claims against prison officials), the United States Court of Appeals for the Third Circuit reversed a district court's grant of qualified immunity at the motion to dismiss stage.  The court of appeals reiterated that "[i]n assessing the claims, we must construe the complaint liberally and assume the veracity of all 'well-pleaded factual allegations.'"  *Id.* at 178.  The district court in *Clark* granted qualified immunity on the basis that no established law was violated, and therefore, the inmate's right was not clearly established.  The Third Circuit Court of Appeals reversed and held that this decision "was premature given the nature of his allegations."  *Id.*  As applicable to this

case, the court must consider the specific facts set forth in the Complaint, construed in the light most favorable to Plaintiffs, in considering whether qualified immunity should be granted at the motion to dismiss stage.

In any event, Plaintiffs' claims would not be denied in their entirety on the basis of qualified immunity. Plaintiffs seek injunctive relief in this case, in addition to compensatory damages. *See* Complaint (ECF No. 1 at 44). Qualified immunity is not a defense to injunctive relief. *See Hill v. Borough of Kutztown*, 455 F.3d 225, 244 (3d Cir. 2006) ("[T]he defense of qualified immunity is available only for damages claims – not for claims requesting prospective injunctive relief."). In addition, municipal entities, such as the District, "do not enjoy qualified immunity from suit for damages under § 1983." *Barna v. Bd. of Sch. Directors of Panther Valley Sch. Dist.*, 877 F.3d 136, 145 (3d Cir. 2017).[21]

### 2. First prong – violation of constitutional rights

For the reasons set forth in its prior discussion, the court adheres to its determination that Plaintiffs articulated plausible constitutional claims.

### 3. Second prong - clearly established

The court now turns to the second prong of the qualified immunity analysis. The court

---

[21] In *Barna*, the court explained:

> Although not subject to respondeat superior liability, municipalities may be held directly liable under *Monell* if they adopt a custom or policy that is unconstitutional or that is the "moving force" behind any constitutional violation. *See Monell*, 436 U.S. at 694, 98 S.Ct. 2018; *Thomas v. Cumberland Cty.*, 749 F.3d 217, 222 (3d Cir. 2014). Municipalities can be held liable regardless of whether it was clear at the time of the policy's adoption that such conduct would violate a plaintiff's constitutional rights. *Owen*, 445 U.S. at 656–57, 100 S.Ct. 1398. Because liability may be imposed on a municipality separate and apart from the liability imposed on an individual officer, "[t]he precedent in our circuit requires the district court to review the plaintiffs' municipal liability claims independently of the section 1983 claims against the individual ... officers." *Kneipp v. Tedder*, 95 F.3d 1199, 1213 (3d Cir. 1996); *see also Fagan v. City of Vineland*, 22 F.3d 1283, 1292 (3d Cir. 1994) ("A finding of municipal liability does not depend automatically or necessarily on the liability of a police officer.").

*Barna*, 877 F.3d at 145 n.6.

must decide whether the claims asserted by Plaintiffs were clearly established.  In determining whether a right is clearly established, the "ultimate question is whether the state of the law when the offense occurred gave the [ ] officials 'fair warning' that their conduct violated [plaintiffs' constitutional right[s]."  *Clark*, 55 F.4th at 181.  In this case, the conduct occurred during the 2021-2022 school year.

The court must first define the rights at the appropriate level of specificity "in light of the specific context of the case, not as a broad general proposition" based on the specific facts set forth in the Complaint.  *Id.* at 181-82.  The court in *Clark* reiterated:  "The dispositive question is whether the violative nature of the *particular* conduct is clearly established."  *Id.* at 182 (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)) (emphasis in original).  In *Clark*, the court explained that the right at issue was not "housing a mentally ill inmate in solitary confinement for long periods of time," but "keeping Clark in solitary confinement for seven months despite knowing of his serious mental illness."  *Id.*[22]

The Third Circuit Court of Appeals takes a "broad view of what constitutes an established right of which a reasonable person would have known."  *Id.* State officials can "receive fair warning that their conduct is violative even in 'novel factual circumstances' never previously addressed in caselaw."  *Id.*  In *Clark*, the court held that even if the inmate's initial placement in solitary confinement was justified, the allegations in the complaint gave rise to a reasonable inference that his continued isolation, despite the worsening of his mental health symptoms, resulted in the gratuitous infliction of suffering in violation of the Eighth Amendment.  *Id.* at 183.  The court of appeals concluded in *Clark* that the grant of qualified

---

[22] The court of appeals redefined the right as: "the right of a prisoner known to be seriously mentally ill to not be placed in solitary confinement for an extended period of time by prison officials who were aware of, but disregarded, the risk of lasting harm posed by such conditions."  *Id.* at 182.  In this case, as discussed above, the rights at issue must be defined to reflect the full scope of Williams' transgender agenda and the District's de facto policy, as alleged in the Complaint.

immunity was premature in light of the plausible constitutional violation alleged, while recognizing that the allegations may be disproved in discovery. *Id.* at 188.

In *Mack* (which reversed a grant of qualified immunity at the summary judgment stage), the court explained that the "clearly established" prong involves two steps: (1) defining the right allegedly violated at the appropriate level of specificity; and (2) considering whether that right was clearly established at the time of the alleged violation. *Mack*, 63 F.4th at 228. The court reiterated that in defining the right at issue, all reasonable inferences must be drawn in favor of the nonmovant. *Id.* In *Mack*, the court held that the proper definition, reflecting the context of the case viewed in the light most favorable to the inmate, was a violation of his right to "engage in prayer free of substantial, deliberate, repeated, and unjustified disruption by prison officials." *Id.* at 230.

The court in *Mack* explained that a right can be "clearly established" in two ways: (1) there is closely analogous caselaw establishing that a defendant's conduct was unlawful; or (2) the violation is obvious, i.e., the conduct is "so patently violative of the ... right that reasonable officials would know [it to be a violation] without guidance from a court." *Id.* at 232 (citation omitted). The court explained that broad principles of law may "suffice to give fair warning to a reasonable officer that the conduct at issue is illegal." *Id.* at 233 (citation omitted). The court observed: "A public official, after all, does not get the benefit of 'one liability-free violation' simply because the circumstance of his case is not identical to that of a prior case." *Id.* (citation omitted).

In *Mack*, the court concluded there was no closely analogous caselaw, but denied qualified immunity because the violation was obvious. The court commented: "it should be clear to any reasonable correctional officer that, in the absence of some legitimate penological

interest, he may not seek to prevent an inmate from praying in accordance with his faith." *Id.*
The court noted that the long-standing history and force of the general principles protecting the
practice of religion made the right at issue clearly established. *Id.* at 234. The court also noted
the defendants offered no justification for their actions and "their argument [was] based on the
erroneous presumption that their preferred framing of the facts and inferences must be accepted."
*Id.*[23]

The District's policies are relevant to whether the individual Defendants had fair warning
that their conduct violated the Constitution. *Hope*, 536 U.S. at 743-44. In *Clark*, the court
explained that allegations that the officials disregarded regulations "provided sufficient grounds
for the denial of qualified immunity at the complaint stage." *Clark*, 55 F.4th at 185. In this case,
the District had a published policy, District Policy I(F), which recognized broad parental notice
and opt out rights. The Complaint quotes portions of District Policy I(F):

> 37. District Policy I(F) is titled "Curriculum and Parental Rights." It
> expressly recognizes that parents "have a stake in the learning programs of the
> District." It expressly acknowledges that "parents and guardians of students have
> the right to access and review **information** concerning the instruction, assessment
> and academic progress of their children." (emphasis added). A stated "Objective"
> of the Policy is "to assure that parents and guardians of students can **access and
> review information** concerning the instruction, assessment, and academic
> progress of their children."

> 38. Policy I(F) further provides that the parental rights from the
> Pennsylvania School Code should be adhered to by, inter alia, providing "access
> to **information** about the curriculum, including academic standards to be
> achieved, **instructional materials**, and assessment techniques[,]" "a process for
> the review of **instructional materials**[,]" and opt out rights related to instruction
> that conflicts with First Amendment beliefs. (emphasis added). The Policy also
> guarantees that "Parents and guardians of students enrolled in the District have the
> **right to access and review instructional materials** for courses in which their
> children are enrolled and all assessment materials that have been administered to
> their children." (emphasis added).

---

[23] In this case, as in *Mack*, long-standing principles about the importance of the rights at issue are
implicated, Plaintiffs allege purposeful interference with their rights, Defendants did not try to justify
their actions and Defendants' argument is based on their preferred framing of the events.

Complaint ¶¶ 38-39 (emphasis in original).  Plaintiffs allege that Defendants adopted a de facto policy that violated District Policy I(F) by eliminating parental rights to notice and opt out of Williams' transgender agenda, even though Williams' agenda conflicted with the parents' fundamental rights and religious beliefs.  The District's practice of permitting opt out rights for other sensitive matters, such as the Holocaust, slavery, the 9/11 terrorist attacks, reproductive education, sex education, Black Lives Matter and Planned Parenthood, shows the District's awareness of protecting important parental rights.

In its initial motion to dismiss opinion, the court concluded that Supreme Court and Third Circuit Court of Appeals precedent put a reasonable defendant on notice that the conduct alleged in this case would – absent a compelling interest – plausibly infringe the Parents' Substantive and Procedural Due Process and Free Exercise rights and denied qualified immunity without prejudice with respect to those claims.  The parental rights at issue are fundamental, long-recognized and clearly established.  Defendants had fair warning from numerous Supreme Court and Third Circuit Court of Appeals decisions and District Policy I(F) and practices that their alleged conduct violated parental interests of the greatest importance, i.e., forming the identity of their children.  Bielewicz was on notice that Williams' transgender agenda violated parental rights throughout the school year and the remaining individual Defendants adopted a de facto policy that violated the District's own parental rights policy and practices.  *See Clark*, 55 F.4th at 185 (alleged disregard of policies is sufficient to deny qualified immunity at the motion to dismiss stage).  The Free Exercise claims are intertwined with the parental rights claims and were also clearly established such that qualified immunity should not be granted at this stage of the case.

The court noted in its initial motion to dismiss opinion that the familial privacy claim was

less clearly established (and to clarify that comment, the court recognized there were no decisions directly on point, *see Mack*, 63 F.4th at 234). There were, however, sufficient allegations to reasonably infer that Williams had fair warning that her alleged conduct (the intrusion of her transgender agenda into the values being taught by the family) violated familial privacy rights such that she is not entitled to qualified immunity at the motion to dismiss stage. *See, e.g., Gruenke*, 225 F.3d at 303-04, 307.   Williams' conduct in trying to keep her agenda a secret from the parents must be construed in the light most favorable to Plaintiffs to show she knew her conduct violated the familial privacy claims, i.e., she was trying to influence the child's gender identity and values contrary to those of the child's family.   In 1977, Supreme Court stated:  "It is through the family that we inculcate and pass down many of our most cherished values, moral and cultural." *Moore*, 431 U.S. at 503–04.  A reasonable teacher in Williams' position would have known that where no notice or opt out rights are given, the alleged conduct would violate the Parents' right to inculcate in their children their values about their own children's gender and identity. The court adheres to its conclusion.

With respect to the Equal Protection claim, this court recognized it was less clearly established because (as noted in the initial motion to dismiss opinion) the court did not find any published decisions recognizing an Equal Protection claim under similar facts.  That recognition, though, is not determinative. *See Mack*, 63 F.4th at 234; *Clark*, 55 F.4th at 182 (officials can receive fair warning that their conduct is violative even in novel factual circumstances). Accepting the facts pled as true, the Complaint states a plausible claim that the disparate treatment in the de facto policy is based on the Parents' fundamental rights and religious beliefs and the de facto policy was adopted in response to the Parents' assertion of their fundamental

rights. Steinhauer, Irvin and Wyland[24] are not entitled to qualified immunity at the motion to dismiss stage because there were plausible allegations they had fair warning that their alleged conduct (adoption of a de facto policy to eliminate parental notice and opt out rights for Williams' transgender agenda in violation of District Policy I(F) and the District's practices of providing notice and opt out rights for sensitive secular topics) would violate Equal Protection. *See Danielson v. Chester Twp.*, No. CIV.A. 13-5427, 2014 WL 3362435, at *10 (D.N.J. July 9, 2014) (denying qualified immunity because it was "clearly established on the date in question that an individual's rights under the Equal Protection clause are violated when 'he has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.'") (quoting *Hill*, 455 F.3d at 239).


**IV. <u>Conclusion</u>**

In summary, for the reasons set forth above, the court adheres to its conclusion that the Plaintiffs, based upon the factual allegations in the Complaint and the reasonable inferences drawn from them, assert plausible claims against all remaining Defendants that the Parents' fundamental constitutional rights pursuant to Substantive and Procedural Due Process and the First Amendment Free Exercise clause were violated. The court adheres to its conclusions that Plaintiffs pled plausible familial privacy claims against Williams and the District and plausible Equal Protection claims against Steinhauer, Irvin and Wyland and the District. The rights allegedly violated were clearly established such that the remaining individual Defendants are not entitled to qualified immunity at this stage of the case.

---

[24] The Equal Protection claims against Williams and Bielewicz were dismissed.

In accordance with the foregoing analysis, the motion for reconsideration pursuant to Rule 54(b) (ECF No. 41) and the motion to amend judgment pursuant to Rule 59(e) (ECF No. 44) will be DENIED.

An appropriate Order follows.

Dated: May 31, 2023                    BY THE COURT:

                                       s/ Joy Flowers Conti
                                       Joy Flowers Conti
                                       Senior United States District Judge