IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

CARMILLA TATEL, et al.,                    )
                                           )
            Plaintiffs,                    )
                                           )    Civil Action No.: 2:22-cv-837
      v.                                   )
                                           )    Judge Joy Flowers Conti
MT. LEBANON SCHOOL DISTRICT;               )
et al,                                     )
                                           )
            Defendants.                    )

**DEFENDANTS' MOTION *IN LIMINE* TO PRECLUDE
THE USE OF HEARSAY STATEMENTS AS EVIDENCE**

Defendants, Mt. Lebanon School District, Megan Williams, Dr. Timothy Steinhauer, Dr. Marybeth Irvin, Brett Bielewicz and Jacob W. Wyland, by their attorneys, Tucker Arensberg, P.C., submit the following Motion *In Limine* to preclude the attempted introduction of hearsay statements as evidence at the trial of this matter or in support of or in opposition to any pre-trial motion.

A.    Introduction

1.    Plaintiffs' claims in this action arise from Mt. Lebanon School District teacher Megan Williams having read two books addressing the subject of gender identity to her first-grade class while showing video illustrations of the books. The books, *When Aidan Became a Brother* and *Introducing Teddy* were age-appropriate, have received critical acclaim and promote tolerance and the acceptance of others' transgender identities. Plaintiffs each had a child who was assigned to and present within Williams' classroom for one or both of the readings. Plaintiffs assert that these classroom readings violated their Constitutional rights, premised upon an alleged interference with the parental right to control the upbringing and education of their children.

2.     To support and dramatize their claims of a constitutional violation, Plaintiffs further allege that Williams pursued her own transgender agenda outside the curriculum and targeted the children's own gender identity and their parents' beliefs about the gender identity of their own children, which include: (1) instructing the children in her first-grade class that their parents might be wrong about their children's gender; (2) telling a student that the child could dress like a different gender and be like the teacher's transgender child (who was also in first grade in a different school); (3) telling a student that she, the teacher, would never lie (implying that the parents may lie about their child's gender identity); and (4) instructing students not to tell their parents about the transgender discussions. Additionally, to disparage Williams and although not relevant to their claims, Plaintiffs allege that Williams intentionally refused to have her students recite the Pledge of Allegiance at the commencement of each school day. Through discovery, Defendants have learned that these allegations are premised upon what the children of Plaintiffs' and non-party parents purportedly told their parents had occurred or was said in Williams' classroom. The accusations are denied by the Defendant and were not corroborated by the deposition testimony of other School District employees that were present in Williams' classroom.

3.     Since these allegations derive from statements purportedly made to Plaintiffs and non-party witnesses by their children, Defendants informed counsel for Plaintiffs of the need to arrange for the depositions of those minor children. In reply, counsel for Plaintiffs advised that Plaintiffs desired that the children not be required to testify. Subsequent discussion resulted in the Stipulation and Order [ECF Document Nos. 57 and 58] by which the admissibility of testimony of Plaintiffs concerning statements

made to them by their children would be adjudicated prior to further proceedings in this action.

4.     Testimony by Plaintiffs and non-party parents as to what their children purportedly told them had occurred within Williams' classroom or allegedly was said by Williams to the students is, by definition, hearsay. Hearsay means a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) is offered as evidence to prove the truth of the matter asserted in the statement. Fed.R.Evid. 801(c). Evidence that is hearsay generally is not admissible. Fed.R.Evid. 802. "Hearsay is generally inadmissible because the statement is inherently untrustworthy: the declarant may not have been under oath at the time of the statement, his or her credibility cannot be evaluated at trial and he or she cannot be cross-examined." Ezeagwuna v. Ashcroft, 525 F.3d 396, 406 (3d Cir. 2003). As detailed below, the testimony sought to be used as evidence as designated by Plaintiffs [ECF Document No. 62] constitutes hearsay which should not be admissible as evidence at the trial of this matter or in support of or in opposition to any pre-trial motion. [1]

B.     Hearsay Testimony of Carmilla Tatel and Stacy Dunn - *Jacob's New Dress*

5.     In Paragraph 76 of the Complaint, Plaintiffs allege that:

Early in the fall, [Williams] played a video of "*Jacob's New Dress*" to the class. This video can be accessed on line . . . and has subtle undertones related to gender dysphoria, as well as messaging about bullying.

---

[1]     This Motion *In Limine* is limited to Defendants' objections to the admissibility of the hearsay testimony of Plaintiffs and certain non-party parents concerning statements made to them by their children as designated by Plaintiffs in ECF Document No. 62 for adjudication pursuant to the parties' stipulated Order at ECF Document No. 58. Defendants reserve their right to submit subsequent motions *in limine* prior to trial to preclude the introduction of such testimony on other grounds and to contest the admissibility of other testimony or evidence.

6.      Relative to this allegation, which Defendants deny, Plaintiffs propose to introduce the following testimony of Plaintiff, Carmilla Tatel:

Page 41, line 1 through page 42, line 14;

1 Q. **In your Complaint, Paragraph 76, you state**
2 **that early in the fall she, meaning Ms. Williams,**
3 **played a video of Jacob's New Dress to the class.**
4 The video can be assessed at -- there's a link. It
5 has subtle undertones related to gender dysphoria
6 as well as messaging about bullying.
7 A. [sic] **What's your basis for alleging that Ms.**
8 **Williams played this video in October?**
9 MR. BERARDINELLI: Object to the form.
10 A. **My daughter told me that the book was read**.
11 I had gotten in the habit -- after coming through
12 the COVID school year of kindergarten for her, I
13 got in the habit -- I pick her up every day from
14 school and I walk her home. I got into the habit
15 of asking, you know, how was your day, what did you
16 do at school, what book did you read, those sorts
17 of things. I can't say that I've done it every
18 day, but I would say most days and still to this
19 day. **She'd tell me the title and then I would ask,**
20 **you know, what was that about, kind of thing. If**
21 **it was something that didn't sound familiar to me,**
22 **I would go and look it up and see if I could find a**
23 **video.**
24 **I do remember because the message that**
25 **was given to the kids with this book was, there**
1 **are some boys who wear dresses and don't be mean to**
2 **them. And I'm absolutely fine with that.** I think
3 that's a great and age appropriate thing to tell my
4 kid. **Now, she also told the children -- I don't**
5 **know it was exactly this same day, but in the same**
6 **point in time, that her son wears dresses sometimes**
7 **and kids are mean to him on the playground and that**
8 **makes him feel sad.** I asked [J.T.] what she thought
9 about that. We had a discussion. You know, she
10 said, I don't think that's nice. I said, yeah,
11 that is not nice. You should not be mean to
12 anybody for what they wear or how their hair is.
13 It's just not nice. Different people like
14 different things.

**[Exhibit A - Deposition Testimony of Carmilla Tatel]**[2]

7.      Such testimony by Tatel that: (a) her daughter told her that Williams read the book *Jacob's New Dress*, and (b) Williams told the class that "her son wears dresses sometimes and kids are mean to him on the playground" constitutes hearsay and is inadmissible as evidence. Fed.R.Evid. 801 and 802.

8.      Relative to the allegation that Williams read or played a video of the book *Jacob's New Dress*, Plaintiffs also propose to introduce the following testimony of Plaintiff, Stacy Dunn:

Page 28, line 8 through page 29, line 4:

> 8 **Q. Who told you about Jacob's New Dress when**
> 9 **you learned about the other books in April**
> 10 **A. My son [TD].**
> 11 Q. So your son told you about Jacob's New
> 12 Dress in April?
> 13 A. When I took him out of the school, the
> 14 following day we had conversations sporadically
> 15 throughout the day, and every time I would think
> 16 about a scenario from earlier that year, **I would**
> 17 **bring it to his attention and ask him -- by this**
> 18 **time I had looked at YouTube, this book online. I**
> 19 **asked him, has this book ever been read to you**
> 20 **before, and he said yes.**
> 21 **Q. How did you go to search for Jacob's New**
> 22 **Dress?**
> 23 **A. Because my son told me the character. I**
> 24 **couldn't figure out which book it was, so I asked**
> 25 **him what were the characters in the book. When he**
> 1 **told me that, I did some Googling. When I came**
> 2 **across this book, I YouTubed it and showed him a**
> 3 **visual of it and I asked him, is this the book that**
> 4 **was read to you, and he confirmed it was.**

**[Exhibit B - Deposition Testimony of Stacy Dunn]**[3]

---

[2]      In the interests of confidentiality, references to Tatel's minor child have been changed to "J.T."
[3]      In the interests of confidentiality, references to Dunn's minor child have been changed to "T.D."

8.      Such testimony by Dunn that her son told her that Williams read the book

*Jacob's New Dress* constitutes hearsay and is inadmissible as evidence. Fed.R.Evid. 801

and 802.

9.      Plaintiffs also propose to introduce the following testimony of L.R., a parent

of another child that was assigned to Williams' classroom:

Page 94, lines 5 through 17:

> 5 **Q. Did you ever come to learn that**
> 6 **Mrs. Williams had read a book called, Jacob Wears a**
> 7 **New Dress?**
> 8 **A. Yes.**
> 9 **Q. Did that come from [your daughter]?**
> 10 **A. Yes.**
> 11 Q. Do you recall roughly when in time?
> 12 A. Sometime in the fall, I believe. It was, I
> 13 think, before Christmas, and **she said she read the**
> 14 **book. And [C.R.] told me -- I don't know if it was**
> 15 **at the same time or another time that Mrs. Williams**
> 16 **talked about how her son sometimes liked to wear**
> 17 **dresses to school.**

**[Exhibit C - Deposition Testimony of L.R.][4]**

Page 32, line 16 through page 33, line 20:

> 16 **Q. Okay. So if you go down maybe about a**
> 17 **third of the way, there's a text that you sent that**
> 18 **says, "[C.R.] told me in the fall that her son**
> 19 **dressed up as Elsa and the kids weren't very nice**
> 20 **to him." Do you see that?**
> 21 A. Yes.
> 22 Q. Just tell me, what's the -- did this
> 23 conversation between you and [C.R.] occur in the
> 24 fall?
> 25 A. Yes, it did.
> 1 Q. All right. Just tell me about that
> 2 conversation.
> 3 A. I can't remember exactly when this
> 4 occurred, but I believe -- I believe that it was
> 5 before Halloween -- prior to Halloween. And, I
> 6 don't know, [C.R.] is the type of kid that would
> 7 just relay different things, like, that the teacher

---

[4]      In the interests of confidentiality, references the minor child of L.R. and M.R. have been changed to "C.R."

8 said or other kids did in class, so she just
9 brought that up to me. **When I said, "Oh, did you**
10 **guys talk about anything important at school**
11 **today," she must have just, you know, told me that.**
12 Q. So am I correct in understanding that
13 [C.R.] told you that Mrs. Williams told her or the
14 class that her child had dressed as Elsa?
15 A. Correct.
16 **Q. Likewise, am I understanding correctly that**
17 **[C.R.] told you that Mrs. Williams said to her or**
18 **the class that kids didn't treat her child nicely?**
19 **A. Correct. That is what I recall [C.R.]**
20 **saying to me.**

**[Exhibit D - Deposition Testimony of L.R.]**

10.     Such testimony by L.R. that: (a) her daughter told her that Williams read the book *Jacob's New Dress*, (b) Williams told the class that "her son sometimes liked to wear dresses to school," and (c) Williams told students that children were not nice to her child when wearing an Elsa dress constitutes hearsay and is inadmissible as evidence. Fed.R.Evid. 801 and 802.

C.     Hearsay Testimony of Carmilla Tatel, L.R. and M.R. - Pledge of Allegiance

11.     In Paragraph 63 of the Complaint, Plaintiffs allege that:

On Veterans Day, the class said the Pledge but not before Defendant Williams sarcastically explained to her first graders, "can you believe I forgot to say the pledge for fifty-two straight days?" Williams' captive audience of six and seven-year-olds may not have understood the sarcasm and "nose-thumbing" embedded in this comment, but Plaintiffs did when their children reported it to them.

12.     Relative to this allegation, which Defendants deny, Plaintiffs propose to introduce the following testimony of Plaintiff, Carmilla Tatel:

Page 55, lines 1 through 17;

1 Q. Back to Exhibit 31, Paragraph 63, page 18:
2 On Veterans Day, the class said the Pledge, but not
3 before Defendant Williams sarcastically explained
4 to first graders, can you believe I forgot to say
5 the Pledge for 52 days?

6 Do you know the source of that
7 information?
8 A. **Both my daughter Julia and [L.R.'s] daughter**
9 **[C.R.] reported the same thing and they both did**
10 **this (indicating). They took their hands and they**
11 **put them on their hips and they nodded, can you**
12 **believe I forgot to say the Pledge of Allegiance**
13 **for the last 52 days?**
14 My daughter at the time was six. I
15 don't put my hands on my hips and talk like that.
16 I can only assume she was mimicking what was done
17 in front of her.

**[Exhibit E - Deposition Testimony of Carmilla Tatel]**

13.    Plaintiffs also propose to introduce the following testimony of non-party

witnesses L.R. and M.R. concerning what their daughter purportedly told them:

Page 79, line 1 through page 81, line 12;

1 Q. Second paragraph talks about the "Pledge of
2 Allegiance," and you're recounting that you had
3 conversations with your children --
4 A. Yes.
5 Q. -- around 9/11. I'm assuming that's mid
6 September of 2021.
7 A. Around September 11th.
8 Q. Tell me about what you recall from that
9 conversation with your children.
10 A. They must have been talking about September
11 11th at school, and I said, "Oh, I wonder if
12 they'll do anything for September 11th." We were
13 talking a little bit about it. Not in detail. And
14 I said, "Do you guys do the 'Pledge of Allegiance'
15 at school on the loudspeaker," because when I was
16 growing up, we did it over the loudspeaker. And
17 they said they didn't.
18 I said, "Well, do you do it in your
19 classroom?" And my son, [C.R.], said that he did it
20 in his class every day. **Then [C.R.] said something**
21 **to the effect that they don't say it in her class,**
22 **but she can hear other classes saying it, like, I'm**
23 **assuming, through her door or if she is in the**
24 **hall. I didn't ask for clarification.** So I just
25 thought that was interesting, because I think it's
1 important to say the "Pledge of Allegiance."
2 So then one day she told me -- I said,
3 "How was your day?" She said she had a substitute
4 teacher. **So then I said, "Oh, really? Did your**

5 **substitute teacher do the 'Pledge of Allegiance,'"**
6 **and she said that they did do the "Pledge of**
7 **Allegiance" when the substitute was teaching in the**
8 **class.**
9 Q. So I understand correctly, around September
10 11th you asked, "Does your class say the 'Pledge of
11 Allegiance'"?
12 A. Yeah. After they were talking about, like,
13 you know, patriotism and stuff like that.
14 Q. Did your -- I'm sorry, it's [C.R.]; right?
15 A. Yes.
16 MR. BERARDINELLI: A lot of children.
17 Q. Did [C.R.] tell you at some point that
18 Mrs. Williams began saying the "Pledge of
19 Allegiance"?
20 A. Yes. Actually, I had said to Meng [Tatel] at some
21 point, "Do you know if [J.T.] ever mentions that
22 they do the 'Pledge of Allegiance,' because I'm
23 surprised they're not doing this. I thought all
24 schools had to do the 'Pledge of Allegiance.'" So
25 then she said she was going to e-mail Mr. Bielewicz
1 about the "Pledge of Allegiance" or contact him, I
2 don't know if -- you know. So I knew that she had
3 contacted him around Veterans Day.
4 So then since I knew that she had
5 contacted him, then I asked [C.R.], "Did you guys
6 start doing the 'Pledge of Allegiance'?" **She said,**
7 **"Yeah, we did start doing the 'Pledge of**
8 **Allegiance.'" I said, "Oh, really? Did your**
9 **teacher say anything about the 'Pledge of**
10 **Allegiance'?" She said -- [C.R.] said to me**
11 **Mrs. Williams said, "Can you believe I forgot to**
12 **say the 'Pledge of Allegiance' for fifty-two days?"**
13 I said, "Oh."

## [Exhibit F - Deposition Testimony of L.R.]

Page 29, line 18 through page 30, line 15:

18 Q. Was the Pledge of Allegiance a topic of
19 discussion in your meeting with Mr. Bielewicz?
20 A. I think it came up.
21 Q. Can you tell me about that.
22 A. I think **my wife said that -- she indicated**
23 **that [C.R.] told us that the Pledge of Allegiance**
24 **was not being said in the class even though our**
25 **daughter could hear the Pledge being said in other**
1 **classrooms nearby.** So we were concerned about
2 that. I think at the meeting with Mr. Bielewicz
3 she recounted this to him and she recounted what
4 **[C.R.] told us that when the topic was addressed**

9

5 **with Mrs. Williams; that she came into the**
6 **classroom and told the class something like, can**
7 **you believe I forgot to say the Pledge of**
8 **Allegiance 52 days in a row**, or something to that
9 effect. **My wife thought that that was not**
10 **appropriate because kids that age typically don't**
11 **understand sarcasm. Mrs. Williams was trying to be**
12 **sarcastic.** I don't recall -- I think Mr. Bielewicz
13 said something to the effect of that was addressed
14 right away when he learned that it wasn't being
15 said in the classroom.

**[Exhibit G - Deposition Testimony of M.R.]**

14.     Such testimony by Tatel, L.R. and M.R. that: (a) Williams made the statement "can you believe I forgot to say the Pledge of Allegiance for 52 days in a row," (b) Williams made such a statement with her hands placed on her hips, and (c) Williams made such a statement in a sarcastic manner constitutes hearsay and is inadmissible as evidence. Fed.R.Evid. 801 and 802. [5]

D.     Testimony of Stacy Dunn - Alleged Grooming

15.     In Paragraphs 78 and 79 of the Complaint, Plaintiffs allege that:

78. The child of one of the Plaintiffs explained to his mother that Williams had told him, "I can wear a dress and have hair like my mom." When Plaintiff raised this with Williams at a parent-teacher conference, Williams deflected, contending that it must have been a misunderstanding and indicating that maybe it was confusion about Halloween. Plaintiff refuted this assertion, letting Williams know that what her son had told her was "very clear" and expressing her displeasure with what Williams had said to her son.

79. Despite knowing this Plaintiff's objections, or upon information and belief because of them, Williams appears to have targeted this child for repeated approaches about gender dysphoria. Although Plaintiff did not discover Williams' invasion of her parental and family rights until the spring, throughout the school year, Williams had private conversations with this young boy, discussing with him the similarities between the boy and her transgender child again suggesting that the boy might want to wear a dress, at other times commenting to him how the boy and her transgender child

---

[5]     Defendants reserve their right to submit subsequent motions *in limine* prior to trial to preclude the introduction of testimony concerning the recitation of the Pledge of Allegiance in Williams' classroom as irrelevant to Plaintiffs' putative claims.

had similar interest[s] and the same favorite color, and telling the child that
he could be like her transgender child. . . .

16.    Relative to these allegations, which Defendants deny, Plaintiffs propose to

introduce the following testimony of Plaintiff, Stacy Dunn:

Page 10, line 18 through page 11, line 19:

18 Q. What did you guys discuss in September?
19 A. Well, it was during a parent/teacher
20 conference. Initially, we shared different
21 information about his performance and things that
22 he needed to work in. At the end of the meeting
23 she asked me if I had any questions. **I mentioned**
24 **to her about my son, explaining that she told him**
25 **that he can wear dresses to school and he can wear**
1 **fairy costumes, and he can have hair like his mom,**
2 **just making a lot of similes with female**
3 **characteristics**, and he was unsettled about that.
4 So I brought that to her attention during our phone
5 interview -- parent/teacher conference. Nor did
6 she deny it. She just stated that they were having
7 a class discussion and maybe he heard wrong. The
8 next time she brings up the conversation she will
9 make sure it's clear amongst the classroom. **I**
10 **assured her that [TD] was very adamant that he heard**
11 **this information from her.**
12 Q. And this took place in September of 2021?
13 A. Yes. Yes. This was our first
14 parent/teacher conference where the conversation
15 was had about it.
16 Q. Did you inform her that you wanted these
17 conversations to stop?
18 A. I let her know I didn't appreciate the
19 conversations that were being held.

**[Exhibit H - Deposition Testimony of Stacy Dunn]**

Page 11, line 20 through page 12, line 6:

20 Q. What specific -- other than generally
21 discussing that he could wear a dress or that he
22 could have his hair -- long hair like his mom, what
23 specifically did she say to him to the best that
24 you can recall?
25 A. **That it's okay for him to wear a fairy**
1 **costume, to wear dresses and to wear his hair like**
2 **his mom.** Apparently, she was making the
3 correlation between a child named Oliver at the

4 time, because that's who he was referencing. I
5 didn't know who it was at the time. I just assumed
6 it was a kid in his classroom.

## [Exhibit I - Deposition Testimony of Stacy Dunn]

Page 12, line 22 through page 13, line 15:

22 Q. **How did you learn about these conversations**
23 **prior to the parent/teacher conference?**
24 **A. Through my son, [TD].**
25 Q. When did he tell you?
1 A. As far as dates, I don't know. But it was
2 a conversation that was had around Halloween,
3 because I was the homeroom coordinator for the PTA
4 and they were having a Halloween party there. So
5 he was telling me how he wanted to wear his SWAT
6 uniform. I was, like, that's fine; you can wear
7 your SWAT uniform. That's what we bought it for.
8 **Ms. Williams told him that he could wear other**
9 **costumes if he would like. It would be all right**
10 **to wear a fairy costume or other costumes that he**
11 **wasn't wanting to wear.** He was very upset about
12 the fact that the conversation was even had. I
13 said, that's fine; you can wear the costume that
14 you wore. So this conversation happened before the
15 party happened.

## [Exhibit J - Deposition Testimony of Stacy Dunn]

Page 32, line 23 through page 33, line 23:

23 **Q. It basically says that you were taken aback**
24 **to hear that your child [TD] has been included in**
25 **intimate conversations about transgender by his**
1 **homeroom teacher.**
2 **What intimate conversations are you**
3 **referring to there?**
4 **A. These were conversations between Mrs.**
5 **Williams and [TD] regarding making similes between**
6 **Oliver and my son, the whole ordeal about what's**
7 **appropriate for boys and what's appropriate for**
8 **girls. There was a whole gamut of conversations**
9 **that were had together.**
10 **Q. Again, what were the details of those**
11 **conversations that she had with him?**
12 **A. Well, one, for example, she was making a**
13 **correlation about Oliver also liking the Incredible**
14 **Hulk. [TD] likes the Incredible Hulk, too, so it**
15 **wouldn't be extraordinary for [TD] to like some of**

16 **the same things that Oliver likes; those things**
17 **being dresses, dressing up as a fairy for Halloween**
18 **and things that would be characterized for a**
19 **female.**
20 **Q. Do you recall when that conversation was?**
21 **A. I do not. [TD] just let me know that that**
22 **was one of the conversations that was shared**
23 **between him and her.**

## [Exhibit K - Deposition Testimony of Stacy Dunn]

Page 69, line 12 through page 71, line 6:

12 We'll scroll up just a little bit to see
13 where we are. This is under the heading 4A:
14 Williams' actions throughout the school year and
15 her inappropriate conduct toward a particular
16 student -- we've hit on some of this already, like
17 with Paragraph 78: **The child of one of the**
18 **plaintiffs explained to his mother that Williams**
19 **had told him I can wear a dress and have hair like**
20 **my mom.**
21 **That's referring to you and [TD]; correct?**
22 **A. Yes.**
23 Q. With Paragraph 79 -- still on paragraph 78,
24 September 28 is the parent/teacher conference when
25 you raised these issues with Williams?
1 A. Yes.
2 Q. Then to Paragraph 79, you allege that
3 Williams had private conversations this young boy
4 discussing with him the similarities between the
5 boy and her transgender child, again, suggesting
6 that the boy might want to wear a dress and
7 commenting on how the boy and her transgender child
8 had similar interests and the same favorite color.
9 What favorite color do you they share?
10 A. I don't remember the exact color. **She just**
11 **made a lot of similes as far as things that Oliver**
12 **liked that my son could also like.**
13 **Q. What is [TD]'s favorite right color?**
14 **A. Blue and gray.**
15 **Q. As far as the other similar interests, do**
16 **you have any other examples?**
17 **A. One example about [TD] liking the Incredible**
18 **Hulk and Oliver also liking action figures -- not**
19 **the Incredible Hulk exactly, but other action**
20 **figures.**
21 **Q. What exactly did Williams say that supports**
22 **your allegation that she suggested that [TD] might**
23 **want to wear a dress?**
24 **A. She mentioned to [TD] during the Halloween**

25 **conversation what her child was wearing, and when**
1 **it became prevalent that [TD] had an idea of him**
2 **being a boy, I'm pretty sure he questioned why is**
3 **he wearing this versus this or whatever costume he**
4 **was wearing. [TD] felt it wasn't made for a boy.**
5 **That's when she tried to clarify anybody could wear**
6 **whatever they want to wear.**

**[Exhibit L - Deposition Testimony of Stacy Dunn]**

17.     Further, Plaintiffs propose to introduce into evidence a handwritten

statement prepared by Dunn that include the following statements:

> Had a brief discussion about my concerns about a comment suggested
> towards [TD] regarding wearing a dress for Halloween. Williams stated that
> the class was sharing costume ideas and said he must have gotten
> information mixed up. I reassured Williams that [TD] was very detailed about
> hearing it from the teacher and was angry about it.

**[Exhibit M - Handwritten Statement of Stacy Dunn]**

18.     Such testimony by Dunn that: (a) Williams told her son that he can wear

dresses to school; (b) Williams told her son that he can wear fairy costumes; (c) Williams

told her son he could have hair like his mom and (d) Williams discussed with Dunn's son

the similarities or similar interests between him and Williams' child constitutes hearsay

and is inadmissible as evidence. Likewise, Dunn's handwritten statement that Williams

told her son that he could wear a dress for Halloween constitutes hearsay and is

inadmissible as evidence. Fed.R.Evid. 801 and 802.

D.      Testimony of Stacy Dunn - Allegation of Secretive Conversations

19.     In Paragraph 79 of the Complaint, Plaintiffs allege that:

> 79. . . . Williams explained to this young boy [TD] that "doctors can get it
> wrong sometimes." In the course of these private discussions, Williams also
> told this young boy that "she would never lie to him" and, if the subjects they
> were discussing came up at home, to say that "I heard it from a little birdie."
> In other words, upon information and belief, while having private
> discussions with this young boy about topics related to gender dysphoria,
> she told the child not to tell his parents about the discussions.

20.     Relative to these allegations, which Defendants deny, Plaintiffs propose to

introduce the following testimony of Plaintiff, Stacy Dunn:

Page 14, line 7 through page 16, line 19:

7 Q. After that conversation you had with Ms.
8 Williams at the parent/teacher conference, what
9 other action did she take against you -- take with
10 respect to your son regarding his dress or anything
11 else similar to that?
12 MR. BERARDINELLI: Object to the form.
13 You can answer.
14 A. **He also mentioned that they had**
15 **conversations about sometimes doctors and parents**
16 **get it wrong; when children are born, parents get**
17 **it wrong. They're not right. They're not the ones**
18 **who decide. The doctors and parents sometimes get**
19 **it wrong.** That didn't sit right with [TD]. He was
20 super confused and upset and questioning me a lot
21 about the conversation. Initially, I didn't know
22 where this topic was coming from until we engaged
23 in further details about the situation. I later
24 found out that this information was also coming
25 from her.
1 Q. Is that in relation to her reading the two
2 books on March 31, 2022?
3 A. No. This was way prior to that.
4 Q. Do you know when it happened?
5 A. The first conversation we had, "we" being
6 me and [TD], it was around Christmastime. I know it
7 was Christmastime because I remember a Christmas
8 tree being up in our apartment. We were watching
9 the series called The Good Doctor. I don't know if
10 you're familiar with that series. But it's a TV
11 show about a savant doctor who has really
12 heightened skills when it comes to his practice.
13 He doesn't have the best bedside manner, but he's a
14 really good doctor. It's a show that we watch a
15 lot as a family. This particular episode that we
16 were watching had nothing to do with the question
17 that he asked. It was a lady dying from cancer.
18 **So during a commercial break, he goes,**
19 **mom, how do doctors know if you're a boy or a girl?**
20 **I basically let him know, babe, you know the**
21 **difference; we've had conversations about this. He**
22 **keeps reiterating, well, how do they know? I said,**
23 **they go to school; they have many years of school;**
24 **they know; it's not a very hard thing to decipher.**

25 **So right then I could tell he was**
1 **getting this question from somewhere else. So**
2 **later on that day I brought up the conversation.**
3 **Probably around dinnertime, I asked him, why were**
4 **you asking that? This is something that you're**
5 **aware about. I could tell he was hesitant to tell**
6 **he. Like, he didn't want to tell me as if he was**
7 **going to get in trouble. I had to reassure him**
8 **that it's okay; you can talk to me about anything.**
9 **He said, well, I don't want her to get into**
10 **trouble, because teachers never lie. I said, okay,**
11 **well, this is where it's coming from, the teacher.**
12 **I said, did Ms. Williams tell you this? He was,**
13 **like, yes; she would never lie to me; sometimes**
14 **doctors get it wrong and parents get it wrong.** I
15 proceeded to let them him know, she may not lie
16 about certain things, but she lied to you about
17 this; parents do not get it wrong and doctors do
18 not get it wrong; you know who you are; you know
19 what you are and no one else can tell you otherwise.

## [Exhibit N - Deposition Testimony of Stacy Dunn]

Page 71, line 7 through page 72, line 13:

7 Q. **What's your basis for alleging that**
8 **Williams told this young boy [TD] that she would**
9 **never lie to him?**
10 **A. Because she did just that.**
11 **Q. She stated those exact words to him?**
12 **A. Yes.**
13 **Q. What about if the subject they were**
14 **discussing came up at home to say that I heard it**
15 **from a little birdie?**
16 A. What about it?
17 Q. When did Williams allegedly say this to [TD]?
18 A. I couldn't tell you the timeline. **I just**
19 **know in the beginning phases when I was asking him**
20 **about who are you hearing this information from, he**
21 **would say, a little birdie told me. At the time I**
22 **just took it as one of the kids told him that,**
23 **because they have a kid in the classroom named**
24 **Birdie.**
25 **Q. So he told you, I heard it from a little**
1 **birdie?**
2 **A. Yes. The reason why I made the correlation**
3 **of the teacher saying it, at one of the events --**
4 **holiday events that I was attending in the**
5 **classroom, the class was kind of rowdy and she was**
6 **trying to getting everybody to calm down and she**
7 **made the comment, okay, little birdies, calm down.**

8 **So it kind of triggered me when I heard him say**
9 **that.**
10 **Q. So it's an assumption you made that she**
11 **told him that?**
12 **A. You could say that because he didn't say a**
13 **name. He just said a little birdie.**

**[Exhibit O - Deposition Testimony of Stacy Dunn]**

21.     Such testimony by Dunn that: (a) Williams told Dunn's son that doctors and

parents sometime get a child's gender wrong; (b) Williams told Dunn's son "she would

never lie to him;" (c) Williams instructed Dunn's son that, if questioned by his parents, to

say that "I heard it from a little birdie;" and (d) any inference from statements made to

Dunn by her child that Williams told Dunn's son not to tell his parents about discussions

constitutes hearsay and is inadmissible as evidence. Fed.R.Evid. 801 and 802.

E.     Testimony of Stacy Dunn and Gretchen Melton - Allegations of Classroom

Conversations

22.     In Paragraph 92 of the Complaint, Plaintiffs allege that:

One child who was confused by the books/videos politely approached
Williams privately in class and, showing the child's confusion, asked her if
she (Williams) had ever changed her own child's diaper because that would,
to this child's understanding, solve the issue of whether the child was a boy
or a girl.

23.     Relative to this allegation, which Defendants deny, Plaintiffs propose to

introduce the following testimony of Plaintiff, Stacy Dunn:

Page 50, line 19 through page 51, line 18:

19 Q. Briefly going back to March 31, to the best
20 of your knowledge, did [TD] tell you how he reacted
21 after the stories being read to him?
22 A. He did, yes.
23 Q. Did he have an explanation to Ms. Williams
24 about how she could tell whether her baby was a boy
25 or a girl?
1 A. Yes.
2 Q. What did he say?

3 A. **He mentioned after -- I can't remember if**
4 **it was a video being read or the book, he walked up**
5 **to her desk and ask her in private if she had ever**
6 **changed his diapers before.**
7 Do you want me to say verbatim what he
8 said?
9 Q. Yes, say it verbatim.
10 A. **So he walked up to the teacher's desk and**
11 **asked her if she's ever changed Oliver's diaper.**
12 **She responded with yes. He said, well, how come**
13 **you didn't know he was a boy then because you would**
14 **have known he had balls if you changed his diaper.**
15 **He said her response was -- she seemed unhappy**
16 **about the question and told him that they weren't**
17 **going to discuss it and that it was inappropriate**
18 **and asked him to go sit back down at his desk.**

**[Exhibit P - Deposition Testimony of Stacy Dunn]**

24.     Such testimony by Dunn regarding an alleged private conversation between

Williams and Dunn's son concerning changing a baby's diaper following the readings of

the books *When Aidan Became a Brother* and *Introducing Teddy* constitutes hearsay and

is inadmissible as evidence. Fed.R.Evid. 801 and 802.

25.     Additionally, Plaintiffs propose to introduce the following testimony of

Plaintiff, Stacy Dunn, concerning a classroom conversation:

Page 74, line 19 through page 75, line 11:

19 Q. You talked about what [TD] told you he said
20 to Mrs. Williams about the diaper. Did he also
21 discuss with you anything else he might have said
22 in response to what was taught in the classroom on
23 March 31?
24 A. Yes. He mentioned that there was an
25 outburst in class, and I was probing him about what
1 happened. He thought he was going to be in trouble
2 because he made an outburst. He knows that's
3 typically not tolerated. **He mentioned that she**
4 **said a comment about, again, the doctors being**
5 **wrong and the parents getting it wrong when they**
6 **decide what your gender is going to be. He yelled**
7 **out, I'm a boy; that's what I am, or something of**
8 **that nature. He made an exclamatory remark very**
9 **loud and was told to sit down in the classroom.**
10 Yeah, he thought he was in trouble for that, and I

11 reassured him he wasn't, at least he wasn't with me.

**[Exhibit Q - Deposition Testimony of Stacy Dunn]**

26.     Such testimony by Dunn recounting what her son told her occurred in Williams' classroom following the readings of the books *When Aidan Became a Brother* and *Introducing Teddy* constitutes hearsay and is inadmissible as evidence. Fed.R.Evid. 801 and 802.

27.     Also, Plaintiffs propose to introduce the following testimony of Plaintiff, Gretchen Melton, concerning another classroom conversation:

Page 98, line 25 through page 99, line 20.

> 25 Q. The first one where you text, this is from
> 1 April 1 of 2022, I'm going to have some questions
> 2 for [J.M.] today for sure, did you speak with [JM]
> 3 about the instruction after the fact?
> 4 A. I already -- yeah, I told you that before.
> 5 I asked her and she said she had come for the last
> 6 part of the discussion of the book. She wasn't
> 7 sure what it was about because she missed some of
> 8 it. At that point, I did not press it further.
> 9 Q. Did you ask her if Ms. Williams had been
> 10 pushing this for the past three weeks or anything
> 11 along those lines?
> 12 MR. BERARDINELLI: Object to the form.
> 13 **A. I asked her if she had talked about -- I**
> 14 **asked her if she had talked about [Williams' child], if she had**
> 15 **discussed [Williams' child] with their class.**
> 16 Q. What did she say?
> 17 **A. She said, yeah, she's bringing [her child] to**
> 18 **Bring Your Kid To Work Day, so she's been telling**
> 19 **us about him. That's what she said, he's coming to**
> 20 **-- [Williams' child] is coming to Bring Your Kid To Work Day.**

**[Exhibit R - Deposition Testimony of Gretchen Melton][6]**

---

[6]     In the interests of confidentiality, references Melton's minor child have been changed to "J.M."

28.     Such testimony by Melton recounting what her daughter told her was said by Williams regarding "Bring Your Kid to Work Day" constitutes hearsay and is inadmissible as evidence. Fed.R.Evid. 801 and 802.

29.     Additionally, Plaintiffs propose to introduce the following testimony of non-party witness L.R.:

Page 47, lines 4 through 9:

2 He said something like "For as long as
3 I've been here," indicating, probably, I think, at
4 least the last three years. I said to him, "That's
5 really interesting," something like that, "because
6 that's how Mrs. Williams brought this topic" --
7 "**that's how my daughter said Mrs. Williams brought**
8 **this topic up to the class for bringing her child**
9 **to work for Take Your Child to Work Day.** So she
10 used that as an introduction to talk about it with
11 the children, but you're saying that teachers
12 haven't been allowed to bring their children to
13 work."

Page 47, lines 19 through 25;

19 Q. What prompted you to ask that question was
20 what [C.R.] told you?
21 A. **What she said in the car, that she was**
22 **bringing her child to work -- her daughter to work**
23 **for Take Your Child to Work Day when she told me**
24 **about these books being read.** That's what prompted
25 me to ask the question.

**[Exhibit S - Deposition Testimony of L.R.]**

F.     Testimony of Non-Party Witness L.R.- "Parents and Doctors Can be Wrong"

30.     Plaintiffs propose to introduce the following testimony of non-party witness L.R.:

Page 21, line 12 through page 22, line 9:

12 Q. How did you become aware that the books
13 Introducing Teddy and When Aidan Became a Brother
14 were read in Mrs. Williams' class on March 31st?
15 A. Well, initially, when I picked my daughter

20

16 up from school -- I happened to be picking her up
17 that day. I was in a rush to get my other son from
18 daycare. He is not yet school-age. And she said,
19 "Mom, I need to tell you something," and I said,
20 "[C.R.], tell me in a minute. We have to go get
21 Jack." Then she said, "No, Mom, I really need to
22 tell you something." So I turned around and said,
23 "Look, what do you need?" I said, "What's wrong?"
24 **Then she said, "Mrs. Williams is**
25 **bringing her daughter to school for Take a Child to**
1 **Work Day."** And I said, "Daughter? I didn't
2 realize she had a daughter. I thought she had two
3 sons." **Then she told me, "Mrs. Williams said that**
4 **sometimes when parents bring their kids home from**
5 **the hospital, they think they know they have a boy**
6 **or girl, but they're wrong. Parents and doctors**
7 **can be wrong and they really have the other gender.**
8 **Her son now goes by the name [O.W.], and she uses**
9 **she/her pronouns."**

## [Exhibit T - Deposition Testimony of L.R.]

Page 29, lines 1 through 20:

1 Q. Okay. I want to make sure that we haven't
2 missed anything. Is there anything else that
3 Claire told you about what occurred in
4 Mrs. Williams' classroom on March 31st that you
5 haven't related to me?
6 A. Let me think. **I think that she said -- no,**
7 **just that her teacher told her that parents and**
8 **doctors can be wrong. They might think that they**
9 **have one gender of a child, but they really have**
10 **another.** She might have said something like,
11 **"Parents guess what their children are when they**
12 **bring them home from the hospital," something to**
13 **that extent. Parents guessing what the children**
14 **are.**
15 Then I said, like, "How did kids in your
16 class react to this?" She said, "Kids asked
17 questions." Then I think that she said that they
18 got an extra recess that day somewhere subsequent
19 to reading the books. That's all that I can
20 remember.

## [Exhibit U - Deposition Testimony of L.R.]

31.     Such testimony by L.R. that Williams stated to students that "parents and doctors can be wrong" and that parents guess a child's gender constitutes hearsay and is inadmissible as evidence. Fed.R.Evid. 801 and 802.

32.     Plaintiffs also propose to introduce the following testimony of non-party witness M.R., the spouse of C.R.:

Page 13, line 18 through page 14, line 5;

18 **Q. So tell me what your wife told you [C.R.]**
19 **said to her.**
20 A. She said she picked her up from school and
21 that [C.R.] prompted her by saying -- tilting her
22 head and saying, mom -- that she was confused about
23 something that happened in class that day and that
24 Mrs. Williams said she would be bringing her
25 daughter to school for Take Your Child To Work Day.
1 **Then I think my wife said something to the effect**
2 **that she didn't know she had a daughter, then that**
3 **led into, I think, a discussion about the books and**
4 **that sometimes parents make mistakes when they**
5 **bring kids home from the hospital.**

Page 14, line 17 through page 15, line 9:

17 **Q. You recounted for me what your wife -- her**
18 **recounting of the conversation in the car with**
19 **[C.R.]. Did she tell you anything else in terms of**
20 **how she responded or what discussion she had with**
21 **[C.R.]?**
22 A. I remember her saying that she recalled
23 that [C.R.] was walking up our steps to the second
24 floor of our house, I think, and that one of them
1 them, this is [C.R.] and our son [---], and [C.R.]
2 said to [son], [son], should the bear wear -- would
3 the bear wear a bow tie on her head or neck; do you
4 think the bear is a boy or a girl, and that made my
5 wife anxious. Then also I think my wife said that
6 -- she told me that at times she would be out with
7 [C.R.], say, at the store and [C.R.] would ask her
8 if somebody was a boy or a girl. That was
9 troubling to my wife as well.

**[Exhibit V - Deposition Testimony of M.R.]**

31.     Such testimony by M.R. that his spouse told him their daughter told her that Williams stated to students that "parents and doctors can be wrong" constitutes hearsay and is inadmissible as evidence. Fed.R.Evid. 801 and 802.

WHEREFORE, Defendants, Mt. Lebanon School District, Megan Williams, Dr. Timothy Steinhauer, Dr. Marybeth Irvin, Brett Bielewicz and Jacob W. Wyland, by their attorneys, Tucker Arensberg, P.C., request an Order precluding Plaintiffs from introducing the foregoing hearsay statements as evidence at the trial of this matter or in support of or in opposition to any pre-trial motion.

Respectfully submitted,

TUCKER ARENSBERG, P.C.

*/s/ Matthew M. Hoffman*
Matthew M. Hoffman
Pa. I.D. #43949
mhoffman@tuckerlaw.com

Christopher L. Voltz
PA I.D. #200704
cvoltz@tuckerlaw.com

Thomas P. Peterson
Pa. I.D. #32624
tpeterson@tuckerlaw.com

1500 One PPG Place
Pittsburgh, PA  15222
(412) 566-1212

Dated: August 18, 2023                    Counsel for Defendants

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 18th day of August 2023, I have filed electronically the foregoing Defendants' Motion in Limine to Preclude the Use of Hearsay Statements as Evidence with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification to the following attorney(s) of record addressed as follows:

> David J. Berardinelli, Esquire
> DEFOREST KOSCELNIK & BERARDINELLI
> 436 Seventh Ave., 30th Fl.
> Pittsburgh, PA  15219
> Phone:  412-227-3100
> Fax:    412-227-3130
> Email:  berardinelli@deforestlawfirm.com

Respectfully submitted,

*/s/ Matthew M. Hoffman*
Matthew M. Hoffman
Pa.I.D. # 43949
mhoffman@tuckerlaw.com

1500 One PPG Place
Pittsburgh, PA  15222
(412) 566-1212

Attorneys for Defendants