**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CARMILLA TATEL, individually and as parent and natural guardian of her children; STACY DUNN, individually and as parent and natural guardian of her children; and GRETCHEN MELTON, individually and as parent and natural guardian of her children, | ) ) ) ) ) ) | |
| | ) | Civil Docket No.: 2:22-cv-837 |
| Plaintiffs, | ) ) | |
| | ) | **JURY TRIAL DEMANDED** |
| v. | ) ) | |
| MT. LEBANON SCHOOL DISTRICT; MEGAN WILLIAMS; DR. TIMOTHY STEINHAUER; DR. MARYBETH D. IRVIN; BRETT BIELEWICZ AND JACOB W. WYLAND, | ) ) ) ) ) ) | |
| Defendants. | ) | |

**PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

David J. Berardinelli, PA I.D. No. 79204
DEFOREST KOSCELNIK & BERARDINELLI
436 Seventh Ave., 30th Fl.
Pittsburgh, PA 15219
Phone: 412-227-3100
Email: berardinelli@deforestlawfirm.com

*Counsel for Plaintiffs*

## <u>TABLE OF CONTENTS</u>

I. INTRODUCTION ................................................................................................ 1

II. UNDISPUTED RECORD EVIDENCE.............................................................. 4

A.  Plaintiffs' Parental, Moral and Religious Beliefs....................................... 4

B.  Instruction on Gender Identity is Not Part of the Published Mt. Lebanon
    School District Elementary Curriculum...................................................... 5

C.  For Certain Subjects or Topics, But Not Gender Identity, the District
    Provides Advanced Written Notice and the Ability for Parents to Opt
    Their Children Out ...................................................................................... 6
    1.  Advance Notice and Opt Outs on a Wide Variety of Topics................. 6
    2.  The District Does Not Provide and Has Not Provided Specific Advance Notice
        and Opt Out Rights as to Gender Identity Instruction ......................... 6

D.  Mt. Lebanon's Insufficient Notice of Opt Out Rights Found in District
    Policy I(F) .................................................................................................. 7

E.  The District's New Written Procedure for Addressing Opt Out Requests
    Related to  Gender Identity Instruction....................................................... 8

F.  Mrs. Williams' Background and Her Own Child's Gender Transition in
    2021-2022 ................................................................................................... 9

G.  Mrs. Williams' Preparation for and Instruction on March 31, 2022 and
    Record Evidence Related to Certain Material Facts Before March 30, 2022...................... 9
    1.  The Notice of Parental Objections to Gender Identity Instruction and the
        Absence of Any Transgender Students at Jefferson Elementary ....................... 9
    2.  Planning for and Williams' Instruction about Gender Identity on March 31, 2022.......... 10
        a.  When Aidan Became A Brother and the Class Discussion ......................... 11
        b.  Introducing Teddy and the Class Discussion ................................. 12
        c.  Further Evidence of the Children's Confusion ........................... 12

H.  Approval of Williams' Instruction by Bielewicz, Irvin, Steinhauer, and Wyland ............... 12
    1.  Wyland's Approval of Williams' Instruction ..................................... 13
    2.  Steinhauer's Approval of Williams' Instruction................................. 13
    3.  Irvin's Approval of Williams' Instruction ........................................ 14
    4.  Bielewicz's Approval of Williams' Instruction ................................. 14
    5.  The District's Deliberately Indifferent and Reckless Failure to Investigate
        the Events of March 31, 2022 ............................................................. 14

III.  ARGUMENT ................................................................................................... 15

A.   Summary Judgment Should Be Entered on Plaintiffs' Substantive
     Due Process Claim in Count I Founded on their Parental Rights to
     Direct the Education and Upbringing of Their Children ................................... 16
  1.   Summary Judgment Should be Entered against Williams and Bielewicz
       Based on the Classroom Instruction on March 31, 2022 ................................ 17
     a.   Williams is Liable on Count I ................................................................. 17
     b.   Bielewicz is Liable on Count I ................................................................. 20
  2.   Summary Judgment Should Be Entered Against the District, Wyland,
       Steinhauer, Irvin and Bielewicz for Having Ratified Williams' Unconstitutional
       Conduct After it Occurred ................................................................................. 20
  3.   As to Plaintiffs' Forward-Looking Claims, Summary Judgment Should Be
       Entered against the District, Wyland, Steinhauer and Irvin Based on a District
       Policy, Practice or Custom of Refusing to Provide Advance Notice and Opt
       Out Rights for Gender Identity-Related Instruction ........................................ 23
     a.   Applicable Law ........................................................................................ 24
     b.   The District's Refusal to Provide Advance Notice and Opt Out Rights
          Related to Gender Identity Instruction Gives Rise to Monell and Supervisor
          Liability for a Variety of Reasons ........................................................... 25
        1.   The Board's and Wyland's Inaction in the Face of Williams' Conduct ................... 25
        2.   The District's Refusal to Provide Notice and Opt Out Rights for Gender
             Identity-Related Instruction in Light of the Historical Practice of
             Providing it for Other Subjects Violates Section 1983 ........................... 27
        3.   The District's General Notification of Parental Rights Cannot Forestall
             Summary Judgment .................................................................................. 28
        4.   The District's Current Written Directive for Assessing Parental Opt Out
             Requests, Which was Created by Steinhauer and Irvin, Violates Section 1983 ....... 29

B.   Summary Judgment Should Be Entered on Plaintiffs' Procedural
     Due Process Claim ................................................................................................... 30

C.   Summary Judgment Should Be Entered on Plaintiffs' Free Exercise
     of Religion Claim ..................................................................................................... 32

D.   Summary Judgment Should Be Entered on Plaintiffs' Equal Protection Claim ................... 34

E.   The Court Should Enter a Declaratory Judgment Per Count VI Based on
     the Undisputed Record and Also Award Nominal Damages ................................. 35

IV. CONCLUSION ................................................................................................................ 35

**TABLE OF AUTHORITIES**

C<small>ASES</small>

*A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr.*,

    372 F.3d 572 (3d Cir. 2004) ..................................................................... 3, 4, 20, 21, 22, 23, 25

*Baker v. Monroe Twp.*, 50 F.3d 1186 (3d Cir. 1995) .............................................................. 20, 21

*Beck v. City of Pittsburgh*, 89 F.3d 966 (3d Cir. 1996) ...................................................... 23, 25, 26

*Board of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*,

    457 U.S. 853 (1982) .................................................................................................. 16

*Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014) .......................................................... 26

*C.N. v. Ridgewood Board of Ed.*, 430 F.3d 159 (3d Cir. 2005) ............. 1, 16, 18, 27, 28, 29, 30, 32

*Cain v. Tigard-Tualatin Sch. Dist. 23J*, 262 F. Supp. 2d 1120 (D. Or. 2003) ........................ 23, 24

*Carson v. Makin*, 142 S.Ct. 1987 (2022) ...................................................................... 33

*Carter v. City of Philadelphia*, 989 F.2d 117 (3d Cir. 1993) ......................................................... 31

*City of Canton v. Harris*, 489 U.S. 378 (1989) ........................................................................ 25

*City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432 (1985) ......................................... 16

*City of St. Louis v. Praprotnik*, 485 U.S. 112 (1988) .................................................................. 21

DeGroff, *Parental Rights and Public School Curricula*, 38 J.L. & Educ. 83 (2009) .................... 16

*Dipippa v. Union Sch. Dist.,* 819 F. Supp. 2d 435 (W.D. Pa. 2011) ........................................ 22, 24

*Doe #1 v. Delaware Valley School District*, 572 F. Supp.3d 38 (M.D. Pa. 2021) ........................ 16

*Doe v. Southeast Delco. Sch. Dist.*, 140 F.Supp.3d 396 (E.D.Pa. 2015) ....................................... 22

*Edwards v. Aguillard*, 482 U.S. 578 (1987) ................................................................ 19

*Emp. Div. v. Smith,* 494 U.S. 872 (1990) ...................................................................... 34

*Employment Division, Department of Human Resources of Oregon v. Smith,*

   494 U.S. 872 (1990) ................................................................................................ 34

*Epperson v. Arkansas*, 393 U.S. 479 (1960) ............................................................ 19

*Estate of Massey v. City of Phil*, 118 F.Supp.3d 679 (E.D.Pa. 2015) ...................... 16

*Fletcher v. O'Donnell*, 867 F.2d 791 (3d Cir. 1989) ................................................ 26

*Florey v. Sioux Falls Sch. Dist. 49-5,* 619 F.2d 1311 (8th Cir. 1980) ...................... 34

*Fraternal Order of Police v. City of Newark*, 170 F.3d 359 (3d Cir. 1999) ........ 33, 35

*Fulton v. City of Philadelphia*, 141 S.Ct. 1868 (2021) ............................ 26, 32, 33, 34

*G.S. v. Penn-Trafford Sch. Dist.*, No. 20-3281, 2023 WL 4486667

   (3d Cir. July 12, 2023) .................................................................................... 21, 23

*Glaser v. Marietta*, 351 F. Supp. 555 (W.D. Pa. 1972) ...................... 16, 20, 27, 29, 30

*Gruenke v. Seip*, 225 F.3d 290 (3d Cir. 2000) ......................... 1, 3, 16, 18, 20, 31, 36

*Hall v. Marion Sch. Dist. No. 2*, 31 F.3d 183 (4th Cir. 1994) ............................ 22, 23

*Harvard v. Cesnalis*, 973 F.3d 190 (3d Cir. 2020) ................................................ 4, 34

*Hill v. Borough of Kutztown*, 455 F.3d 225 (3d Cir. 2006) ...................................... 34

*In re Diet Drugs (Phenteramine/ Fenfluramine/ Dexfenfluramine) Prod. Liab. Litig.*,

   434 F. Supp.2d 323 (E.D. Pa. 2006) .................................................................. 4, 32

*Kennedy v. Bremerton Sch. Dist.*, 142 S.Ct. 2407 (2022) ...................................... 4, 32

*LaVerdure v. Cnty. of Montgomery*, 324 F.3d 123 (3d Cir. 2003) ............................ 21

*Layton v. Beyer*, 953 F.2d 839 (3d Cir. 1992) .......................................................... 31

*Lee v. Weisman,* 505 U.S. 577 (1992) ...................................................................... 18

*Lemon v. Kurtzman*, 403 U.S. 602 (1971) ................................................................ 19

*Long v. Holtry*, 673 F.Supp.2d 341 (M.D.Pa. 2009) ................................................ 31

*Lytle v. Carl*, 382 F.3d 978 (9th Cir. 2004) .................................................................. 22

*Mayer v. Monroe Cnty. Cmty. Sch. Corp.*, 474 F.3d 477 (7th Cir. 2007) ...................................... 19

*McGreevy v. Stroup*, 413 F.3d 359 (3d Cir. 2005) ........................................................... 22

*Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021) ....................................................... 27

*Meyer*, 262 U.S. at 401 .................................................................................. 26

*Miller v. Mitchell*, 598 F.3d 139 (3d Cir. 2010) ............................................................. 19

*Monell v. Dep't of Soc. Serv's of City of New York*, 436 U.S. 658 (1978) ..................... 3, 24, 25, 28

*Moorehead v. Sch. Dist. of City of Allentown*, No. 5:22-CV-03959-JMG,

    2023 WL 2976556 (E.D. Pa. Apr. 17, 2023) ....................................................... 21, 22

*Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575 (3d Cir. 2003) ..................................... 4, 25

*Nicosia v. Amazon.com, Inc.*, 834 F.3d 220 (2d Cir. 2016) ................................................. 29

*Pierce v. Society of Sisters*, 268 U.S. 510 (1925) ......................................................... 16

*Porter v. City of Philadelphia*, 975 F.3d 374 (3d Cir. 2020) ................................................ 24

*Ricard v. USD 475 Geary Cnty., KS Sch. Bd.*, 2022 WL 1471372 (D. Kan. 2022) ............... 16, 33

*Roberts v. Mentzer*, 382 F. App'x 158 (3d Cir. 2010) ....................................................... 16

*Sample v. Diecks*, 885 F.2d 1099 (3d Cir. 1989) ........................................................... 31

*Schl. Dist. of Abington Twp., Pa. v. Schempp*, 374 U.S. 203 (1963) ...................................... 19

*Starbuck v. Williamsburg James City Cnty. Sch. Bd.*, 28 F.4th 529 (4th Cir. 2022) ................. 3, 21

*Stepien v. Murphy*, 574 F.Supp.3d 229 (D.N.J. 2021) ...................................................... 34, 35

*Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720 (3d Cir. 1989) ..................................... 25

*Students for Fair Admission, Inc. v. Harvard*, 600 U.S. 181(2023) ......................................... 26

*Tandon v. Newsom*, 141 S.Ct. 1294 (2021) ................................................................ 32

*Torres v. City of Philadelphia*, 907 F.Supp.2d 681 (E.D. Pa. 2012) ................................ 20, 21, 23

*Troxel v. Granville*, 530 U.S. 57 (2000) ............................................................. 16, 19

*Welsh v. U.S.,* 398 U.S. 333 (1970) ......................................................................... 34

*Wisconsin v. Yoder*, 406 U.S. 205 (1972) ............................................................. 1, 34

*Zinermon v. Burch,* 494 U.S. 113 (1990) ................................................................. 31

### STATUTES

2022 Fla. Sess. Law Serv. Ch. 2022-22 (C.S.C.S.H.B. 1557) (WEST) ..................... 10

21 Pa. B. 5214 (Nov. 2, 1991) .................................................................................. 32

22 Pa. B. 3360 (July 4, 1992) .................................................................................... 32

22 Pa. B. 3641 (July 11, 1992) .................................................................................. 32

22 Pa. Code §4.4(d)(1)-(3) ...................................................................................... 29

24 P.S. §15-1505-E .................................................................................................. 19

U.S. Const. art. XIV, § 1 ............................................................................................ 4

Fed. R. Civ. P. 57, Advisory Committee's Note ...................................................... 36

42 U.S.C. § 1983 ........................................................... 16, 21, 22, 23, 24, 27, 30, 31

Third Cir. Mod. Civil Jury Instr. §4.3 ...................................................................... 16

Third Cir. Mod. Civil Jury Instr. §4.6.1 .................................................................... 20

Third Cir. Mod. Civil Jury Inst. §4.6.2 ..................................................................... 21

Third Cir. Mod. Civil Jury Instr. §§ 4.6.3, 4.6.5 ...................................................... 25

Third Cir. Mod. Civil Jury Instr. §4.8.2 .................................................................... 36

### OTHER AUTHORITIES

COMM. OF PENNSYLVANIA LEGISLATIVE JOURNAL, House of Representatives, p. 791

    (Monday, April 6, 1992) ..................................................................................... 32

# I.  <u>INTRODUCTION</u>

Third Circuit law holds that when "collisions [between fundamental parental rights and school actions] occur, the primacy of the parents' authority **must** be recognized and should yield **only** where the school's action is tied to a compelling interest." *Gruenke v. Seip*, 225 F.3d 290, 305 (3d Cir. 2000) (emphasis added). "It is not educators, but **parents** who have **primary** rights in the upbringing of children. School officials have only a **secondary** responsibility and **must** respect these [parental] rights." *Id.* at 307 (emphasis added). "It is the parents' responsibility to inculcate 'moral standards, religious beliefs, and elements of good citizenship.'" *Id.* at 307 *quoting Wisconsin v. Yoder*, 406 U.S. 205, 233 (1972). "[I]ntroducing a child to sensitive topics before a parent might have done so herself can . . . undermine parental authority[.]" *C.N. v. Ridgewood Board of Ed.*, 430 F.3d 159, 185 (3d Cir. 2005). The Third Circuit has bluntly warned "[p]ublic schools must not forget that '*in loco parentis*' does **not** mean 'displace parents.'" *Gruenke*, 225 F.3d at 307 (emphasis added). This binding precedent, based on the undisputed record evidence developed in discovery, requires entry of summary judgment in favor of Plaintiffs.

Instruction on gender identity **was not and still is not** part of the published Curriculum in the Mt. Lebanon School District ("District"). Concise Statement of Facts (CSF) ¶8. Defendant Marybeth Irvin, the District's Assistant Superintendent in charge of Elementary Education, testified that the Curriculum should guide classroom instruction and "it would **not** be appropriate in an elementary school to teach the concept of transgenderism because that is not in our curriculum[.]" *Id.* ¶¶ 4-5 (emphasis added).

Yet, on March 31, 2022, Defendant Williams read two books about gender identify to her first-grade class (one, *When Aidan Became a Brother* ("*Aidan*"), in the morning; another, *Introducing Teddy* ("*Teddy*")*,* in the afternoon). CSF ¶¶ 77-106.[1] A Principal in the District

---

[1]  Print copies of the books are found at App. Exs. 57 and 58 in Plaintiffs' Appendix in Support of Summary Judgment ("App."). Williams played videos of the books as she read them. CSF ¶¶ 79, 95. Here are links to videos of the books: https://www.youtube.com/watch?v=8F2_UR4y0iw and https://www.youtube.com/watch?v=ddRmNpLYgCM.

described *Aidan* as being about "a child transitioning." *Id.* ¶91. In conjunction with reading each book, Williams had a discussion with the class about whether someone is a boy or a girl. *See id.* ¶¶ 77-106. In the morning, in response to questions from confused first-graders about "who decides this?", Williams told the class that "your parents do" meaning that parents (not God or biology) choose a child's gender. *Id.* ¶84.  In the afternoon, Williams told the class that "parents make a guess about their children's – when children are born, parents make a guess whether they're a boy or a girl. Sometimes parents are wrong." *Id.* ¶99. In the course of both sessions, she referred to her own first-grade transgender child, explaining that "he is now a she." *Id.* ¶¶ 77, 98a. Williams conducted this instruction despite knowing she might "get pulled into the principal's office" for it. *See* CSF ¶73. Williams' instruction – which the undisputed record establishes occurred – violated Plaintiffs' rights under Third Circuit and Supreme Court precedent.

Compounding those violations, Williams' instruction was consistent with the beliefs of her own church that has pledged to "advocate for  . . transgender . . . people" and has been "on the forefront of LGBTQ inclusion for more than 40 years" but was contrary to the moral and religious beliefs of Plaintiffs. *Compare* CSF ¶57 *with* ¶¶1-2. Williams provided this instruction the same week her own child started using female instead of male pronouns. *Id.* ¶61. Because of her own transgender child, when criticism arose over her instruction, it was "so f*cking personal." *Id.* ¶63.

While the District has a long running practice of providing advance notice and the ability for parents to opt children out from instruction on a wide variety of topics, Plaintiffs were provided no notice that their seven-year-old children were going to be taught about gender identity by their first-grade teacher, nor were they given the chance to opt out of this non-Curricular instruction. CSF ¶21. This violated the parents' Constitutional rights as defined by the above Third Circuit law. It happened despite one parent previously notifying the school Principal (Defendant Bielewicz) that she was "not comfortable with my daughter learning about gender identity at this age" and having been told in response (which response was forwarded to Plaintiff Tatel) that "[t]here is no formal introduction or lessons surrounding it at JES, especially in 1st grade. It's just merely an acknowledgment of inclusivity and awareness to our JES community." *Id.* ¶64.

Williams did not "get pulled into the principal's office." To the contrary, she was not disciplined in any manner. CSF ¶155. Within hours of the instruction, she was texting colleagues that Bielewicz and Irvin "have my back"; and within a week that Steinhauer and Irvin "know everything and I am backed by everyone." *Id.* ¶¶ 112-113. Ultimately, Williams' school Principal (Bielewicz), the Assistant Superintendent (Irvin), the Superintendent (Steinhauer), and the School Board President (Wyland) all voiced support for and approved of Williams' instruction – including doing so under oath at each of their depositions. *Id.* ¶¶ 111-138. These District leaders and their actions make clear that the District **has not and will not** provide express advance notice to parents of gender identity-related instruction and ability to opt out. That, along with other undisputed record evidence, gives rise to both individual and *Monell* liability on summary judgment.[2] [3]

Plaintiffs' lead claim in **Count I** of the Complaint is founded on their fundamental Constitutional right to direct the education and upbringing of their children. *Gruenke, supra.* Williams' instruction on March 31, 2022, particularly without any notice to the parents, violated that right, as well as the right to familial privacy pled in **Count III**. *Id.* Bielewicz **acquiesced** in Williams' violation by taking no action to stop it, despite having notice of parental objections to instruction on gender identity in the first grade, making him liable on **Count I**. *A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004). And, after the fact, the District, Bielewicz, Irvin, Steinhauer and Wyland are each liable on **Count I** for having **ratified** Williams' unconstitutional conduct. *Starbuck v. Williamsburg James City Cnty. Sch. Bd.*, 28 F.4th 529, 534-35 (4th Cir. 2022). Likewise, the District, Wyland, Steinhauer and Irvin have liability on

---

[2] This lack of notice, based on the undisputed record, manifests in a number of ways as discussed *infra*. pp. 6-9. For example, the only "notice" at all that parents are given as to the ability to opt a student out in general (not even specific to gender identity instruction) is via a generic form email that on its face does not mention opt outs or parental rights and requires a parent to click on a generic Notifications link and then navigate the District's website to find the Parental Rights notification. And, even this buried notice, severely limits the grounds on which an opt out can be based. Also, the District, contrary to its practice with regard to a wide variety of other subjects, does not – and has refused to – provide direct advance notice to parents regarding planned gender identity instruction and the ability to opt out prior to the instruction being provided.

[3] *See generally, Monell v. Dep't of Soc. Serv's of City of New York*, 436 U.S. 658 (1978).

the forward-looking claims in **Count I** for having adopted a policy, practice or custom of not providing express advance notice and opt out rights to parents regarding gender identity instruction without a compelling reason supporting the policy. *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 584 (3d Cir. 2003); *A.M. ex rel. J.M.K.*, 372 F.3d at 586. And all the Defendants have liability on the procedural due process claim in **Count II** for failing to provide notice of Williams' gender identity-related instruction and/or for adopting the policy, practice or custom of not providing notice of gender identity-related instruction in the District. *See In re Diet Drugs (Phenteramine/ Fenfluramine/ Dexfenfluramine) Prod. Liab. Litig.*, 434 F. Supp.2d 323, 336 (E.D. Pa. 2006).

On **Count IV**'s **Free Exercise of Religion** claim, the District, Wyland, Steinhauer and Irvin have liability on **Count VI** because, by adopting a policy/practice/custom of not providing notice and opt out for gender identity-related instruction but providing it for a wide variety of other topics and subjects, their policy actions are not "generally applicable" nor are they "neutral." *Kennedy v. Bremerton Sch. Dist.*, 142 S.Ct. 2407, 2421-22 (2022).Williams has liability on **Count IV** for providing gender identity-related instruction that was consistent with her own beliefs and religion but contrary to those of Plaintiffs and, by acquiescing in her conduct, Bielewicz also has liability on **Count IV**. Likewise, as to the **Equal Protection** claim in **Count IV,** the adoption of the above policy, while providing notice and opt outs for a wide variety of other topics, violates the Equal Protection Clause giving rise to liability for the District, Wyland, Steinhauer and Irvin on **Count IV**. *See generally, Harvard v. Cesnalis*, 973 F.3d 190, 205 (3d Cir. 2020). Lastly, Plaintiffs' request for declaratory relief in **Count VI** is also ripe for summary judgment on the undisputed record.

None of the facts supporting liability on the above Counts in the Complaint are disputed. Summary Judgment should, accordingly, be entered for Plaintiffs.

## II. <u>UNDISPUTED RECORD EVIDENCE</u>

### A. <u>Plaintiffs' Parental, Moral and Religious Beliefs</u>

As parents, Plaintiffs were not ready to discuss issues of gender identity with their first-grade children, believing that such a discussion was not age appropriate. CSF ¶1. Naturally, they were also not ready for their children to receive instruction on gender identity from their first-grade

teacher. *Id.* In addition to these parental views, Plaintiffs Tatel (Roman Catholic) and Melton (Church of Jesus Christ of Latter-Day Saints) hold religious and moral beliefs that are contrary to Williams' instruction; Plaintiff Dunn holds similar moral views. *Id.* ¶2. Four District teachers, who are also mothers, testified that teaching gender identity in first grade was not age appropriate or that it is a subject on which parents should control the discussion with their children. *Id.* ¶3.

B.   **Instruction on Gender Identity is Not Part of the Published Mt. Lebanon School District Elementary Curriculum**

Defendant Irvin testified that "[i]t would not be appropriate in an elementary school to teach the concept of transgenderism because that is not in our curriculum[.]" CSF ¶4. Defendant Irvin also testified that the District's Curriculum (made available in a general fashion to parents via the District website and in more detailed fashion via a web portal called Atlas) should guide classroom instruction. *Id.* ¶5. Defendant Wyland testified that, if a parent in the District wanted to understand what their child is going to be taught, the Curriculum section of the District website and Atlas are where they would go. *Id.* ¶6. One reason the Curriculum is available to parents is so they can evaluate whether to ask to excuse their children from certain instruction. *Id.* ¶7.

For the 2021-22 school year, the 2022-23 school year and the present school year, neither the Curriculum section of the District's website, nor the more detailed information available to parents in Atlas, refers to teaching the subject of gender identity to elementary students, including first-graders. CSF ¶8. In 2020, the District created a DEI Taskforce – the District's DEI Taskforce never discussed teaching gender identity in elementary school. *Id.* ¶9. The Board has a DEI Committee – with the exception of discussing the books read by Defendant Williams at an April 19, 2022 meeting – the DEI Committee of the Board has never discussed teaching gender identity in elementary school. *Id.* ¶10. The District has not yet adopted a DEI Curriculum. *Id.* ¶11.

District Policy I(J) concerns selection of "Instructional Materials," defining "instructional materials" to include video materials. CSF ¶12. District Policy I(F) indicates, *inter alia*, that parents should have access to information about the curriculum, including "instructional materials," and provides implementing authority for the policy to the Administration. *Id.* ¶13.

**C.** **For Certain Subjects or Topics, But Not Gender Identity, the District Provides Advanced Written Notice and the Ability for Parents to Opt Their Children Out**

**1.** **Advance Notice and Opt Outs on a Wide Variety of Topics**

The District provides advanced parental notice and the ability to opt students out of instruction related to, in fifth and eighth grade, human development and sexuality; in eleventh grade, HIV, sexuality, birth control/contraceptives and sexually transmitted infections. CSF ¶15. The advanced notice and opt outs provided by the District cover topics that are **broader** than those for which advance notice is required by Pennsylvania law. *Id*. ¶16.[4]

Additionally, District representatives have sent advance notice and the ability for parents to opt students out of participation in, among others, an assembly involving a therapy dog; for certain movies to be shown in class (including The Bad Guys, The Tiger Rising, Invictus (which concerns Nelson Mandela and Apartheid), and The Giver, ); for lunch group meetings with a school counselor; for PASS surveys; for the Scripps Spelling Bee; for stories related to Chanukah, Christmas and Kwanza; dissection of animals in biology; and video clips from a TV series that involves a homosexual character. CSF ¶18. None of the notices related to the above indicate that a parental decision to opt a student out needs to be based on a religious objection. *Id*. ¶19.

**2.** **The District Does Not Provide and Has Not Provided Specific Advance Notice and Opt Out Rights as to Gender Identity Instruction**

While it sends the notices in the above section, the District has **never** sent a letter or email directly to parents advising them in advance of planned instruction on the subject of gender identity and providing the ability to opt. CSF ¶20. Similarly, even after Williams' instruction on March 31, 2022, the Board has not discussed the adoption of a policy whereby parents would be provided advance notice and opt-out rights for gender identity instruction, nor has the Board provided any directive prohibiting instruction on gender identity. *Id*. ¶24. Since March 31, 2022, the Board's Policy Committee has not discussed any changes to the District's Curriculum and Parental Rights

---

[4] Also broader than the requirements of Pennsylvania law, certain of the letters written to parents about opting out of the above instruction do not indicate that opting out must be based on a religious objection. CSF ¶19. *See* 22 Pa.Code §4.4(d)(3) (opt out must be based on religion).

policy (Policy I(F)) or adopting any additional or different parental rights policies. *Id*. ¶27.

School Board President Wyland testified that he was not aware of any written operational guideline (*i.e.*, a written procedure implementing a Board policy) from District Administration telling principals and teachers to provide advance notice if the subject of gender identify is to be taught. CSF ¶25.  Nor was he aware of any directive from the Administration prohibiting the subject of gender identity from being taught. *Id.*. No written administrative practice or procedure requiring advance notice to parents of gender identity related instruction has been created. *Id*. ¶26.

**D.**   **Mt. Lebanon's Insufficient Notice of Opt Out Rights Found in District Policy I(F)**

Under District Policy I(F), the District's Administration has authority to develop procedures necessary to notify parents and guardians of their right to have their child(ren) excused from specific instruction which conflicts with their religious beliefs. CSF ¶28. Under Policy I(F), parents can only excuse a child from instruction based on a conflict with their religious beliefs; no other basis for opting out is contained in the Policy, including parents' general or moral objection based on what they believe is best for their children. *Id*. ¶29.

The District has never sent an email or letter to parents where, in the body of the communication, parents are notified of their "Parental Rights." CSF ¶34. Nor, is an email or letter sent to parents where the body of the communication provides a direct link to the District's "Parental Rights" notification on the website. *Id*. ¶35. Rather, in 2021-22 and 2022-23, at the start of the school year, a general email was sent to all District parents titled "Important Annual Notification to Parents." *Id*.  ¶30a. For the 2023-24 school year, rather than this general email, parents received via email a MLSTD Weekly Newsletter titled "MTLSD Newsletter-Update Links"; one tab on the Newsletter email was "Annual Notifications" but the tab was not called out in any way in the body of the Newsletter. *Id*. ¶30b. Parents' religious-based opt out rights under District Policy I(F) are not mentioned on the face of either email. *Id*. ¶31. To find reference to religious-based opt out rights under Policy I(F), a parent needs to (i) for years prior to 2023-24, click on a link in the Important Annual Notification to Parents email and, for 2023-24, click on the Annual Notifications tab on the Newsletter, each of which takes you to the District website, then

(ii) find the Parental Rights button, which is one of twenty-one buttons on the Annual Notifications webpage to which a parent is directed, then (iii) click the Parental Rights button. *Id*. ¶32. A teacher, who has been a District employee for over 20 years and a parent of students in the district, testified that she was unaware of the opt-out language in the Parental Rights notification. *Id*. ¶37.

For the 2021-22 and 2022-23 school years, nothing in the "Parental Rights" notification on the District Website mentioned instruction on gender identity. CSF ¶38. For the 2023-24 school year, the "Parental Rights" notification on the District website indicates that "the District curriculum may include instruction or discussion on a wide array of topics including race, color, age, creed, religion, sex, gender, gender identity, sexual orientation, ancestry, national origin, familial status, language, genetic information, pregnancy, or handicap or disability, **even if such instruction is not specifically identified in the published Curriculum.**" *Id*. ¶39 (bold added).

Wyland testified that, other than potentially calling out gender identity in the Curriculum, he did not recall any other discussions with administrative leadership about parental notification related to gender identity instruction. *Id*. ¶52. For the 2023-24 school year, the published Curriculum for elementary school that is available to parents via the District website and Atlas portal still does **not** mention instruction on gender identity. *Id*. ¶40.

**E.** **The District's New Written Procedure for Addressing Opt Out Requests Related to Gender Identity Instruction**

The District has not created a written procedure instructing that, if the topic of gender identity is to be taught, that parents should be given advance notice and the ability to opt out. CSF ¶43. Rather, after March 31, 2022, the only written procedure created by District representatives addressing how to handle parental opt out requests was developed in August 2022 by Steinhauer and Irvin. *Id*. ¶¶41, 42. This written procedure does not provide for advance notice to parents of planned instruction so that they can decide whether or not to opt out their children; rather, it places the onus on parents to assume gender identity-related instruction will be taught (even though it is not in the Curriculum) and preemptively request that their child be excused. *Id*. ¶43. Steinhauer testified that, in order to carry that onus, the parent must navigate the general Annual Notifications

email discussed above. *Id*. ¶45. The new written procedure only permits a parent to a child out if they have a religious objection. *Id*. ¶¶48-50. Here is a pdf excerpt from the August 2022 procedure:

> Some requests may not have all the required information. For example, a sample form letter has been circulating and used by several requestors.  This letter references the stipulated agreement and does not claim a religious objection. In addition, this request also requires advance notice of opt-out topics and a chance to review materials in a specific timeline. **Do not sign and return any forms sent by parents.**

App Ex. 34. (emphasis in original).

## F.      **Mrs. Williams' Background and Her Own Child's Gender Transition in 2021-2022**

Williams is an active member of a church that has pledged to "advocate for  . . transgender . . . people" and has been "on the forefront of LGBTQ inclusion for more than 40 years." CSF ¶¶57-58. Consistent with this, in the middle of the COVID-19 pandemic in June of 2020 – before her own child changed from identifying as a boy to identifying as a girl – Williams took her family to a rally and march in support of "Pittsburgh Black Trans Lives." *Id*. ¶59.

Williams' child transitioned from identifying as a boy to identifying as a girl during the 2021-22 school year. CSF ¶61. As part of this gender transition, Williams' child changed to using female pronouns the **same week** that Williams read *When Aidan Became a Brother* and *Introducing Teddy* to her first-grade class. *Id*. In text messages with colleagues in March and April 2023, Williams indicated that this was "breaking me," was "so much big change all at once," and has "just been a lot." *Id*. ¶62. Because of her own child's gender transition, Williams felt that criticism that arose from the events in her own first-grade classroom was "so f*cking personal." *Id*. ¶63.

## G.      **Mrs. Williams' Preparation for and Instruction on March 31, 2022 and Record Evidence Related to Certain Material Facts Before March 30, 2022**

### 1.      **The Notice of Parental Objections to Gender Identity Instruction and the Absence of Any Transgender Students at Jefferson Elementary**

On October 1, 2021, in response to information in the school newsletter about acknowledging LBGTQ month, in an email to Bielewicz, L.R. asked, "I was wondering if/how this is acknowledged in the first grade because **I am not comfortable with my daughter learning about gender identity at this age**." Bielewicz replied, "[t]here is no formal introduction or lessons

9

surrounding it at JES, especially in 1st grade. It's just merely an acknowledgment of inclusivity and awareness to our JES community." CSF ¶64 (bold added). L.R. forwarded this to Mrs. Tatel.

Williams' class for the 2021-22 school year did not have any transgender students; for 2021-22, no student at Jefferson Elementary identified themselves as transgender; the District received no complaints of transgender harassment at Jefferson in 2021-22. *Id.* ¶¶ 65-66.

### 2.   Planning for and Williams' Instruction about Gender Identity on March 31, 2022

In March of 2022, teaching the subject of gender identity in elementary schools was a controversial subject in the national media particularly due to the passage in Florida on March 28, 2022 of a bill prohibiting such instruction in kindergarten through third grade. CSF ¶71; 2022 Fla. Sess. Law Serv. Ch. 2022-22 (C.S.C.S.H.B. 1557) (WEST). In the midst of this controversy, in planning to recognize "international trans day of visibility" (March 31, 2022), on the night of March 30, 2022, Williams engaged in a text message conversation with two fellow teachers; during the text exchange, they discussed reading the books *When Aidan Became a Brother* and *Introducing Teddy*. *Id.* ¶72. In an apparent acknowledgment of the national controversy, one of the participants in the text string indicated, "I may get pulled into the principal's office." *Id.* ¶73.

Despite Williams planning it the night before, parents were not provided advance notice of, or the ability to opt out their children from, Williams' playing/reading *When Aidan Became a Brother* and *Introducing Teddy* on March 31, 2022.  CSF ¶21. No such notice was sent even though Williams had emailed her parents throughout the year about happenings in her class. *Id.* ¶22.

At 9:23 am on March 31, 2022, Williams sent Bielewicz an email stating, "I was thinking of sharing these read alouds with colleagues, but I just wanted to run it by you first?  They were both recommended to me by other teachers in the district"; after he reviewed the books, Bielewicz replied at 11:25 a.m., "I'm fine with it.  It's their choice if they wish to incorporate or not." CSF ¶74. Bielewicz did not tell her not to play the books or to provide notice to parents. *Id.* ¶74(a), (b).

At 11:38 am on March 31, 2022, Williams shared links to *Aidan* and *Teddy* with the faculty and staff of Jefferson Elementary via email; the email, among other things, indicated "Today is Transgender Day of Visibility" and "This is a topic close to my heart." CSF ¶75. Williams also

posted a link to the books on her personal Facebook page. *Id.* ¶76.

### a.     When Aidan Became A Brother and the Class Discussion

As testified to by Sharon Boss (an aide in the class in the morning)[5]: during the morning of March 31, 2022, Williams brought up Take Your Child to Work Day with her class and mentioned that her child may come to school and, in the course of that discussion, indicated that "[Williams' child] is a she now" and "he is a she." CSF ¶77.[6] "Right after" this introduction, Williams played the video and read *When Aidan Became a Brother. Id.* ¶79. The normally boisterous first-graders were abnormally quiet while Williams read *Aidan. Id.* ¶80. When Williams finished reading/playing the book, Williams asked the class if there were any questions. *Id.* ¶81. The book caused "confusion" amongst the first-grade students with Mrs. Dunn's son shouting out, "I don't get it." *Id.* ¶82. One student then called out "Oh, I get it – she was a he" and Williams, as part of the discussion, said "yes, she was a he" referring to Aidan. *Id.* ¶83. Several students then asked, "who decides this?". *Id.* ¶84. Williams got flustered and responded, "your parents do." *Id.* Williams then called for an unscheduled recess. *Id.* ¶¶85-86. As the class left, Williams said to Mrs. Boss, "I hope you were ok with that lesson," to which Mrs. Boss responded, "It doesn't matter what I think – it matters what they think and what their parents think." *Id.* ¶88.

One principal described *Aidan* as about "[a] child transitioning." CSF ¶91. Neither the word "tolerance" nor "kindness" is contained in *Aidan*. App. Ex. 57. No character in *Aidan* was the subject of bullying or being picked on. CSF ¶93. *Aidan* uses the term "transgender" on p. 6 and, in referring to Aidan after he started to identify as a boy instead of a girl, on p. 18 contains the following line from Aidan's mother: "When you were born, we didn't know you were going to be our son. We made some mistakes but you helped us fix them." App. Ex. 57. The record contains no evidence that Williams discussed kindness or tolerance with her class as part of reading *Aidan.*

---

[5] Williams testified that she read the deposition testimony of Sharon Boss, Lisa Mathewson and Jackie Girman and did not disagree with the factual substance of each aide's testimony. CSF ¶106.
[6] As of March 31, 2022, teachers were **not** permitted to bring their children to work on Take Your Child to Work Day, which occurred on April 28, 2022. CSF ¶78.

### b.        Introducing Teddy and the Class Discussion

In the afternoon on March 31, Williams played/read *Teddy*. CSF ¶95. After reading the book, Williams discussed it with the class for about five to ten minutes. *Id*. ¶97. During that discussion, Williams again referred to her own transgender child and told the class her child would be coming for Bring Your Child to Work Day and would be in a dress. *Id*. ¶98(a)(b). As part of the discussion, Williams told her first-graders, "parents make a guess about their children's – when children are born, parents make a guess whether they're a boy or a girl. Sometimes parents are wrong." *Id*. ¶¶ 99,100. During the discussion, Mrs. Dunn's son yelled, "But, I'm a boy." *Id*. ¶101.

Jackie Girman (an afternoon aide in the class) reported the above to Casey Stewart, the Kindergarten teacher. CSF ¶100. Stewart then sent an email to Bielewicz indicating that Williams had told the children, "when you're born, your parents make a guess of what you are and sometimes they're right and sometimes they're not." *Id*. ¶100. He ignored the email. *Id*. ¶135.

The subtitle of *Teddy* indicates it is "A Gentle Story About Gender." App. Ex. 58. Neither the word "tolerance" nor "kindness" is contained in *Teddy*. *Id*. No character in *Teddy* was the subject of bullying or being picked on. CSF ¶104. The record contains no evidence that Williams discussed kindness or tolerance with her class as part of reading *Teddy.*

### c.        Further Evidence of the Children's Confusion

Regarding *Aidan,* Sharon Boss testified that students in the class "didn't understand the concept of it." CSF ¶107. Consistent with this, after school on March 31, 2022, Mrs. Tatel's daughter asked her "how do you know that I am a girl?" *Id*. ¶108. On the evening of March 31, L.R.'s daughter was questioning whether her pink stuffed bear who she referred to as a boy should really be a girl. *Id*. ¶110. The following day, Mrs. Tatel's daughter was "upset" and brought up to Mrs. Boss that "when you change a baby's diaper . . . you know if they're a boy or a girl." *Id*. ¶109.

### H.        Approval of Williams' Instruction by Bielewicz, Irvin, Steinhauer, and Wyland

In a text message on the night of March 31, 2022, Williams wrote, that Brett [Bielewicz] and MB [Irvin] "have my back" and in a text on April 3, 2022 that Tim [Steinhauer] and MB [Irvin] "know everything and I am backed by everyone." CSF ¶111-110. Referring to the controversy that

had arisen regarding the events of March 31 and based on conversations with Irvin and Steinhauer, Bielewicz wrote "having mb [Irvin] and tim [Steinhauer] support helps too." *Id*. ¶113-114.

### 1.   <u>Wyland's Approval of Williams' Instruction</u>

Wyland is the President of the School Board and, in that capacity, sets Board agendas and has the ability to ask the Board or the Board's Policy Committee to consider policy changes. CSF ¶¶161-162. At a public Board meeting on April 11, 2022, Wyland made comments that were in favor of Williams' instruction. *Id*. ¶116. Wyland testified that as of the date of his deposition on June 28, 2023, he was still in favor of Williams' instruction. *Id*. ¶117. Since March 31, 2022, neither the Board's Policy Committee nor the Board has discussed any changes to the District's Parental Rights policy (Policy I(F)) or adopting any different parental rights policies. *Id*. ¶¶ 24, 27.

### 2.   <u>Steinhauer's Approval of Williams' Instruction</u>

Until he retired at the end of the 2022-23 school year, Steinhauer was the District's Superintendent. CSF ¶118. As Superintendent, Steinhauer had "a hundred percent authority" to create and implement written procedures for district administrators and teachers to follow. *Id*. ¶119-120. If a procedure is going to apply to all the schools in the District, Steinhauer would typically put the procedure in writing. *Id*. ¶123. In Board Policy I(F) (Curriculum and Parental Rights), the Board has delegated to the Administration the authority to develop procedures necessary to implement the policy. *Id*. ¶122. No written administrative practice or procedure requiring advance notice to parents of gender identity related instruction has been created. *Id*. ¶25.

Steinhauer thought "it was appropriate that [Williams] used the books in her classroom," told others he was supportive of Williams, and spoke about the books at a Board meeting. CSF ¶¶ 114, 123. On April 1, 2022, Mrs. Dunn wrote an email to Steinhauer in which she complained:

Hello Dr. Steinhauer —- I am the parent of a first grader at Jefferson Elementary; and it has come to my attention that a teacher there is having adult teachings about transgender with children. Education about all walks of life is essential, however this topic is clearly being expressed with no regard to parental consent. This isn't a conversation to be had amongst a child's teacher (especially from a personal subjective view), and the last time I checked it also wasn't a part of the curriculum plan that was submitted to the district. I send my child to school to be a kid and to learn the fundamentals of reading, writing, arithmetic, and socializing; not to have my child told that he can wear dresses, make- up etc.

At this point, I don't feel comfortable sending him back into the classroom and would like asynchronous instruction for the remainder of the school year. Could you be so kind in helping me to get this accomplished?

Warm Regards,
Stacy Dunn

CSF ¶125, App. Ex. 66. Steinhauer did not respond to Mrs. Dunn's email. CSF ¶125a.

### 3.   Irvin's Approval of Williams' Instruction

Until she retired at the end of the 2022-23 year, Irvin was the Assistant Superintendent in charge of Elementary Education and she, like Steinhauer, had the ability to make District-wide procedures. CSF ¶¶126-127. At an April 19, 2022 Board meeting, Irvin expressed her opinion that it was okay for Williams to have read the books and that *Aidan* was simply about a child getting a new sibling. *Id*. ¶¶ 130, 167 (meeting link). At deposition, Irvin testified that one point of *Aidan* was "about a student's gender identity" but that she did not mention this at the School Board meeting. *Id*. ¶128. Irvin testified that it is her position that "it's okay that [Williams] read those books" and that she didn't think there was anything wrong with what Williams did. *Id*. ¶129.

### 4.   Bielewicz's Approval of Williams' Instruction

Bielewicz testified that he does not have any objection to the use of the books. CSF ¶133. He did not find alarming Stewart reporting to him that Williams had said "when you're born, your parents make a guess at what you are, and sometimes they're right and sometimes, they are not" even if this was said to six- and seven-year-old kids. *Id*. ¶134. Bielewicz never responded to Stewart's email nor did anything to determine if the statement in Stewart's email was factually accurate. *Id*.¶¶135-136. Brenda Nascone, a Kindergarten aide, emailed Bielewicz expressing her opinion that the books should not have been read "without express parental consent." *Id*. ¶137. Bielewicz never responded to Nascone's email. *Id*. ¶138.

### 5.   The District's Deliberately Indifferent and Reckless Failure to Investigate the Events of March 31, 2022

As part of what he would have liked to have seen done to investigate the facts of what happened in the classroom on March 31, 2022, Wyland would want to interview "the people that were directly present." CSF ¶139. Yet, no one in District Administration ever interviewed the aides (Boss, Mathewson and Girman) that were in the classroom or even Williams. *Id*. ¶143. Likewise, it was important to Steinhauer, as the Superintendent of the District, to have a full understanding of what happened in the classroom on March 31, 2022. *Id*. ¶140. Yet, prior to the lawsuit, Steinhauer did not know that (i) there were aides in the classroom and (ii) did not do anything to

determine the full facts of what Williams said in the classroom on March 31, 2022. *Id*. ¶¶141-142.

Similarly, Bielewicz had no knowledge that Williams had read one book in the morning and another in the afternoon. CSF ¶147. Bielewicz did not know if Williams did any introduction to her class before reading either book; whether she mentioned her own transgender child and potentially bringing him to school; or whether Williams engaged in any question and answers with the class after she read either *Aidan* or *Teddy. Id*. ¶148. Bielewicz did not interview any of the other adults that were in the classroom; Bielewicz did not interview Williams about the events of March 31, 2022 *Id*. ¶¶149-150. The only thing Bielewicz did to determine what actually happened in the classroom on March 31, 2022 was listen to parents' complaints and emails. *Id*. ¶151.  No one in upper Administration asked Bielewicz to try and figure out all the facts and circumstances of what happened in the classroom on March 31, 2022. *Id*. ¶152.[7]

Williams was not disciplined regarding anything that occurred on March 31, 2022. CSF ¶155. Bielewicz was not disciplined regarding anything that occurred on March 31, 2022. *Id*. ¶156.

### III. ARGUMENT

The required elements of a Section 1983 claim in the Third Circuit are: (1) that the defendant(s) acted under color of state law, and (2) while acting under color of state law, the defendant(s) deprived plaintiff of a federal constitutional right. *E.g.,* Third Cir. Mod. Civil Jury Instr. §4.3. The Defendants are all state actors. *E.g., Estate of Massey v. City of Phil*, 118 F.Supp.3d 679, 687 (E.D.Pa. 2015). As discussed in detail below, for each respective Defendant as to each claim in the Complaint on which summary judgment is sought, the undisputed record establishes that Plaintiffs' Constitutional rights were violated.

---

[7]  Contrasting with the "investigation" of the events in Williams' classroom is what happened with a German teacher in the Fall of 2022. The German teacher was doing some introductory instruction to a fifth-grade class. During the course of instruction about family-related words in German and, in response to a comment/question by a student, the teacher made a statement to the effect of "I understand biology, and there's always one mother and there's always one father." CSF ¶153. After discussing this with Irvin, the principal interviewed each student in the class. *Id*. ¶154.

**A.**    **Summary Judgment Should Be Entered on Plaintiffs' Substantive Due Process Claim in Count I Founded on their Parental Rights to Direct the Education and Upbringing of Their Children**

The elements of a Section 1983 Fourteenth Amendment Substantive Due Process claim are:  (i) Defendants acted under color of law; (ii) the defendants had a duty of care toward the plaintiff; (iii) a protected property or liberty interest was at stake; and (iv) a deprivation within the meaning of the Due Process clause occurred. *E.g., Roberts v. Mentzer*, 382 F. App'x 158, 166 (3d Cir. 2010).  Given the fundamental right at issue in Count I, this claim is subject to strict scrutiny making Defendants' actions permissible only if they are narrowly tailored to serve a compelling state interest. *E.g., City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985); *Doe #1 v. Delaware Valley School District*, 572 F. Supp.3d 38, 68 (M.D. Pa. 2021).

Each of the requisite elements is met here based on the undisputed record. As to the first three elements: as noted above, (i) it cannot be contested that the defendants are state actors; (ii) likewise, it cannot be disputed that Defendants, as public-school employees, administrators and officials, owed a duty of care to the Plaintiffs (*see e.g., Board of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 864 (1982); *Gruenke*, 225 F.3d at 307; 24 P.S. §13-1317); and (iii) based on well-established Supreme Court and Third Circuit law, the Constitution protects the fundamental right of parents to direct the education, upbringing and the care, custody, and control of their children regarding matters that "strike at the heart of parental decision-making authority on matters of the greatest importance." *C.N.*, 430 F.3d at 184; *accord Pierce v. Society of Sisters*, 268 U.S. 510 (1925); *Troxel v. Granville*, 530 U.S. 57, 68 (2000); *Gruenke*, 225 F.3d at 307; *Glaser v. Marietta*, 351 F. Supp. 555, 559-61 (W.D. Pa. 1972); *Ricard v. USD 475 Geary Cnty., KS Sch. Bd.*, 2022 WL 1471372, at *8 (D. Kan. 2022); Doc 38 at 20-22, 24-25; *see* DeGroff, *Parental Rights and Public School Curricula*, 38 J.L. & Educ. 83, 108-28 (2009) (tracing history of this fundamental parental right, including opt out, back to English common law).

Further, as to the third element, the Court has already held that "[t]he transgender topics at issue implicate a core parental interest in forming the identity of their children," "[t]eaching a child how to determine one's gender identity at least plausibly is a matter of great importance

that goes to the heart of parenting," "[i]ntroducing and teaching a child about complex and sensitive gender identity topics before the parent would have done so can undermine parental authority," "[a] teacher instructing first graders that the child's parents' beliefs about gender identity may be wrong and the teacher's beliefs are correct directly repudiates parental authority," and "defendants' conduct appears to strike at the heart of parental decision making in a matter of greatest importance in their relationship with their children, i.e., forming their children's religious and moral beliefs and their identity." Doc. 38 *seriatim*. As the Court aptly summarized: "the Parents seek to teach their children that sex and gender are synonymous and immutable and that humans are created beings who must accept their place in a larger reality. The transgender movement asserts that human beings are autonomous, self-defining entities who can impose their internal beliefs about themselves on the exterior world. The contradictions between these worldviews are likely beyond the grasp of most first-graders." Doc. 38 at 31. The Court now has before it the undisputed record evidence to support these same findings as a matter of both fact and law in favor of Plaintiffs on summary judgment.

Finally, as to the fourth element, the only question is did the Defendants engage in conduct violative of the above parental rights? The undisputed record demonstrates that they most certainly did.

**1.   Summary Judgment Should be Entered against Williams and Bielewicz Based on the Classroom Instruction on March 31, 2022**

Paragraphs 1-3, 8, 21, and 57-110 from Plaintiffs' Concise Statement of Material Facts bear on Williams' liability for Count I for her conduct on March 31, 2022 and Paragraphs 74, 74a, 74b, and 133-137 bear on Bielewicz's liability on Count I for his acquiescence in Williams' conduct.

**a.   Williams is Liable on Count I**

The undisputed record establishes that Williams planned on the night of March 30, 2022 to present two books about gender identity to her first-grade class with one of her colleagues acknowledging "I may get pulled into the principal's office." CSF ¶¶72-73. On the morning of March 31, after starting the class discussion by referring to her own transgender child, Williams

read *Aidan* in the morning and, after reading the book, told her confused students that parents decide a child's gender (not God or biology). *Id*. ¶¶ 77-94. In the afternoon, she read *Teddy*, again mentioned her own transgender child, and told her first-graders that "parents make a guess about their children's – when children are born, parents make a guess whether they're a boy or a girl. Sometimes parents are wrong." *Id*. ¶¶ 95-106. Nothing about teaching the topic of gender identity is in the District's first-grade Curriculum. *Id*. ¶8. Plaintiffs were provided no notice of Williams' instruction on March 31, 2022 or the ability to opt their children out. *Id*. ¶21.

Williams' actions and statements on March 31, 2022 "strike at the heart of parental decision-making authority on [a] matter[] of the greatest importance," "implicate a core parental interest in forming the identity of their children" and "undermine parental authority." *C.N.*, 430 F.3d at 184; Doc. 38 at 30-32. Williams' non-Curricular instruction and statements to Plaintiffs' then seven-year-old children were directly contrary to the Plaintiffs' beliefs and deal with a complex topic that Plaintiffs were not yet ready to broach with their young children. CSF ¶¶1-2. The record is devoid of any compelling interest or need, let alone a narrowly tailored one, for Williams' instruction. *See id.* ¶¶ 65-66. The record is devoid of any compelling interest or need, let alone a narrowly tailored one, preventing advance notice of Williams' instruction. *Id.* Simply, Williams' actions run afoul of the Third Circuit's clear directive that "[p]ublic schools must not forget that '*in loco parentis*' does **not** mean 'displace parents.'" *Gruenke*, 225 F.3d at 307.

In addition to the controlling Third Circuit law on parental rights, although the subject matter of the instruction involved here is arguably secular (keeping in mind that it is not purely secular because it was consistent with the beliefs of Williams' own church), the logic in the Supreme Court's teachings in school-related Establishment Clause cases involving young children has application here. *See Lee v. Weisman,* 505 U.S. 577, 592 (1992) ("there are heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools."); *Lemon v. Kurtzman*, 403 U.S. 602, 616 (1971) ("The process of inculcating religious doctrine is of course enhanced by the impressionable age of the pupils, in primary schools particularly."); *Epperson v. Arkansas*, 393 U.S. 479, 487 (1960) ("The vigilant

protection of constitutional freedoms is nowhere more vital than in the community of American schools."). As the Supreme Court wrote in *Edwards v. Aguillard*, 482 U.S. 578, 584 (1987):

> Families entrust public schools with the education of their children, but condition their trust on the understanding that the classroom will not purposely be used to advance religious views that may conflict with the private beliefs of the student and his or her family. Students in such institutions are impressionable and their attendance is involuntary. The State exerts great authority and coercive power through mandatory attendance requirements, and because of the students' emulation of teachers as role models and the children's susceptibility to peer pressure.

If the words "political or social" were substituted for "religious," the quote from *Edwards* would directly describe Williams' instruction, and the logic from *Edwards* highlights why Williams' actions violated Plaintiffs' Constitutionally protected parental rights. *Accord Miller v. Mitchell*, 598 F.3d 139, 150-52 (3d Cir. 2010). The first-grade students were a captive audience for Williams teaching them "parents make a guess about their children's – when children are born, parents make a guess whether they're a boy or a girl. Sometimes parents are wrong." They could not leave the classroom and, at age seven, lack the intellectual capacity to refute or counter the instruction of their first-grade teacher, whose instruction was contrary to the beliefs held by their parents.[8]

An analogy to the Supreme Court's decision in *Troxel v. Granville,* 530 U.S. 57 (2000), also makes this point. Williams' challenged instruction can be analogized to the improper decision of the state court judge in *Troxel*. The Supreme Court found that the state court judge's decision to grant visitation rights to the child's grandparents infringed on the mother's Constitutionally protected parental rights because the judge substituted his own judgment for what he believed was in the best interest of the child over the mother's judgment on that same issue. *Id.* at 72-73; *accord Glaser*, 351 F. Supp. at 561. Williams did the same thing – substituting what she (and her own church) believe is appropriate to the detriment of what the Plaintiffs believe is appropriate. She did so without a compelling state interest, let alone a narrowly tailored one. That violates the

---

[8] A public school teacher does not have a constitutional right to depart from the school's curriculum even if teaching secular topics. *Mayer v. Monroe Cnty. Cmty. Sch. Corp.*, 474 F.3d 477, 480 (7th Cir. 2007). "[T]he State may not establish a 'religion of secularism[.]'" *Schl. Dist. of Abington Twp., Pa. v. Schempp*, 374 U.S. 203, 225 (1963); *see also*, 24 P.S. §15-1505-E (prohibiting instructing, proselytizing or indoctrinating "students in a specific religious or political belief.").

Constitution and requires entry of summary judgment against Williams on Count I.[9]

### b.  Bielewicz is Liable on Count I

Despite knowing Williams was sharing links to the books with colleagues and having watched videos of the books himself, Bielewicz took no action to stop Williams' instruction and did not tell her not to use the books. Bielewicz took no action despite the mother of one child in the class having previously told him that "I am not comfortable with my daughter learning about gender identity at this age." CSF ¶64. Bielewicz failure to act, particularly in light of this notice, requires entry of summary judgment against him on Count I.

A supervisor bears liability whenever he, "as the person in charge, had knowledge of and acquiesced in his subordinates' violations." *A.M. ex rel. J.M.K.*, 372 F.3d at 586; *Baker v. Monroe Twp.*, 50 F.3d 1186, 1190-91, 1193-94 (3d Cir. 1995). "[N]on-feasance on the part of the defendant may be sufficient to constitute an affirmative role in the misconduct if the individual defendant in a supervisory role had actual knowledge of and acquiesced in his subordinate's violations of the plaintiff's rights." *Torres v. City of Philadelphia*, 907 F.Supp.2d 681, 689 (E.D. Pa. 2012) (collecting cases). "To 'acquiesce' in a violation means to give assent to the violation. Acquiescence 'can occur through silent acceptance.'" Third Cir. Mod. Civil Jury Instr. §4.6.1.

Applying this law – particularly given Bielewicz's prior notice that gender identity-related instruction could be contrary to certain parental wishes – Bielewicz taking no action to prevent Williams' instruction demonstrates a clear acquiescence in the instruction requiring entry of summary judgment against him on Count I. *E.g., Baker, supra; Torres, supra.*[10]

### 2.  Summary Judgment Should Be Entered Against the District, Wyland, Steinhauer, Irvin and Bielewicz for Having Ratified Williams' Unconstitutional Conduct After it Occurred

Based on a ratification theory, Paragraphs 115-117 and 139 from Plaintiffs' Concise

---

[9] This same record also supports summary judgment against Williams on Count III for violation of the Plaintiffs' right to familial privacy, given how she intruded into the parent-child relationship by, for example, telling the children that a parent can make a mistake about one's gender. *See generally, Gruenke*, 225 F.3d at 303-07.

[10] An analogy can be made to Section 1983 liability for law enforcement officers' failure to intervene. *E.g.,* Third Cir. Mod. Civil Jury Inst. §4.6.2.

Statement of Material Facts bear on Wyland's liability on Count I; Paragraphs 111-114, 118-125a and 140 bear on Steinhauer's liability; Paragraphs 111-114, 126-132 and 144-145 bear on Irvin's liability; and Paragraphs 133-138 and 147-151 bear on Bielewicz's liability. All of the above Paragraphs bear on the District's liability on Count I because the approval and ratification of Williams' instruction by the other individual Defendants is sufficient to constitute a District policy in favor of the instruction for purposes of Section 1983 liability. *See Starbuck*, 28 F.4th at 534-35 (discussing ratification liability in school setting, citing relevant Supreme Court precedent).

"Ratification liability . . . holds the [decision maker] liable for *its own* decision to uphold the actions of subordinates." *Id.* (emphasis in original). This typically occurs after the initial Constitutionally infirm conduct. *Id.* Thus, where school officials with policy making authority approve of a subordinate's unconstitutional actions, or by their own actions ratify the unconstitutional conduct, both the individual school officials and the school district have liability under Section 1983. *E.g., G.S. v. Penn-Trafford Sch. Dist.*, No. 20-3281, 2023 WL 4486667, at *4 n. 34 (3d Cir. July 12, 2023) ("The Supreme Court has held . . . that if the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final.") (cleaned up); *LaVerdure v. Cnty. of Montgomery*, 324 F.3d 123, 125–26 (3d Cir. 2003) *citing City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988); *A.M. ex rel. J.M.K.*, 372 F.3d at 586; *Moorehead v. Sch. Dist. of City of Allentown*, No. 5:22-CV-03959-JMG, 2023 WL 2976556, at *8-12 (E.D. Pa. Apr. 17, 2023) (finding that District and voting School Board members who approved teacher's termination could be held liable under § 1983); *Starbuck*, 28 F.4th at 534 (4th Cir. 2022) ("[W]hen a final policymaker has the authority to review the decision of a subordinate, its approval of that allegedly unconstitutional decision can also give rise to liability under Section 1983."); *Hall v. Marion Sch. Dist. No. 2*, 31 F.3d 183, 196 (4th Cir. 1994) (finding school board had ratified superintendent's unconstitutional firing of teacher because it "refus[ed] to intervene"). Under a ratification theory, "[a] single decision by an individual with policy making authority may be sufficient to impose liability on the school district." *A.M. ex rel. J.M.K*, 372 F.3d at 586 (citing *McGreevy v. Stroup*, 413 F.3d 359, 367-68 (3d

Cir. 2005)); *accord Dipippa v. Union Sch. Dist.,* 819 F. Supp. 2d 435, 443-446 (W.D. Pa. 2011) (deliberate indifference by policymakers gave rise to § 1983 liability).

Each of Wyland (Board President), Steinhauer (Superintendent), Irvin (Assistant Superintendent), and Bielewicz (Principal at Jefferson Elementary) have policy or procedure making authority either for the District as a whole, Jefferson Elementary, or both. *Accord, Moorehead,* 2023 WL 2976556 at *8 ("School boards and their **members** are policy making officials for their school district.") (bold added); *Doe v. Southeast Delco. Sch. Dist.*, 140 F.Supp.3d 396, 401 (E.D.Pa. 2015) (superintendent is policy maker for purposes of §1983). Wyland is the Board President; Steinhauer functions as the District's CEO, has been delegated by the Board the authority to implement its Curriculum and Parental Rights Policy, and has "one-hundred percent" authority to create and implement written procedures for district administrators and teachers to follow; Irvin has the same authority as Steinhauer in Elementary School; and Bielewicz, as principal, has the power to run his particular school. CSF ¶¶ 119-121, 127, 161, and 163.[11]

Each of these Defendants affirmatively approved of and spoke in favor of Williams' instruction, including in meetings with Plaintiffs and other parents (Bielewicz), at Board meetings (Wyland, Irvin, Steinhauer) and at their depositions under oath (each Defendant). CSF ¶¶ 116, 117, 123, 129-30, 133. In the same vein, Williams was not subjected to any form of discipline (nor was Bielewicz). *Id.* ¶¶155-56. *Torres,* 907 F. Supp. 2d at 689 ("His refusal to discipline [teacher] was itself a sufficiently affirmative act to render him liable under § 1983 because he had actual knowledge of and acquiesced in his subordinate's violations of Plaintiffs' rights."). Further, the individual and collective failure by these Defendants to attempt to discover the actual facts of what

---

[11] District Policy BG (App Ex. 73) provides: "Policies are guides for action by the administration, who then sets rules and regulations to provide specific directions to District personnel[,]" "[t]o implement Board policy, Administrative Procedures will be developed by the Superintendent or under the Superintendent's direction. The Board reserves the right to review Administrative Procedures issued by the administration at its discretion, but it shall revise or veto such Administrative Procedures only when, in the Board's judgment, they are inconsistent with policies adopted by the Board. The Board shall be provided with copies of all policies and Administrative Procedures issued by the administration." *See, Lytle v. Carl*, 382 F.3d 978, 983-85 (9th Cir. 2004) (Superintendent had §1983 policy making authority based on delegation of authority from Board).

occurred in the classroom on March 31, 2022 (CSF ¶¶139-154) clearly shows acquiescence in Williams' conduct, particularly since her instruction was discussed at a number of public School Board meetings. CSF ¶167; *see Cain v. Tigard-Tualatin Sch. Dist. 23J*, 262 F. Supp. 2d 1120, 1131-32 (D. Or. 2003) (failure to investigate and discipline school employee can serve as a basis for § 1983 liability); *cf. Beck v. City of Pittsburgh*, 89 F.3d 966, 974 (3d Cir. 1996) ("It is not enough that an investigative process be in place; . . . '[t]he investigative process must be real.  It must have some teeth.'"). All of the above, based on the undisputed record, show an approval and ratification of Williams' conduct by each of the other individual Defendants. This gives rise to Section 1983 liability for each of these individuals on Count I. *See e.g., A.M. ex rel. J.M.K*, 372 F.3d at 586.

The conduct of these individuals with policy-making authority in approving and ratifying Williams' conduct also gives rise to Section 1983 liability for the District. *See e.g., G.S.*, 2023 WL 4486667, at *4 n. 34; *Hall*, 31 F.3d at 196; *Cain,* 262 F. Supp. 2d at 1131-32.

### 3. As to Plaintiffs' Forward-Looking Claims, Summary Judgment Should Be Entered against the District, Wyland, Steinhauer and Irvin Based on a District Policy, Practice or Custom of Refusing to Provide Advance Notice and Opt Out Rights for Gender Identity-Related Instruction

Based on a ***refusal*** to provide parents advance notice and opt out rights for gender identity-related instruction, which refusal continues to the present, Paragraphs 1-21, 25-26, 28-56, 118-122, 127, 165-167 from Plaintiffs' Con. Stat. of Mat. Facts bear on Steinhauer's and Irvin's liability for Count I on Plaintiffs' forward-looking claims including declaratory relief; and Paragraphs 1-3, 24-27, 52, 53, 115, 161-62, and 167 bear on Wyland's liability. All of the above bear on the District's *Monell* liability on Count I for Plaintiffs' forward-looking claims and declaratory relief.[12]

---

[12]  The Complaint referred to this as a *de facto* policy. Discovery has resulted in a factual record demonstrating that the District has *Monell* liability for a variety of reasons, including (i) the Board's failure to adopt an appropriate notice and opt out policy for gender identity-related instruction, (ii) a custom of providing advance notice and opt out for a wide variety of subjects but refusal to do so for gender identity-related instruction, (iii) a custom of providing insufficient notice to parents of their general ability to opt children out of certain instruction and refusing to do so for opt out requests that are based only on a non-religious parental objection, and (iv) adoption of a new written procedure that expressly refuses to provide advanced notice of instruction and does not permit a parent to have a child excused simply because they disagree with teaching gender identity issues to their young child. Each of these four bases is discussed below.

a.     **Applicable Law**

A municipal defendant is liable under Section 1983 "for constitutional violations that are caused by its official policies and customs." *Porter v. City of Philadelphia*, 975 F.3d 374, 383 (3d Cir. 2020). However, "[a] policy need not be passed by a legislative body . . . to constitute an official policy for the purposes of § 1983." *Id*.  In the absence of an express policy, an implied policy may exist where "the policymaker has failed to act affirmatively at all," if, despite an obvious need to correct inadequate existing practices, a policymaker does nothing – evincing a deliberate indifference to the likelihood of constitutional violations. *Natale*, 318 F.3d at 584 (citation omitted); *accord* Third Cir. Mod. Civil Jury Instr. §4.6.3.

In the context of a Section 1983 suit against a school district, the district may be held liable based on "a custom, practice, or policy of deliberate indifference" towards known conduct which is likely to cause a deprivation of Constitutional rights.  *Dipippa,* 819 F. Supp. 2d at 442 (W.D. Pa. 2011); *see also Cain*, 262 F. Supp. 2d at 1131-32 (District could be liable under § 1983 for failure to investigate or discipline teacher, as said failure signaled "that the district's official policy, practice, and custom was to inadequately supervise and discipline" said teacher). Thus, a Section 1983 plaintiff may establish liability by proving that the school district had a policy, practice or custom of *inaction* whenever a reasonable alternative would reduce the likelihood of known constitutional violations. *See Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720, 725 (3d Cir. 1989) *citing City of Canton v. Harris*, 489 U.S. 378, 389 (1989). A custom giving rise to liability based on acquiescence can also be shown via knowledge of past violations and inadequate responses to them that are the cause of the instant violation. *See Beck*, 89 F.3d at 92.

District liability can also be established based on a statement or decision made by a policy making official within that person's purview. *E.g.,* Third Cir. Mod. Civil Jury Instr. §§ 4.6.3, 4.6.5. Likewise, an individual with policymaking authority may also be liable based on the adoption of, or the failure to adopt, a policy, custom or practice that results in the infringement of Constitutional rights. *E.g., A.M. ex rel. J.M.K.*, 372 F.3d at 586 ("Individual defendants who are policymakers may be liable under § 1983 if it is shown that such defendants, 'with deliberate indifference to the

consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm.'") (quoting *Stoneking*, 882 F.2d at 725).

### b.   The District's Refusal to Provide Advance Notice and Opt Out Rights Related to Gender Identity Instruction Gives Rise to Monell and Supervisor Liability for a Variety of Reasons

#### 1.   The Board's and Wyland's Inaction in the Face of Williams' Conduct

In the wake of the public controversy that erupted after Williams' instruction on March 31, 2022, including discussion at multiple Board meetings (CSF ¶167) and the filing of this lawsuit, the School Board (led by Wyland who sets its agendas) has done nothing to protect parental rights despite the lack of any parental notice on March 31, 2022. The Board has not discussed, let alone voted on, any new parental notification policy if gender identity instruction is to take place, nor taken any action to prevent instruction on the topic; nor has the Board's Policy Committee. *Id.* ¶¶24, 27. This complete lack of action has persisted for nearly **two years**. As a matter of law, this creates an implied or *de facto* policy of not providing advance notice and opt our rights for gender identity-related instruction in the District because "the policymaker has failed to act affirmatively at all," after Williams' instruction and the lack of any notice of it showed an obvious need to correct inadequate existing practices, particularly as to notice and opt out rights. *Natale*, 318 F.3d at 584; *Stoneking*, 882 F.2d at 725; *A.M. ex rel. J.M.K.*, 372 F.3d at 586. Given Williams' instruction – particularly since two other teachers in the District read the books (CSF ¶165) and since the District has indicated it may teach the subject of gender identity even though it is **not** in the published Curriculum (*id.* ¶39) – this implied policy constitutes deliberate indifference to Plaintiffs' (and other parents') rights based on the undisputed record.[13]

Is this policy narrowly tailored to achieve a compelling interest? The record contains no evidence of a compelling need or interest to support the policy, let alone a narrowly tailored one.

---

[13] With three teachers using the books, coupled with and Irvin's knowledge of this and her ability to establish procedures for elementary schools (CSF ¶¶ 127, 166) – but with no procedure requiring parental notification having been made – the District also has an actionable custom of not providing notice and opt out for gender identity-related instruction. *Beck, supra*; *Fletcher v. O'Donnell*, 867 F.2d 791, 793 (3d Cir. 1989); *Bielevicz v. Dubion*, 915 F.2d 845, 850 (3d Cir. 1990).

Further, even a generalized interest in promoting tolerance, while laudable, cannot override the fundamental parental right to teach sensitive topics that go to the heart of the parents' relationship with their young children. *Meyer*, 262 U.S. at 401 ("a desirable end cannot be promoted by prohibited means"); *Students for Fair Admission, Inc. v. Harvard*, 600 U.S. 181, 214-15 (2023) ("commendable goals" "not sufficiently coherent for strict scrutiny"). This is particularly true in light of the historical practice in the District (discussed in detail below at p. 27) of providing advance notice and opt out rights on a wide variety of other subjects ranging from human development and "sex ed" to the showing of certain movies to attendance at an assembly involving a therapy dog. *See Burwell v. Hobby Lobby Stores, Inc*., 573 U.S. 682, 692 (2014) (regulation was not "least restrictive alternative" where system was available to accommodate objections).

In *Fulton v. City of Philadelphia*, 141 S.Ct. 1868 (2021), the Supreme Court explained that an asserted "compelling need" must be scrutinized in light of the specific opt out request:

> Rather than rely on "broadly formulated interests," courts must "scrutinize[ ] the asserted harm of granting specific exemptions to particular religious claimants." *O Centro*, 546 U.S. at 431, 126 S.Ct. 1211. The question, then, is not whether the City has a compelling interest in enforcing its non-discrimination policies generally, but whether it has such an interest **in denying an exception to CSS**.

141 S.Ct. at 1881 (emphasis added).  In other words, the District must demonstrate **why** it has a compelling need **not** to provide advance notice and opt out rights related to gender identity instruction. Here, the record shows no such compelling need and the District cannot rely on a generalized interest in promoting tolerance to deny providing advanced notice and ability to opt out. This is particularly true since the undisputed record establishes that there were no instances of bullying or intolerance of transgender children at the school. CSF ¶¶ 65-66.

Notice and opt out is a solution that recognizes both the District's claimed interest as well as the rights of the parents who disagree with the instruction. *See Meriwether v. Hartop*, 992 F.3d 492, 510-511 (6th Cir. 2021) (in First Amendment context, refusal to accept compromise on dispute about use of transgender pronouns undermined compelling interest

argument related to stopping transgender discrimination); *Glaser*, 351 F.Supp. at 560-61 (Judge Weis found that school policy on corporal punishment needed to provide opt out for parents). Yet, the District refuses to provide it and the total lack of Board action creates an implied/*de facto* policy that it will not be provided. Absent a compelling reason (one does not exist), parents' rights to shield their young children from sensitive topics they consider religiously, morally or age inappropriate, particularly in early elementary school, is paramount. *C.N.*, 430 F.3d at 185 (introducing a child to sensitive topics before a parent might have done so can undermine parental authority). Summary Judgment should, accordingly, be entered on Count I regarding Plaintiffs' forward-looking policy-based and declaratory claims against the District and Wyland, who as Board President has responsibility for setting the Board's agenda.

   2.   The District's Refusal to Provide Notice and Opt Out Rights for Gender Identity-Related Instruction in Light of the Historical Practice of Providing it for Other Subjects Violates Section 1983

Historically, the District has a practice and custom of providing notice and opt out on a wide variety of instruction and topics. The District provides advanced notice and the ability to opt out of instruction related to human development and sexuality, HIV, birth control/contraceptives and sexually transmitted infections. CSF ¶¶15-19. The topics for which notice is sent are broader than those for which advance notice is required by Pennsylvania law and the notice letters typically do not require a religious objection in order for a student to be excused. *Id.* Additionally, without the need for a religious objection, District representatives have sent advance notice and opt out letters for an assembly involving a therapy dog; certain movies to be shown in class; lunch group meetings with a school counselor; PASS surveys; the Scripps Spelling Bee; stories related to Chanukah, Christmas and Kwanza; dissection of animals in biology; and clips for a TV series involving a homosexual character. *Id.*

But the District has **never** sent a similar letter related to gender identity instruction; no such notice was provided as to Williams' instruction on March 31, 2022; and no written administrative practice or procedure requiring advance notice to parents of gender identity related instruction has been created. *Id.* ¶¶ 20-27, 41-56. Again, this amounts to a policy, practice or custom of refusing

to provide such notice and, for the reasons discussed above, no compelling interest undergirds this policy, practice or custom. This provides another basis for *Monell* liability against the District.

        3.    The District's General Notification of Parental Rights Cannot Forestall Summary Judgment

Plaintiffs' fundamental right to instill their important moral and religious values in their young children cannot be purely hypothetical – it must be enforceable. To exercise their rights, the Plaintiffs and other parents must have realistic advance notice of when the topic of gender identity will be presented. *See C.N.*, 430 F.3d at 176. The District does not provide it.

The District provides no direct communication indicating that parents generally can opt their children out of instruction and provides no direct communication related to gender identity instruction. CSF ¶¶ 28-56. All parents get – assuming it does not go into their spam folder – is a general Annual Notifications email or an emailed Newsletter with a Notifications tab. *Id.* A parent must discern that this is not junk mail, click on the notifications tab, then navigate multiple pages of the District's website before they would ever see a Parental Rights notification. *Id.* And even that notification (until the current school year) did not mention instruction on gender identity. Nor does the Parental Rights notification permit a parent to have a child excused if the parent's objection to the instruction is based on moral or personal (as opposed to strictly religious) beliefs.[14]

---

[14]  The new 2023-24 Parental Rights notice – accessible only by reading the generic email and navigating several web-clicks and then the District's website – indicates that gender identity instruction may occur "even if such instruction is not specifically identified in the published Curriculum." CSF ¶39. This further runs afoul of the parental rights asserted in Count I for at least four reasons. **First**, as Irvin testified, "[i]t would not be appropriate in an elementary school to teach the concept of transgenderism because that is not in our curriculum[.]" *Id.* ¶4. **Second**, an expressed intent to teach the subject but to intentionally not include it in the written Curriculum is contrary to the structure and intent of Pennsylvania statutory law as to parental rights. *See* 22 Pa. Code §4.4(d)(1)-(3).These regulatory provisions work together and must be read in the conjunctive – parents are provided access to curriculum information (§d(1)) and instructional information (§d(2)) so that they can properly exercise their right to have their children excused from certain instruction (§d(3)). The District's failure to follow Pennsylvania law by expressing an intent to teach gender identity but intentionally not placing gender identity instruction in the published Curriculum is itself compelling evidence of the District's continuing violation of Plaintiffs' fundamental parental rights. **Third**, it avoids placing the subject in the place that parents are supposed to look to see what their children are being taught – the published Curriculum. *Id.*¶¶6-

Under *C.N.*, this "notice" via a generic email is woefully insufficient as it is not reasonable for any parent to see the email and do the multiple click throughs in order to get to the Parental Rights section of the District website – in fact, one teacher with over two decades in the District and a parent of multiple District students had no idea the Parental Rights information even existed (CSF ¶37). *C.N.*, 430 F.3d at 176; *accord Glaser*, 351 F. Supp. at 557, n. 1 (mother did not have notice of ability to opt out of corporal punishment); *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 237 (2d Cir. 2016) (refusing to enforce on-line agreement based on website notice with "fifteen and twenty-five links on the Order Page . . . alongside multiple buttons").

Additionally, the "rights" provided by the District fail to adequately protect the parental rights at issue in Count I because they are limited to religious objections. While, in some respects and for certain of the Plaintiffs, the rights asserted in Count I align with their religious beliefs, the rights are not *per se* religious-based; rather, they are **parental** rights. An agnostic or atheist still has a fundamental right to direct the education, upbringing and the care, custody, and control of their children with regard to matters that "strike at the heart of parental decision-making authority on matters of the greatest importance." *C.N.*, 430 F.3d at 184; *accord Glaser*, 351 F. Supp. at 561 (parental objection to corporal punishment was not religion-based). Yet, an agnostic or atheist has no rights under the District's policy because a religious-based objection is required. Simply, the District's insufficient, limited "notice" cannot forestall summary judgment.

> 4.  The District's Current Written Directive for Assessing Parental Opt Out Requests, Which was Created by Steinhauer and Irvin, Violates Section 1983

District Policy I(F) (Curriculum and Parental Rights) delegates to the Administration, *i.e.,* Steinhauer and Irvin, "the responsibility to develop procedures necessary to implement this policy." CSF ¶28, App. Ex. 17. Based on this delegation of policy making authority, in August of

---

7. **Fourth**, it is at odds with the DEI Committee of the Board not having discussed, let alone approved, gender identity instruction in elementary school. At bottom, his is a clear, improper effort to get gender-identity instruction in through a backdoor because it is not allowed to come through the front door based on the current District Curriculum and state law. That effort violates the parental rights asserted in Count I and merits summary judgment against the District.

2022, Steinhauer and Irvin created a new written directive for evaluating parental opt out requests. CSF ¶¶ 41-51. Rather than protect the asserted parental rights, this new directive tramples on them.

Since March 31, 2022, this is the only written procedure created by District representatives regarding how to handle parental opt out requests. Under the directive, advance notice is not provided to parents; rather, the onus is on parents to assume gender identity will be taught (even though it is not in the Curriculum) and preemptively request that their child be excused from gender identity-related instruction. App. Ex. 24. The directive expressly refers to the Stipulated Order of Court (Doc. 12) entered in this case that mooted Plaintiffs' preliminary injunction request. In the summer of 2022, other parents were requesting the same temporary relief afforded to Plaintiffs by that Order, including advance notice of instruction on gender identity and access to related instructional materials. *Id*. In response, the new directive created by Steinhauer and Irvin instructs principals **not** to sign certain parental requests because (i) they do not expressly contain a religious exemption and (ii) require "advance notice of opt-out topics and a chance to review materials in a specific timeline." *Id.* In other words, the new directive, on its face, is a refusal to provide advance notice of gender-identity instruction and one cannot be excused simply on a non-religious parental objection.[15] That "policy" violates the fundamental parental rights asserted in Count I and requires summary judgment as to the District, as well as Steinhauer and Irvin who created it.

**B.**   **Summary Judgment Should Be Entered on Plaintiffs' Procedural Due Process Claim**

The elements of a § 1983 Fourteenth Amendment Procedural Due Process claim are: (1) the plaintiff was deprived of a protected liberty or property interest[16]; (2) this deprivation was

---

[15]   While opt outs under Pennsylvania law are limited to religious objections (*see* 22 Pa.Code. §4.4(d)), Defendants are still liable for their abrogation of Plaintiffs' Constitutional rights. Courts routinely recognize that § 1983 liability may attach even where the manner by which the plaintiffs' rights were deprived occurred in apparent compliance with a state statute. *See, e.g., Zinermon v. Burch*, 494 U.S. 113 (1990); *Gruenke*, 225 F.3d at 307. Thus, the Defendants' actions, even if in accord with Section 4.4(d), are nevertheless Constitutionally infirm.

[16]   The Constitutionally protected interest can either arise "from the Constitution itself" or "from an expectation interest created by state law or policies." *Long v. Holtry*, 673 F.Supp.2d 341, 347-49 (M.D.Pa. 2009); *Montanez v. Sec. of Pa. Dept. of Corr.*, 773 F.3d 472, 482 (3d Cir. 2014). Constitutionally protected liberty or property interests can be created by state regulations as well

without due process; (3) the defendant subjected the plaintiff to this deprivation; (4) the defendant was acting under color of state law; and (5) the plaintiff suffered injury as a result. *Sample v. Diecks*, 885 F.2d 1099, 1113 (3d Cir. 1989). The record facts and legal issues underlying Count II largely mirror those in Count I and for brevity are not repeated here.

The lack of procedural due process as to the claims against Williams, Bielewicz and the District concerning the instruction on March 31, 2022 stems from the failure to give advance notice and opt out rights regarding Williams' instruction (which the record establishes did not happen), particularly given that the Curriculum does not mention instruction on gender identity and the statutory framework in 22 Pa.Code §4.4(d).[17] For the forward looking and declaratory claims, the District's policy, practice and custom of not providing advance notice and opt out rights for gender identity-related instruction (which is discussed above with undisputed record support) is the basis for the procedural due process claim against the District, Wyland, Steinhauer and Irvin.

The record has no disputed material facts bearing on either of these bases for liability. No notice was given; the present policy, practice and custom is not to give such notice; and any

---

as statutes. *Layton v. Beyer*, 953 F.2d 839, 845 (3d Cir. 1992); *Carter v. City of Philadelphia*, 989 F.2d 117, 120 (3d Cir. 1993). Mandatory language dictating that state actors must treat qualified persons a certain way creates a protected liberty interest. *See Long*, 673 F.Supp.2d at 348.

[17]  The Pennsylvania's School Code creates due process-protected liberty and/or property interests in parental notice and opt out rights. *See* 22 Pa. Code §4.4(d)(1)-(3). Section 4.4(d) **requires** (1) access to information about Curriculum – but Defendants' published Curriculum gave no notice of the proposed instruction or anything similar to it; (2) access to instructional materials and a process for reviewing instruction materials – but Defendants did not make Williams' videos available for review or include them on any list of instructional materials; and (3) [t]he **right** of parents to have children excused from specific instruction that conflicts with their religious beliefs – here, because no notice of Williams' instruction was provided, parents were deprived of this opt out right. Prior to 1992, 22 Pa. Code §4.4(d)(3) only provided opt out rights for what is commonly referred to as "sex education." In 1991, the Board of Education proposed regulations mandating an objectives-based education curriculum that would have sought to instill certain values among public school students. *See e.g.*, 21 Pa. B. 5214 (Nov. 2, 1991). The General Assembly, in response to vocal concerns from parents, insisted that the Board broaden and strengthen parents' rights to excuse their children from instruction that conflicted with their religious beliefs, resulting in the current version of § 4.4(d)(3). *See* 22 Pa. B. 3641 (July 11, 1992); *see* also, 22 Pa. B. 3360 (July 4, 1992). The current §4.4(d)(3) was, thus, a conscious expression of parents' rights to direct the upbringing of their children in the public-school setting. *See* COMM. OF PENNSYLVANIA LEGISLATIVE JOURNAL, House of Representatives, p. 791 (Monday, April 6, 1992).

"notice" currently provided via the "Newsletter notification" is insufficient. *See C.N.*, 430 F.3d at 176; *In re Diet Drugs*, 434 F. Supp.2d at 336 (involving class actions) (noting that Supreme Court described "minimal Procedural Due Process protection" as consisting of the "best practicable" notice and a concomitant right to opt-out). Summary Judgment should be entered on Count II.

**C.**     **Summary Judgment Should Be Entered on Plaintiffs' Free Exercise of Religion Claim**

In two recent cases, *Fulton*, 141 S.Ct. 1868 and *Kennedy*, 142 S.Ct. 2407, the Supreme Court discussed the Free Exercise Clause of the First Amendment. Under this recent jurisprudence, a plaintiff can establish a Free Exercise violation in various ways, including by showing that a government entity burdened a sincere religious practice pursuant to a policy that is not "neutral" or "generally applicable." *Kennedy*, 142 S.Ct. at 2421-22; *accord Tandon v. Newsom*, 141 S.Ct. 1294 (2021). To overcome that showing, the government can satisfy "strict scrutiny" by demonstrating a compelling state interest and actions narrowly tailored in pursuit of that interest. *Kennedy, supra.*   A government policy will not qualify as "neutral" if it: (1) is specifically directed at religious practice; (2) discriminates on its face; or (3) has as its object a religious exercise. *Id.* (citations omitted). A government policy will not be "generally applicable" if it "prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way, or if it provides a mechanism for individualized exemptions." *Id.* (citations omitted); *accord Fulton,* 141 S.Ct. at 1881 ("Rather than rely on 'broadly formulated interests,' courts must scrutinize [] the asserted harms of granting specific exemption to particular religious claimants."); *Ricard,* 2002 WL 1471372 at *5; *Fraternal Order of Police v. City of Newark*, 170 F.3d 359, 365 (3d Cir. 1999) (Free Exercise Clause prohibits "deciding that secular motivations are more important than religious motivations."). Paragraphs 15-27 and 41-56 from Plaintiffs' Concise Statement bear on liability for the Free Exercise claim in Count IV as does the discussion on pages 25-30 above.

The Plaintiffs have sincerely held religious and/or moral beliefs about sexual and gender identity being synonymous and they desire to instill those beliefs in their children. On March 31, 2022, Williams taught her own contrary beliefs about gender identity to Plaintiffs' children.

The District provides parents advance notice and ability to opt out of instruction related to a wide variety of other topics, but no such notice was provided for Williams' instruction and, as discussed above based on the undisputed record, the District has a policy, practice, or custom of not providing advance notice if gender identity instruction is to occur even though gender identity instruction is admittedly not in the published Curriculum. Thus, under the above Supreme Court precedent, Defendants' actions are not neutral or generally applicable – advance notice and opt out is provided for secular reasons and topics but not for gender-identity instruction that impacts Plaintiffs' beliefs. This is, *inter alia*, specifically directed at Plaintiffs' beliefs, discriminatory on its face, and an improper mechanism for individualized exemptions.[18]

Further, *Fulton*, 141 S.Ct. at 1876, teaches that because the District has placed itself in the position of making individualized policy-related exemption decisions about when to provide advance notice and opt out rights, strict scrutiny applies to its conduct and the District must show a narrowly tailored, compelling interest. *See Fulton*, 141 S.Ct. at 1876. Strict scrutiny also applies because the policy, practice and custom relates to parents' rights to exercise their religion by "directing the education of their children[.]" *Emp. Div. v. Smith,* 494 U.S. 872, 881 (1990) (citations omitted).[19] As discussed above at pp. 25-27, the District cannot satisfy strict scrutiny based on the undisputed record, resulting in a  Free Exercise violation. Thus, summary judgment should be entered.

Simply, the Constitution protects Plaintiffs from having their kids' faith-based and moral beliefs indoctrinated out of them by a first-grade teacher (and the other Defendants' policy, practice, or custom) under the guise of teaching "tolerance." [20]  This is particularly true when what

---

[18]  Not providing notice and opt out also implicates the Free Exercise Clause's "protection against indirect coercion," because, without notice, to attend free, public-school parents are coerced to potentially subject their children to gender identity instruction that is counter to their belief systems. *See Carson v. Makin*, 142 S.Ct. 1987, 1996 (2022).

[19]  The concurring opinions in *Fulton*, make clear that *Smith's* fundamental rights approach under the Free Exercise Clause is the law, not *dicta*.

[20]  While Plaintiff Dunn testified she is not very religious, she has a strong moral opposition to Williams' instruction. The First Amendment protects these moral beliefs. To enjoy First

Williams taught is consistent with her own religious beliefs, but contrary to Plaintiffs. CSF ¶¶ 57-60. Summary Judgment should be entered on Plaintiffs' Free Exercise claim in Count IV.

**D.**    <u>**Summary Judgment Should Be Entered on Plaintiffs' Equal Protection Claim**</u>

The elements of an Equal Protection "class of one" claim are: (1) a public entity treated the plaintiff differently than others similarly situated; (2) the entity did so intentionally; and (3) there was not a proper basis for the difference. *Hill v. Borough of Kutztown*, 455 F.3d 225, 239 (3d Cir. 2006).[21] To establish a selective enforcement claim, plaintiffs must demonstrate that they were (1) treated differently from other, similarly situated persons and (2) this selective treatment was based on an unjustifiable standard, such as race, or religion, or some other arbitrary factor or to prevent the exercise of a **fundamental right**. *Harvard*, 973 F.3d at 205. Paragraphs 15-27 and 41-56 from Plfs' Concise Statement of Material Facts bear on liability for the Equal Protection claim in Count IV as does the discussion *supra* pp 25-30.

The gravamen of Plaintiffs' Equal Protection claim is that the District provides notice and opt out rights to parents for a variety of other topics but, under the policies, practices and customs discussed *supra* at 25-30, refuses to do so for gender identity-related instruction. The undisputed record establishes this is factually accurate. This dichotomy clearly impacts and burdens Plaintiffs' fundamental parental rights and it values some religious beliefs or concerns over others by providing notice and opt rights for certain instruction on sensitive topics but not for instruction on the controversial, life-altering topic of gender identity; thus, strict scrutiny applies. *E.g., Stepien*, 574 F.Supp.3d at 237 ("Strict scrutiny is appropriate if the challenged [conduct] . . . burdens the exercise of a fundamental right."); *see, Fraternal Order of Police*, 170 F.3d at 365 (secular motivations cannot be more important than religious motivations). By

---

Amendment Protection under the Free Exercise Clause, an individual's beliefs need not be tied to any specific religion. *See e.g., Florey v. Sioux Falls Sch. Dist. 49-5,* 619 F.2d 1311, 1318-19 (8th Cir. 1980) (citing *Wisconsin v. Yoder*, 406 U.S. 205 (1972)). Where an individual holds "beliefs that are purely ethical or moral in source and content[,]" those beliefs are entitled to protection under the Free Exercise Clause. *Welsh v. U.S.,* 398 U.S. 333, 340 (1970).

[21] While *Hill* used the phrase "rationale basis," here because fundamental parental rights are implicated, strict scrutiny, *i.e.*, a compelling interest, should be applied. *Stepien v. Murphy*, 574 F.Supp.3d 229, 237 (D.N.J. 2021).

intentionally creating this dichotomy, without any compelling (or even rational) basis for doing so (and the record contains no supportable basis), Defendants violate the Equal Protection Clause and summary judgment should be entered against the District and, given their policy making roles, Wyland, Steinhauer and Irvin on Count IV.

**E.** **The Court Should Enter a Declaratory Judgment Per Count VI Based on the Undisputed Record and Also Award Nominal Damages**

Among other relief, based on the undisputed record evidence, in order to protect their Constitutional rights, Plaintiffs seek on summary judgment, a Declaratory Judgment that: (1) Defendants are precluded from providing instruction related to gender identity without providing direct advance notice to parents and the ability to opt out of such instruction; (2) prior to any such instruction, all instructional materials will be made available to parents for review through appropriate technological means (i.e., parent portal) reasonably in advance of any instruction; and (3) Defendants are precluded from providing instruction related to gender identity without placing references to such instruction in the District's published Curriculum. Fed.R.Civ.Proc. 57, Advisory Comm. Note ("A declaratory judgment is appropriate when it will 'terminate the controversy' giving rise on undisputed or relatively undisputed facts").

Plaintiffs also request an award of nominal damages if the Court grants summary judgment on any of their claims. *See* Third Cir. Mod. Civil Jury Instr. §4.8.2 (Nominal Damages).[22]

## IV. CONCLUSION

The undisputed record establishes that Williams' instruction on March 31, 2022, the District's and other Defendants' acquiescence in and ratification of it, and adoption of a policy, practice, or custom of not providing advance notice and opt out rights for gender identity-related instruction violated and violates Plaintiffs' Constitutional rights for a multitude of reasons. The Defendants have rejected the Third Circuit's clear warning "that '*in loco parentis*' does not mean 'displace parents.'" *Gruenke*, 225 F.3d at 307. Summary Judgment should be entered.

---

[22] While Plaintiffs have a prayer for compensatory and punitive damages, if summary judgment and nominal damages are awarded, Plaintiffs will likely waive any other relief sought.

Dated: January 12, 2024

By:     /s/ David J. Berardinelli
David J. Berardinelli, PA I.D. No. 79204
DEFOREST KOSCELNIK & BERARDINELLI
436 Seventh Ave., 30th Fl.
Pittsburgh, PA  15219
Phone:  412-227-3100
Email:  berardinelli@deforestlawfirm.com

*Counsel for Plaintiffs*