**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CARMILLA TATEL, individually and as parent and natural guardian of her children; STACY DUNN, individually and as parent and natural guardian of her children; and GRETCHEN MELTON, individually and as parent and natural guardian of her children, | ) ) ) ) ) ) ) | Civil Docket No.: 2:22-cv-837 |
| Plaintiffs, | ) ) | |
| | ) | **JURY TRIAL DEMANDED** |
| v. | ) ) | |
| MT. LEBANON SCHOOL DISTRICT; MEGAN WILLIAMS; DR. TIMOTHY STEINHAUER; DR. MARYBETH D. IRVIN; BRETT BIELEWICZ AND JACOB W. WYLAND, | ) ) ) ) ) ) | |
| Defendants. | ) | |

**PLAINTIFFS' CONCISE STATEMENT OF MATERIAL FACTS THAT ARE**
**UNDISPUTED OR ASSUMED TO BE TRUE FOR PURPOSES OF THEIR**
**SUMMARY JUDGMENT MOTION**

Pursuant to Local Rule 56(B)(1), Plaintiffs submit the following Concise Statement of Material Facts that are undisputed or assumed to be true for purposes of their Summary Judgment Motion. The citations are to materials found in the Appendix submitted along with the Motion for Summary Judgment.

**I.    Plaintiffs' Parental, Moral and Religious Beliefs**

1.    Plaintiffs were not ready to discuss issues of gender identity with their (first- grade) children, believing that such a discussion was not age appropriate, and Plaintiffs were not ready for their children to receive instruction on gender identity. App. Ex. 1, Tatel Dep. at 100; App. Ex. 2, Melton Dep. at 15-16; App. Ex. 3 Dunn Dep. at 19;

2.    Plaintiffs Tatel (Roman Catholic) and Melton (Church of Jesus Christ of Latter-Day Saints) hold sincere religious and moral beliefs, *inter alia*, that human beings are created male or

female and that the natural created order regarding human sexuality cannot be changed regardless of individual feelings, beliefs, or discomfort with one's identity and biological reality, as either male or female; although not founded in a particular religion, Plaintiff Dunn holds similar moral views. App. Ex. 1, Tatel Dep. at 26-28; App. Ex. 2, Melton Dep. at 9-12, 15-16; App. Ex. 3, Dunn Dep. at 18-20, 22-24.

3.      At least three elementary school teachers in the Mt. Lebanon School District (the "District"), who are also mothers, testified that they thought teaching gender identity to first graders was either not age appropriate or was a subject on which parents should control the discussion with their children; a secondary school teacher, who is also a mother, expressed a similar opinion. App. Ex. 4, Wolling Dep. at 16-18, 25-26, 43-46; App. Ex. 5, Stewart Dep. at 11-13, 18-19;  App. Ex. 6, Cernicky Dep. at 11; App. Ex. 7, Christuldes Dep. at 20-21; *see* App. Ex. 8, Holloway Dep. at 21.

## II.     Instruction on Gender Identity is *Not* Part of the Published Mt. Lebanon School District Elementary Curriculum

4.      Defendant Irvin, who was the Assistant Superintendent for Elementary Education prior to retiring in June 2023, testified that "[i]t would not be appropriate in an elementary school to teach the concept of transgenderism because that is not in our curriculum but introducing a transgender person is not the same thing." App. Ex. 9, Irvin Dep. at 81.

5.      Defendant Irvin testified that the District's curriculum (made available in a general fashion to parents via the District website and in more detailed fashion via a web portal called Atlas) should guide classroom instruction. *Id.* at 31-33.

6.      Defendant Wyland is the School Board President and testified that, if a parent in the District wanted to understand what their child is going to be taught, the Curriculum section of the District website and Atlas are where they would go. App. Ex. 10, Wyland Dep. at 21-22.

7.      An elementary school teacher who is also a parent of District students testified that one reason the Curriculum is made available to parents is so that they can evaluate whether or not to ask their children to be excused from certain instruction. App. Ex. 4, Wolling Dep. at 21.

8.      For the 2021-22 school year, the 2022-23 school year and the present school year, neither the Curriculum section of the District's website nor the information available to parents in Atlas refers to teaching the subject of gender identity to elementary students, including first graders. App. Ex. 11, Tatel Decl. ¶3 and Exs. A, B, and C thereto; App. Ex. 12, Defs' Answers to Requests for Admission (ARFA) Nos. 6, 7; App. Ex. 10, Wyland Dep. at 23-26; App. Exs. 13, 14 and 15 (Dep. Exs. 29, 69 and 70).

9.      The District's DEI (Diversity, Equity, and Inclusion) Taskforce never discussed in a public meeting teaching the subjects of gender dysphoria and gender/transgender transitioning or any other topic specifically related to gender identity in elementary school. App. Ex. 12, ARFA No. 1.

10.     With the exception of discussing the books/videos played by Defendant Williams at an April 19, 2022 meeting, the DEI Committee of the School Board has never discussed in a public meeting teaching the subjects of gender dysphoria and gender/transgender transitioning or any other topic specifically related to gender identity in elementary school. *Id.*, No. 2.

11.     The District has not yet adopted a formal DEI Curriculum. *Id.,* No. 9.

12.     District Policy I(J) concerns selection of "Instructional Materials" and defines Instructional materials to include digital media, video and audio materials. *Id.*, No. 20; App. Ex. 16.  Appendix Exhibit 16 is an accurate copy of Policy I(J).

13.     District Policy I(F) indicates that parents and guardians should have access to information about the curriculum, including academic standards to be achieved, instructional materials, and assessment techniques. App. Ex. 12, No. 21; App. Ex. 17. Appendix Exhibit 17 is an accurate copy of Policy I(F).

14.     The other first grade teacher at Jefferson Elementary School (JES), which is the school where Williams teaches, testified that "I base everything what [sic] I do at school on the curriculum, the Mt. Lebanon Curriculum." App. Ex. 18, Bilodeau Dep. at 13.

III.   **For Certain Subjects or Topics, But Not Gender Identity, the District Provides Advance Written Notice and the Ability for Parents to Opt Their Children Out**

    A.   **Advance Notice and Opt Outs on Certain Topics**

15.   The District provides advanced parental notice and the ability to opt students out of instruction related to: in fifth and eighth grade, human development and sexuality; and in eleventh grade, HIV, sexuality, birth control/contraceptives, and sexually transmitted infections. App. Ex. 12, ARFA Nos. 12, 16; App. Ex. 19, Interrogatory Resp. No. 9; App Ex. 20 (sample notice letters).

16.   The advance notice and opt outs provided by the District cover topics that are broader than those topics for which advance notice and opt out is required by the Pennsylvania statutes and regulations. App. Ex. 21, Steinhauer Dep. at 69-70.

17.   Certain of the letters written to parents about opting out of the instruction referred to in Paragraph 15 do not indicate that opting out must be based on a religious objection. App. Ex. 20.

18.   District representatives have sent advance notice and the ability for parents to opt students out of participation in an assembly involving a therapy dog; for certain movies to be shown in class (including The Bad Guys, The Tiger Rising, Invictus (which concerns Nelson Mandela and Apartheid), and The Giver, ); for lunch group meetings with a school counselor; for PASS surveys; for the Scripps Spelling Bee; for stories related to Chanukah, Christmas and Kwanza; dissection of animals in biology; and video clips from a TV series that involves a homosexual character. App. Ex. 22 (sample notices); App. Ex. 21, Steinhauer Dep. at 67-71; App Ex. 8, Irvin Dep. at 72-76.

19.   None of the letters/notices found at Appendix Exhibit 22 indicate that a parental decision to opt a student out of the items listed in Paragraph 18 needs to be based on a religious objection. App. Ex. 22; *see* App. Ex. 21, Steinhauer Dep. at 67-69.

B.    **The District Does Not Provide and Has Not Provided Specific Advance Notice and Opt Out Rights as to Gender Identity Instruction**

20.    The District has **never** sent a letter directly to elementary school parents advising them in advance of particular planned instruction on the subject of gender identity/transgender issues and providing the ability to opt out their children. App. Ex. 12, ARFA No. 19.

21.    Parents were not provided any advance notice of, with the ability to opt out their children from, Mrs. Williams' playing/reading *When Aidan Became a Brother* ("Aidan") and *Introducing Teddy* ("Teddy") on March 31, 2022. App. Ex. 12, ARFA No. 4.

22.    During the course of the 2021-2022 school year, Williams had sent group emails to the parents of the students in her class, including an email titled "Family Interest Inventory" that advised, in part, that the family of a student had expressed interest in sharing their Hanukkah traditions with the class. App. Ex. 23, Williams Dep. at 27-30; App Ex. 24, Dep. Ex. 58.

23.    After March 31, 2022, either in communications with parents or in helping a teacher respond to a parent communication, three elementary school principals in the District, one of which was Defendant Bielewicz, indicated that advance notice potentially should be provided to parents with regard to gender identity instruction. App Ex. 25, Dep. Ex. 30; App Ex. 26, Yablonski Dep. at 20; App Ex. 27, Dep. Ex. 24; App Ex. 28, Kitsko Dep. at 22-23; App. Ex.29, Dep. Ex. 19; App Ex. 30, Murray Dep. at 19.

24.    The School Board has not discussed the adoption of a policy whereby parents would be provided advance notice and opt-out rights for gender identity instruction nor has the Board provided any directive prohibiting instruction on gender identity. App. Ex. 21, Steinhauer Dep. at 71; App. Ex. 10, Wyland Dep. at 53-54

25.    Defendant Wyland, the School Board President, testified that he was not aware of any written operational guideline (*i.e.*, a written procedure implementing a Board policy) from the District's Administration telling principals and teachers to provide advance notice if the subject of gender identify is to be taught, nor any directive from the Administration prohibiting the subject of gender identity from being taught. App. Ex. 10, Wyland Dep. at 51-52, 53-54.

26.     No written administrative practice or procedure requiring advance notice to parents of gender identity related instruction has been created by the Administration. App. Ex. 8, Irvin Dep. at 62-65.

27.     Since March 31, 2022, the School Board's Policy Committee has not discussed any changes to the District's Parental Rights policy (Policy I(F)) or adopting any additional or different parental rights policies. App. Ex. 10, Wyland Dep. at 17-19.

**IV.     Mt. Lebanon's Insufficient Notice of Religious Opt Out Rights in General**

28.     Under District Policy I(F), the District's Administration is responsible for developing procedures necessary to notify parents and guardians of their right to have their child(ren) excused from specific instruction which conflicts with their religious beliefs. App. Ex. 12, ARFA No. 25.

29.     Under Policy I(F), a parent can only excuse a child from instruction based on a conflict with their religious beliefs; no other basis for opting out is contained in the Policy. App. Ex. 17.

30a.    For the 2021-22 and 2022-23 school years, at the start of the school year, a general email was sent to all District parents titled "Important Annual Notification to Parents." App Ex. 31, Dep. Ex. 35; App. Ex. 8, Irvin Dep. at 42-45; App. Ex. 11, Tatel Decl. ¶5 and Ex. F thereto

30b.    For the 2023-24 school year, parents received by email a MLSTD Weekly Newsletter, with the first one titled MTLSD Newsletter-Updated Links; one Tab on the Newsletter email was "Annual Notifications" but the Tab was not called out in any way in the body of the Newsletter. App. Ex. 11, Tatel Decl. ¶ 6 and Ex. F thereto

31.     Parents' religious opt out rights under District Policy I(F) are not mentioned on the face of the email in paragraph 30a or the Newsletter in Paragraph 30b. App Ex. 31, Dep. Ex. 35; App. Ex. 8, Irvin Dep. at 42-45; App. Ex. 11, Tatel Decl. ¶¶ 5, 6 and Exs. D and F thereto.

32.     To find a reference to religious opt out rights under District Policy I(F), a parent needs to (i) for years prior to 2023-24, click on a link in the Important Annual Notification to Parents email that takes you to the District website and, for 2023-24, click on the Annual

Notifications Tab on the Newsletter that takes you to the District website, then (ii) find the Parental Rights button, which is one of twenty-one buttons on the Annual Notifications webpage to which a parent is directed, then (iii) click the Parental Rights button, which is one of twenty-one buttons on the page. App. Ex. 11, Tatel Decl. ¶¶ 5, 6 and Ex. E thereto; App. Ex. 32 (pages from website).

33.      The "Parental Rights" information can also be accessed on the District's website but in order to get to it, a parent needs to (i) visit the website, (ii) click on the "District" tab, (iii) then click on the Annual Notifications tab, (iv) then find the Parental Rights button, which is one of twenty-one buttons on the page, then (v) click on the Parental Rights button. App. Ex. 11, Tatel Decl. ¶7 and Ex. G thereto; App. Ex. 32 (pages from website).

34.      The District does not send (and has never sent) an email to parents where, in the body of the email, parents are notified of their "Parental Rights" as set forth in the Parental Rights button on the website. App. Ex. 11, Tatel Decl. ¶11; App. Ex. 8, Irvin Dep. at 44.

35.      The District does not send (and has never sent) an email to parents where the body of the email provides a direct link to the District's "Parental Rights" notification on the website. App. Ex. 11, Tatel Decl. ¶10.

36.      The District does not send (and has never sent) an email to parents where, in the body of the email, parents are notified that they can opt a student out of gender identify-related instruction. App. Ex. 11, Tatel Decl ¶11; *see* App. Ex. 12, No. 19

37.      A teacher who has been a District employee for over 20 years and also a parent of students in the District for over a decade testified that she was unaware of the opt-out language in the Parental Rights notification. App. Ex. 4, Wolling Depo. 23-24.

38.      For the 2021-22 and 2022-23 school years, nothing in the "Parental Rights" notification on the District Website mentioned possible instruction on gender identity. App. Ex. 11, Tatel Decl. ¶8 and Ex. H thereto.

39.      For the 2023-24 school year, the "Parental Rights" notification on the District website indicates that "the District curriculum may include instruction or discussion on a wide array of topics including race, color, age, creed, religion, sex, gender, gender identity, sexual

orientation, ancestry, national origin, familial status, language, genetic information, pregnancy, or handicap or disability, **even if such instruction is not specifically identified in the published Curriculum.**" App. Ex. 33 (capitalization in original, bold added); App. Ex. 11, Tatel Decl. ¶9 and Ex. I thereto.

40.     For the 2023-24 school year, the published Curriculum for elementary school that is available to parents via the District website and Atlas portal still does not mention instruction on gender identity. App. Ex. 11, Tatel Decl. ¶¶ 3, 9 and Exs. A and C thereto.

**V.     The District's New Written Procedure for Addressing Opt Out Requests Related to Gender Identity Instruction**

41.     After March 31, 2022, the only written procedure created by District representatives addressing how to handle parental opt out requests is Deposition Exhibit 13 (an accurate copy of Deposition Exhibit 13 is found at App. Ex. 34). App. Ex. 21, Steinhauer Dep. at 64-65.

42.     Exhibit 13 was developed in August 2022 primarily by Steinhauer, Irvin and the Assistant Superintendent for secondary education. App. Ex. 8, Irvin Dep. at 67-68.

43.     No written procedure has been created instructing that, if topics of gender identity are to be taught, that parents should be given advance notice and the ability to opt out. App. Ex. 21, Steinhauer Dep. at 65-66.

44.     The written procedure found at Exhibit 13 places the onus on the parent to request that their child be excused from instruction. App. Ex. 34; App. Ex. 21, Steinhauer Dep. at 67;  App Ex. 35, Ramsey Dep. at 17; *see* App Ex. 10, Wyland Dep. at 20.

45.     Steinhauer testified that, in order to carry that onus, the parent must navigate the general Annual Notifications email that is sent out at the beginning of the year about policies and procedures. App. Ex. 21, Steinhauer Dep. at 67.

46.     The written procedure (Dep. Exhibit 13) does not provide for advance notice to parents of planned instruction so that they can decide whether or not to opt out their children. App. Ex. 34.

47.     One portion of Exhibit 13, in addressing certain form requests that had been submitted by parents, states "this request also requires advance notice of opt-out topics and a chance to review materials in a specific timeline. **Do not sign and return any forms sent by parents**." (emphasis in original). App Ex. 34.

48.     Dep. Exhibit 13 only permits a parent to opt out a child if they have a religious objection. *Id.*

49.     One elementary school principal testified that if the parental objection is non-religious, the opt out should not be approved. App. Ex. 35, Ramsey Dep. at 17-18.

50.     Another elementary school principal testified, "if you don't say 'I object on religious beliefs,' then I can't opt your child out." App Ex. 36, Artinger Dep. at 36.

51.     Dep. Exhibit 13 makes specific reference to certain parents using a "sample form" that "refences the stipulated agreement [in Civil Docket No. 2:22-cv-837] and does not claim a religious objection"; principals are instructed, "**Do not sign and return any forms sent by parents**." App. Ex. 34.

52.     Wyland testified that, other than potentially calling out gender identity in the curriculum, he did not recall any other discussions with administrative leadership about parental notification related to gender identity instruction. App. Ex. 10, Wyland Dep. at 45-48.

53.     The District's Elementary Curriculum available to parents via the District website and Atlas portal still has no refence to gender identity or gender identity instruction. App. Ex. 11, Tatel Decl. ¶¶ 3, 9 and Exs. A and C thereto.

54.     One elementary school teacher, in response to the question, "Have there been any directives given to you or your colleagues about, if you're going to teach this subject matter [gender identity], you ought to give your parents notice?" testified "No, not that I recall." App. Ex. 4, Wolling Dep. at 26.

55.     Another teacher testified that Bielewicz has not instructed the faculty to let parents know ahead of time if the subject of gender identity is going to be taught at Jefferson Elementary. App. Ex. 37, Davis Dep. at 17.

56.     One elementary school principal testified that he has not received any instruction from Irvin that parents should be given advance notice if a book about gender identity is going to be used in their child's classroom. App. Ex. 35, Ramsey Dep. at 23-24.

**VI.     Mrs. Williams Background and Her Own Child's Gender Transition in 2021-2022**

57.     Williams attends a church that has pledged to "advocate for . . . transgender . . . people" and has been "on the forefront of LGBTQ inclusion for more than 40 years." App Ex. 38, Magaw Depo. at 15-23, 27; App Ex. 39, Dep. Exs. 94-95 (church website printouts).

58.     Williams is an active member of the church. App. Ex. 23, Williams Dep. at 11-12, 13.

59.     In June of 2020, Williams took her family to a rally and march in support of "Pittsburgh Black Trans Lives." *Id.* at 85-86; App. Ex. 40, Dep. Ex. 67.

60.     This was before her oldest child, who previously used male pronouns, began to use female pronouns, which occurred in March of 2022. App. Ex. 23, Williams Dep. at 31-32; App Ex. 41, Dep. Exs. 59 and 60.

61.     Williams' child changed to using female pronouns the same week that Williams read *When Aidan Became a Brother* and *Introducing Teddy* to her first-grade class. App Ex. 41, Dep. Exs. 59 and 60.

62.     In text messages with colleagues in March and April 2023, Williams indicated that this was "breaking me," was "so much big change all at once," and "it's just been a lot," and "[s]ometimes I just feel like life is too much." App. Ex. 42, Dep. Ex. 22, text thread between M. Williams and C. Froelich dated 3/31/22; App. Ex. 41, Dep. Exs. 59 and 60, text thread between M. Williams and S. Shaw; App. Ex. 43, Dep. Ex. 61, text string between M. Williams and "Jess"; App. Ex. 44, Dep. Ex. 64, text thread between M. Williams and multiple recipients; App. Ex. 23, Williams Dep. at 47-48, 48-49, 52-53, 63-64; App. Ex. 45, Froelich Dep. at 33-34.

63.     Because of her own child's gender transition, Williams felt that criticism that arose from the events in her own first-grade class on March 31, 2022 was "so f**king personal." App. Ex. 41, Dep. Exs. 59 and 60; App. Ex. 23, Williams Dep. at 39.

**VII.** **Mrs. Williams' Preparation for and Instruction on March 31, 2022 and Other Disregard for Parental Rights**

**A.** **Record Evidence Related to Material Facts Before March 30, 2022**

64. On October 1, 2021, in response to information in the Jefferson Elementary newsletter about acknowledging LBGTQ month, in an email to Bielewicz, L.R. asked, "I was wondering if/how this is acknowledged in the first grade because I am not comfortable with my daughter learning about gender identity at this age." Bielewicz responded, "[t]here is no formal introduction or lessons surrounding it at JES, especially in 1ˢᵗ grade. It's just merely an acknowledgment of inclusivity and awareness to our JES community." L.R. forwarded this response to Mrs. Tatel. App. Ex. 46, Dep. Ex. 82.

65. To the District's knowledge, Williams' class for the 2021-22 school year did not contain any students who had identified themselves to the District as transgender and, for academic year 2021-22, no student at Jefferson Elementary identified themselves to the District as transgender. App. Ex. 12, ARFA Nos. 10 and 11.

66. The District received no complaints of transgender harassment or discrimination by a transgender student at Jefferson Elementary in the 2021-22 school year. *Id.* No. 40.

67. Williams informed her class that her child went as Elsa for Halloween. App. Ex. 23, Williams Dep. at 69-70. When asked why she did so, Williams answered, "I do not recall." *Id.*

68. For the first fifty-two days of the school year in 2021-22, if Williams was present in class, Williams did not have her class recite the Pledge of Allegiance and, on Veterans Day 2021, Williams said to her class, in substance, "can you believe I forgot to say the pledge for fifty-two straight days." App. Ex. 12, ARFA Nos. 26 and 27.

69. On Valentine's Day 2022, Williams played an episode or video from the Pete the Cat series for her class; prior to the class watching the video, Plaintiff Melton's daughter informed Williams that she was not permitted to watch Pete the Cat by her parents; Williams then told Plaintiff Melton's daughter, in substance, "I will tell your mom that I told you it was ok to watch it" and permitted Plaintiff Melton's daughter to watch the show/video. App. Ex. 12, ARFA Nos.

28-30.

70.     Williams told Plaintiff Dunn's son, in substance, that he had similar interests to Williams' child including the same favorite color.  *Id.*, No. 33.

**B.      Planning for and Williams' Instruction about Gender Identity on March 31, 2022**

71.     In March of 2022, issues about teaching the subject of gender identity in elementary schools was in the national media particularly due to the passage in Florida of a bill prohibiting such instruction in kindergarten through third grade – the bill was signed into law by Governor DeSantis on March 28, 2022. App. Ex. 47 (legislative history of bill and news articles); App. Ex. 59, Mathewson Dep. at 19-20.

72.     In planning to recognize "international trans day of visibility" (March 31, 2022), on the night of March 30, 2022, Williams engaged in a text message conversation with two fellow teachers; during the text exchange, the books *When Aidan Became a Brother* and *Introducing Teddy* were discussed. App. Ex. 48, Dep. Ex. 27 (text thread dated 3/30/22 between Williams, D. Lewis & K. Herzog).

73.     One of the participants in the text string indicated she was going to read *Aidan* even though "I may get pulled into the principal's office." *Id.*

74.     At 9:23 am on March 31, 20222, Williams sent Bielewicz an email stating, "I was thinking of sharing these read alouds with colleagues, but I just wanted to run it by you first?  They were both recommended to me by other teachers in the district"; after he reviewed the two video illustrations of the books, Bielewicz replied at 11:25 a.m., "I'm fine with it.  It's their choice if they wish to incorporate or not." App. Ex. 19, Answer to Interrogatory No. 3; App. Ex. 49 (MLSD 0001).

74a.    After watching the videos, Mr. Bielewicz testified that he "went about my day." App Ex. 50, Bielewicz Dep. at 22.

74b.    After watching the videos, he did not tell Williams "we ought to put the brakes on this for now." *Id.* at 23.

75.    At 11:38 am on March 31, 2022, Williams shared links to *Aidan* and *Teddy* with the faculty and staff of Jefferson Elementary via email; the email, among other things, indicated "Today is Transgender Day of Visibility" and "This is a topic close to my heart." App. Ex. 51, Dep. Ex. 1.

76.    Williams also posted a link to the books on her personal Facebook page. App. Ex. 5, Stewart Dep. at 23.

### 1.    *When Aidan Became A Brother* and the Class Discussion

77.    Sharon Boss (an aide in the class in the morning) testified that, during the morning of March 31, 2022, Williams brought up Take Your Child to Work Day with her class and mentioned that her child may come to school and, in the course of that discussion, indicated that "[Williams' child] is a she now" and "he is a she." App. Ex. 52, Boss Dep. 31-35; App. Ex. 53, Dep. Ex. 9 (Boss notes).

78.    As of March 31, 2022, teachers were not permitted to bring their children to work on Take Your Child to Work Day which occurred on April 28, 2022. App. Ex. 54, Dep. Ex. 2, Email dated 4/19/22 from B. Bielewicz to JES staff; App. Ex. 55, Depo. Ex. 84 Email from B. Bielewicz to N. Bilodeau dated 4/19/22; App. Ex. 50, Bielewicz Dep. at 61-62; App. Ex. 4, Wolling Dep. at 39-40.

79.    Boss testified that Williams then ("right after") played the video and read *When Aidan Became a Brother*. App. Ex. 52, Boss Dep. at 36-37; Dep. Ex. 9.

80.    Boss testified that the students were abnormally quiet while Williams read *When Aidan Became a Brother*. App Ex. 52, Boss Dep. at 22.

81.    Boss testified that when Williams finished reading/playing the book, Williams asked the class if there were any questions. App. Ex. 52, Boss Dep. at 23, 40; Dep. Ex. 9.

82.    According to Sharon Boss, the reading of *Aidan* caused "confusion" amongst the first-grade students, with Mrs. Dunn's son shouting out "I don't get it." App. Ex. 52, Boss Dep. at 23-28, 40-45; Dep. Ex. 9.

83.     Boss testified that one student called out "Oh, I get it – she was a he" and Williams as part of the discussion said "yes, she was a he" referring to the character in the book. App. Ex. 52, Boss Dep. at 23-28, 40-45; Dep. Ex. 9.

84.     Boss testified that several students then asked, "who decides this" and Williams responded, "your parents do." App. Ex. 52, Boss Dep. at 23-28, 40-45; Dep. Ex. 9.

85.     Boss testified that Williams then called for a recess. App. Ex. 52, Boss Dep. at 23-28, 40-45; Dep. Ex. 9.

86.     Based on the class schedule created by Williams, no recess was scheduled at this time of day. App. Ex. 56, Dep. Ex. 10.

87.     Based on the class schedule created by Williams, at the time of the morning when the above discussion and reading of *Aidan* took place, the class was scheduled for Readers' Workshop" focused on phonemic awareness. App. Ex. 56, Dep. Ex. 10.

88.     Boss testified that as the class left, Williams said to Mrs. Boss, "I hope you were ok with that lesson," to which Mrs. Boss responded, "It doesn't matter what I think – it matters what they think and what their parents think." App. Ex. 52, Boss Dep. at 48-49; Dep. Ex. 9.

89.     Plaintiffs' deeply rooted parental, moral and religious beliefs teach that parents do not select a child's gender – a child's gender is determined by God and (scientifically) by the child's X and Y chromosomes. App. Ex. 11, Tatel Decl. ¶2; App. Ex. 1, Tatel Dep. at 26-28; App. Ex. 2, Melton Dep. at 9-12, 15-16; App. Ex. 3, Dunn Dep. at 18-20, 22-24.

90.     A print copy of *Aidan* is found at App. Ex. 57.

91.     One elementary school principal described *Aidan* as a book about "[a] child transitioning." App. Ex. 30, Murray Dep. at 18-19.

92.     Neither the word "tolerance" nor the word "kindness" is contained in *Aidan*. App. Ex. 57.

93.     No character in *Aidan* was the subject of bullying or being picked on. *Id.*; App. Ex. 10, Wyland Dep. at 42-43.

94.     *Aidan* uses the term "transgender" on page 6 and, in referring to Aidan, on page 18 contains the line: "When you were born, we didn't know you were going to be our son. We made some mistakes but you helped us fix them." App. Ex. 57.

        **2.**     ***Introducing Teddy* and the Class Discussion**

95.     Later in the day, at some point in the afternoon, Williams played/read *Teddy*. App Ex. 23, Williams Dep. 59.

96.     A print copy of *Teddy* is found at App. Ex. 58 and the title uses the term "Gender." App. Ex. 58.

97.     Lisa Mathewson (an aide in the class in the afternoon) testified that after playing/reading the book, Williams discussed it with the class for about five to ten minutes. App. Ex. 59, Mathewson Dep. at 13-15.

98a.     Mathewson testified that, during that discussion, Williams referred to her own child. App. Ex. 59, Mathewson Dep. at 12-15.

98b.     Jackie Girman (an aide in the class in the afternoon) testified Williams told the class her child would be coming for Bring Your Child to Work Day and would be in a dress. App. Ex. 60, Girman Dep. at 18.

99.     Mathewson testified that as part of the class discussion, Williams told her first-grade class "parents make a guess about their children's – when children are born, parents make a guess whether they're a boy or a girl. Sometimes parents are wrong." App. Ex. 59, Mathewson Dep. at 13.

100.     Girman reported to a colleague, who then memorialized the statement in an email to Defendant Bielewicz, that Williams had told the children, "when you're born, your parents make a guess of what you are and sometimes they're right and sometimes they're not." App. Ex. 61, Dep. Ex. 3, Email dated 4/1/22 from C. Stewart to B. Bielewicz; App. Ex. 60, Girman Dep. at 12-15.

101.   During the discussion with her first-grade class after Williams played/read *Teddy*, Mrs. Dunn's son exclaimed at Williams, "But, I'm a boy." App. Ex. 59, Mathewson Dep. at 12-15, 22; App Ex. 60, Girman Dep. at 19-20.

102.   *Teddy* was played/read at a time when, according to the schedule created by Williams, either Social Studies/Science, Math or Writer's Workshop should have been taught. App. Ex. 56*,* Dep. Ex. 10.

103.   Neither the word "tolerance" nor the word "kindness" is contained in *Teddy*. App. Ex. 58.

104.   No character in *Teddy* was the subject of bullying or being picked on. *Id.*; App. Ex. 10, Wyland Dep. at 42-43.

105.   Mathewson was surprised that Williams played the video and one reason she provided for being surprised was the on-going public controversy about such instruction in the national media at the time. App. Ex. 59, Mathewson Dep. at 19-20.

106.   Williams testified that she read the deposition testimony of Boss, Mathewson and Girman and "nothing stood out in her mind" as being factually incorrect or inaccurate and when she read the depositions she did not see anything that caused her to say "that's wrong." App. Ex. 23, Williams Dep. at 13-15.[1]

### 3.   Further Evidence of the Children's Confusion

107.   Regarding *Aidan,* Sharon Boss testified that certain girls in the class "didn't understand the concept of it." App. Ex. 52, Boss Dep. at 35.

108.   After school on March 31, 2022, Mrs. Tatel's daughter asked Mrs. Tatel "how do you know that I am a girl?". App. Ex. 1, Tatel Dep. at 74-75.[2]

---

[1]  Williams did indicate that she found Boss' description of being "unable to stand, weakness in her knees" to be hyperbolic. *Id.*

[2]  The District did not seek to exclude this testimony or the testimony in ¶110 in its Motion in Limine.

109.    Sharon Boss testified that the following day, Mrs. Tatel's daughter was "upset" and brought up that "when you change a baby's diaper . . . you know if they're a boy or a girl." App. Ex. 52, Boss Dep. at 54-55.

110.    On the evening of March 31, 2022, L.R.'s daughter was questioning whether her pink stuffed bear who she referred to as a boy should really be a girl. App. Ex. 62, L.R. Dep. at 22-24.

## VIII.    Approval of Williams' Instruction by Bielewicz, Irvin, Steinhauer, and Wyland

111.    In a text message to Jessica DiGregory on April 3, 2022, Williams wrote, that Tim [Steinhauer] and MB [Irvin] "know everything and I am backed by everyone. App. Ex. 23, Williams Dep. at 49-50; App. Ex. 63 (MLSD 000508-509).

112.    In a text message to Dani Lewis and Kat Herzog on March 31, 2022 (as determined by the April 1 date on MLSD 1328), Williams wrote, that Brett [Bielewicz] and MB [Irvin] "have my back[.]" App. Ex. 64, Dep. Ex. 62.

113.    In a text message to Sarah Shaw, regarding the events of March 31, 2022, Bielewicz wrote "having mb [Irvin] and tim [Steinhauer] support helps too." App. Ex. 65, Dep. Ex. 80; App. Ex. 50, Bielewicz Dep. at 29.

114.    Regarding the text message referred to in Paragraph 113, Bielewicz testified that, based on his conversations with Steinhauer and Irvin, they had no issue with Williams having read the books. App. Ex. 50, Bielewicz Dep. at 29.

### A.    Wyland

115.    Wyland is the President of the School Board. App Ex. 10, Wyland Dep. at 8.

116.    At a public School Board meeting on April 11, 2022, Wyland made comments that he testified were in favor of Williams' instruction. *Id.* at 42; link to Board meeting at ¶167 below (Wyland's comments start at 1:24:23 and end at 1:29:22).

117.    Wyland testified that as of the date of his deposition on June 28, 2023, he was still in favor of Williams' instruction. *Id.*

**B.** **Steinhauer**

118.    Until he retired at the end of the 2022-23 school year, Steinhauer was the District's Superintendent. App. Ex. 21, Steinhauer Dep. at 6.

119.    As Superintendent, Steinhauer had the authority to create and implement written procedures for District administrators and teachers to follow. *Id.* at 8-9.

120.    On the "procedure end," Steinhauer had "a hundred percent authority." *Id.*

121.    In Board Policy I(F) (Curriculum and Parental Rights), the Board has delegated to the Administration the responsibility to develop procedures necessary to implement the policy. App. Ex. 17 (Policy I(F)).

122.    If a procedure is going to apply to all the schools in the District, Steinhauer would typically put the procedure in writing. App. Ex. 21, Steinhauer Dep. at 45.

123.    Steinhauer spoke about the books at a public School Board meeting on April 11, 2022 and indicated that he had seen the books and the underlying theme was about "kindness, empathy towards all and acceptance towards others" and, at his deposition, testified that he thought "it was appropriate that [Williams] used the books in her classroom." *Id.* at 33; link to Board meeting at ¶167 below (Steinhauer's comments start at 58:26 and end at 59:56).

124.    An elementary school principal testified that she believed Steinhauer was supportive of Williams based on a discussion she had with him. App. Ex. 36, Artinger Dep. at 43-44.

125.    On April 1, 2022, Mrs. Dunn wrote an email to Steinhauer that is marked as Deposition Exhibit 91 and found at App. Ex. 66.

125a.    Steinhauer did not respond to Mrs. Dunn's email. App. Ex. 3, Dunn Dep. at 35.

**C.** **Irvin**

126.    Until she retired at the end of the 2022-23 school year, Irvin was the Assistant Superintendent in charge of elementary education in the District. App. Ex. 9, Irvin Dep. at 6.

127.    In the area of elementary education, Irvin had the ability to make procedures that would be District-wide. App. Ex. 21, Steinhauer Dep. at 46.

128. Irvin testified that one point of *Aidan* was "about a student's gender identity." App. Ex. 9, Irvin Dep. at 61.

129. Irvin testified that it is her position that "it's okay that [Williams] read those books." And, regarding the books, that she didn't think there was anything wrong with what Williams did. *Id.* at 59-62, 63, 96-97.

130. She expressed her opinion that it was okay for Williams to have read *Aidan* at a public April 19, 2022 School Board DEI Committee meeting. *Id.* at 61-62; link to meeting at ¶167 below (Irvin's comments start at 19:22 and end at 22:49).

131. The principal at Foster Elementary notified Irvin that two of his teachers had read the same books that Williams read. App. Ex. 35, Ramsey Dep. at 12-15.

131a. Irvin did not ask the principal at Foster Elementary to talk to either the students or parents of students who were in the respective classes. App. Ex. 35, Ramsey Dep. at 12-15.

131b. Dani Lewis read *Aidan* to her class on March 31, 2022. App. Ex. 67, Lewis Dep. at 19.

131c. Kat Herzog read *Aidan* to her class in March 2022. App. Ex. 68, Herzog Dep. at 17-19.

132. At the beginning of the 2022-23 school year, Irvin sent a letter to all families in the District with children in elementary school; the letter is titled "DEI Family Letter September 2022"; the letter does not mention gender identity or books about gender identity but does discuss children's literature and read alouds.  App. Ex. 69, Dep. Ex. 73; App. Ex. 9, Irvin Dep. at 64-65.

**D.** **Bielewicz**

133. Bielewicz testified that he does not have any objection to the use of the books. App. Ex. 50, Bielewicz Dep. at 23-25.

134.  Bielewicz testified that he did not find it alarming Stewart reporting to him that Williams had said "when you're born, your parents make a guess at what you are, and sometimes they're right and sometimes, they are not" even if this was said to six- or seven-year-old kids. *Id.* 24-25.

135.   Bielewicz never responded to Stewart's email which is found at App. Ex. 61 or spoke to her about it. *Id.* at 16-17.

136.   Bielewicz did not do anything to determine if the statement in Stewart's email was factually accurate. *Id.*

137.   Brenda Nascone, an aide in the Kindergarten class, emailed Mr. Bielewicz expressing her opinion that *Aidan* should not have been read "without express parental consent." App. Ex. 70, Nascone Dep. at 13-14.

138.   Bielewicz never responded to Nascone's email or talked to her about it. App. Ex. 70, Nascone Dep. at 13- 15.

### E.      The District's Total Failure to Investigate What Happened on March 31, 2022

139.   Wyland testified that, as part of what he would have liked to have seen done to investigate the facts of what happened in the classroom on March 31, 2022, he would want to interview "the people that were directly present." App. Ex. 10, Wyland Dep. at 39.

140.   Steinhauer testified that it was important to him as the Superintendent of the District to have a full understanding of what happened in the classroom on March 31, 2022. App. Ex. 21, Steinhauer Dep. at 26.

141.   Prior to the lawsuit, Steinhauer did not know that there were aides in the classroom on March 31, 2022. *Id.*

142.   Prior to the lawsuit, Steinhauer did not do anything to determine the full facts of what Williams said in the classroom on March 31, 2022. *Id.* at 23.

143.   No District Administrator ever interviewed Sharon Boss, Lisa Mathewson, Jackie Girman, or Casey Stewart. App. Ex. 52, Boss Dep. at 64; App. Ex. 59, Mathewson Dep. at 17; App. Ex. 60, Girman Dep. at 21, 22, 25; App. Ex. 5, Stewart Dep. at 17.

144.   Irvin did not talk to any of the aides in the classroom about the events of March 31, 2022. App. Ex. 9, Irvin Dep. at 51, 56

145.   Irvin did not interview Williams about what occurred in the classroom. *Id.* at 52.

146.     Outside the litigation, Williams testified that "I was never interviewed about what happened in my classroom March 31." App. Ex. 23, Williams Dep. at 52.

147.     Bielewicz had no knowledge that Williams had read one book in the morning and another in the afternoon on March 31, 2022. App. Ex. 50, Bielewicz Dep. at 13-14.

148.     Bielewicz did not know if Williams did any introduction to her class before reading either book, whether she mentioned her own transgender child and potentially bringing the child to school, or whether Williams engaged in any question and answers with the class after she read either *Aidan* or *Teddy.* App. Ex. 50, Bielewicz Dep. at 14.

149.     Bielewicz did not interview any of the other adults that were in the classroom. *Id.* at 15.

150.     Bielewicz did not interview Williams about the events of March 31, 2022. *Id.*

151.     The only thing Bielewicz did to determine what happened in the classroom on March 31, 2022 was listen to parent complaints and emails. *Id.* at 14-20.

152.     No one in upper Administration asked Bielewicz to try and figure out all the facts and circumstances of what happened in the classroom on March 31, 2022. *Id.* at 26-27.

153.     In the Fall of 2022, a German teacher was doing some introductory instruction to a fifth-grade class and during the course of instruction about family-related words in German, and in response to a comment/question by a student, the teacher made a statement to the effect of "I understand biology, and there's always one mother and there's always one father." App. Ex. 28, Kitsko Dep. at 27-29.

154.     After discussing this with Irvin, the school's principal interviewed every student in the class. *Id.* at 29-31.

155.     Williams was not disciplined with regard to anything that occurred on March 31, 2022. App. Ex. 19, Answer to Interrogatory No. 6.

156.     Bielewicz was not disciplined with regard to anything that occurred on March 31, 2022. App. Ex. 19, Answer to Interrogatory No. 7.

## XI.   **Miscellaneous**

157.    District Policy BDD is titled "Board-Superintendent Relationship" and a copy of it is attached at Appendix Ex. 71.

158.    District Policy CBC is titled "Superintendent Powers and Responsibilities" and a copy of it is attached at Appendix Ex. 72.

159.    District Policy BG is titled "Board Policy Development and Dissemination" and a copy of it is attached at Appendix Ex. 73.

160.    District Policy BDB is titled "Board Officers" and a copy of it is attached at Appendix Ex. 74.

161.    Under Policy BDB the Board President is to meet with the Vice President and Superintendent to develop agendas for School Board meetings. App. Ex. 74.

162.    Wyland testified that he, the Vice President and the Superintendent have an "agenda-setting meeting" to set the agenda for School Board meetings. App. Ex. 10, Wyland Dep. at 15-16.

163.    From an administrative standpoint, school principals have immediate responsibility for their respective school. *See* App. Ex. 35, Ramsey Dep. at 23.

164.    In a meeting with Mrs. Tatel on or about April 5, 2022, Bielewicz said that Ms. Williams felt that reading *Aidan* and *Teddy* was an appropriate decision in her classroom and for her community of learners. App. Ex. 50, Bielewicz Dep. at 70.

165.    Two other teachers in the District read either *Aidan* or *Teddy* in elementary school in 2021-2022. App Ex. 67, Lewis Dep. at 19-20; App. Ex. 68, Herzog Dep. at 17-19.

166.    Irvin was aware that these teachers had read the books. App Ex. 67, Lewis Dep. at 49-53; App. Ex. 68, Herzog Dep. at 22-23.

167.    At School Board meetings on April 11, April 19, May 9, and June 13, 2022, members of the public, including Plaintiffs Melton and Dunn at the April 11 meeting, spoke both for and against what occurred in Mrs. Williams' classroom on March 31, 2022.  Links to the full

School Board meetings, as well as an April 19, 2022, DEI Committee of the Board Meeting where Irvin speaks about the instruction, can be found at:

04/11/2022 - School Board Meeting (Start at 45:47 – Stop at 2:17:40, Steinhauer comments at 58:26 – 59:56, Wyland comments at 1:24:23 – 1:29:22)
04/19/2022 - School Board DEI Meeting (Irvin comments at 19:22 – 22:49, Public comments Start at 36:00 – Stop at 44:53)
04/19/2022 - School Board Meeting (Start at 2:20:29 – Stop at 3:33:19)
05/09/2022 - School Board Meeting (Start at 1:07:50– Stop at 1:39:23)
06/13/2022 - School Board Meeting (Start at 1:11:27 – Stop at 1:56:15)


links to minutes of the meetings can be found at:

https://resources.finalsite.net/images/v1653663242/mtlebanon/komjhfn4ildloyyozuse/4112022BoardMeetingSummary.pdf (April 11)

https://resources.finalsite.net/images/v1654787605/mtlebanon/ub92pufk5j01hmckzd8i/4192022BoardMeetingSummary.pdf (April 19)

https://resources.finalsite.net/images/v1660833080/mtlebanon/wwog8ait4vjhu8pbdmxr/DiscussionMeetingSummary59.pdf (May 9, although no reference to the applicable discussion is made in these minutes)

https://resources.finalsite.net/images/v1660839686/mtlebanon/e1tc5pexiaw1zgmoladz/June13RegularBoardMeetingSummary.pdf (June 13)

168.   In a *New York Times* poll conducted in September 2022, 61% of those responding indicated that the statement "Gender is determined by a person's biological sex at birth" was closest to their view and 58% of those responding indicated that they "strongly oppose" allowing public school teachers to provide classroom instruction on gender identity in elementary school, with another 12% indicating they "somewhat oppose" such instruction. https://www.nytimes.com/interactive/2022/09/16/upshot/september-2022-times-siena-poll-crosstabs.html.

Dated: January 12, 2024

By:    /s/ David J. Berardinelli
David J. Berardinelli, PA I.D. No. 79204
DEFOREST KOSCELNIK & BERARDINELLI
436 Seventh Ave., 30th Fl.
Pittsburgh, PA  15219
Phone:  412-227-3100
Email:  berardinelli@deforestlawfirm.com

*Counsel for Plaintiffs*