IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CARMILLA TATEL, individually and as parent and natural guardian of her children; STACY DUNN, individually and as parent and natural guardian of her children; and GRETCHEN MELTON, individually and as parent and natural guardian of her children, | ) ) ) ) ) ) ) ) | Civil Action No.: 2:22-cv-837 Judge Joy Flowers Conti |
| Plaintiffs, | ) ) ) | |
| v. | ) ) ) | |
| MT. LEBANON SCHOOL DISTRICT; MEGAN WILLIAMS; DR. TIMOTHY STEINHAUER; DR. MARYBETH D. IRVIN; BRETT BIELEWICZ; and JACOB W. WYLAND, | ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## DEFENDANTS' BRIEF IN SUPPORT
## OF MOTION FOR SUMMARY JUDGMENT

Defendants, Mt. Lebanon School District ("District"), Megan Williams ("Williams"), Dr. Timothy Steinhauer (Steinhauer"), Dr. Marybeth Irvin ("Irvin"), Brett Bielewicz ("Bielewicz"), and Jacob W. Wyland ("Wyland"), (collectively, "Defendants"), by and through their attorneys, Tucker Arensberg, P.C., submit this Brief in Support of Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

**I.   Introduction**

On March 31, 2022, at the conclusion of the "morning meeting" with her first-grade students at the beginning of the school day, Defendant, Megan Williams ("Williams"), a teacher at the Mt. Lebanon School District's Jefferson Elementary School, informed the students that she may be bringing her transgender child, ███, to school on Take Your Child to Work Day. Some of the students stated that they knew ███, referring to the child as "him." Williams informed the students that ███ now identified as a girl. (Concise Statement, ¶¶ 45-46). Williams then played

a video read-aloud of the children's book *When Aidan Became A Brother*. (Concise Statement, ¶ 47). The children's book *When Aidan Became A Brother* is summarized by its publisher as follows:

> When Aidan was born, everyone thought he was a girl. His parents gave him a pretty name, his room looked like a girl's room, and he wore clothes that other girls liked wearing. After he realized he was a trans boy, Aidan and his parents fixed the parts of his life that didn't fit anymore, and he settled happily into his new life.
>
> Then Mom and Dad announce that they're going to have another baby, and Aidan wants to do everything he can to make things right for his new sibling from the beginning--from choosing the perfect name to creating a beautiful room to picking out the cutest onesie. But what does "making things right" actually mean? And what happens if he messes up? With a little help, Aidan comes to understand that mistakes can be fixed with honesty and communication, and that he already knows the most important thing about being a big brother: how to love with his whole self.

(Concise Statement, ¶ 48).  After the book was read, there was discussion among the students. One child, the son of Plaintiff, Stacy Dunn ("Dunn") stated "I don't get it," in response to which another student stated "I get it. She was a he." Williams responded, "yes, she was a he." Dunn's child asked, "Who decides this?" Williams responded, "**your parents do**." Discussion then ended and Williams told the students they would have a recess. (Concise Statement, ¶¶ 52-54)

In the afternoon of that same school day, Williams played a video read-aloud of another children's book, *Introducing Teddy. A Gentle Story About Gender and Friendship*. (Concise Statement, ¶ 55). The children's book *Introducing Teddy* is summarized by its publisher as follows:

> Errol and his teddy, Thomas, are best friends who do everything together. Whether it's riding a bike, playing in the tree house, having a tea party, or all of the above, every day holds something fun to do. One sunny day, Errol finds that Thomas is sad, even when they are playing in their favorite ways. Errol can't figure out why, until Thomas finally tells Errol what the teddy has been afraid to say: "In my heart, I've always known that I'm a girl teddy, not a boy teddy. I wish my name was Tilly, not Thomas." And Errol says, "I don't care if you're a girl teddy or a boy teddy! What matters is that you are my friend."[1]

(Concise Statement, ¶ 66). Following the read-aloud of *Introducing Teddy*, Williams again told the

---

[1]     The books *When Aidan Became A Brother* and *Introducing Teddy* were recommended to Williams by Kathleen Herzog, a first grade teacher at another elementary school within the District as having the themes of kindness and respect. Herzog read the books to her class sometime prior to March 31, 2022. Williams explained that she chose to read *When Aidan Became A Brother* and *Introducing Teddy* to promote inclusivity, acceptance, kindness and respect for all students. (Concise Statement, ¶¶ 22-26)

students that she would be bringing her child Ollie to school on Take Your Child to Work Day and that Ollie would be wearing a dress. (Concise Statement, ¶ 57). Williams stated to the effect that "when you are born, your parents make a guess of what you are and sometimes they're right and sometimes they're not." Dunn's child raised his hand and made the statement "But I'm a boy." Williams responded, "Yes you are. ***Talk with your parents about that***." (Concise Statement, ¶¶ 58-61).

On April 1, 2022, Dunn emailed Superintendent, Dr. Timothy Steinhauer ("Steinhauer"), and requested that the District provide her child with on-line asynchronous instruction for the remainder of the school year. The District implemented Dunn's request.  (Concise Statement, ¶¶ 76-78).

On April 4, 2022, Plaintiff, Gretchen Melton ("Melton") met with Williams concerning the events of March 31, 2022. In her account of the meeting in a text message later that day, Melton wrote that Williams "apologized to me," and "said that she really didn't think that is was going to cause such an uproar."  According to Melton's account, Williams "said that she wanted to shed a little light on kids who feel marginalized," and Williams did tell me that she wasn't going to read books like that again." Melton observed that "I really don't think that she meant it in any kind of malicious way. I think she honestly thought people would think it was a good idea." (Concise Statement, ¶¶ 79-81). Melton requested that her daughter be removed from class during any future discussions/lessons on the issue of gender identity. (Concise Statement, ¶ 127).

On April 5, 2022, Plaintiff, Carmilla Tatel ("Tatel") met with the school principal, Defendant, Brett Bielewicz ("Bielewicz"), concerning the books read in Williams' classroom on March 31, 2022. By email on April 6, 2022, Tatel requested that her daughter be removed from class during any future discussions/lessons on the issue of gender identity. Bielewicz replied stating he would inform Williams of Tatel's opt-out request.  (Concise Statement, ¶¶ 124-126).

On April 7, 2022, another parent emailed Jefferson Elementary School second-grade teacher Sarah Davis asking that she be informed if "transgender" topics would be discussed in her

classroom. At the recommendation of Bielewicz, Davis replied by stating that, in the event of any controversial subject, "moving forward, we will certainly inform parents ahead of time so that they may determine if they'd like their child to be present during the activity."  (Concise Statement, ¶¶ 104-105).   On April 11, 2022, another parent emailed Bielewicz objecting to instruction on "transgender topics to first graders." Bielewicz replied that "My message to our team here at JES Elementary in moving forward is to lean on the parent partnership that we value by being proactive in our communication and giving parents the opportunity to request that a child not engage in any particular lesson, book, discussion, etc."  (Concise Statement, ¶¶ 92-93).  Similar communications occurred between parents and administrators at the District's other elementary schools. (Concise Statement, ¶¶ 94-100).

These are the salient facts as established by the evidentiary record. Equally important is that many of allegations within Plaintiffs' Complaint -- which were critical to the Court's earlier disposition of Defendants' Motion to Dismiss -- are not supported by any admissible evidence. In denying the District's Motion to Dismiss, the Court wrote:

> The parents allege that their children's first-grade teacher, with the permission of the public school district, pursued her own agenda outside the curriculum, which included showing videos or reading books about transgender topics and telling the first-grade students in her class (ages six and seven years old) ***to keep her discussions with them about transgender topics secret from their parents***. The teacher's alleged conduct went far beyond instructing a student that someone who differs from that student must be treated with kindness, tolerance and respect. As pled in the complaint, ***the teacher, among other things, instructed the children in her first-grade class that their parents might be wrong about their children's gender and told one of her students that she (the teacher) would never lie (implying that the parents may lie about their child's identity) and the child could dress like a different gender and be like the teacher's transgender child. When the parents complained, the school district supported the teacher and allegedly adopted a policy (the "de facto policy")*** that the teacher's conduct could continue in the future without notice to the parents or the opportunity to opt out.

(ECF # 38, pp. 1-2) (emphasis added). Contrary to those unverified allegations,: (1) Williams did not engage in instruction or instruction on transgender topics "throughout the school year;" (2) Williams did not instruct the children in her first-grade class that their parents might be wrong

about their children's gender; (3) Williams never told a student that the child could dress like a different gender and be like the teacher's transgender child; (4) Williams never told a student that she, the teacher, would never lie (implying that the parents may lie about their child's gender identity); (5) Williams never instructed students not to tell their parents about her March 31, 2022 instruction; (6) Williams never targeted the children's own gender identity and their parents' beliefs about the gender identity of their own children; and (7) when parents complained, the District never adopted a *de facto* policy that instruction on gender identity could occur in the future without notice to the parents and/or without the opportunity for parents to opt-out of such instruction. (Compare ECF # 38, pp. 1-2; ECF # 55, pp. 1-2 with Concise Statement ¶¶, 65-68, 70-72, 80, 86-118).

To be clear, the District policy makers contemporaneously agreed that the situation could have been handled differently and they were working to improve their processes, including providing notice and opt-out opportunities.   (Concise Statement ¶¶, 102, 108-113, 116).   In practice, since March 31, 2022, the District has received and honored parent opt-outs for instruction on gender identity subjects. (Concise Statement, ¶¶ 123-130).  Williams did not read any books or engage in any discussion addressing gender identity after March 31, 2022. (Concise Statement, ¶¶ 86, 122).

In consideration of the evidentiary record as developed through extensive discovery, this Honorable Court must decide whether a teacher's act of reading, without providing Plaintiffs with prior notice or an opportunity to-opt out, two children's books regarding gender identity and engaging in a brief classroom discussion about these books and gender identity (wherein she made a statement to the effect of: "when you are born, your parents make a guess of what you are and sometimes they're right and sometimes they're not") violated Plaintiffs' constitutional rights.  (Concise Statement ¶¶, 45-61). As set forth below, Defendants respectfully contend that Plaintiffs' constitutional rights were not violated and that this Court should enter summary judgment in favor of the Defendants.

## II.      Standard of Review

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A motion for summary judgment will not be defeated by 'the mere existence' of some disputed facts but, will be denied when there is a genuine issue of material fact." Am. Eagle Outfitters v. Lyle & Scott Ltd., 584 F.3d 575, 581 (3d Cir. 2009) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986)). "After making all reasonable inferences in the nonmoving party's favor, there is a genuine issue of material fact if a reasonable jury could find for the nonmoving party." Pignataro v. Port Auth. of N.Y. & N.J., 593 F.3d 265, 268 (3d Cir. 2010).  While the moving party bears the initial burden of showing the absence of a genuine issue of material fact, meeting this obligation shifts the burden to the nonmoving party who must "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 250 (quoting Fed. R. Civ. P. 56).

On December 21, 2023, this Honorable Court ruled that: "Testimony by the parents about what their children told them will not be admissible to prove the truth of the matter about what Williams did or said. . . ."  (ECF #87, pp. 6-7). Accordingly, Plaintiffs cannot rely on inadmissible hearsay statements to create an issue of material fact. Bouriez v. Carnegie Mellon Univ., No. 02-2104, 2005 U.S. Dist. LEXIS 18324, 2005 WL 2106582, at *9 (W.D. Pa. Aug. 26, 2005) (quoted in Njos v. United States, No. 3:15-CV-931, 2017 U.S. Dist. LEXIS 172460, at *12 (M.D. Pa. Oct. 17, 2017)).

## III.     Argument

### A.      All Counts - Dunn's and Melton's Claims

Plaintiff Dunn admitted during her deposition that the March 31, 2022, lessons did not violate any of her rights.  (Concise Statement ¶¶ 63).  As to her claims that Williams engaged in a year-long effort to "groom" her child, Williams did not tell him that he could dress like a different gender and be like the teacher's transgender child, did not tell him that she, the teacher, would never lie (implying that the parents may lie about their child's gender identity) and did not tell him

to keep their conversations a secret.  (Concise Statement ¶¶ 72, 88-91).   Simply put, there is no evidence in the record supporting the claim that Williams targeted and groomed Dunn's child during the 2021-22 school year.   (ECF #87, pp. 6-7). Accordingly, because Dunn's claims are admittedly based on this alleged conduct, summary judgment should be entered on all of Dunn's claims in favor of all of the Defendants.

Melton believes that the March 31, 2022, instruction and discussions violated her rights, but she is not even sure if her child was present for any of the instruction or discussions.  Melton's daughter was not present in Williams' classroom for most, if not all, of the read-aloud of *When Aidan Became A Brother*. (Concise Statement ¶ 49).  Melton is not sure if her child was present for the presentation of *Introducing Teddy*.  (Concise Statement ¶ 62).  At her deposition, Melton testified that she has never asked any more questions and does not know what her child was exposed to, other than she caught the tail end of a book about a baby and an older brother. (Concise Statement ¶ 50).

On May 10, 2022, Melton informed Tatel, Dunn and others that she and her husband: "feel like it's better if we aren't listed as plaintiffs.  We feel like since [their child] was not part of any of those conversations, it's weak testimony from us."  (Concise Statement ¶ 82).   On May 11, 2022, Melton sent a similar text to Dunn, stating that Melton's child: "hasn't been part of any of these conversations." (Concise Statement ¶ 83).    At her deposition, Melton confirmed that Williams never targeted her or her beliefs, never told Melton's child that Melton's beliefs were wrong and admitted that Williams never told her child that the child might be transgender. (Concise Statement ¶¶ 67, 71, 75).

Accordingly, because there is no evidence as to what Melton's child was exposed to, summary judgment should also be entered on all of Melton's claims in favor of all of the Defendants.

**B.      Counts I, II, IV and V - Irvin, Steinhauer and Wyland**

Summary Judgment should be entered in favor of individual defendants, Irvin, Steinhauer and Wyland on Count I, II, IV and V because they did not have contemporaneous knowledge of and did not acquiesce to Williams' March 31, 2022, instruction.  Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*. <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 683. 129 S. Ct. 1937, 1948 (2009). Rather, "each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." <u>Id</u>. at 1939.  To prevail on a supervisory-liability against these defendants, must establish that "he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinates' violations." <u>Santiago v. Warminster Twp</u>., 629 F.3d 121, 129 (3d Cir. 2010) (<u>quoting</u> <u>A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr</u>., 372 F.3d 572, 586 (3d Cir. 2004).  Summary judgment is appropriate because Irvin, Steinhauer and Wyland did not participate, direct or have knowledge of Williams' actions.

To succeed on a "knowledge and acquiescence" theory of supervisory liability, Plaintiffs must demonstrate that the individual defendants had contemporaneous knowledge of the constitutional deprivation and acquiesced to it. <u>D.B. v. Tredyffrin/Easttown Sch. Dist.</u>, No. 17-2581, 2020 U.S. Dist. LEXIS 197714, at *44 (E.D. Pa. Oct. 23, 2020); <u>Santiago</u>, 629 F.3d at 130 (stating that plaintiff must allege facts making it plausible that supervisor "had knowledge of Alpha Team's use of excessive force *during the raid* and acquiesced in Alpha Team's violations" (<u>quoting</u> <u>A.M.</u>, 372 F.3d at 586); <u>Baker</u>, 50 F.3d 1194-95 (denying summary judgment where supervising officer was present while alleged constitutional deprivation was occurring and did nothing to stop it); <u>Sullivan v. Warminster Twp.</u>, 765 F. Supp. 2d 687, 706 (E.D. Pa. 2011) (dismissing knowledge and acquiescence claim since defendant was not present during the shooting). Acquiescence occurs: "If the authorized policymakers approve a subordinate's decision *and the basis for it*." <u>Andrews v. Philadelphia</u>, 895 F.2d 1469, 1481 (3d Cir. 1990)

(quoting St. Louis v. Praprotnik, 485 U.S. 112, 127, 108 S. Ct. 915, 926 (1988).  In Andrews, the Third Circuit concluded that a policymaker did not acquiesce to a lower level employees' sexual harassment because, while he reviewed the decision made with respect to the complaints of sexual harassment, he did not personally observe or acquiesce in any sexual harassment and was not convinced that the decisions were motivated by sexual animus.  Thus, the court concluded, the policymaker did not "knowingly acquiesce to departmental sexual discrimination" and the "City may not be held liable for that discrimination under section 1983." Id., 895 F.2d at 1481-82.

It is undisputed that Defendants Irvin, Steinhauer and Wyland did not have prior or contemporaneous knowledge of the reading of the *Aidan* or *Introducing Teddy* books or any statements of Williams concerning gender identity. (Concise Statement ¶¶ 101-102, 105-106, 112, 114-115).  In addition, though they did not find the books objectionable, they all agreed that notice and an opportunity to opt out should have been provided.  (Concise Statement ¶¶ 103-104,106, 109-113, 116).  Accordingly, Irvin, Steinhauer and Wyland may not be held liable for any alleged unconstitutional conduct of Williams under a theory of *respondeat superior* and summary judgment should be entered in their favor on all claims.

### C.      Count I - Substantive Due Process (All Defendants)

Plaintiffs assert that the actions of Defendants infringed upon a fundamental right to direct their children's upbringing in violation of the Due Process Clause of the Fourteenth Amendment. The elements of a § 1983 Fourteenth Amendment Due Process claim are: (1) defendants acted under the color of law; (2) a protected property or liberty interest was at stake; (3) the defendants had a duty of care toward the plaintiff; and (iv) a deprivation within the meaning of the Due Process Clause occurred. Roberts v. Mentzer, 382 F.App'x 158, 166 (3d Cir. 2010). Defendants are entitled to summary judgment because Plaintiffs have not been deprived of a protected liberty interest. In particular: (1) no Defendant intentionally interfered with Plaintiffs' rights; (2) the exposure of Plaintiffs' children to story books and discussion concerning gender identity on March

9

31, 2022, did not infringe upon a fundamental liberty interest of Plaintiffs; (3) Defendants have a compelling interest to protect transgender students and any intrusion upon Plaintiffs' liberty interests was justified; and (4) the District did not adopt a *de facto* policy precluding Plaintiffs from excusing their children from any future instruction involving gender identity. Further, as set forth in Section III.H. below, the individual defendants are entitled to qualified immunity because the rights claimed by Plaintiffs were not clearly established and Defendants, Irvin, Steinhauer and Wyland did not have contemporaneous knowledge of Williams' instruction on March 31, 2022.

### 1. Instruction Regarding Gender Identity is Not an Infringement of a Fundamental Liberty Interest of Parents.

The "liberty" interest protected by the Due Process Clause includes the right of parents "to control the education of their own," Meyer v. Nebraska, 262 U.S. 390, 401, 43 S. Ct. 625 (1923), and "to direct the upbringing and education of children under their control," Pierce v. Society of Sisters, 268 U.S. 510, 534-35, 45 S. Ct. 571 (1925). Although the Supreme Court has never been called upon to define the precise boundaries of a parent's right to control a child's upbringing and education, it is clear that the right is neither absolute nor unqualified despite the Supreme Court's "near-absolutist pronouncements." C.N. v. Ridgewood Board of Education, 430 F.3d 159, 182 (3d Cir. 2005). An infringement on a "fundamental" constitutional right is subject to a heightened or "strict" level of judicial scrutiny, whereas an encroachment on other rights or liberties must be analyzed under "the traditional standard of review, which requires only that the [challenged state action] be shown to bear some rational relationship to legitimate state purposes." Doe #1 v. Delaware Valley School District, 572 F. Supp.3d 38, 68 (M.D. Pa. 2021); San Antonio Indep. Sch. Dist. v. Rodriguez, 411 U.S. 1, 37-40, 93 S.Ct. 1278 (1973).

While the plurality decision in Troxel v. Granville, 530 U.S. 57 (2000), described the interest of parents in the care, custody and control of their children as a fundamental liberty interest, only three of the cases cited by the Troxel plurality implicated parental rights in the context of public education: the Meyer, Pierce, and Yoder trilogy. See Meyer v. Nebraska, 262

U.S. 390, 401-03, 43 S. Ct. 625 (1923) (state law prohibiting foreign language instruction violated the "power of parents to control the education of their own"); Pierce, 268 U.S. at 535-36 (state compulsory education law requiring students to attend solely public schools "unreasonably interferes with the liberty of parents . . . to direct the upbringing and education of children under their control"); Wisconsin v. Yoder, 406 U.S. 205, 214, 234-36, 92 S. Ct. 1526 (1972) (a compulsory education system, as applied to the Amish, violated the Free Exercise Clause"). Importantly, the Supreme Court did not apply heightened scrutiny to the challenged governmental interference in either Meyer or Pierce. Further, with respect to the parental rights claim alone, the Yoder Court indicated that rational basis scrutiny was appropriate. See Meyer, 262 U.S. at 399-400 (the state interference must not be "arbitrary or without reasonable relation to some purpose within the competency of the state to effect."); Pierce, 268 U.S. at 534-535 (same); and Yoder, 406 U.S. at 215 ("A way of life . . . may not be interposed as a barrier to reasonable state regulation of education if it is based on purely secular considerations."); see also Runyon, 427 U.S. at 177 (stressing the "limited scope" of Meyer and Pierce). Thus, for that line of jurisprudence concerning parental rights and their relationship with public educational interests, **the Supreme Court has directed a rational basis review**. Further, the Yoder Court was clear that its holding was inexorably linked to the Amish community's unique religious beliefs and practices. Yoder, 406 U.S. at 235-36. Consequently, while parents have the rights to "control the education of their own" and "to direct the upbringing and education of children under their control," such are not universally a fundamental right in substantive due process jurisprudence relative to subject matters that may be introduced in schools.

Moreover, this Court and others have recognized that rational basis review applies to the state's restrictions on protected parental rights in the upbringing and education of their children even when parents' religious beliefs are implicated. Combs v. Homer Ctr. Sch. Dist., 2005 U.S. Dist. LEXIS 32007, at *103-07 (W.D. Pa. Dec. 8, 2005) ("the several United States Circuit Courts of Appeals . . . have rejected the argument that a state's restrictions on protected parental rights

in the upbringing and education of their children, *ala* <u>Meyer</u>, <u>Pierce</u>, <u>Yoder</u>, even when combined with a free exercise of religion, due process or some other constitutional challenge, triggers heightened scrutiny.") <u>See also</u> <u>Parents United for Better Schools, Inc. v. Sch. Dist. of Philadelphia Bd. of Educ.,</u> 148 F.3d 260 (3d Cir. 1998) (court applied **rational basis** test to parents' challenge to school district's program for prevention of sexual disease raising parental rights in conjunction with other constitutional claims); <u>Brown v. Hot, Sexy & Safer Prods.</u>, Inc., 68 F.3d 525 (1st Cir. 1995) (upholding compulsory high school sex education assembly program against parents' challenges that sexually explicit AIDS awareness assembly violated privacy rights and right to rear children ala <u>Meyer</u>, <u>Pierce</u>, <u>Yoder</u>, due process, free exercise clause and right to educational environment free from sexual harassment); <u>Leebaert v. Harrington</u>, 332 F.3d 134 (2d Cir. 2003) (parent's challenge to mandatory health education curriculum on religious grounds was subject to **rational basis** analysis); <u>Immediato v. Rye Neck School Dist.</u>, 73 F.3d 454, 461-462 (2d Cir. 1996) (holding that **rational basis** scrutiny applied to parents' due process objection to a mandatory, community service curriculum requirement adopted by the school board). <u>Herndon v. Chapel Hill-Carrboro City Bd. of Educ.</u>, 89 F.3d 174 (4th Cir. 1996) (tracing the lineage of <u>Yoder</u> and concluding that due process claims involving parental rights in the school context warrant only **rational basis** scrutiny and upholding school district's mandatory community service program); <u>Littlefield v. Forney Indep. Sch. Dist</u>., 268 F.3d 275 (5th Cir. 2001) (uniform policy, even assuming that it regulated expressive conduct entitled to constitutional protection, did not violate students' First Amendment's free speech rights, did not implicate parents' fundamental due process right in the upbringing and education of their children, and was justified by a **rational basis;** and its opt-out procedure, which required parents with *bona fide* religious or philosophical objections to apply for exemption by filling out questionnaire designed to gauge the sincerity of their beliefs, did not violate free exercise and establishment clauses of First Amendment).

This Court's finding in <u>Combs</u>, that every court addressing the issue of what is taught in public schools has concluded that rational basis applies to alleged violations of parental rights, remains true today.  The Third Circuit subsequently held: "Federal courts addressing the issue have held that parents have no right to exempt their child from certain subjects, reading assignments, community-service requirements or assembly programs they find objectionable." <u>Combs v. Homer-Center Sch. Dist.</u>, 540 F.3d 231, 248 n.24 (3d Cir. 2008)).  <u>See</u> <u>also</u> <u>Miller v.</u> <u>Mitchell</u>, 598 F.3d 139, 151 n.13 (3d Cir. 2010).  Accordingly, in the Third Circuit: "Parents do not have a constitutional right to avoid reasonable state regulation of their children's education."  <u>Id</u>., at 249.  As aptly stated by the <u>Brown</u> court:

> We think it is fundamentally different for the state to say to a parent, "You can't teach your child German or send him to a parochial school," than for the parent to say to the state, "You can't teach my child subjects that are morally offensive to me." The first instance involves the state proscribing parents from educating their children, while the second involves parents prescribing what the state shall teach their children. If all parents had a fundamental constitutional right to dictate individually what the schools teach their children, the schools would be forced to cater a curriculum for each student whose parents had genuine moral disagreements with the school's choice of subject matter. We cannot see that the Constitution imposes such a burden on state educational systems, and accordingly find that the rights of parents as described by <u>Meyer</u> and <u>Pierce</u> do not encompass a broad-based right to restrict the flow of information in the public schools.

<u>Brown v. Hot, Sexy & Safer Prods.</u>, 68 F.3d 525, 533-34 (1st Cir. 1995).

Recently, in <u>Mahmoud v. McKnight</u>, No. DLB-23-1380, 2023 U.S. Dist. LEXIS 150057, at *92 (D. Md. Aug. 24, 2023), a federal court dealing with similar issues to those presented in this case (i.e., elementary aged students, LGBTQ+ reading material that is not part of the curriculum, no advance notice, no opt-out opportunities), stated:

> As of 2008, '[n]o published circuit court opinion . . . ha[d] ever applied strict scrutiny to a case in which plaintiffs argued they had presented a hybrid claim.' . . .. <u>That observation remains true today [</u>August 24, 2023] . . . . The Court concludes the plaintiffs' asserted due process right to direct their children's upbringing by opting out of a public-school curriculum that conflicts with their religious views <u>is not a fundamental right. Rational basis review is the appropriate level of scrutiny</u>.

<u>Mahmoud v. McKnight</u>, No. DLB-23-1380, 2023 U.S. Dist. LEXIS 150057, at *93 (D. Md. Aug. 24, 2023) (emphasis added).

Instead, parents' fundamental rights to control a child's upbringing and education are implicated only when the state's action "deprived them of their right to make decisions concerning their child," J.S. ex rel. Snyder v. Blue Mountain Sch. Dist., 650 F.3d 915, 934 (3d Cir. 2011) (en banc) (quoting Anspach v. City of Phila, 503 F.3d 256, 266 (3d Cir. 2007)).   They are not implicated when the action merely "complicated the making and implementation of those decisions." Id.   Stated differently, when a school's challenged actions are "not neatly tied to considerations of curriculum or educational environment," fundamental parental rights are violated if the state's actions strike at the heart of parental decision-making authority on matters of the greatest importance.   C. N. v. Ridgewood Bd. of Educ., 430 F.3d 159, 182, 183 (3d Cir. 2005).   State actions that are unwise and offensive are not of constitutional dimension.  Id, at 183, 184. In Gruenke v. Seip, 225 F.3d 290, 306 (3d Cir. 2000), the Third Circuit found that the parents of a public school student forced to take a commercial pregnancy test by her high school swim coach who later discussed the positive result with others (but notably not the student's parents), had stated a claim for violation of a fundamental right because the coach's action deprived the family's ability to deal with the pregnancy privately.   As examples of similar actions that impermissibly deprived parents from making decisions about their children, the Third Circuit cited the decisions in Arnold v. Board of Education, 880 F.2d 305 (11th Cir. 1989) (school officials coerced a student into having an abortion and urged her not to discuss the matter with her parents) and Merriken v. Cressman, 364 F. Supp. 913, 922 (E.D. Pa. 1973) (questionnaire probing family relationships by school authorities).

In C. N. v. Ridgewood Bd. of Educ., 430 F.3d 159, 184 (3d Cir. 2005), the Third Circuit rejected a claim that a school district violated a fundamental right by not requiring parental consent prior to the administration of a survey about substance abuse, sexual activity, suicide and personal relationships (including the parental relationship) and failing to provide sufficient information to allow an objecting parent to avoid having their child participate, explaining:

We recognize that introducing a child to sensitive topics before a parent might
have done so herself can complicate and even undermine parental authority, but
conclude that the survey in this case did not intrude on parental decision-making
authority in the same sense as occurred in Gruenke. A parent whose middle or
high school age child is exposed to sensitive topics or information in a survey
remains free to discuss these matters and to place them in the family's moral or
religious context, or to supplement the information with more appropriate
materials. School Defendants in no way indoctrinated the students in any
particular outlook on these sensitive topics; at most, they may have introduced a
few topics unknown to certain individuals.

C.N. v. Ridgewood Bd. of Educ., 430 F.3d 159, 184-185 (3d Cir. 2005). Accord Parker v. Hurley,

514 F.3d 87, 102 (1st Cir. 2008); Jones v. Boulder Valley Sch. Dist. RE-2, 2021 WL 5264188, at

*15 (D. Colo. Oct. 4, 2021); Mahmoud v. McKnight, No. DLB-23-1380, 2023 U.S. Dist. LEXIS

150057, at *93 (D. Md. Aug. 24, 2023) (claim that reading of books involving gender identity and

sexual orientation without an opt-out opportunity that conflicted with parents' religious views was

not a fundamental right).

### 2. Application

#### a. The Defendants Have a Compelling Interest in Protecting Transgender Students and the March 31, 2022 Instruction and Subsequent Support is Supported by a Rational Basis.

The Defendants have a compelling interest in ensuring that all students, including

transgender students, are educated in a safe and welcoming environment so that they can thrive

academically, socially and emotionally.   On June 21, 2021, the Mt. Lebanon School District

adopted the following Equity Statement:

The Mt. Lebanon School District is committed to providing a safe, inclusive and
welcoming school environment that recognizes and celebrates the diverse identities
of all members of our school community, including students, their families, faculty
and staff.   All students, regardless of background, identity or ability, will be
supported to reach their full potential and pursue their unique talents.  The District
will provide resources in a just and equitable manner and remove barriers to allow
students to thrive academically, socially, and emotionally.

(Concise Statement ¶ 3). At the June 13, 2022, School Board meeting, Dr. Irvin made a

presentation regarding the District's Diversity, Equity and Inclusion Plan. Dr. Irvin noted that "the

District had and continues to have incidents that require a response from the DEI perspective,

including swastikas and racial slurs found in District buildings and students reporting bullying and issues and so on.  So we know these things are real." (Concise Statement ¶ 4).

As noted by the Third Circuit, there can be "no denying that transgender individuals face discrimination, harassment, and violence because of their gender identity," that "when transgender students face discrimination in schools, the risk to their wellbeing cannot be overstated—indeed, it can be life threatening" and "that 40% [of transgender individuals] reported a suicide attempt (a rate nine times higher than the general population)." Doe v. Boyertown Area Sch. Dist., 897 F.3d 518, 523, 528-29 (3d Cir. 2018); (Concise Statement ¶ 6).  Accordingly, school districts have "a compelling state interest in protecting transgender students from discrimination." Id., at 529.  The Third Circuit continued:

> When a school promotes diversity and inclusion, "classroom discussion is livelier, more spirited, and simply more enlightening and interesting [because] the students have the greatest possible variety of backgrounds." Students in diverse learning environments have higher academic achievement leading to better outcomes for all students. Public education "must prepare pupils for citizenship in the Republic," and inclusive classrooms reduce prejudices and promote diverse relationships which later benefit students in the workplace and in their communities. Accordingly, the School District's policy not only serves the compelling interest of protecting transgender students, but it benefits all students by promoting acceptance.

Id. (internal citations omitted).  The District and its officials are determined to ensure that every student feels welcome and safe.  (Concise Statement, ¶¶ 111, 116).

Though she did not authorize Williams to engage in the March 31, 2022, instruction, Irvin subsequently concluded that the books were developmentally appropriate and consistent with the District's strategic plan of providing an inclusive, welcoming and safe and secure learning environment. Irvin further concluded that the books aligned with the "Mirrors, Windows and Sliding Glass Doors" perspective by which books are mirrors when students see their own lives reflected in the pages and books are windows when they allow students a view of lives and stories that are different from their own. (Concise Statement ¶¶ 4, 5, 104).  Steinhauer and Wyland similarly concluded, after reviewing the books, that they were appropriate.  (Concise Statement ¶¶ 106, 116).

The aftermath of this incident confirmed that teaching lessons about accepting others for who they are remains necessary.   At public meetings, numerous residents explained that transgender individuals are members of the community and schools, that they are entitled to respect and that their existence must be recognized.  (Concise Statement, ¶¶ 7-14).  On April 23, 2022, Defendant Williams informed the parents of her first-grade class, including Plaintiffs, that her transgender child, ███ would be joining her on Take Your Child to Work Day on April 28, 2023. (Concise Statement, ¶ 15).  Tatel and Melton kept their children home so that they would not be exposed to a transgender child.  (Concise Statement, ¶¶ 16-22).

The District and its employees have a compelling need to ensure that all students, including transgender students, feel welcome, included, and safe while in the District's schools. Accordingly, Williams' instruction, approved by Bielewicz, and the subsequent support from Irvin, Steinhauer and Wyland survives strict scrutiny or rational basis review and summary judgment should be entered in their favor.

> **b.      Defendants Did Not Deliberately Infringe Upon a Fundamental Right of Plaintiffs.**

In <u>Daniels v. Williams</u>, the Supreme Court made it clear that the: "Due Process Clause is simply not implicated by a *negligent* act of an official causing unintended loss of or injury to life, liberty, or property." 474 U.S. 327, 328, 106 S. Ct. 662, 666 (1986) (emphasis in original).  "In the context of parental liberty interests, . . . the Due Process Clause only protects against <u>deliberate</u> violations of a parent's fundamental rights - that is, where the state action at issue was specifically aimed at interfering with protected aspects of the parent-child relationship." <u>McCurdy v. Dodd</u>, 352 F.3d 820, 827-28 (3d Cir. 2003) (emphasis added) (<u>citing</u> <u>Valdivieso Ortiz v. Burgos</u>, 807 F.2d 6, 8 (1st Cir. 1986); <u>see also</u> <u>J.S. ex rel. Snyder v. Blue Mountain Sch. Dist</u>., 650 F.3d 915, 933-34 (3d Cir. 2011) (en banc) (requiring "manipulative, coercive, or restraining conduct by the State").

There is no evidence of record that any Defendant engaged in a conduct with deliberate intent to interfere with Plaintiffs' parent-child relationships or their religious beliefs. McCurdy v. Dodd, 352 F.3d 820, 827-28 (3d Cir. 2003). In fact, Plaintiffs admit this. (Concise Statement ¶¶ 65-72).  Plaintiff Tatel testified, in response to questions as to whether Williams gave the March 31, 2023, instruction because of Tatel and the Plaintiffs other beliefs: "No. Did she do that lesson that day because I would object to it?  No."  (Concise Statement ¶ 68).  Plaintiff Melton similarly stated that Williams never told her child that she might be transgender and never told her child that Melton's beliefs are wrong about gender identity.  (Concise Statement ¶¶ 67, 71).  To the contrary, Williams read the books after discussing them with colleagues, who agreed that the books were age appropriate and good vehicles for teaching tolerance and understanding. (Concise Statement ¶¶ 37-40).  Williams did not instruct her students not to tell their parents about the transgender discussions on March 31, 2022. (Concise Statement ¶¶ 70, 91).   Moreover, Williams did not engage in instruction or discussion on transgender topics "throughout the school year" as alleged in Plaintiffs' complaint. (Concise Statement ¶ 40).[2]

Williams did make a general statement to the effect that: "when you are born, your parents make a guess of what you are and sometimes they're right and sometimes they're not." (Concise Statement ¶¶ 58-59).  Importantly, however, this statement was not directed at any particular student. (Concise Statement ¶¶ 58-59).  Moreover, in the class discussion following the reading of the books, Williams expressly *affirmed* the primacy of parental authority. When asked "Who decides this?" concerning gender identity, Williams responded, "***your parents do***." (Concise Statement ¶ 53).  When Dunn's child raised his hand and made the statement "But I'm a boy", Williams responded, "Yes you are. ***Talk with your parents about that***." (Concise Statement ¶¶ 60-61).

---

[2]      In addition, Williams was not told that one parent (not a Plaintiff) had informed Bielewicz that she was not comfortable with her daughter learning gender identity.  (Concise Statement ¶¶ 33-35).

As for the remaining individual defendants, Bielewicz, at most, approved Williams' request to read the books on March 31, 2022.  (Concise Statement ¶¶ 42-44).[3] Defendants Irvin, Steinhauer and Wyland had no knowledge that the books were read until afterwards.  (Concise Statement ¶¶ 101, 105, 114). Such conduct does not rise to the level of an intentional infringement of Plaintiffs' constitutional liberty interests and summary judgment should be entered in the Defendants' favor.

**c.      Defendants' Actions Did Not Deprive Plaintiffs of Their Right to Make Decisions Concerning their Children**

Parents' fundamental rights to control a child's upbringing and education are implicated only when the state's action "deprived them of their right to make decisions concerning their child," J.S., 650 F.3d at 934.  They are not implicated when the action merely "complicated the making and implementation of those decisions." Id.  There is no evidence that any Defendant has deprived Plaintiffs of their right to make decisions about their children.  To the contrary, as explained by Tatel, Plaintiffs were able to discuss with their children the topic of gender identity and explain their beliefs.  Tatel testified that she subsequently explained "what we know to be true" about gender to her child and "have gotten her straight." (Concise Statement ¶ 74).  Dunn similarly stated that "the only emotional distress he's experienced is why his teacher doesn't know the difference, but he does." (Concise Statement ¶¶ 73).  Melton has elected not to discuss Williams' instruction with her child.  (Concise Statement ¶ 50).  Accordingly, summary judgment should be entered in favor of all Defendants because they did not deprive Plaintiffs of their right to make decisions about their children.

---

[3]      At his deposition, Bielewicz testified that he did not provide prior approval for Williams to read the books. Conversely, Tatel and L.R. testified that, in meetings after March 31, 2022, Bielewicz stated that he had approved the books to be read by Williams to her class.

**d.      The District Did Not Adopt a *De Facto* Policy to Deprive
Plaintiffs of Any Rights**

The District never adopted a *de facto* policy to deprive Plaintiffs of any rights. To establish § 1983 due process liability, a plaintiff must show that the enforcement of a District policy was "the moving force" of the violation of plaintiff's federally protected rights. Monell v. Dep't of Social Services of the City of New York, 436 U.S. 658, 690, 98 S.Ct. 2018, 2036 (1978).   For purposes of Monell liability, a policy is defined as a "statement, ordinance, regulation, or decision officially adopted and promulgated by [a local governing] body's officers." Eaton v. Figaski, Civil Action No. 1:16-cv-279, 2019 U.S. Dist. LEXIS 41297, at *6 (W.D. Pa. Mar. 14, 2019); Simmons v. City of Philadelphia, 947 F.2d 1042, 1059 (3d Cir. 1991).  Significantly, a municipality "cannot be deemed to have engaged in a constitutional violation by virtue of a policy [or] custom" in the absence of a "conscious decision or deliberate indifference of some natural person." Id.; Simmons, 947 F.2d at 1063.

A policymaker is an official with "final unreviewable discretion to make a decision or take an action." Andrews v. City of Philadelphia, 895 F.2d 1469, 1481 (3d Cir. 1990). Under Pennsylvania law, a school board may be the final policymaker with respect to some actions, while the school superintendent may be the final policymaker with regard to other actions.  E.N. v. Susquehanna Twp. Sch. Dist., No. 1:09-CV-1727, 2011 U.S. Dist. LEXIS 91316, 2011 WL 3608544, at *8 (M.D. Pa. July 5, 2011); see also Flood v. Sherk, 400 F. Supp. 3d 295, 307-08 (W.D. Pa. 2019).  School boards are statutorily vested with authority to act only when acting as a governing body; individual school directors, such as Wyland, do not have policy-making authority. Hazelton Area School District v. Krasnoff, 672 A.2d 858, 863 (Pa.Cmwlth. 1996); School District of Philadelphia v. Framlau, 328 A.2d 866,870 (Pa.Cmwlth. 1974). As a school principal, Bielewicz is not a policymaker.  "[I]f a municipal employee's decision is subject to review, even discretionary review, it is not final and that employee is therefore not a policymaker for purposes of imposing municipal liability under § 1983." Brennan v. Norton, 350 F.3d 399, 428 (3d Cir. 2003). Although

the Pennsylvania School Code affords school principals some discretion and decision-making authority, "decision-making authority does not equate to final policymaking authority for purposes of Monell liability." Flood v. Sherk, 400 F. Supp. 3d 295, 308 (W.D. Pa. 2019) (explaining that "district courts in the Third Circuit appear to uniformly refuse to consider a school principal to be a final policymaker such that a principal's disciplinary decisions, without more, could subject a school district to liability under § 1983").

Discovery has confirmed that the District never adopted a *de facto* policy authorizing Williams to engage in the March 31, 2022 instruction.  To the contrary, only Williams and Bielewicz had knowledge that such instruction may occur.  (Concise Statement ¶¶ 37-44, 101-102, 105, 114).  Subsequent to March 31, 2022, the District never adopted a policy that eliminated the right of Plaintiffs to excuse their children from instruction on the subject of gender identity. District Policy IF expressly allows parents and students to opt out of any instruction that offends a parent and/or student's religious beliefs. (Concise Statement ¶ 28).  Although Plaintiffs never exercised that right prior to March 31, 2022, following Williams' instruction, Tatel and Melton requested and were immediately granted opt-outs for their children from any future lessons or discussions concerning gender identity. (Concise Statement ¶¶ 28-32, 125-128).  Dunn did not make any similar requests.  Instead, Dunn removed her child to online learning. (Concise Statement ¶¶ 76-78).  After the initiation of this action, each of Plaintiffs' children were exempted from future instruction on gender identity by virtue of the parties' stipulation, stating, in part that: "Plaintiff's Complaint in the above-captioned matter will be deemed and considered to be Plaintiffs' written request, under 22 Pa.Code § 4.4(d), and District Policy IF,  on the basis of their religious beliefs, that their children be excused from instruction on the subject matters of gender identity and gender transitioning." (Concise Statement ¶¶ 129-130).  Following the publicity of this suit, the District received multiple parental requests pursuant to District Policy IF that their children be excused from lessons or discussions concerning gender identity - each of which has been honored. (Concise Statement ¶ 123).

As to notice, in response to parental complaints about Williams' instruction on March 31, 2022, Irvin, Steinhauer and Wyland agreed that parents should have been given notice ahead of time that the subject of gender identity would be presented to students. (Concise Statement ¶¶ 103, 109-113, 116).  To this end, the District has amplified its website to state that instruction or classroom discussion may involve the subject of gender identity.  (Concise Statement ¶ 131).

Accordingly, summary judgment should be entered in favor of the District because the evidentiary record does not establish that the District had adopted or implemented a *de facto* policy to preclude notice and opt-outs regarding gender identity instruction.[4]

**D.  Count II - Procedural Due Process (All Defendants)**

Count II of the Complaint also asserts an alleged infringement of the fundamental right of parents to direct the education, upbringing and the care, custody, and control of their children without adequate procedural due process.   The elements of a § 1983 Fourteenth Amendment Procedural Due Process claim are: (1) the plaintiff was deprived of a protected liberty interest; (2) this deprivation was without due process; (3) the defendant subjected the plaintiff to this deprivation; (4) the defendant was acting under the color of state law; and (5) the plaintiff suffered injury as a result. Sample v. Diecks, 885 F.2d 1099, 1113 (3d Cir. 1989). Defendants are entitled to summary judgment upon Plaintiffs' claim: (1) for the reasons discussed above in Section III.C, Plaintiffs were not deprived of a fundamental liberty interest; (2) for the reasons discussed above in Section III.C, Defendants have not adopted a *de facto* policy precluding Plaintiffs from opting their children out of instruction, lessons or discussions concerning gender identity; (3) Plaintiffs were provided notice that lessons on accepting others for who they are was on the curriculum;

---

[4]     There is no evidence of record that anyone adopted a policy to allow Williams to tell students not to discuss her lessons with their parents or to indoctrinate students to beliefs contrary to those of their parents. Bielewicz, Irvin, Steinhauer and Wyland had no knowledge of or did not believe allegations that Williams told students not to tell their parents about the reading of *Aidan Introducing Teddy* or any discussion concerning gender identity. (Concise Statement ¶ 118).

and (4) Plaintiffs did not exercise their rights under District Policy IF to request that their children be excused from instruction concerning gender identity. (Concise Statement ¶¶ 25-32).

In addition to publicly adopting its Equity Statement in 2001, the District's first grade social studies curriculum includes a unit on "What Does a Good Citizen Do?" The unit includes instruction on "the universal attributes of respect, honesty, love, justice, courage, loyalty and hope" and learning objectives to "identify the characteristics of students who are bullied." (Concise Statement ¶¶ 3, 25). In addition, the District sent and Plaintiffs received notice of their ability to inspect instructional material and to have their children opt out of instruction inconsistent with their religious beliefs. (Concise Statement ¶¶ 23-24, 28-30). Prior to March 31, 2022, Plaintiffs never requested to review any instructional material, inform the District that certain instruction conflicted with their religious beliefs or informed the District they wanted their children excused from instruction on any specific instruction. (Concise Statement ¶¶ 26-27, 31). Accordingly, to the extent Plaintiffs were deprived of any constitutionally protected liberty interests, which they were not, they had notice and an opportunity to "opt-out."

In addition, to the extent Plaintiffs believe that the District's notice was inadequate, they never availed themselves to the proper remedies. Constitutionally adequate procedural due process exists when a state provides reasonable remedies to rectify an alleged legal error by a local administrative body. See MFS, Inc. v. DiLazaro, 771 F.Supp. 2d 382, 436 (E.D. Pa. 2011), aff'd, 476 Fed. App'x. 282 (3d Cir. 2012). When a state affords a mechanism with which to challenge an administrative decision, adequate procedural due process is provided, whether or not the plaintiff avails herself of the mechanism. Alvin v. Suzuki, 227 F.3d 107, 116 (3d Cir. 2000); Donovan v. Pittston Area Sch. Dist., 218 F. Supp. 3d 304, 314 (M.D. Pa. 2016), aff'd, 717 Fed. App'x. 121 (3d Cir. 2017) (demoted principal did not state a procedural due process claim when she failed to exercise her statutory right to appeal to the Pennsylvania Secretary of Education).

District Policy IF is based on regulations promulgated by the Pennsylvania State Board of Education at 22 Pa.Code. 4.4(d)(3).  Those regulations also provide an administrative remedy if any parent, guardian or child believes that a school district is not complying with these requirements.  Specifically, Section 4.81 of the regulations provides that the Pennsylvania Secretary of Education will receive complaints and investigate and remedy any wrongdoing committed by a school district upon receipt of any complaint. 22 Pa.Code. § 4.81.

Because Plaintiffs did not avail themselves of the opt-out process in District Policy IF and Section 4.4(d)(3) of the state regulations and never challenged the District's actions through Section 4.81 of the regulations, they cannot prevail on a procedural due process claim.  (Concise Statement ¶¶ 26-27, 31).  Therefore, Defendants are entitled to summary judgment upon Plaintiffs' procedural due process claim.

### E.  Count III - Familial Privacy (District and Williams)

As noted by the Court in its ruling upon Defendants' Motion to Dismiss, the elements of a familial privacy claim are not well defined. (ECF # 38, p. 46). In C.N. v. Ridgewood Board of Education, the Third Circuit explained that the familial privacy right was construed "to encompass only those instances where state official's actions were: (1) directly aimed at the parent-child relationship"; (2) implicated the "right of the family to remain together"; or (3) "eroded the family's solidarity internally and impaired the family's ability to function." 430 F.3d at 184. Deprivations can occur when children are taken by the state and not returned to their parents or when the state accuses a family member of child abuse. C.N., 430 F.3d at 184 (citing Duchesne v. Sugarman, 566 F.2d 817, 825 (2d Cir. 1977); Bohn v. County of Dakota, 772 F.2d [1433], at 1436 n.4 [(8th Cir. 1985)  State action that affects the parental relationship incidentally does not violate the right to familial privacy.  Id. By way of example, the Third Circuit cited with approval the First Circuit's holding that there was no familial privacy claim where police threatened children that they would never see their arrested family member again and refused to let them kiss him goodbye.  C.N. 430 F.3d at 184 (citing Pittsley v. Warish, 927 F.2d 3, 8 (1st Cir. 1991). In its ruling upon

Defendants' Motion for Reconsideration, the Court noted that Plaintiffs' familial privacy claim is not based on Williams' teaching lessons, but rather is premised upon the allegations that Williams encouraged students to believe their parents were wrong about their gender, that Williams "groomed" one child to consider gender transitioning and that Williams told students not to tell their parents about the gender identity discussions. (ECF # 55 at 27). Williams and the District are entitled to summary judgment upon this claim because: (1) these allegations are not substantiated by evidence of record; (2) Williams' conduct does not violate the right to familial privacy; (3) there is no evidence of record that the District permitted such alleged conduct; and (4) the District does not have *respondeat superior* liability for such actions.

Beyond the reading of *Aidan* and *Introducing Teddy*, the only other statement made by Williams concerning gender identity is: "when you are born, your parents make a guess of what you are and sometimes they're right and sometimes they're not." (Concise Statement ¶¶ 40-61). This statement is much less invasive than the one made by the police officer in the <u>Pittsley</u> case, <u>supra</u>., which was found not to violate the familial right to privacy. Moreover, in response to a student question about who decides gender, Williams responded, "your parents do." When Dunn's child raised his hand and made the statement "But I'm a boy," Williams responded, "Yes you are. Talk with your parents about that." (Concise Statement ¶¶ 53, 60-61). These exchanges did not contradict students' parents about their children's gender. To the contrary, Williams reinforced that the students' parents' perspectives prevailed. Accordingly, summary judgment should be entered in favor of Williams because her conduct: 1) was not directly aimed at the parent-child relationship; 2) did not implicate the "right of the family to remain together; and 3) did not erode the family's solidarity internally and impair the family's ability to function. <u>C.N.</u>, 430 F.3d at 184.

As to the District, there is no evidence of record that any potential policymaker authorized Williams to engage the alleged instruction. (Concise Statement ¶¶ 101-102, 105, 114). As discussed above, the District is not liable for any unconstitutional conduct of Williams under a theory of *respondeat superior*." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 683, 129 S. Ct. 1937, 1948,

(2009). Insofar as no District policymaker had contemporaneous knowledge of Williams' singular statement on March 31, 2022, it cannot be concluded that the District acquiesced to any alleged violation of Plaintiffs' constitutional rights. D.B. v. Tredyffrin/Easttown Sch. Dist., No. 17-2581, 2020 U.S. Dist. LEXIS 197714, at *44 (E.D. Pa. Oct. 23, 2020).  Accordingly, summary judgment should be entered in favor of Williams and the District.

### F.  Count IV - Free Exercise of Religion (All Defendants)

The First Amendment prohibits the government from burdening the free exercise of religion. Anspach, 503 F.3d at 272.  However, the First Amendment is only implicated if the governmental burden on religion is "substantial," *i.e.*, compulsory or coercive. Id. In other words, the Free Exercise Clause does not require "the Government to conduct its own internal affairs in ways that comport with the religious beliefs of particular citizens." Id., at 272-273.  Instead, governments may not "coerce individuals into acting contrary to their religious beliefs."  Id.[5]

To violate the Free Exercise Clause, a law, regulation, or government policy must "burden religious exercise." Fulton v. City of Philadelphia, ___U.S. _, 141 S. Ct. 1868, 1876 (2021); Trinity Lutheran Church of Columbia, Inc. v. Comer, 582 U.S. 449, 462-63, 137 S. Ct. 2012, 2021-22 (2017); Sch. Dist. of Abington Twp., Pa. v. Schempp, 374 U.S. 203, 223, 83 S. Ct. 1560, 1572 (1963) (noting "a violation of the Free Exercise Clause is predicated on coercion"). Even when state action burdens religious exercise, it still may be "constitutionally permissible" if it survives the requisite level of judicial scrutiny. Fulton, 141 S. Ct. at 1876. A "facially neutral and generally applicable" law that has the incidental effect of burdening religious exercise is subject to rational basis review. Alive Church of the Nazarene, 59 F.4th at 108; see Emp't Div., Dep't of Human Res. of Ore. v. Smith, 494 U.S. 872, 878-82, 110 S. Ct. 1595, 1599-1602 (1990).

---

[5]      As noted recently by the United States Supreme Court, the Third Circuit does not recognize a hybrid-rights/strict scrutiny review of Free Exercise claims when combined with another alleged constitutional violation.  See Fulton v. City of Philadelphia, Pennsylvania, 141 S. Ct. 1868, 1918 (2021) (Alito, J. concur.) (quoting Combs v. Homer-Center School Dist., 540 U.S. 231, 247 (3d. Cir. 2008) ("Until the Supreme Court provides direction, we believe the hybrid-rights theory to be dicta").

Defendants are entitled to summary judgment upon Plaintiffs' Free Exercise claim because: (1) the instruction does not burden Plaintiffs' religious beliefs; (2) Defendants did not have notice and, thus, did not intentionally burden Plaintiffs' religious beliefs; and (3) Defendants always granted religious exemptions from instruction. (Concise Statement ¶¶ 65-68, 74, 92-100, 103, 109-113, 116).

### a.      Defendants Have Not Burdened Plaintiffs' Religious Exercise

Before reaching the question of the appropriate level of judicial review, the court must first address the threshold question of whether Plaintiffs can establish that the District has burdened their religious exercise.[6]  "[T]he ordinary meaning of 'prohibiting the free exercise of religion' was (and still is) forbidding or hindering unrestrained religious practices or worship." Fulton, 141 S. Ct. at 1896 (Alito, J., concurring). Thus, "it is necessary in a free exercise case for one to show the coercive effect of the enactment as it operates against him in the practice of his religion." Schempp, 374 U.S. at 223; see Burwell v. Hobby Lobby Stores, Inc., 573 U.S. 682, 720, 134 S. Ct. 2751, 2775 (2014) (finding religious exercise burdened by a law that required the plaintiffs to "engage[] in conduct that seriously violates their religious beliefs").

As recently noted by a federal court, "[e]very court that has addressed the question [of when a mandatory public-school curriculum might burden the religious exercise of students or parents] has concluded that the mere exposure in public school to ideas that contradict religious beliefs does not burden the religious exercise of students or parents."  Mahmoud v. McKnight, No. DLB-23-1380, 2023 U.S. Dist. LEXIS 150057, at *51 (D. Md. Aug. 24, 2023).  When courts have found free exercise violations based on public-school curricula, the challenged curricula involved more than exposure to ideas. Mahmoud v. McKnight, No. DLB-23-1380, 2023 U.S. Dist. LEXIS 150057, at *58 (D. Md. Aug. 24, 2023).  In Moody v. Cronin, for example, parents and

---

[6]      Mahmoud v. McKnight, No. DLB-23-1380, 2023 U.S. Dist. LEXIS 150057, at *83 n.14 (D. Md. Aug. 24, 2023) ("Because the plaintiffs have not shown that the no-opt-out policy likely will burden their religious exercise, the Court need not address whether the policy is neutral and generally applicable under *Fulton, Tandon,* and *Masterpiece/Lukumi.*").

students brought a free exercise challenge against a statewide requirement that public-school students "attend all coeducational physical education classes under penalty of suspension, expulsion, denial of credits for graduation and other discipline." 484 F. Supp. 270, 272 (C.D. Ill. 1979). The families had religious objections to their children being "required to view and interact with members of the opposite sex who are wearing 'immodest attire.'" Id. The court found the statewide requirement "substantially interfere[d] with the religious development of the Pentecostal children and their integration into the way of life of the Pentecostal faith community." Id. at 276.   Similarly, another court found a requirement that high school students participate in a military training program or be denied a diploma burdened the religious exercise of a student whose religious beliefs prohibited him from participating in training to prepare for war. Spence v. Bailey, 465 F.2d 797, 800 (6th Cir. 1972).

In Mahmoud v. McKnight, No. DLB-23-1380, 2023 U.S. Dist. LEXIS 150057, at *67 (D. Md. Aug. 24, 2023), the school district refused to allow notice or opt out options for books that expressly endorsed LGBTQ+ issues.  Plaintiffs asserted that this policy burdened their free exercise of religion because not allowing opt-outs from the storybooks exerts "behavioral pressure" on the children to "modify their religious beliefs and behavior."  Id., at *67.  In rejecting these arguments, the court concluded: 1) while that the topics in the storybooks the plaintiffs find objectionable—gender identity, transgenderism, and same-sex marriage—outnumber the single objectionable issue (same-sex marriage) in the two books in Parker; and 2) while some of the books may be viewed as endorsing particular viewpoints, like one of the books in Parker," the storybooks were still a small subset of many books used in the language arts curriculum; they are not a "constant stream of like materials." Mahmoud v. McKnight, No. DLB-23-1380, 2023 U.S. Dist. LEXIS 150057, at *69-70 (D. Md. Aug. 24, 2023). (citing Parker, 514 F.3d at 106). Accordingly, the court found that the district's policy did not impose any burden on Plaintiffs' religion.

In the present case, discovery has confirmed the children in Williams' class were not subjected to a "constant stream" of lessons on gender identity. (Concise Statement, ¶ 40). To the contrary, Williams provided instruction that involved transgender issues only on March 31, 2022. Moreover, on March 31, 2022, students were not required to behave contrary to their faiths or affirm any views contrary to their religious beliefs; and parents were not prevented from discussing and contextualizing any contrary views at home. (Concise Statement, ¶¶ 65-68, 74) Simply put, no one was coerced into violating any of their religious beliefs.[7]

### b. Defendants Did Not Intentionally Burden Plaintiffs' Exercise of Religion.

Moreover, Defendants had to have been informed of Plaintiffs' religious beliefs before they could burden them. Anspach ex rel. Anspach v. City of Philadelphia, Dept. of Pub. Health, 503 F.3d 256, 273 (3d Cir. 2007) (citing Lovelace v. Lee, 472 F.3d 174, 201 (4th Cir. 2006) (holding that "unintended denials of religious rights do not violate the Free Exercise Clause."); Mikell v. Folino, 722 F. App'x 304, 309 (3d Cir. 2018) ("Mikell has not shown that Sibanda knowingly or intentionally interfered with his free exercise of his religion").

In the present case, Plaintiffs did not inform Williams or the District prior to March 31, 2022, that instruction or discussion of gender identity conflicted with Plaintiffs' religious beliefs. (Concise Statement ¶ 31). Melton and Tatel have admitted that the instruction was not done to offend their beliefs. (Concise Statement ¶¶ 65-68). Accordingly, there is no evidence in the record supporting Plaintiffs' claims that any defendant knowingly violated their religious beliefs.

### c. Defendants Always Grant Religious Exemptions

A law is not generally applicable under Smith if it (1) "invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions," or (2) "prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." In Tandon, the Supreme Court stated:

---

[7]     Dunn has confirmed that the instruction did not offend her religious beliefs. (Concise Statement ¶ 69).

Government regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any* comparable secular activity more favorably than religious exercise. It is no answer that a State treats some comparable secular business or other activities as poorly as or even less favorably than the religious exercise at issue.

Tandon v. Newsom, __ U.S. __, 141 S.Ct. 1294, 1296 (2021); Religious Rights Found. of PA v. State Coll. Area Sch. Dist., No. 23-CV-01144, 2023 U.S. Dist. LEXIS 214653, at *15-16 (M.D. Pa. Dec. 1, 2023)

This is consistent with Third Circuit precedent.  In Fraternal Order of Police v. City of Newark, 170 F.3d 359, 366 (3d Cir.1999), the court explained that a police department's medical exemption to a no-beard policy, along with its refusal to allow a religious exemption, "indicate[d] that the Department ha[d] made a value judgment that secular (i.e., medical) motivations for wearing a beard are important enough to overcome its general interest in uniformity but that religious motivations are not." The discriminatory conduct in Fraternal Order of Police was the failure to provide a religious exemption after establishing a secular one, notwithstanding the fact that other police officers remained subject to the no-beard policy. Similarly, in Blackhawk v. Pennsylvania, 381 F.3d 202, 210-11 (3d Cir. 2004), Pennsylvania imposed a permit fee for keeping wild animals to raise revenue and to discourage keeping wild animals in captivity, but categorically waived wildlife permit fees for zoos and nationally recognized circuses. Its refusal to waive that fee for the plaintiff, a Native American who kept two bears in captivity for religious reasons, violated the Free Exercise Clause notwithstanding the fact that the permit fee was in no way targeted towards religious reasons for keeping wild animals in captivity.

As authority from the Supreme Court and Third Circuit demonstrates, the Free Exercise Clause is not affronted where a person is denied special treatment in the context of a religion-neutral policy. But if an exemptions regime exists, the failure to grant an exemption to religiously motivated conduct is considered discriminatory because it evidences a decision "that secular motivations are more important than religious motivations."  Religious Rights Found. of PA v.

State Coll. Area Sch. Dist., No. 23-CV-01144, 2023 U.S. Dist. LEXIS 214653, at *16-18 (M.D. Pa. Dec. 1, 2023).

In the present case, the Defendants never denied a religious exemption from instruction. To the contrary, state law and District policy mandate that such requests be granted and the District has consistently granted such request.  ((Concise Statement ¶¶ 123, 130).  Accordingly, summary judgment should be granted because the Defendants do not discriminate against religion.

### F.  Count IV - Equal Protection (All Defendants)

The elements of an Equal Protection "class of one" claim are: (1) a public entity treated the plaintiff differently than others similarly situated; (2) the entity did so intentionally; and (3) there was no rational basis for the difference. Hill v. Borough of Kutztown, 455 F.3d 225, 239 (3d Cir. 2006). Intentional discrimination is vital to a "class of one" claim for any violation of the Equal Protection Clause. Greco v. Senchak, 627 Fed.App'x. 146, 149 (3d Cir. 2015); Wayte v. United States, 470 U.S. 598, 610, 105 S. Ct. 1524 (1985) ("[D]iscriminatory purpose" can be shown by demonstrating that "the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects . . . .") (quoting Pers. Adm'r of Mass. v. Feeney, 442 U.S. 256, 279, 99 S. Ct. 2282 (1979)). To establish a selective enforcement claim under the Equal Protection Clause, plaintiffs must demonstrate that they were (1) treated differently from other, similarly situated person, and (2) this selective treatment was based on an unjustifiable standard, such as race or religion or some other arbitrary factor or to prevent the exercise of a fundamental right. Harvard v. Cesnalis, 973 F.3d 190, 205 (3d Cir. 2020).

Defendants are entitled to summary judgment upon Plaintiffs' equal protection claim because, as set forth above, (1) Defendants were unaware of Plaintiffs' religious beliefs prior to the gender identity lesson on March 31, 2022; (2) Plaintiffs cannot establish that Defendants intentionally treated Plaintiffs differently from others similarly situated on the basis of their assertion of parental rights or religious beliefs; and (3) Defendants did not adopt a *de facto* policy

precluding notice, or the opportunity for Plaintiffs or others to opt out their children out of instruction, lessons or discussions concerning gender identity on the basis of their religious beliefs. (Concise Statement ¶¶ 31, 65-68; 70,74). 123-131).[8]

For these reasons, Defendants are entitled to summary judgment upon this claim.

### G.   Count VI State Law Claim - District

In Count VI of the Complaint,[9] Plaintiffs seek, inter alia, a declaratory judgment that Defendants violated 22 Pa.Code 44.4(d)(1) and (2) (sic) by permitting Williams to provide in-class instruction on gender dysphoria and transgender transitioning when the District's published curriculum and related information did not provide for such subjects to be taught in first grade. (ECF. #1, ¶ 163.a).  Plaintiffs also allege that the Defendants violated 22 Pa.Code 44.4(d)(4) (sic) by permitting Williams to provide in-class instruction on gender dysphoria and transgender transitioning and permitting such without providing appropriate notice and opt out rights to parents.  (ECF. #1, ¶ 163.b).  22 Pa. Code § 4.4(d) provides:

> (d)  School entities shall adopt policies to assure that parents or guardians have the following:
>
> (1)  Access to information about the curriculum, including academic standards to be achieved, instructional materials and assessment techniques.
>
> (2)  A process for the review of instructional materials.
>
> (3)  The right to have their children excused from specific instruction that conflicts with their religious beliefs, upon receipt by the school entity of a written request from the parent or guardians.
>
> (4)  The right to review a State assessment in the school entity during convenient hours for parents and guardians, at least 2 weeks prior to their administration, to determine whether a State assessment conflicts with their religious belief. . . .

Id.

---

[8]     Although previously rejected by the Court in the context of Defendants' Motion to Dismiss, Defendants also maintain that Plaintiffs have not demonstrated differing treatment based upon their religious beliefs insofar as no families received prior notice of Williams' instruction on March 31, 2022. See Jones v. Boulder Valley School District RE-2, 2021 WL 5264188 at *17-18 (D. Colo. Oct. 4, 2021).

[9]     Count VI of the Complaint is brought under the Declaratory Judgment Act which does not provide a standalone basis for federal subject-matter jurisdiction. (ECF #1, ¶¶ 31, 160-163); Allen v. DeBello, 861 F.3d 433, 444 n.57 (3d Cir. 2017).

Initially, the District has adopted policies consistent with 22 Pa. Code § 4.4(d)(1)-(4). (Concise Statement, ¶¶ 23-24, 28-29). The published first grade curriculum includes a unit that includes instruction on "the universal attributes of respect, honesty, love, justice, courage, loyalty and hope" and learning objectives to "identify the characteristics of students who are bullied" which apply to transgender individuals. (Concise Statement, ¶ 25).  Accordingly, the regulations have not been violated.  In the event of a claimed violation, the state regulations provide an administrative remedy if any parent, guardian or child believes that a school district is not complying with these requirements.  22 Pa.Code. § 4.81.

It is undisputed that Plaintiffs did not request to review any instructional materials, did not avail themselves of the opt-out process in District Policy IF and Section 4.4(d)(3) of the state regulations, and never challenged the District's actions through Section 4.81 of the regulations. (Concise Statement ¶¶ 25). Therefore, Defendants are entitled to summary judgment upon Plaintiffs' state law claims.[10]

### H.      The Individual Defendants Are Entitled to Qualified Immunity

Summary judgment should be entered in favor of Defendants Williams, Steinhauer, Irvin, Bielewicz and Wyland on all claims because they are entitled to qualified immunity.  "Qualified immunity shields federal and state officials from money damages unless a plaintiff establishes that: (1) the official violated a statutory or constitutional right, and (2) the right was 'clearly established' at the time of the challenged conduct." Ashcroft v. al-Kidd, 563 U.S. 731, 735, 131 S.Ct. 2074, 2080 (2011). In White v. Pauly, 580 U.S. 73, 137 S. Ct. 548 (2017), the Supreme Court reaffirmed that "existing precedent must have placed the statutory or constitutional question beyond debate." See id. at 551.  Clearly-established law "must be 'particularized' to the facts of the case," and cautioned that the fact that a case presents a unique set of facts and circumstances

---

[10]      In addition, if the federal claims are dismissed, this Court would not have jurisdiction to evaluate the state law claims mentioned in Count VI, which are not pleaded as separate counts.  See e.,g., Heriveaux v. Durkin & Durkin LLC, CV1813148KMMAH, 2020 WL 487290, at *9 (D.N.J. Jan. 30, 2020).

is an "important indication" that a defendant's conduct at issue did not violate a "clearly established" right. See id. at 552. In analyzing the "clearly established law" prong, courts proceed in two steps: 1) "define the right allegedly violated at the appropriate level of specificity," and 2) "ask whether that right was 'clearly established' at the time of its alleged violation.'" Mack v. Yost, 63 F.4th 211, 228 (3d Cir. 2023).

The Supreme Court has repeatedly cautioned that the qualified immunity inquiry demands a "high 'degree of specificity'" and that courts may not "define clearly established law at a high level of generality," which would "avoid[] the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." Id. (citing District of Columbia v. Wesby, 583 U.S. 48, 63-64 138 S. Ct. 577, 590 (2018). A right is clearly established if there is either "closely analogous" caselaw establishing that a defendant's conduct was unlawful or "evidence that the Defendant's conduct was so patently violative of the ... right that reasonable officials would know [it to be a violation] without guidance from a court." Schneyder v. Smith, 653 F.3d 313, 330 (3d Cir. 2011); Mack v. Yost, 63 F.4th 211, 231-32 (3d Cir. 2023).  As the Supreme Court noted, "[t]his demanding standard protects 'all but the plainly incompetent or those who knowingly violate the law.'" See District of Columbia v. Wesby, 138 S. Ct. 577, 589 (2018).

As set forth above, the individual defendants have not violated any of Plaintiffs constitutional or statutory rights.  Even if this Court disagrees, these rights were not clearly established.  In other words, Williams did not know and had no reason to know that her instruction on March 31, 2022, violated Plaintiffs' rights.  Similarly, Bielewicz had no reason to know that allowing Williams to present these books to her class would violate any of Plaintiffs' rights. Finally, Irvin, Steinhauer and Wyland could not possibly expect that their comments, which supported the books as being consistent with the District's educational philosophy, but recognized parents' concerns about notice and the ability to opt out, would violate Plaintiffs' constitutional rights.  Furthermore, after March 31, 2022, Irvin, Steinhauer and Wyland consistently expressed that parents should have prior notice of gender identity lessons and be afforded the opportunity

to opt out their children from such lessons for religious reasons in accordance with District Policy IF and 22 Pa. Code § 4.4(d). (Concise Statement ¶¶ 103-104, 106, 109-113, 116). The *de facto* policy alleged by Plaintiffs never existed. Consequently, Williams, Bielewicz, Irvin, Steinhauer and Wyland are entitled to qualified immunity upon Plaintiffs' claims.

IV.    **Conclusion**

As set forth above, discovery has confirmed that the salacious allegations contained in the complaint are not supported by any admissible evidence. (ECF # 38, pp. 1-2). To the contrary, the evidence confirms that Williams' instruction did not go beyond providing instruction that her students should treat those who are different, including transgender students, with kindness, tolerance and resect. Further, the other defendants confirmed that notice and an opportunity to opt-out of certain instruction were appropriate. Accordingly, summary judgment should be granted in favor of the Defendants on all claims.

Respectfully submitted,

TUCKER ARENSBERG, P.C.

*/s/ Christopher L. Voltz*
Christopher L. Voltz
PA I.D. #200704
cvoltz@tuckerlaw.com

*/s/ Matthew M. Hoffman*
Matthew M. Hoffman
Pa. I.D. #43949
mhoffman@tuckerlaw.com

*/s/ Thomas P. Peterson*
Thomas P. Peterson
Pa. I.D. #32624
tpeterson@tuckerlaw.com

1500 One PPG Place
Pittsburgh, PA  15222
(412) 566-1212

Counsel for Defendants

Dated: January 12, 2024

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of January, 2024, I have filed electronically the foregoing Brief in Support of Motion for Summary Judgment with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification to the following attorney(s) of record addressed as follows:

David J. Berardinelli, Esquire
DEFOREST KOSCELNIK & BERARDINELLI
436 Seventh Ave., 30th Fl.
Pittsburgh, PA  15219
Phone:  412-227-3100
Fax:    412-227-3130
Email:  berardinelli@deforestlawfirm.com

Respectfully submitted,

*/s/ Christopher L. Voltz*
Christopher L. Voltz
PA I.D. #200704
cvoltz@tuckerlaw.com

1500 One PPG Place
Pittsburgh, PA  15222
(412) 566-1212

Attorneys for Defendants