IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CARMILLA TATEL, individually and as parent and natural guardian of her children; STACY DUNN, individually and as parent and natural guardian of her children; and GRETCHEN MELTON, individually and as parent and natural guardian of her children, | ) ) ) ) ) ) ) ) | Civil Action No.: 2:22-cv-837<br><br>Judge Joy Flowers Conti |
| Plaintiffs, | ) ) ) | |
| v. | ) ) ) | |
| MT. LEBANON SCHOOL DISTRICT; MEGAN WILLIAMS; DR. TIMOTHY STEINHAUER; DR. MARYBETH D. IRVIN; BRETT BIELEWICZ; and JACOB W. WYLAND, | ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

## DEFENDANTS' CONCISE STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

Defendants, Mt. Lebanon School District, Megan Williams, Dr. Timothy Steinhauer, Dr. Marybeth D. Irvin, Brett Bielewicz and Jacob W. Wyland, submit this Concise Statement of Material Facts Not in Dispute in support of their motion for summary judgment.

### Welcoming School Environment

1.   Mt. Lebanon School District Policy AC (Nondiscrimination) provides:

It is the policy of the Mt. Lebanon School District to comply fully with the requirements of the applicable nondiscrimination acts and to adhere to a plan of nondiscrimination on the basis of any protected class including, but not limited to, race, color, age, creed, religion, sex, gender, gender identity, sexual orientation, ancestry, national origin, familial status, language, genetic information, pregnancy, or handicap or disability in its programs, activities and employment practices.

(**Appendix 1, p.1**).

2.   Mt. Lebanon School District Policy AD (Educational Philosophy) provides, in part:

. . . . The goal of our schools is to prepare students to be self-directed, creative life-long learners and responsible citizens.

****

Each individual has worth and deserves dignity and respect;

****

Learning is most effective in a safe, caring environment, taught by highly qualified teachers;

(**Appendix 2, pp. 1, 2).**

3.      On June 21, 2021, the Mt. Lebanon School District ("District") adopted the following

Equity Statement:

> The Mt. Lebanon School District is committed to providing a safe, inclusive and welcoming school environment that recognizes and celebrates the diverse identities of all members of our school community, including students, their families, faculty and staff.   All students, regardless of background, identity or ability, will be supported to reach their full potential and pursue their unique talents.  The District will provide resources in a just and equitable manner and remove barriers to allow students to thrive academically, socially, and emotionally.

(**Appendix 4**, 17:20; **Appendix 3** (minutes), p. 6).

4.      At the June 13, 2022, meeting of the Board of School Directors ("Board"), Assistant

Superintendent Dr. Marybeth Irvin ("Irvin") made a presentation regarding the District's Diversity,

Equity and Inclusion Plan. Irvin noted that "the District had and continues to have incidents that

require a response from the DEI perspective, including swastikas and racial slurs found in District

buildings and students reporting bullying and issues and so on.  So we know these things are real."

(**Appendix 4**, 15:25).

5.      As noted by Irvin at the June 13, 2022, Board meeting, the Board is engaged in this

process because, *inter alia*: "We want to make sure that students of color and students who are

LGBTQ feel safe and secure and welcome in all of our spaces, inside our schools and at our

activities . . . that's why we're doing this."  (**Appendix 4**, at 19:38).

6.      As documented by the Third Circuit:

> a.  Transgender students face extraordinary social, psychological, and medical risks.
>
> b.  There can be "no denying that transgender individuals face

2

discrimination, harassment, and violence because of their gender identity."

    c.   The risk of experiencing substantial clinical distress as a result of gender dysphoria is particularly high among children and may intensify during puberty.

    d.   Mistreatment of transgender students can exacerbate gender dysphoria, lead to negative educational outcomes, and precipitate self-injurious behavior.

    e.   When transgender students face discrimination in schools, the risk to their wellbeing cannot be overstated—indeed, it can be life threatening.

    f.   In a survey of 27,000 transgender individuals, 40% reported a suicide attempt (a rate nine times higher than the general population.

<u>Doe v. Boyertown Area Sch. Dist.</u>, 897 F.3d 518, 523, 528-29 (3d Cir. 2018).

    7.   At the April 11, 2022, Board meeting, one parent shared with the Board how her child had been misgendered in school:

> She was in class and someone deliberately mis-gendered her. Other students corrected him. His response was "ugh. I always have to know this stuff. The 2020s are so hard." A couple of points can be made here: 1) my guess is that the student is not being taught at home that trans people exist and if they do, it's probably not in the most positive light; 2) perhaps if this student had been read books like *Introducing Teddy* or had appropriate conversations in advisory or guidance groups, then this hurtful conversation would not have taken place

(**Appendix 5**, 1:02:50).

    8.   The Board was also informed by parents at this meeting that trans people exist in the community and that trans kids exist in the District's elementary schools. Specifically, one parent made the following comments about his own child and analogized the current debate with the past practice of isolating disabled children from public view:

> I cannot stress enough the importance of acknowledging the existence of LGTBQ people in our community. These are people who know who they are as early as first grade. He knew in first grade, we knew in first grade. It was pretty obvious as I said. And I don't think it's fair to say that this is something that, you know, gets to be filtered by the parent, because the last thing I want is [for him?] to shoved in a room and hidden from the world when he's in elementary school. Those sheltered rooms for people with disabilities in the back corners of people's houses, that's basically what's being discussed here and that's just not acceptable in this day and age. They exist, they are here in our community and, I got to tell you, they're in a

lot of your communities too, whether you know it or not.  A lot of them are hiding and are afraid, and that's not good.

(**Appendix 5**, 1:57:07).

9.      Another parent informed the Board that trans kids exist in the District's community and elementary school.  She opined that the District needs to educate students about appropriate terminology, how to treat people lovingly, how to accept people for exactly who they are, even if that presentation of who they are may change over the time that you know them. (**Appendix 5**, 2:01:20).

10.     In response a statement made earlier at the Board meeting on April 11, 2022, by Plaintiff Gretchen Melton ("Melton"), that the District should not be teaching kids that their parents make mistakes, this parent stated that we should teach kids that everybody makes mistakes and that parents can learn from their children and become more loving and better people. (**Appendix 5**, 1:43:21 (Melton); 2:02:00 (parent)).

11.     The following week, at the Board meeting on April 19, 2022, one individual informed the Board that when she was a student (graduated in 2000), she remembered the only gay student in her class being bullied so much that his family paid to send him to private school. (**Appendix 6**, 2:20:33).

12.     Another parent explained to the Board that trans kids and trans adults are vulnerable and asked: "what is it like to explain to a kid that who they are is so controversial you cannot say it out loud in class.  That is not who we are.  That is not who we should be." (**Appendix 6**, 2:32:00).

13.     Another parent asked: "Is my child's identity such a shameful, confusing or complicated idea that they should hide it until you are ready for your child to learn about it. . . . Would you have tried to force my child out or move your child to another classroom." (**Appendix 6**, 2:41:15).

14.     She continued:

no one's parental rights extend to erasing my child because you are not ready for your child to know that humans don't fit into the simplified story you've been telling them.

****

Thank God Mt. Lebanon is committed to creating a safe, welcoming and inclusive environment.  Inclusion means, at the very least, not denying the existence of entire populations.

****

The only time I have ever been scared for my kid in this community was after hearing how upset some parents were after a simple acknowledgment of the existence of trans people.

(**Appendix 6**, 2:42:45).

15.     On April 23, 2022, Defendant, Megan Williams ("Williams") informed the parents of her first-grade class, including Plaintiffs, that her transgender child, █████, would be joining her on Take Your Child to Work Day on April 28, 2023.  (**Appendix 7** (Melton), p. 109:7-12); **Appendix 8** (Exhibit 52), p. 10).

16.     Melton immediately sent a text to her friend, stating: "And it continues . . . . This is a total "f you" and I don't use that kind of language.  This is a woman who knows she can get away with it.  They are disgusting!  We are keeping our kids home and I'm emailing both her [Williams] and Mr. B [Brett Bielewicz].  (**Appendix 7** (Melton), p. 109:7-113:7; **Appendix 8** (Exhibit 52), p. 13).

17.     Tatel and Melton did not send their children to school on Take Your Child to Work Day (April 28, 2022) because Williams' transgender child would be in the classroom.  (**Appendix 7** (Melton), 111:7-112:3; 119:8-20; **Appendix 9** (Tatel), 124:13-125:13; **Appendix 8** (Exhibit 52), p. 40).

18.     On April 28, 2022, Plaintiff's Tatel and Melton engaged in the following text message exchange:

Tatel: Someone just texted me that █████ is in a dress and playing on the

playground now

Melton: This makes me so crazy!!

(**Appendix 7** (Melton), 117:13-118:16), **Appendix 8** (Exhibit 52), p. 37).

19.     Melton confirmed at her deposition that she objects to the presence of a transgender child in the same classroom as her child.  (**Appendix 7** (Melton), 102:22-105:2) (…."If you bring a boy to a classroom full of six-and-seven-year-olds and he's wearing a dress, they're going to ask questions.").

20.     Melton confirmed that she would not accept the existence of a transgender child. (**Appendix 7** (Melton), pp. 68:25-70:5) ("As a child, I would not."); 99:25-100:10) (agreeing with the statement "he was born a boy and maybe he feels like he is not meant to be a boy, but don't confuse him even more.")).

21.     Melton also confirmed that she objects to the District telling kids "that it's fine to be transgender.  To think that it -- you know, maybe it's fine if I'm a boy and I think I'm a girl.  That's totally normal and totally fine." (**Appendix 7** (Melton), 102:8-11).

22.     Melton believes that LGBTQ people have an insidious agenda.  (**Appendix 7** (Melton), 120:25-123:22 ("Yes, I do believe that there is an agenda there.")); (**Appendix 10** (Exhibit 47), p. 18)).

**Parental Rights**

23.     Mt. Lebanon School District Policy IF (Curriculum and Parental Rights) provides that, "[u]pon request, parents and guardians will be provided with copies of instructional and assessment materials (except for certain confidential exams) for courses in which their children are enrolled. Requests for such copies may be written or oral and should be made directly to the teacher of the course." (**Appendix 11** (Irvin), 41:5 - 42:10; **Appendix 12** (Exhibit 71)).

24.     The term "instructional materials" is defined by Mt. Lebanon School District Policy IJ (Selection of Instructional Materials and Resources) as "any material(s) (whether acquired or

locally produced) with instructional content or function that is used for formal or informal teaching/learning purposes. These materials may include, but are not limited to textbooks, other books or articles, supplementary reading and instructional materials, charts, dioramas, flash cards, games, globes, kits, maps, models, periodicals, realia, digital media, audio and video materials, computer software, websites, and mobile applications." (**Appendix 11** (Irvin), 36:4 - 37:7, 42:1 - 42:4; **Appendix 13** (Exhibit 14)).

25.     The District's first grade social studies curriculum includes a unit on "What Does a Good Citizen Do?" The unit includes instruction on "the universal attributes of respect, honesty, love, justice, courage, loyalty and hope" and learning objectives to "identify the characteristics of students who are bullied." (**Appendix 14** (Exhibit 29)).

26.     Prior to March 31, 2022, Plaintiffs, Tatel, Melton and Stacy Dunn ("Dunn") did not request to review any instructional materials to be used in the first-grade classroom taught by Williams. (**Appendix 7** (Melton), 29:17-30:17; **Appendix 16** (Exhibit 32), ¶ 5)).

27.     Melton did not make such a request even though she expressed pre-existing concerns about Williams' political beliefs.  On August 29, 2021, she texted a friend, stating: "Her teacher is a big supporter of the BLM and the LGBT communities.  I worry about what she will be teaching.  It's a bit stressful." (**Appendix 7**, (Melton) pp. 31:17-32:22; **Appendix 10**, (Exhibit 47), p. 1).

28.     Mt. Lebanon School District Policy IF (Curriculum and Parental Rights) provides that parents have "the right to have their child(ren) excused from specific instruction which conflicts with their religious beliefs, upon receipt by the school district of a written request from the parents or guardians." (**Appendix 11** (Irvin), 42:18 - 45:19; **Appendix 12** (Exhibit 71).

29.     The District annually provides notice to parents of enrolled students of their rights under Policy IF and 22 Pa. Code Section 4.4 of their rights to review instructional materials upon request and to request that their children be excused from specific instruction which conflicts with

their religious beliefs upon written request. (**Appendix 11** (Irvin), 42:18 - 45:19; **Appendix 17** (Exhibit 35).

30.    Plaintiffs received and were aware of this notice.  (**Appendix 9** (Tatel), 30:4-31:8; **Appendix** 7 (Melton), 28:12-29:16).

31.    Prior to March 31, 2022, Tatel, Dunn and Melton did not request that their children be excused from instruction involving gender identity or inform the District that instruction involving gender identity conflicted with their religious beliefs. (**Appendix 9** (Tatel), 30:4 - 33:24; **Appendix 7** (Melton), 28:12 - 30:23; **Appendix 17** (Exhibit 35); **Appendix 16** (Exhibit 32, ¶ 6).

32.    Plaintiffs did not avail themselves of the opt-out process in District Policy IF and Section 4.4(d)(3) of the state regulations and there is no evidence in the record that Plaintiffs challenged the District's actions through Section 4.81 of the state regulations.

**October 2022**

33.    The weekly newsletter distributed to parents by Defendant, Brett Bielewicz ("Bielewicz"), Jefferson Elementary School Principal, during the first week of October 2022 included a list of October observances including Italian American Heritage Month, Filipino American Heritage Month, German American Heritage Month, Hispanic Heritage Month, Polish American Heritage Month and LGBTQIA+ History Month. (**Appendix 18** (Bielewicz), 40:21 - 41:7; **Appendix 47** - (Exhibit 36)).

34.    By email on October 1, 2022, L.R., a parent of a student in Williams' first grade classroom, noted that the newsletter acknowledged October being LBGTQ month, asked whether this observation was acknowledged in first grade and stated that she was not comfortable with her daughter learning gender identity at her age. (**Appendix 18** (Bielewicz), 40:3 - 44:1; **Appendix 19** (Exhibit 82)).

35.    Bielewicz responded that there is no formal instruction or lessons on gender identity in first grade and explained that the reference was "an acknowledgement of inclusivity

and awareness to our JES community." (**Appendix 18** (Bielewicz), 40:3-44:1; **Appendix 19** (Exhibit 82).

36.     Bielewicz did not inform Williams of his communication with L.R. (**Appendix 18** (Bielewicz), 43:20 - 43:23, 45:5-17; **Appendix 20** (Williams), 84:10 - 84:14).

**March 30, 2022**

37.     The books *When Aidan Became A Brother* and *Introducing Teddy* were recommended to Williams by Kathleen Herzog ("Herzog"), a first grade teacher at the District's Foster Elementary School as having the themes of kindness and respect. (**Appendix 21** (Herzog), 17:22 - 20:25; **Appendix 22** (Exhibit 27)).

38.     Herzog read the books to her class sometime prior to March 31, 2022. (**Appendix 21** (Herzog), 17:22 - 20:25; **Appendix 22** (Exhibit 27)).

39.     On or about March 30, 2022, Williams, Herzog and another District teacher, Dani Lewis ("Lewis"), wrote the following about *When Aiden Became a Brother*:

Williams: Do you think it's good to read aloud in first [grade]?

Lewis: I do!  Honestly it's been sitting on my desk all year and tomorrow sounds like a good day to read it.

Williams: I'll do it to.

Herzog: I read it this week and it was a really great discussion.  It is a perfect book for first grade.  I had a couple that were like "but is he a boy or a girl?"  And I talked briefly about his assignment and birth being different from what he felt and wanted and our job isn't always to try to figure that out but instead just be kind.  And if we respect others and act with kindness that's what matters.

(**Appendix 22** (Exhibit 27).

**Events of March 31, 2022**

40.     Williams did not engage in instruction or discussion on transgender topics "throughout the school year" as alleged in Plaintiffs' complaint. On March 31, 2022, Williams read *When Aidan Became A Brother* and *Introducing Teddy* to promote inclusivity, acceptance, kindness and respect for all students. (**Appendix 20** (Williams), 60:17 - 61:4, 79:22 - 82:17;

**Appendix 23** (Exhibit 44)).

41.     March 31st of each year is designated as Transgender Day of Visibility (TDOV) to raise awareness about transgender people. It is a day to celebrate the lives and contributions of trans people, while also drawing attention to the poverty, discrimination, and violence the community faces. (**Appendix 23**, (Exhibit 44); available: https://glaad.org/tdov/).

42.     On March 31, 2022, at 9:23 a.m., Williams sent to Bielewicz an email with a subject line "Trans Day of Visibility" stating:

> Williams: I was thinking of sharing these read alouds with colleagues, but I just wanted to run it by you first? They were both recommended to me by other first grade teachers in the district.
>
> When Aidan Became A Brother
> Introducing Teddy
>
> Bielewicz: "I'm fine with it. It's their choice if they wish to incorporate them or not."

(**Appendix 24** (Exhibit 41)).

43.     Bielewicz first reviewed the video read-alouds of *When Aidan Became A Brother* and *Introducing Teddy. A Gentle Story About Gender and Friendship* sometime in the morning of March 31, 2022, after receiving Williams' email. (**Appendix 24** (Exhibit 41); **Appendix 18** (Bielewicz), 21:18-22:12).

44.     Bielewicz did not know whether he had reviewed the books before or after Williams had presented them in her classroom. (**Appendix 24** (Exhibit 41); **Appendix 18** (Bielewicz), 21:18-22:12).

45.     On March 31, 2022, at the conclusion of the "morning meeting" with her first-grade students at the beginning of the school day, Williams informed the students that she may be bringing her child ■■■ to school later in the school year on Take Your Child to Work Day. (**Appendix 25** (Boss), 30:6 - 35:17; **Appendix 26** (Exhibit 9)).

46.     Some of the students stated that they knew ███, referring to the child as "him."

Williams stated to the students that Ollie was now a "she." (**Appendix 25** (Boss), 30:6 - 35:17;

**Appendix 26** (Exhibit 9)).

47.     On March 31, 2022, sometime between 9:00 a.m. and 10:15 a.m., Williams played

a video read-aloud of the children's book *When Aidan Became A Brother* authored by Kyle Lukoff.

(**Appendix 25** (Boss), 14:19 - 14:22, 58:24 - 59:16; **Appendix 27** (Exhibit 43)).

48.     The children's book *When Aidan Became A Brother* is summarized by its publisher

as follows:

> When Aidan was born, everyone thought he was a girl. His parents gave him a pretty name, his room looked like a girl's room, and he wore clothes that other girls liked wearing. After he realized he was a trans boy, Aidan and his parents fixed the parts of his life that didn't fit anymore, and he settled happily into his new life.
>
> Then Mom and Dad announce that they're going to have another baby, and Aidan wants to do everything he can to make things right for his new sibling from the beginning--from choosing the perfect name to creating a beautiful room to picking out the cutest onesie. But what does "making things right" actually mean? And what happens if he messes up? With a little help, Aidan comes to understand that mistakes can be fixed with honesty and communication, and that he already knows the most important thing about being a big brother: how to love with his whole self.
>
> *When Aidan Became a Brother* is a heartwarming book that will resonate with transgender children, reassure any child concerned about becoming an older sibling, and celebrate the many transitions a family can experience.

**Appendix 27** (Exhibit 43)).

49.     Melton's daughter was not present in Williams' classroom during the read-aloud of

*When Aidan Became A Brother*. (**Appendix 7** (Melton), 42:4 - 46:13; **Appendix 10** (Exhibit 47),

p. 3).

50.     At her deposition, Melton testified that her child caught the end of one of the books

(presumably, *When Aidan Became a Brother*), but that Melton has never asked any more

questions and does not know what her child was exposed to, other than she caught the tail end

of a book about a baby and an older brother. (Appendix 7 (Melton), pp. 42:4-44:18).

51.     Following the read-aloud of *When Aidan Became A Brother*, paraprofessional

Sharon Boss ("Boss") observed that the students began talking among themselves and that some expressed confusion. (**Appendix 25** (Boss), 23:16 - 28:3, 40:18 - 45:10; **Appendix 26** (Exhibit 9)).

52.     Dunn's child stated "I don't get it," in response to which another student stated "I get it. She was a he." Williams responded, "yes, she was a he." (**Appendix 25** (Boss), 23:16 - 28:3, 40:18 - 45:10; **Appendix 26** (Exhibit 9)).

53.     Dunn's child then asked: "Who decides this?" Williams responded, "your parents do." (**Appendix 25** (Boss), 23:16 - 28:3, 40:18 - 45:10; **Appendix 26** (Exhibit 9)).

54.     Discussion then ended and Williams told the students they would have a recess. (**Appendix 25** (Boss), 23:16 - 28:3, 40:18 - 45:10; **Appendix 26** (Exhibit 9)).

55.     On March 31, 2022, sometime in the afternoon, Williams played a video read-aloud of the children's book *Introducing Teddy. A Gentle Story About Gender and Friendship* authored by Jessica Walton. (**Appendix 28** (Girman), 11:2-11:15; **Appendix 29** (Mathewson), 11:17-13:17; **Appendix 30** (Exhibit 42)).

56.     The children's book *Introducing Teddy* is summarized by its publisher as follows:

Errol and his teddy, Thomas, are best friends who do everything together. Whether it's riding a bike, playing in the tree house, having a tea party, or all of the above, every day holds something fun to do. One sunny day, Errol finds that Thomas is sad, even when they are playing in their favorite ways. Errol can't figure out why, until Thomas finally tells Errol what the teddy has been afraid to say: "In my heart, I've always known that I'm a girl teddy, not a boy teddy. I wish my name was Tilly, not Thomas." And Errol says, "I don't care if you're a girl teddy or a boy teddy! What matters is that you are my friend."

(**Appendix 30** (Exhibit 42)).

57.     Following the read-aloud of *Introducing Teddy*, Williams told the students that she would be bringing her child Ollie to school on Take Your Child to Work Day and that Ollie would be wearing a dress. (**Appendix 28** (Girman), 18:7 - 18:20).

58.     According to Jackie Girman, a classroom aide who was present at that time, Williams also stated to the class something to the effect that: "when you are born, your parents

make a guess of what you are and sometimes they're right and sometimes they're not." (**Appendix 28** (Girman), 13:22 - 14:9; **Appendix 31** (Exhibit 3).

59.     Lisa Mathewson, another classroom aide, reported Williams comments differently, testifying that Williams told her first-grade class: "parents make a guess about their children's – when children are born, parents make a guess whether they're a boy or a girl. Sometimes parents are wrong." **Appendix 29** (Mathewson), 11:17 - 13:17.

60.     During this discussion, Dunn's child raised his hand and made the statement: "But I'm a boy." (**Appendix 28** (Girman), 14:21 - 15:4, 19:18 - 20:2; **Appendix 29** (Mathewson), 14:18 - 15:15, 22:1 - 22:12).

61.     Williams responded, "Yes you are. Talk with your parents about that." (**Appendix 28** (Girman), 14:21-15:4, 19:18 -20:2; **Appendix 29** (Mathewson), 14:18 - 15:15, 22:1 - 22:12).

62.     Melton is not sure if her child was present for the presentation of *Introducing Teddy*. (**Appendix** 7 (Melton). 43:13-44:18).

63.     Dunn admitted that she has no objections to Williams presenting the *Introducing Teddy* and *When Aiden Became a Brother*.  (**Appendix 15** (Dunn), 62:10-63:12).

64.     Dunn has never read *Introducing Teddy* or *When Aidan Became a Brother*, and has no first-hand knowledge as to the contents of the book. (**Appendix 15** (Dunn), 45:22-47:13).

65.     Williams did not tell her first grade students that their parents' beliefs about gender or gender identity were wrong. (**Appendix 28** (Girman), 13:22 - 14:9; **Appendix 29** (Mathewson), 11:17 - 13:17).

66.     Tatel specifically acknowledged that Williams never criticized Tatel's views on gender and never punished her child because of her beliefs. (**Appendix 9** (Tatel), 75:12-22).

67.     William's never told Melton's child that Melton's beliefs were wrong. (**Appendix 7** (Melton), 52:10-53:2).

68.     Williams did not provide the March 31, 2022, instruction in opposition to Plaintiffs' beliefs.  Tatel testified, in response to questions as to whether Williams gave the March 31, 2023,

instruction because of Tatel and the Plaintiffs' beliefs: "No. Did she do that lesson that day because I would object to it?  No."  (**Appendix 9** (Tatel), 112:12-113:5).

69.     Dunn does not have a religion. Dunn's opposition to gender identity being discussed by Williams with students does not derive from a religious perspective. (**Appendix 15** (Dunn), 18:5 - 19:14).

70.     Williams never instructed her class not to tell their parents about these discussions. To the contrary, Tatel expressly refuted such interpretation of the Complaint, stating: "That is not what we're alleging."  (**Appendix 9** (Tatel), 71:25-72:21); **Appendix 7** (Melton), 72:6-16)

71.     Williams never told Melton's child that Melton's child might be transgender. (**Appendix 7** (Melton), 52:7-9).

72.     Williams never made such a statement to any child. (**Appendix 32** (L.R.), 69:13-70:5; 71:2-7) ("She never told me that. . . .Claire never told me that Mrs. Williams told TC, "You could wear a dress.").

73.     No children were harmed because of Williams' actions. (**Appendix 15** (Dunn), p. 44:2-19) ("the only emotional distress he's experienced is why his teacher doesn't know the difference, but he does."); Appendix 16 (Exhibit 32), ¶ 3).

74.     After school on March 31, 2022, Tatel and her spouse discussed with their daughter the topic of gender identity and explained their beliefs and "what we know to be true" about gender and "have gotten her straight." (**Appendix 9** (Tatel), 25:25 - 26:14, 146:23 - 147:18).

75.     Plaintiffs have confirmed that the March 31, 2022, instruction did not target them or their beliefs. (**Appendix 9** (Tatel), 112:12-113:5); (**Appendix 7** (Melton), 52:7-53:2).

**Aftermath**

<u>Dunn</u>

76.     On April 1, 2022, Dunn emailed Defendant, Superintendent, Dr. Timothy Steinhauer ("Steinhauer"), stating that "I am a parent of a first grader at Jefferson Elementary; and it has come

to my attention that a teacher there is having adult teachings about transgender with children." (**Appendix 33** (Exhibit 49), pp. 3-7).

77.     Dunn further stated that she was not comfortable with having her child return to Williams' classroom and requested that the District provide her child with on-line asynchronous instruction for the remainder of the school year. (**Appendix 33** (Exhibit 49), pp. 3-7).

78.     The District implemented Dunn's request. (**Appendix 33** (Exhibit 49), pp. 3-7).

<u>Melton</u>

79.     On April 4, 2022, Melton met with Williams concerning the books that were read on March 31, 2022, to the first grade class. (**Appendix 7** (Melton), 79:21-23).

80.     In her account of the meeting in a text message later that day, Melton wrote that Williams "apologized to me," and "said that she really didn't think that is was going to cause such an uproar."  Williams "said that she wanted to shed a little light on kids who feel marginalized," and Williams did tell me that she wasn't going to read books like that again." Melton observed that "I really don't think that she meant it in any kind of malicious way. I think she honestly thought people would think it was a good idea." (**Appendix 7** (Melton), 80:8 - 81:6, 83:3 - 84:8; **Appendix 10** (Exhibit 47), pp. 10, 13).

81.     At her deposition, Melton confirmed that William's apologized and stated "well, I won't be reading anything like that" anytime soon or again.  (**Appendix 7** (Melton), 80:21-81:6).

82.     On May 10, 2022, Melton informed her Tatel, Dunn and others that she and her husband "feel like it's better if we aren't listed as plaintiffs.  We feel like since [their child] was not part of any of those conversations, it's weak testimony from us."  (**Appendix 34** - Deposition Exhibit 55, p. 1; **Appendix 7** (Melton), 123:23-124:10).

83.     On May 11, 2022, Melton texted to Dunn that Melton's child: "hasn't been part of any of these conversations." (Appendix 34 - Exhibit 55, p. 2; Appendix 7 - Melton, pp. 129:21-130:10).

84.     Melton's child did not have any private conversations with Williams. (**Appendix 7** (Melton), 127:10-25).

Tatel

85.     Tatel confirmed that the book, *Introducing Teddy*, did not offend her religious beliefs (**Appendix 9** (Tatel), 66:1-15).

Williams

86.     Williams did not read any books addressing gender identity after March 31, 2022. (**Appendix 7** (Melton), p. 89:2-4).

87.     Williams never read the children's book *Jacob's New Dress* to her first grade students. (**Appendix 20** - Williams, 69:12 - 70:7); (**Appendix 7** (Melton), 50:11-25; 128:3-129:3).

88.     Williams did not tell Dunn's child that he could grow his hair long like his mother. (**Appendix 20** - Williams, 75:20 - 77:11).

89.     Williams did not tell Dunn's child that he could wear dresses. (**Appendix 20** - Williams, 76:14 - 76:16, 79:5 - 79:18).

90.     Williams did not tell Dunn's child that he and Williams' child have similar interests. (**Appendix 20** - Williams, 78:25 - 79:4).

91.     Williams did not tell Dunn's child that, if his parents questioned him about discussions with Williams, the child should say "I heard if from a little birdie." (**Appendix 25** - Boss, 66:24 - 67:4; **Appendix 28** - Girman, 23:24 - 24:2; **Appendix 29** - Mathewson, 22:22 - 23:1).

Other District Employees

92.     On April 7, 2022, a parent emailed Jefferson Elementary School second-grade teacher Sarah Davis asking that she be informed if "transgender" topics would be discussed in her classroom. (**Appendix 18** - Bielewicz, 46:4 - 49:18; **Appendix 35** - Exhibit 30).

93.     Bielewicz recommended that Davis reply by stating that, in the event of any controversial subject, "moving forward, we will certainly inform parents ahead of time so that they

may determine if they'd like their child to be present during the activity."  Davis then emailed the reply, as suggested by Bielewicz, to the parent. (**Appendix 18** - Bielewicz, 46:4 - 49:18; **Appendix 35** - Exhibit 30).

94.    On April 7, 2022, a parent emailed Foster Elementary School principal, Dr. Jason Ramsey, asking whether the book *When Aidan Became a Brother* or "anything similar in subject" would be read at Foster Elementary School. (**Appendix 36** - Ramsey 20:6 - 23:5; **Appendix 37**, Exhibit 20).

95.    Ramsey replied, "If this would be read, I would most certainly let you know." (**Appendix 36** - Ramsey 20:6 - 23:5; **Appendix 37**- Exhibit 20).

96.    On April 8, 2022, a parent emailed Lincoln Elementary School principal Dr. Ron Kitsko expressing concern with Williams having read a "transgender book and then lead a discussion about the topic." (**Appendix 38** - Kitsko, 17:24 - 23:7; **Appendix 39** - Exhibit 24; **Appendix 40** - Exhibit 45).

97.    Kitsko replied that, if such a lesson were to occur, he would communicate with the families of students and respond accordingly. (**Appendix 38** - Kitsko, 17:24 - 23:7; **Appendix 39** - Exhibit 24; **Appendix 40** - Deposition Exhibit 45).

98.    Kitsko forwarded this email thread to Irvin, who endorsed his reply by stating "Great response." (**Appendix 38** - Kitsko, 17:24 - 23:7; **Appendix 39** - Deposition Exhibit 24; **Appendix 40** - Deposition Exhibit 45).

99.    On April 11, 2022, a parent emailed Bielewicz objecting to instruction on "transgender topics to first graders." (**Appendix 41** - Exhibit 46).

100.    Bielewicz replied that "My message to our team here at JES Elementary in moving forward is to lean on the parent partnership that we value by being proactive in our communication and giving parents the opportunity to request that a child not engage in any particular lesson, book, discussion, etc." (**Appendix 41** - Exhibit 46).

<u>Irvin</u>

101.    Irvin, first became aware of the books *When Aidan Became a Brother* and *Introducing Teddy* after Williams had presented them to her class. (**Appendix 11** - Irvin, 49:20 - 50:9).

102.    Irvin did not authorize Williams to present the books. (**Appendix 11** - Irvin, 48:12 - 48:15).

103.    After being informed of the parental complaints, Irvin reviewed *When Aidan Became a Brother* and *Introducing Teddy* and concluded that she had no objection to them having been read to Williams' students, but wished parents of the students would have been provided prior notice that the books would be read. (**Appendix 11** - Irvin, 49:20 - 50:20, 61:22 - 64:3).

104.    At the DEI committee meeting on April 19, 2022, Irvin explained why she believed the book, *When Aidan Became a Brother* was appropriate:

> When we think of these books that were shared, that we're sharing with children in the classroom, we think of them as windows, mirrors and sliding glass doors. By windows (sic), what we mean is all students should see a reflection of themselves in the classroom. . . . In terms of windows, we think that these books that represent multiple identities help other children learn and respect differences, build empathy and to be less centered on their own experiences.  And finally, this addition . . . of sliding glass doors is important because it helps these universal themes help children from different identities see their similarities and connections.
>
> ****
>
> We want to be able to continue to provide these Windows, Mirrors and Sliding Glass doors to make sure that those things that make us different and unique individuals are never used in hurtful, demeaning or derogatory ways and instead, that our community, especially our children, respect our individual and collective identities and work to support the [welfare] of all children.

(**Appendix 42**, at 20:45).

<u>Steinhauer</u>

105.    Steinhauer, first became aware that Williams read the books *When Aidan Became a Brother* and *Introducing Teddy* to her first grade students by having been informed by Irvin that there were parental complaints about Williams reading those books to her classroom. (**Appendix**

**43** - Steinhauer, 14:8 - 14:17).

106.     Upon being informed of the concerns expressed by parents, Steinhauer reviewed the books *When Aidan Became a Brother* and *Introducing Teddy* and concluded that it was appropriate for Williams to use the books in her classroom. (**Appendix 43**, Steinhauer, 32:25 - 33:20).

107.     At a public meeting of the District's Board of School Directors on April 11, 2022, several parents made statements objecting to Williams have read *When Aidan Became a Brother* and *Introducing Teddy* to her first grade classroom. (**Appendix 5**).

108.     On April 11, 2022, Dunn spoke during the public comment portion of the meeting. Dunn stated that she was taken aback by books being read in class and that she was frustrated that they did not get notice.  Dunn also disputed Beilewicz's position that Williams teaches with "inclusion, tolerance and passion" and asked "at what point are conversations about boys being girls more important than time spent with their teachers . . . " (**Appendix 5**; 55:00).

109.     In response, Steinhauer stated that it was not the intent of the teacher to create such a negative community discourse and then acknowledged that the District was looking into the matter and reviewing how it could avoid such situation in the future:

> Our goal is to get better.  And if there was a better way for us to do it, then that's what we're talking about right now.  If Parent notification was appropriate, then we should have done that. Or at least after the book was read, the teacher could have sent something home to talk about it.  To tell you the teacher's intent was to help students understand…to me, after seeing both books, the underlying theme was kindness towards all and acceptance towards others. . .
>
> [Dunn: did we read the same book?]
>
> 59:45 – I value your comments and that's why we're taking a look at what happened, how it happened and why it happened and how we can do better.

(**Appendix** 5; 58:35).

110.     Later, in response to another parent's comment, Steinhauer explained:

> The Board is only required to approve textbooks and core resources.  Beyond that, we do have a curriculum that is listed and available for parents to review. And beyond that . . . beyond that we rely on the educators to make thoughtful decisions

about instructional materials that support the mission of the District.  The District does have a mission of providing an inclusive, welcoming, safe and secure environment for all students.  This teacher obviously believed that this book supported that mission, but we're in the process of reviewing it with them and will make sure that we're making good decisions as we move forward.  Your feedback is important to us. [pause] Your feedback is important to us.

(**Appendix 5**, at 1:40:03)

111.    At the conclusion of the April 11, 2022, meeting, a parent asked about the District's plan moving forward.  Steinhauer responded:

Your feedback is valuable to us.  When this came to our attention, Dr. Irvin and Dr. Bielewicz talked with the teacher, talked about the rationale, talked about is there a better way to do it or is there no way to do it better. That's why we take public comment, parents do have the ability to weigh in on curriculum matters and weigh in on what we discuss, but I want to go back to what I said at the very beginning, I will do everything in my power to make sure that every child feels welcome and included in this school district.  That's our mission, that's my mission as an educator and I will protect their rights just as I will protect the rights of parents to weigh in on curriculum matters.  So, we are looking at it and if we can do it better, we certainly will do it better.

(**Appendix 5**, at 2:15:00)

112.    On May 5, 2022, Steinhauer met with L.R. and M.R., parents of a student in Williams' classroom. During that conversation, Steinhauer stated he didn't know that the books were read prior to them being read and that parents should have been notified in advance of Williams having read the books concerning gender identity. (**Appendix 43**, Steinhauer, 62:7 - 64:2; **Appendix 44** - Exhibit 92); (**Appendix 32**, L.R.., p. 65:3-10).

113.    After meeting with L.R. and M.R., Steinhauer directed the principals to ensure that parents would be provided notice and the opportunity to opt out of instruction involving controversial subjects. (**Appendix 43**, Steinhauer, 63:13 - 65:7).

<u>Wyland</u>

114.    Defendant, Jacob Wyland ("Wyland"), President of the Board of School Directors, first became aware that Williams read the books *When Aidan Became a Brother* and *Introducing Teddy* to her first grade students on April 5, 2022, by Steinhauer having forwarded to him an email received from parents expressing concern with Williams reading the books to her first grade class.

(**Appendix 45** - Wyland, 27:11 - 30:18, 33:10 - 33:25; **Appendix 46** - Exhibit 99.

115.    Wyland first reviewed the books *When Aidan Became a Brother* and *Introducing Teddy* either the day of or the day before the April 11, 2022, meeting of the Board of School Directors. (**Appendix 45** - Wyland, 40:1 - 40:12).

116.    At the public meeting of the Board of School Directors on April 11, 2022, Wyland made the following statement:

> This is a difficult, but very important conversation for us to be having.  I'm proud that our district has an express strategic goal set forth and approved by the Board to offer a safe, welcoming and inclusive environment in all of our schools.
>
> ****
>
> Teaching our kids to be kind, teaching our kids to respect each other, regardless of our differences works.
>
> ****
>
> All of our students are blessed with different gifts and abilities.  All of our students have value and all of our students have potential.  All of our students are different from all of our other students.
>
> ****
>
> Our society includes transgender people.  They are our neighbors, our friends, they are our coworkers, they are family, they are our kids.  As has been shared, they are kids in our school district. And they deserve to be treated with respect, empathy and kindness just like every other member of the community.
>
> ****
>
> I reviewed both of these books and the message of both was to be kind to each other regardless of our differences.  They are not propaganda.  They are not pushing a political view or agenda.  They are not attempting to indoctrinate anybody.  They are not ideological.
>
> In the past several decades we have made great strides and I look forward to the day when no disclaimer is necessary to teach our students about the beauty of diversity.  But I recognize that growth is not always easy. . . . To give parents notification if it's necessary at this time.  You know at some point I hope we can grow past it where it is necessary, but if it's necessary now as we grow together, I'm sure that the administration is happy to accommodate that.

(**Appendix 5**, at 1:24:29; **Appendix 45** - Wyland, pp. 40:1-45:21).

117.    This statement was based on his belief that Williams simply read the two books to the class.  He had no knowledge that she was accused of doing anything else.  (**Appendix 45** - (Wyland., pp. 40:1-45:21).

118.    Bielewicz, Irvin, Steinhauer and Wyland had no knowledge of or did not believe the unsupported allegations that Williams told students not to tell their parents about the reading of *When Aidan Became a Brother* and *Introducing Teddy* or any discussion concerning gender identity. (**Appendix 18** - Bielewicz, 51:25 - 56:9; **Appendix 48** - Exhibit 83; **Appendix 11** - Irvin, 53:1-10; 55:19-56:22, 96:23-97:9; **Appendix 43** - Steinhauer, 20:22 - 22:16; **Appendix 45** - Wyland, 33:10 - 37:11; **Appendix 49** - Exhibit 90; **Appendix 50** - Exhibit 100).

### Take Your Child To Work Day

119.    During the 2022 school year, the Administration decided to allow its teacher's to participate in Take Your Child to Work Day because there would be no conflict with the PSSA and Keystone tests.  (**Appendix 43** (Steinhauer), pp. 55:1-57:1; **Appendix 51** (Exhibit 78)).

120.    On April 19, 2022, Assistant Superintendent Ronald Davis sent an email to District principals that the District, while the District does not encourage or discourage participation in Take Your Child to Work Day, it would be permitted on Thursday, April 28, 2022. (**Appendix 8** (Exhibit 52), 3, 4).

121.    Plaintiffs were interested in what was said during class on that date.  (**Appendix 7** (Melton), 116:1-16; **Appendix 8** (Exhibit 52), p. 32 ("We need to find out what she says in class to those kids.").

122.    Plaintiffs were informed, by a person they trust, that Take Your Child to Work Day "was totally uneventful.  Nothing was discussed about gender differences/identity."  (**Appendix 7** (Melton), 119:21-120:4; **Appendix 8** (Exhibit 52), p. 41).

### District Response - Notice and Opt-Out Rights

123.    Since March 31, 2022, the District has received and honored parent opt-outs for gender identity subjects. At the beginning of the 2022-23 school year, principals received direction

concerning procedures to be followed in response to parental requests for students to be excused from instruction that conflicts with their religious beliefs as provided in District Policy IF (Curriculum and Parental Rights). The District has honored all such excusal requests. (**Appendix 11** (Irvin), 67:8 - 72:7; **Appendix 52** (Exhibit 13); **Appendix 36** (Ramsey), 15:17 - 17:25, 46:2 - 47:10; **Appendix 53** (Artinger), 28:15 - 30:3, 34:23 - 36:14; **Appendix 54** (Holloway), 16:23 - 18:3; **Appendix 12** (Exhibit 71); **Appendix 55** (Exhibit 109); **Appendix 56** (Opt-Out Spreadsheet)).

124.    On April 5, 2022, Tatel met with Bielewicz concerning the books read in Williams' classroom on March 31, 2022. (**Appendix 9** (Tatel), 103:4 - 103:17; **Appendix 57** (Exhibit 48), 14).

125.    By email on April 6, 2022, Tatel requested that her daughter be removed from class during any future discussions/lessons on the issue of gender identity. (**Appendix 9** (Tatel) 103:4 - 103:17; **Appendix 57** (Exhibit 48), 14).

126.    Bielewicz replied stating that Tatel's request would be communicated to Williams. (**Appendix 9** (Tatel), 33:14-24;103:4 - 103:17; **Appendix 57**, (Exhibit 48),.14).

127.    Sometime after March 31, 2022, Melton requested that her daughter be removed from class during any future discussions/lessons on the issue of gender identity. (**Appendix 7** (Melton), 94:22 - 95:9; **Appendix 10** (Exhibit 47), 14).

128.    Williams did not provide any instruction on gender identity for the rest of the year. (**Appendix 7** (Melton), 94:22-95:9; **Appendix 10** (Exhibit 47), 14).

129.    On June 8, 2022, Plaintiffs filed their Complaint in this action. (ECF Document 1).

130.    On June 27, 2022, Plaintiffs and Defendants entered into a Stipulation (ECF # 10), subsequently approved by Order of the Court (ECF # 12), stating:

> Plaintiffs' Complaint in the above-captioned matter will be deemed and considered to be Plaintiffs' written request, under 22 Pa.Code §4.4(d), and District Policy IF, on the basis of their religious beliefs, that their children be excused from instruction on the subject matters of gender identity and gender transitioning. Defendant, Mt. Lebanon School District ("School District") will provide, at a minimum, one (1) week written notice (by email) to Plaintiffs of the intention to provide instruction or information on the topics of gender identity or gender transitioning in classrooms where any of the children of any of the

Plaintiffs is a student or in school assemblies that Plaintiffs' children are required or scheduled to attend. Upon written request from Plaintiffs, the School District will promptly, and in no event less than two (2) business days, provide Plaintiffs with access (if feasible via email or an emailed link and, if not feasible, provision of titles to the materials and in-person access) to any and all Instructional Materials (as defined by District Policy IJ) that may be used in such instruction or assemblies. Unless Plaintiffs otherwise notify the building principal, by email, at least one school day prior to the planned instruction or assembly, their children shall be excused from such instruction, assembly and/or receipt of information.

131.   The information on the District's website, under the subheading "Academics"

([https://www.mtlsd.org/academics](https://www.mtlsd.org/academics)) has been modified to include the following information:

**PARENTAL RIGHTS**

*In accordance with School Board Policy IF - Curriculum and Parental Rights and 22 Pa. Code Section 4.4 parents and guardians have the following rights: a) access to information about the curriculum including academic standards to be achieved, instructional materials, and assessment techniques; b) a process for review of instructional materials: c) the right to have their child(ren) excused from specific instruction which conflicts with their religious beliefs, upon receipt by the District of a written request from the parents or guardians; d) the right to have their child(ren) excused from the State assessments if, upon inspection of the assessments, the parents or guardians find the assessments to be in conflict with their religious belief and wish their child(ren) to be excused, upon written request to the school superintendent: e) the opportunity for involvement in the strategic planning process; f) the right to have their child(ren) excused from the any research studies or surveys conducted by entities other than the District unless prior written consent has been obtained; g) the right to review the State assessments in the District two weeks prior to their administration (or as soon thereafter as the district receives the assessments during hours convenient to the parents and guardians; and, h) the right to have their child(ren) excused from instruction regarding the prevention of human immunodeficiency virus (AIDS) and other life-threatening and communicable diseases when the instruction conflicts with the parents' or guardians' religious beliefs or principles, upon receipt by the District of a written request for exemption.*

*Under Act 88, students have the right to decline to participate in education projects involving harmful or destructive use of animals (i.e.: dissection, vivisection, incubation, capture, etc.)*

*Please be advised that the District curriculum may include instruction or discussion of a wide array of topics including race, color, age, creed, religion, sex, gender, gender identity, sexual orientation, ancestry, national origin, familial status, language, genetic information, pregnancy, or handicap or disability, even if such instruction is not specifically identified in the published Curriculum.*

*Parents/guardians who wish their child(ren) to be excused from specific instruction on these or any other topics because they conflict with their religious beliefs should notify their child(ren)'s principal in writing.*

(**Appendix 58** - District Website / Academics ([https://www.mtlsd.org/academics)](https://www.mtlsd.org/academics))).

Respectfully submitted,

TUCKER ARENSBERG, P.C.

*/s/ Christopher L. Voltz*
Christopher L. Voltz
PA I.D. #200704
[cvoltz@tuckerlaw.com](mailto:cvoltz@tuckerlaw.com)

*/s/ Matthew M. Hoffman*
Matthew M. Hoffman
Pa. I.D. #43949
[mhoffman@tuckerlaw.com](mailto:mhoffman@tuckerlaw.com)

*/s/ Thomas P. Peterson*
Thomas P. Peterson
Pa. I.D. #32624
[tpeterson@tuckerlaw.com](mailto:tpeterson@tuckerlaw.com)

1500 One PPG Place
Pittsburgh, PA  15222
(412) 566-1212

Counsel for Defendants

Dated: January 12, 2024

TADMS:20270377-1:032545-194804

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of January, 2024, I have filed electronically the foregoing Defendants' Concise Statement of Facts not in Dispute with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification to the following attorney(s) of record addressed as follows:

David J. Berardinelli, Esquire
DEFOREST KOSCELNIK & BERARDINELLI
436 Seventh Ave., 30th Fl.
Pittsburgh, PA  15219
Phone:  412-227-3100
Fax:   412-227-3130
Email:  berardinelli@deforestlawfirm.com

Respectfully submitted,

*/s/ Christopher L. Voltz*
Christopher L. Voltz
PA I.D. #200704
cvoltz@tuckerlaw.com

1500 One PPG Place
Pittsburgh, PA  15222
(412) 566-1212

Attorneys for Defendants