**EXHIBIT 1**

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CARMILLA TATEL, STACY DUNN, and GRETCHEN MELTON, individually and as parents and natural guardians of their children,<br><br>     Plaintiffs,<br><br>        v.<br><br>MT. LEBANON SCHOOL DISTRICT, MEGAN WILLIAMS, DR. TIMOTHY STEINHAUER, DR. MARYBETH D. IRVIN, BRETT BIELEWICZ, and JACOB W. WYLAND,<br><br>     Defendants. | CIVIL ACTION NO. 2:22-cv-837<br><br>Judge Joy Flowers Conti |

**BRIEF OF *AMICUS CURIAE* LEBO PRIDE IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Jacqueline Perlow
PaID 321594
jperlow@womenslawproject.org
Women's Law Project
239 Fourth Avenue, Suite 2108
T (412) 281-2892

Daniel G. Vitek
PaID 209013
dvitek@cpjlaw.org

Anne Puluka
PaID 322652
apuluka@cjplaw.org

Community Justice Project
100 Fifth Avenue, Suite 900
Pittsburgh, PA 15222
T (412) 434-6002


Counsel for Lebo Pride

## TABLE OF CONTENTS

Page

TABLE OF CONTENTS .................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................. ii

INTERESTS OF *AMICUS CURIAE* ............................................................................ vii

BRIEF ................................................................................................................................ 1

   I.     BACKGROUND ................................................................................................... 1

   II.    ARGUMENT .......................................................................................................... 3

       A.  **The School District has a compelling interest in protecting transgender students** ................................................................................................................ 3

       B.  **Adopting an LGBTQ-inclusive curriculum is narrowly tailored to serve the School District's compelling interest of protecting transgender students** ...... 4

       C.  **Permitting students to opt out of instruction on gender identity would undermine the School District's efforts to protect transgender students** ....... 7

   III.   **CONCLUSION** ................................................................................................... 11

DECLARATION OF LEXI BYROM .......................................................... Exhibit A

DECLARATION OF MICHELE NAPIERKOWSKI ............................................ Exhibit B

DECLARATION OF ASTA KILL ................................................................. Exhibit C

DECLARATION OF LINDSAY AND CHRIS CASHMAN .................................... Exhibit D

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

A.C. by M.C. v. Metro. Sch. Dist. of Martinsville,
    75 F.4th 760 (7th Cir. 2023) ............................................................... 5

Bostock v. Clayton Cnty.,
    140 S. Ct. 1731 (2020) ....................................................................... 5

Doe v. Pine-Richland Sch. Dist.,
    No. 2:24-cv-00051 (W.D. Pa. filed Jan. 12, 2024) ........................... 2, 12

Doe by & through Doe v. Boyertown Area School District,
    897 F.3d 518 (3d Cir. 2018) ....................................................3, 7–9, 11

Doe No. 1 v. Bethel Loc. Sch. Dist. Bd. of Educ.,
    2023 WL 5018511 (S.D. Ohio 2023) ................................................. 2, 12

Evancho v. Pine-Richland Sch. Dist.,
    237 F. Supp. 3d 267 (W.D. Pa. 2017) ................................................. 4–5

Grabowski v. Arizona Bd. of Regents,
    69 F.4th 1110 (9th Cir. 2023) ............................................................. 5

Grimm v. Gloucester Cnty. Sch. Bd.,
    972 F.3d 586 (4th Cir. 2020) ............................................................. 5

Littlejohn v. Sch. Bd. of Leon Cnty. Fla.,
    647 F. Supp. 3d 1271 (N.D. Fla. 2022) ............................................. 2, 12

Mahmoud v. McKnight,
    2023 WL 5487218 (D. Md. 2023) ...................................................... 1, 8, 12

Parents Defending Educ. v. Olentangy Local Sch. Dist. Bd. of Educ.,
    2023 WL 4848509 (S.D. Ohio 2023) .................................................. 2

Parker v. Hurley,
    514 F.3d 87 (1st Cir. 2008) ............................................................... 12

Save Our Saltsburg Sch. v. Blairsville-Saltsburg Sch. Dist.,
    2021 WL 2209294 (W.D. Pa. 2021) ................................................... 13

Troxel v. Granville,
    530 U.S. 57 (2000) ……………………….......................................... 2

Willey v. Sweetwater Cnty. Sch. Dist. No. 1 Bd. of Trs.,
  2023 WL 4297186 (D. Wy. 2023) ........................................................... 2

**Statutes**

20 U.S.C. § 1681(a) ............................................................................ 4

22 Pa. Code § 4.4(d) .......................................................................... 11

**Other Authorities**

*2023 U.S. National Survey on the Mental Health of LGBTQ Young People*,
  The Trevor Project, *available at* https://www.thetrevorproject.org/survey2023/assets/static
  /05__TREVOR05_2023survey.pdf ..................................................... 3

*2023-02-13 MTLSD School Board Discussion Meeting*,
  YouTube (Feb. 13, 2023), *available at* https://youtu.be/22Sj0baZxJs?si=MBpO_3wm
  PJdyNrrT ......................................................................................... 2

*2024 Anti-Trans Bills Tracker*,
  Trans Legislation Tracker, *available at* https://translegislation.com/ .................... 1

Adam Gabbatt,
  *Revealed: Christian Legal Non-Profit Funds US Anti-LGBTQ+ and Anti-Abortion
  Organizations*, The Guardian (June 30, 2023), *available at* www.theguardian.com/world/
  2023/jun/30/christian-hate-group-funding-us-anti-lgbtq-anti-abortion-organizations ............ 1

Adam Nagourney & Jeremy Peters,
  *How a Campaign Against Transgender Rights Mobilized Conservatives*, N.Y. Times (Apr.
  17, 2023), *available at* https://www.nytimes.com/2023/04/16/us/politics/transgender-
  conservative-campaign.html ............................................................... 1

Ben Colliver & Marisa Silvestri,
  *The Role of (In)visibility in Hate Crime Targeting Transgender People*, 22:2 Criminology &
  Criminal Justice (2020) ..................................................................... 9

Caitlin L. Ryan et al.,
  *Discussing Princess Boys and Pregnant Men: Teaching About Gender Diversity and
  Transgender Experiences within an Elementary School Curriculum*, 10:1-2 J. of LGBT
  Youth 83, 86 87 (2013) ................................................................. 6, 7

Caitlin L. Ryan et al.,
  Reading the Rainbow: LGBTQ-Inclusive Literacy in the Elementary Classroom (2018) .. 7, 12

Carol Lynn Martin & Diane N. Ruble,
*Patterns of Gender Development*, 61 Annual Rev. Psychology 353 (2010) .......................... 6

Chelsea N. Proulx et al.,
*Associations of LGBTQ-Inclusive Sex Education with Mental Health Outcomes and School-Based Victimization in U.S. High School Students*, 64:5 J. Adolescent Health 608 (2019)
......................................................................................................................... 5, 12

Clare Bartholomaeus & Damien W. Riggs,
*Whole-of-School Approaches to Supporting Transgender Students, Staff, and Parents*, 18:4 Int'l. J. of Transgenderism 361 (2017) ................................................................... 6

Daniel Lewis et al.,
*American Attitudes Toward Transgender Rights*, The Gender Policy Report: Univ. of Minn. (Nov. 15, 2023), *available at* https://genderpolicyreport.umn.edu/american-attitudes-toward-transgender-rights/ ......................................................................................................... 1

*Developing LBGTQ-Inclusive Classroom Resources*,
GLSEN (2019), *available at* GLSEN_LGBTQ_Inclusive_Curriculum_Resource_2019_0.pdf
......................................................................................................................... 5, 12

Greta R. Bauer et al.,
*"I Don't Think This Is Theoretical; This Is Our Lives": How Erasure Impacts Health Care for Transgender People*, 20:5 Nurses in AIDS Care 348 (2009) ........................................... 9

Hilary Burdge et al.,
*Implementing Lessons that Matter: The Impact of LGBTQ-Inclusive Curriculum on Student Safety, Well-Being, and Achievement*, Gay Straight Alliance Network (2013) .................... 10

Jill M. Hermann-Wilmarth & Caitlin L. Ryan,
*Reading and Teaching the Rainbow: Making Elementary School Classrooms LGBTQ-Inclusive*, 43:1 Am. Educator 17 (2019) ............................................................... 6

Joseph G. Kosciw et al.,
*The 2021 National School Climate Survey: The Experiences of LGBTQ+ Youth in Our Nation's Schools*, GLSEN 10 (2022), *available at* glsen.org/sites/default/files/2022-10/NSCS-2021-Full-Report.pdf ......................................................................... 4

Joseph G. Kosciw et al.,
*The Effect of Negative School Climate on Academic Outcomes for LGBT Youth and the Role of In-School Supports*, 12:1 J. Sch. Violence 45 (2013) ....................................... 5

Katie R. Eyer,
*Anti-Transgender Constitutional Law*, -- Vanderbilt L. Rev. (forthcoming 2024), *available at* https://ssrn.com/abstract=4627458 ................................................................. 1–2

Katie R. Eyer,
  *Transgender Constitutional Law*, 171 U. Pa. L. Rev. 1405 (2023) ........................................ 2

Lynn S Liben & Rebecca S. Bigler,
  *The Role of Gender in Educational Contexts and Outcomes,* 289 (2014) ........................ 5, 12

Melissa J. Smith & Elizabeth Payne,
  *Binaries and Biology: Conversations with Elementary Education Professionals After
  Professional Development on Supporting Transgender Students*, 80:1 The Educ. Forum 34
  (2016) ................................................................................................................................ 6, 7

Michael Zaliznyak et al.,
  *Age at First Experience of Gender Dysphoria Among Transgender Adults Seeking Gender-
  Affirming Surgery*, 3:3 JAMA Network Open 1 (2020) ............................................................ 6

Michael Zaliznyak et al.,
  *How Early in Life do Transgender Adults Begin to Experience Gender Dysphoria? Why This
  Matters for Patients, Providers, and for Our Healthcare System*, 9:6 Sexual Medicine 1
  (2021) ................................................................................................................................... 6

Michelle M. Johns et al.,
  *Strengthening our Schools to Promote Resilience and Health among LGBTQ Youth:
  Emerging Evidence and Research Priorities from The State of LGBTQ Youth Health and
  Wellbeing Symposium*, 6:4 LGBT Health 146 (2019) .................................................... 4, 6, 8

*Pennsylvania*,
  Trans Legislation Tracker, *available at* https://translegislation.com/bills/2024/PA ............... 1

*Ready, Set, Respect! GLSEN's Elementary School Toolkit*,
  GLSEN (2016), *available at* glsen.org/sites/default/files/GLSEN%20Ready%20Set%20
  Respect.pdf ..................................................................................................................... 7, 12

*Reported Hate Crimes in Schools: 2018-2022*,
  U.S. Dept. of Justice 9-10 (Jan. 2024), *available at* https://cde.ucr.cjis.gov/LATEST/
  webapp/# ............................................................................................................................... 3

Russel B. Toomey et al.,
  *Gender-Nonconforming Lesbian, Gay, Bisexual, and Transgender Youth: School
  Victimization and Young Adult Psychosocial Adjustment*, 46 Dev. Psychology 1580 (2010)
  ............................................................................................................................................... 4

Russell Contreras,
  *The Forces Behind Anti-Trans Bills Across the U.S.*, Axios (Mar. 31, 2023), *available at*
  https://www.axios.com/2023/03/31/anti-trans-bills-2023-america .......................................... 1

S. Russell et al.,
  *LGBT Issues in the Curriculum Promotes School Safety: California Safe Schools Coalition Research Brief 4*, California Safe Schools Coalition (2006), *available at* http://www.casafe schools.org/FactSheet-curriculum.pdf ........................................................................... 5

Samskruthi Madireddy & Sahiti Madireddy,
  *Strategies for Schools to Prevent Psychological Stress, Stigma, and Suicidality Risks among LGBTQ+ Students*, 8:9 Am. J. Educ. Rsch. 659 (2020) ......................................................... 6

Shannon D. Snapp et al.,
  *LGBTQ-Inclusive Curricula: Why Supportive Curricula Matter*, 15:6 Sex & Educ. 580 (2015) ................................................................................................................. 5, 6, 10

Shannon D. Snapp et al.,
  *Students Perspectives on LGBTQ-Inclusive Curriculum*, 48:2 Equity & Excellence in Educ. 249 (2015) ...................................................................................................................... 5, 12

Tania Ferfolja & Jacqueline Ullman,
  *Inclusive Pedagogies for Transgender and Gender Diverse Children: Parents' Perspectives on the Limits of Discourses of Bullying and Risk in Schools*, 29:5 Pedagogy, Culture, & Soc'y 793 (2021) ....................................................................................................... 4, 6, 8, 10

Viviane Namaste,
  Invisible Lives: The Erasure of Transexual and Transgendered People (2000) ..................... 9

Wayne Martino et al.,
  *Supporting Transgender Students in Schools: Beyond an Individualist Approach to Trans Inclusion in the Education System*, 74:4 Educ. Review 753 (2020) .................................... 7, 9

William J. Hall,
  *Psychological Risk and Protective Factors for Depression Among Lesbian, Gay, Bisexual, and Queer Youth: A Systematic Review*, 65:3 J Homosexuality 263 (2018) .......................... 5

## INTERESTS OF *AMICUS CURIAE*

Lebo Pride is a nonprofit organization dedicated to bringing queer and gender diverse education and visibility to the Mt. Lebanon community. Lebo Pride accomplishes this mission through a combination of celebration, outreach, and advocacy. Lebo Pride's work is rooted in the Mt. Lebanon community and is led by local LGBTQIA+ individuals and allies. A significant portion of Lebo Pride's community service involves working directly with young people, including many of whom are transgender and gender non-conforming. The majority of these young people attend school in the Mt. Lebanon School District.

The Court's decision in this case will have a significant and direct effect on the students Lebo Pride works with and on behalf of, as well as the larger Mt. Lebanon LGBTQIA+ community Lebo Pride represents. Lebo Pride is concerned that limiting instruction on gender identity in the Mt. Lebanon School District will hinder Lebo Pride's ability to accomplish its mission and undo the hard work the organization has put into creating a safe and welcoming community by celebrating and promoting visibility for queer, gender diverse, and other marginalized groups. Limiting gender identity education directly undermines Lebo Pride's goal of bringing LGBTQ-inclusive education to the Mt. Lebanon community and serves to further erase the people Lebo Pride works to celebrate. Lebo Pride submits this *Amicus Curiae* Brief to provide insight into the broader anti-trans movement of which Plaintiffs' complaint is a part and to amplify the voices of the young people who will be affected by this Court's decision, including current and recent transgender students, who up to this point have been absent from the narratives presented to the Court. For these reasons, Lebo Pride has an interest in this lawsuit and can offer a valuable and unique perspective to this Court.

**BRIEF OF *AMICUS CURIAE* LEBO PRIDE IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

**And Now,** *Amicus Curiae* Lebo Pride, by and through its attorneys, the Women's Law

Project and the Community Justice Project, submit this Brief in Support of Defendants' Motion

for Summary Judgment.

## I.    BACKGROUND

In recent years, our nation has seen the rapid growth of a concerted and malicious

movement against the transgender community. Lawmakers are introducing legislation targeting

the rights of transgender people at record speed, with over 500 bills introduced in 2023 alone.[1]

Political strategists are using anti-transgender (anti-trans) rhetoric to galvanize socially

conservative voters,[2] and anti-trans advocacy groups are spending millions of dollars to attack

the rights of transgender people, especially children.[3] The majority of Americans, however,

believe that transgender people should have the same rights and protections as other Americans,

and, in particular, that the law should protect the safety of transgender children in schools.[4] It is

not surprising, then, that only a small percentage of anti-trans bills have passed into law.[5] In

Pennsylvania, not a single anti-trans bill introduced in 2023 has even moved out of committee.[6]

Without the political support necessary to advance their cause, anti-trans groups have

increasingly turned to the courts.[7] This is precisely the situation in which Plaintiffs find

---

[1] *2024 Anti-Trans Bills Tracker*, Trans Legislation Tracker, https://translegislation.com/ (last visited Feb. 5, 2024).
[2] Adam Nagourney & Jeremy Peters, *How a Campaign Against Transgender Rights Mobilized Conservatives*, N.Y. Times (Apr. 17, 2023), https://www.nytimes.com/2023/04/16/us/politics/transgender-conservative-campaign.html.
[3] Russell Contreras, *The Forces Behind Anti-Trans Bills Across the U.S.*, Axios (Mar. 31, 2023), https://www.axios.com/2023/03/31/anti-trans-bills-2023-america; Adam Gabbatt, *Revealed: Christian Legal Non-Profit Funds US Anti-LGBTQ+ and Anti-Abortion Organizations*, The Guardian (June 30, 2023), https://www.the_guardian.com/world/2023/jun/30/christian-hate-group-funding-us-anti-lgbtq-anti-abortion-organizations.
[4] *See* Daniel Lewis et al., *American Attitudes Toward Transgender Rights*, The Gender Policy Report: Univ. of Minn. (Nov. 15, 2023), https://genderpolicyreport.umn.edu/american-attitudes-toward-transgender-rights/.
[5] *See 2024 Anti-Trans Bills Tracke*r, *supra* note 1.
[6] *Pennsylvania*, Trans Legislation Tracker, https://translegislation.com/bills/2024/PA (last visited Feb. 5, 2024).
[7] While anti-transgender constitutional litigation was "virtually non-existent" prior to 2016, these cases have increased dramatically in recent years. Katie R. Eyer, *Anti-Transgender Constitutional Law*, -- Vanderbilt L. Rev.

themselves.[8] While Plaintiffs focus on their rights as parents, it is quite evident that this case is part of a larger anti-trans effort. Not only do Plaintiffs' replicate the same legal arguments used by anti-trans law firms and advocacy groups around the country,[9] but the primary relief sought in their complaint—that the Court "prevent instruction in the District on gender dysphoria and transgender transitioning now and in the future" (ECF No. 1)—belies the fact that their motivation stems not from an interest in their individual rights as parents, but from a general hostility toward transgender people. This case is not being litigated in a vacuum, but is part of a nationwide effort to eliminate the rights, protections, and legal recognition of transgender people, a movement that does real and lasting harm to transgender youth. For example, almost one-third of participants in a 2023 survey of 28,000 LGBTQ+ youth said that their mental health was poor

---

(forthcoming 2024), *available at* https://ssrn.com/abstract=4627458. Courts have overwhelmingly held in favor of pro-transgender rights litigants. *See* Katie Eyer, *Transgender Constitutional Law*, 171 U. Pa. L. Rev. 1405, 1416 (2023) (finding that, of the 37 cases decided between 2017 and 2021 addressing constitutional rights of transgender litigants, 78% resulted in pro-transgender victories; the success rate reached near-100% when prisoner litigation and criminal cases were removed from the calculation). In the public school context, courts faced with substantive due process claims similar to the one at issue here have consistently cabined the scope of parental rights as they relate to LGBTQ+ topics and policies. *See, e.g.*, Mahmoud v. McKnight, 2023 WL 5487218, at *26–27 (D. Md. 2023) (finding parents were not likely to succeed on challenge to a school's policy that did not allow parents to opt their children out of discussing storybooks with LGBTQ+ characters); Willey v. Sweetwater Cnty. Sch. Dist. No. 1 Bd. of Trs., 2023 WL 4297186, at *13-16 (D. Wy. 2023) (holding mother was unlikely to succeed on challenge to school's policy of not actively informing parents of child's preferred pronoun and name; to the extent the mother was likely to succeed, it was limited to school's withholding or lying about such information upon parent inquiry, in absence of reasonable safety concern); Parents Defending Educ. v. Olentany Local Sch. Dist. Bd. of Educ., 2023 WL 4848509, at *18–19 (S.D. Ohio 2023) (holding parents do not have fundamental right to exempt their children from policies prohibiting intentional misgendering of fellow students); Doe No. 1 v. Bethel Loc. Sch. Dist. Bd. of Educ., 2023 WL 5018511, at *12 (S.D. Ohio 2023) ("[T]he Supreme Court has limited [the parental right] to instances where parents 'must make decisions concerning the care, custody, and control of their children'—never suggesting that parents may dictate what a public school teaches to its students . . .") (citing Troxel v. Granville, 530 U.S. 57, 66 (2000)).

[8] The Mt. Lebanon community has shown active support for LGBTQ+ rights. At a school board meeting in February 2023, twenty-seven individuals, including students from second to twelfth grade, parents, educators, and community members, provided testimony on a policy to support LGBTQ+ students. Every speaker advocated for the policy's approval. The School Board member leading the meeting also spoke in favor, affirming that the Board was committed to doing more to support LGBTQ+ students. *Recording available at 2023-02-13 MTLSD School Board Discussion Meeting*, YouTube (Feb. 13, 2023), https://youtu.be/22Sj0baZxJs?si=MBpO_3wmPJdyNrrT.

[9] *See, e.g.*, Doe v. Pine-Richland Sch. Dist., No. 2:24-cv-00051 (W.D. Pa. filed Jan. 12, 2024) (lawsuit challenging school policies based on parental rights brought by America First Legal Foundation, an activist law firm whose stated mission is to save America from the radical left); Doe No. 1, 2023 WL 5018511, at *11 (same); Littlejohn v. Sch. Bd. of Leon Cnty. Fla., 647 F. Supp. 3d 1271, 1277 (N.D. Fla. 2022) (lawsuit raising parental rights claims filed by Parental Rights Campaign, a law firm whose mission is to defend parents' rights to shield their children from gender identity ideology); Willey, 2023 WL 4297186, at *1 (same).

"most of the time or always" as a result of anti-LGBTQ+ policies and legislation,[10] and data published last month by the FBI's Uniform Crime Reporting Program found that school-based hate crimes motivated by gender identity bias increased by nearly 250% between 2018-2022.[11]

It is against this landscape, and the serious consequences this case could have for transgender students in the Mt. Lebanon School District ("the District"), that the Court must determine whether parents have a right to opt their children out of instruction about the identity and experiences of transgender people. *Amici* strongly believes that curriculum that is inclusive of gender identity is not only beneficial to all children, but is a vital tool for protecting the health, safety, and well-being of transgender students. As such, the District has a right to provide this instruction to all students without the opt out requested by Plaintiffs.

## II.   ARGUMENT

### A.   The School District has a compelling interest in protecting transgender students.

In its opinion on Motion to Dismiss, this Court held that "accepting the facts in the complaint as true, the parental right at issue in this case is fundamental." (ECF No. 38, p. 32). If the Court finds that the same standard applies at summary judgment, the Mt. Lebanon School District has a compelling state interest in protecting transgender students and LGBTQ-inclusive curricula are narrowly tailored to serve that interest. The Third Circuit recognized the compelling state interest at the heart of this case in Doe v. Boyertown Area School District, stating:

> [T]ransgender students face extraordinary social, psychological, and medical risks and the School District clearly had a compelling state interest in shielding them from discrimination. There can be "no denying that transgender individuals face discrimination, harassment, and violence because of their gender identity." The risk of experiencing substantial clinical distress as a result of gender dysphoria is particularly high among children and may intensify during puberty. The Supreme Court has regularly held that the state has a compelling interest in protecting the physical and psychological well-being of minors. We have similarly found that the government has a compelling interest in protecting and caring for children in various contexts. Mistreatment of transgender students can exacerbate gender dysphoria, lead to negative educational outcomes,

---

[10] *2023 U.S. National Survey on the Mental Health of LGBTQ Young People*, The Trevor Project, https://www.the trevorproject.org/survey2023/assets/static/05___TREVOR05_2023survey.pdf (last visited Feb. 5, 2024).
[11] *Reported Hate Crimes in Schools: 2018-2022*, U.S. Dept. of Justice 9-10 (Jan. 2024) https://cde.ucr.cjis.gov/.

and precipitate self-injurious behavior. When transgender students face discrimination in schools, the risk to their wellbeing cannot be overstated—indeed, it can be life threatening. This record clearly supports the District Court's conclusion that the School District had a compelling state interest in protecting transgender students from discrimination.

897 F.3d 518, 528–29 (3d Cir. 2018). The data is unequivocal that transgender students face a greater risk of discrimination and harassment in school than other students. Research shows that transgender students "may be as much as four times more likely to experience bullying and harassment as cisgender students."[12] A 2021 national survey of LGBTQ+ students found that over 40% felt unsafe at school because of their gender identity or gender expression, and nearly 60% had been verbally harassed, over 20% physically harassed, and 8% physically assaulted at school in the past year based on their gender expression.[13] School-based harassment has serious consequences for transgender students. School-based victimization can result in higher risk for PTSD, depression, anxiety, and suicidality.[14] Discrimination against transgender students "has been shown to decrease one's ability to focus at school, has a negative impact on grades and leads to school avoidance and truancy. It is also associated with decreased feelings of school belonging and educational aspiration."[15]

Not only has the Third Circuit held that school districts have a compelling state interest in supporting the physical and psychological well-being of transgender students, but school districts also have a statutory obligation under Title IX to ensure transgender students are not subject to discrimination on the basis of sex.[16] Thus, based on the Third Circuit's opinion in Boyertown

---

[12] Michelle Johns et al., *Strengthening our Schools to Promote Resilience and Health among LGBTQ Youth: Emerging Evidence and Research Priorities from The State of LGBTQ Youth Health and Wellbeing Symposium*, 6:4 LGBT Health 146, 147 (2019).

[13] Joseph G. Kosciw, et al., *The 2021 National School Climate Survey: The Experiences of LGBTQ+ Youth in Our Nation's Schools*, GLSEN 10, 16, 19–20 (2022), glsen.org/sites/_default/files/2022-10/NSCS-2021-FullReport.pdf.

[14] Russel B. Toomey et al., *Gender-Nonconforming Lesbian, Gay, Bisexual, and Transgender Youth: School Victimization and Young Adult Psychosocial Adjustment*, 46 Dev. Psychology 1580, 1581 (2010).

[15] Tania Ferfolja & Jacqueline Ullman, *Inclusive Pedagogies for Transgender and Gender Diverse Children: Parents' Perspectives on the Limits of Discourses of Bullying and Risk in Schools*, 29:5 Pedagogy, Culture, & Soc'y 793, 795 (2021); *see also* Exhibit A ¶¶ 4–5; Exhibit B ¶¶ 4–7; Exhibit D ¶ 3.

[16] 20 U.S.C. § 1681(a). Discrimination based on sex includes discrimination based on gender identity. *See* Evancho

and the District's duties under Title IX, it is unquestionable that the District has a compelling

state interest, as well as a legal obligation, to protect transgender students.

   **B.  Adopting an LGBTQ-inclusive curriculum is narrowly tailored to serve the
        School District's compelling interest of protecting transgender students.**

   Research shows that one of the most effective methods for protecting transgender

students from discrimination and harassment is by integrating gender diversity and the

representation of LGBTQ-individuals into the standard curriculum, also known as LGBTQ-

inclusive curriculum.[17] Implementing an LGBTQ-inclusive curriculum is associated with

reduced incidences of bullying and victimization,[18] reduced adverse mental health outcomes,[19]

reduced prejudices,[20] higher GPAs,[21] greater perceptions of safety,[22] and more positive school

climates.[23] Experts regularly cite inclusive curricula as one of the primary tools schools can use

---

v. Pine-Richland Sch. Dist., 237 F. Supp. 3d 267, 297 (W.D. Pa. 2017) ("Plaintiffs have demonstrated a reasonable likelihood of showing that Title IX's prohibition of sex discrimination includes discrimination as to transgender individuals based on their transgender status and gender identity."). According to the Supreme Court, "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." Bostock v. Clayton Cnty., 140 S. Ct. 1731, 1741 (2020). Although decided under Title VII, several circuit courts have found that Bostock's reasoning applies equally to Title IX. *See, e.g.*, A.C. by M.C. v. Metro. Sch. Dist. of Martinsville, 75 F.4th 760, 769 (7th Cir. 2023); Grabowski v. Arizona Bd. of Regents, 69 F.4th 1110, 1116 (9th Cir. 2023); Grimm v. Gloucester Cnty. Sch. Bd., 972 F.3d 586, 616 (4th Cir. 2020).

[17] "LGBTQ-inclusive curriculum" is a broad term. It can include direct instruction on gender identity and sexual orientation, as well as "the inclusion of the sexual minority civil rights movement in history courses, acknowledging that certain pioneers in many fields (e.g., the arts and sciences) identified as lesbian, gay, bisexual, or transgender, or ensuring that word problems in math assignment are not strictly heteronormative (e.g., only referring to opposite sex-couples or "nuclear" families)." Lynn S. Liben & Rebecca S. Bigler, *The Role of Gender in Educational Contexts and Outcomes*, 289 (2014); for best practices in LGBTQ-inclusive curriculum, *see Developing LBGTQ-Inclusive Classroom Resources*, GLSEN (2019), GLSEN_LGBTQ_Inclusive_Curriculum_Resource_2019_0.pdf.

[18] Chelsea Proulx et al., *Associations of LGBTQ-Inclusive Sex Education with Mental Health Outcomes and School-Based Victimization in U.S. High School Students*, 64:5 J. Adolescent Health 608, 611 (2019); Joseph Kosciw et al., *The Effect of Negative School Climate on Academic Outcomes for LGBT Youth and the Role of In-School Supports*,12:1 J. Sch. Violence 45, 55 (2013); Shannon Snapp et al., *LGBTQ-Inclusive Curricula: Why Supportive Curricula Matter*, 15:6 Sex & Educ. 580, 590–92 (2015); William Hall, *Psychological Risk and Protective Factors for Depression Among Lesbian, Gay, Bisexual, and Queer Youth: A Systematic Review*, 65:3 J Homosexuality 263, 283 (2018).

[19] Proulx, *supra* note 18, at 611; Exhibit A ¶¶ 7–10.

[20] Shannon D. Snapp et al., *Students Perspectives on LGBTQ-Inclusive Curriculum*, 48:2 Equity & Excellence in Educ. 249, 251 (2015).

[21] Kosciw, *supra* note 18, at 55; *see* Exhibit B ¶ 10.

[22] S. Russell et al., *LGBT Issues in the Curriculum Promotes School Safety: California Safe Schools Coalition Research Brief 4*, California Safe Schools Coalition (2006), *available at* casafeschools.org/FactSheet-curriculum.pdf

[23] Snapp, *supra* note 18, at 590–92.

to protect the health, safety, and well-being of transgender youth.[24]

These findings hold true even for children in early elementary school. Research shows that children are aware of their gender identity at a very young age[25] and begin to engage in gender prejudice and discrimination as early as preschool.[26] These early attitudes and behaviors manifest in many forms, including through "correction ('give that girl puppet to a girl'), ridicule, and 'identity negation' (e.g., 'Jeff is a girl')."[27] Elementary school is, thus, an environment in which children become aware of their own gender identity as well as societal expectations of gender for themselves and for others.[28] Given the importance of the school setting for gender identity development, many studies highlight the need to integrate LGBTQ-inclusive curricula into the elementary school level, especially as a tool for reducing gender-based harassment.[29] Students and parents also underscore the value of integrating LGBTQ+ topics and representation

---

[24] *See* Samskruthi Madireddy & Sahiti Madireddy, *Strategies for Schools to Prevent Psychological Stress, Stigma, and Suicidality Risks among LGBTQ+ Students*, 8:9 Am. J. Educ. Rsch. 659 (2020); Clare Bartholomaeus & Damien W. Riggs, *Whole-of-School Approaches to Supporting Transgender Students, Staff, and Parents*, 18:4 Int'l. J. of Transgenderism 361, 365 (2017); Johns et al., *supra* note 12; Snapp et al., *supra* note 18.

[25] Michael Zaliznyak et al., *How Early in Life do Transgender Adults Begin to Experience Gender Dysphoria? Why This Matters for Patients, Providers, and for Our Healthcare System*, 9:6 Sexual Medicine 1, 4 (2021) (finding average onset of gender dysphoria is "prior to age 7"); Michael Zaliznyak et al., *Age at First Experience of Gender Dysphoria Among Transgender Adults Seeking Gender-Affirming Surgery*, 3:3 JAMA Network Open 1, 3 (2020) ("[G]ender identity typically becomes constant at ages 5-7 years"); Exhibit A ¶ 3; Exhibit B ¶ 3.

[26] Carol Lynn Martin & Diane N. Ruble, *Patterns of Gender Development*, 61 Annual Rev. Psychology 353, 357–61 (2010) (collecting studies showing the tendency among preschoolers to feel more positively about their own sex and to respond negatively to gender norm violations); *see also* Exhibit A ¶¶ 3–4.

[27] Martin & Ruble, *supra* note 26, at 360.

[28] *See* Melissa J. Smith & Elizabeth Payne, *Binaries and Biology: Conversations with Elementary Education Professionals After Professional Development on Supporting Transgender Students*, 80:1 The Educ. Forum 34, 37 (2016) ("When transgender children go to school, they enter environments where LGBTQ identities are doubly present – spoken into being through both the taboo against their mention and the consistent presence of homophobic discourse. Despite educators' insistent claims that gender identity and sexuality are not relevant topics to preadolescent children, numerous scholars have illustrated how elementary schools are, in fact, significant social contexts for the gender socialization of children."); Exhibit A ¶¶ 3–5, 10; Exhibit C ¶¶ 8–9.

[29] *See, e.g.*, Caitlin L. Ryan et al., *Discussing Princess Boys and Pregnant Men: Teaching About Gender Diversity and Transgender Experiences within an Elementary School Curriculum*, 10:1-2 J. of LGBT Youth 83, 87 (2013) ("Because research suggests that reenforcing gender stereotypes in young children can lead to gender-based harassment, issues of gender diversity and gender nonconformity should be discussed in elementary school classrooms to head off such harassment."); Smith, *supra* note 28, at 37 ("Elementary school is, therefore, a critical phase for teaching about gender and sexuality diversity and for raising both adult and student awareness about how heteronormativity regulates the identity expressions of all students."); Ferfolja, *supra* note 15, at 802 (discussing teaching gender identity "early on, so it's a non-issue."); Jill M. Hermann-Wilmarth & Caitlin L. Ryan, *Reading and Teaching the Rainbow: Making Elementary School Classrooms LGBTQ-Inclusive*, 43:1 Am. Educator 17 (2019).

into the elementary school curriculum.[30] While parents may feel that young children are not ready to learn about such topics, [31] the research shows that children are presented with gender expectations from a very early age and that "children are, in fact, quite ready to learn about gender diversity."[32] Thus, using age appropriate curricula[33] to educate children about gender identity and gender diversity may be especially important and appropriate for elementary school children. The District, therefore, has a compelling interest in protecting the well-being of transgender students and shielding them from discrimination, and the research overwhelmingly indicates that implementing an LGBTQ-inclusive curriculum, including at the elementary school level, is a meaningful tool by which the District can accomplish this interest.

### C. **Permitting students to opt out of instruction on gender identity would undermine the School District's efforts to protect transgender students**.

Plaintiffs have dropped their original request that the Court stop *all* present and future "instruction in the District on gender dysphoria and transgender transitioning," (ECF No. 1) and instead shifted focus to their alternative request for parental notice and opt out. An opt out, however, does not simply narrowly tailor an LGBTQ-inclusive curriculum in deference to Plaintiffs' religious and moral beliefs; rather, it undermines the purpose of this curriculum entirely.[34] The Third Circuit has already held that a school district is not required to adopt a compromise in the name of narrow tailoring if that compromise undermines the compelling state

---

[30] Exhibit A ¶¶ 10–13; Exhibit B ¶¶ 5–11, Exhibit C ¶¶ 8–12; Exhibit D ¶¶ 4–7.

[31] Smith, *supra* note 28, at 35 ("Resistance is most intense in elementary schools, where adults cling to entrenched beliefs about childhood innocence and adult responsibility for preserving it…A growing body of research has noted the fallacy of such beliefs…documenting the ways children's lives are saturated with normative gender expectations.")

[32] Wayne Martino et al., *Supporting Transgender Students in Schools: Beyond an Individualist Approach to Trans Inclusion in the Education System*, 74:4 Educ. Review 753, 763 (2020); *see also* Ryan, *supra* note 29, at 86 (finding, based on a year-long case study integrating ongoing education about gender diversity into a third grade classroom, that "students' engagement with and thoughtful responses to such lessons indicate that even elementary school-aged children are ready for this kind of curriculum, especially when teachers scaffold increasing complexity over time.").

[33] For examples of LGBT-inclusive lessons for elementary classes, *see Ready, Set, Respect! GLSEN's Elementary School Toolkit*, GLSEN (2016), glsen.org/sites/default/files/GLSEN%20Ready%20Set%20Respect.pdf; Caitlin L. Ryan et al., Reading the Rainbow: LGBTQ-Inclusive Literacy in the Elementary Classroom (2018).

[34] *See* Boyertown, 897 F.3d at 530.

interest it is trying to achieve.[35] An opt out would not only serve to encourage the sort of anti-trans stigma the Third Circuit condemned in <u>Boyertown</u>, but would also undermine the District's ability to accomplish its compelling interest in protecting transgender students.

As the Third Circuit explained in the context of school bathroom policies in <u>Boyertown</u>, policies that treat transgender students differently "'invite[] more scrutiny and attention from [ ] peers.' Adopting [a trans-exclusive policy] would very publicly brand all transgender students with a scarlet 'T,' and they should not have to endure that at the price of attending their public school." 897 F.3d at 530. The same can be said of the opt out policy requested here. Allowing students to leave the classroom or skip class when a lesson turns to the subject of gender identity invites attention and scrutiny from peers and results in the same sort of stigma the Court condemned in <u>Boyertown</u>.[36] Increasing the risk of stigma directly undermines an LGBTQ-inclusive curriculum, as "stigma and minority stress processes are the theorized drivers of the negative health outcomes experienced by LGBTQ populations."[37] A practice or policy, like an opt out, which marks transgender students as "other" "subjects their identities to excessive analysis and arbitration, reinforcing their outsider status while impacting their mental health."[38]

An opt out from instruction promoting respect and humanity towards transgender individuals is, therefore, its own form of discrimination, as it further stigmatizes transgender

---

[35] *See* <u>Boyertown</u>, 897 F.3d at 530 (rejecting plaintiffs' proposal that transgender students use single-user restrooms as this requirement would "significantly undermine" the district's compelling interest in reducing stigma and discrimination).

[36] This was precisely the holding in <u>Mahmoud v. McKnight</u>, in which the court determined that a "no-opt out policy" for LGBTQ-inclusive curriculum "helps prevent students who identify with characters in the storybooks from feeling stigmatized or discriminated against when other students leave the room when the books are read, furthering the School Board's interests in providing a safe and supportive learning environment for its students, protecting LGBTQ+ students' health and safety, and complying with anti-discrimination laws." 2023 WL 5487218, at *27; *see also* Ferfolja, *supra* note 15, at 805 ("[S]ilences and redirections are not without their own pedagogy, marking the child as different and conversations about gender transitions as taboo.").

[37] Johns et al., *supra* note 12, at 146.

[38] Ferfolja, *supra* note 15, at 804; *see also* Exhibit A ¶ 11 ("An opt out feels like a public statement that really invalidates my existence as a human being, like it's up for debate whether other students need to respect and recognize my very existence."); Exhibit B ¶ 12.

students, erases their existence, and validates the perspective that even their existence is too controversial to acknowledge in the classroom.[39] Like in <u>Boyertown</u>, an opt out in this case will brand transgender students in the District with a "scarlet T." Because the Third Circuit has found that policies that invite such scrutiny are their "own form of discrimination," the District is not constitutionally required to offer an opt out for instruction on gender identity for its curriculum to be narrowly tailored to its compelling interest in protecting transgender students.[40]

Moreover, Plaintiffs' proposed opt out would diminish the efficacy of the District's LGBTQ-inclusive curriculum, undermining its efforts to protect transgender students. Research suggests that providing an opt out from LGBTQ-inclusive curriculum reduces the positive effects this curriculum has on school climate. Studies examining LGBTQ-inclusive curricula as tools for protecting transgender youth have found that an LGBTQ-inclusive curriculum is most effective for this purpose when implemented school-wide. For example, one study, which used data from over 1,300 students to examine the impact of LGBTQ-inclusive curricula on school safety, found that "inclusive and supportive curricula are important, but are only effective in promoting a

---

[39] Studies show that transgender people are regularly made invisible across institutional and cultural settings, *see* Viviane Namaste, <u>Invisible Lives: The Erasure of Transexual and Transgendered People</u> (2000), and that this erasure makes transgender individuals more vulnerable to harm. *See e.g.* Ben Colliver & Marisa Silvestri, *The Role of (In)visibility in Hate Crime Targeting Transgender People*, 22:2 Criminology & Criminal Justice (2020); Greta R. Bauer et al., *"I Don't Think This Is Theoretical; This Is Our Lives": How Erasure Impacts Health Care for Transgender People*, 20:5 Nurses in AIDS Care 348 (2009). Scholars have argued that including gender identity in the school curricula is one means "for interrupting trans erasure and invisibility." Martino, *supra* note 32, at 764.

[40] Plaintiffs make much of the fact that the District offers opt outs for certain other subjects. (ECF 93 at 6; ECF 94 at 4; ECF 1 at 12.) Even if the District offers parents an opt out for certain topics, it does not follow that the District is constitutionally required to allow an opt out for LGBTQ-inclusive curricula. As discussed above, the District has a statutory obligation to provide a learning environment free of discrimination based on gender identity, and the Third Circuit has already acknowledged that protecting transgender students from harm is a compelling state interest. In contrast, while the topics Plaintiffs identify may serve an important role in a school's curriculum, there is nothing to suggest that opt outs from these topics undermine a compelling state interest or statutory obligation in the same way as would Plaintiff's proposed opt out policy. Further, opt outs for instruction on discrete historical events in the recent past, such as the Holocaust or the September 11th terrorist attacks, serve the purpose of protecting students from intergenerational trauma that could arise in a classroom discussion about events that may have directly affected a student or their family. An LGBT-inclusive curriculum, on the other hand, introduces students to a protected class, with whom students will interact throughout their lives, and encourages students to treat peers with humanity and respect. The District has a compelling interest in requiring this type of learning, which has been shown to create a safer, more positive school climate, particularly for LGBTQ+ students. *See supra* notes 18–24.

positive overall school climate when they reach a critical mass within a school."[41] Conversely, researchers found that when these curricula are "scarce" within a school, they are not associated with improved school climate, prompting the conclusion that "students feel safer and report less bullying when the *overall school level of inclusive and supportive curricula is higher*."[42] Another study looked at the effects LGBTQ-inclusive curricula had at three different schools. Of the three schools, only one introduced LGBTQ-inclusive lessons to a significant portion of the student body.[43] While each school saw some improvement in school climate, the school that introduced LGBTQ-inclusive curriculum to a significant portion of students saw improvement across six school safety measures, compared to only one safety measure for the other schools,[44] and six measures of support for LGBTQ+ people, compared to zero and one measure of support at the other schools.[45] Based on these findings, researchers concluded that LGBTQ-inclusive curriculum "will have the greatest impact on school safety and perceptions of support for LGBTQ people and issues," when, *inter alia*, it "reaches a substantial portion of the school's population."[46]

Data shows that when it comes to LGBTQ-inclusive curricula, smaller scale interventions do not have the same positive effects for transgender students as school-wide implementation. Allowing some students to opt out of lessons about gender identity negates the "whole-of-school educational approach" recommended by experts and reduces the reach and efficacy of LGBTQ-inclusive curricula.[47] Because LGBTQ-inclusive curricula are much more effective in advancing

---

[41] Snapp et al., *supra* note 18, at 590.

[42] *Id*. (emphasis added).

[43] Hilary Burdge et al., *Implementing Lessons that Matter: The Impact of LGBTQ-Inclusive Curriculum on Student Safety, Well-Being, and Achievement*, Gay Straight Alliance Network, 25 (2013).

[44] *Id*. n. 19. These measures were increased safety for gender non-conforming students and LGBTQ+ students, teachers, and staff; decreased prevalence of slurs; increased response to slurs; increased knowledge of "out" teachers and staff; and increased knowledge of where to go for support and information about sexuality or gender identity.

[45] *Id*. n 20. These measures were increased support for LGBTQ+ people and issues from teachers and staff; library materials; school sports; history/social studies classes; health/life skills classes; and sexuality education classes.

[46] *Id*. at 26.

[47] Ferfolja, *supra* note 15, at 806 ("[P]edagogies of containment and disclosure that limit access and understanding

the District's compelling interest in protecting transgender students when they reach a critical mass of the student body, allowing parents to opt their children out of this instruction threatens the fundamental purpose of an LGBTQ-inclusive curriculum in the first place.[48] Thus, an opt out does not narrowly tailor the District's approach to achieving its compelling interest, as Plaintiffs may suggest, but undermines this interest completely. The Third Circuit has already held that this type of compromise is not required for a school district's policy to pass constitutional muster. [49]

## III. CONCLUSION

An order from this Court permitting students to leave the classroom when instruction turns to the subject of gender identity would send a harmful message to transgender students, their peers, and the school community that transgender students are not worthy of society's equal respect and that their classmates need to be protected from information about their very existence. An order to this effect would come as a stark contrast to the overwhelming majority of federal court opinions in this area, including Third Circuit opinions, which, with few exceptions, have affirmed school district policies meant to protect and support transgender students.[50] Such

---

for all students, work against the needs of [transgender and gender diverse] students (and their families) who are often already in a vulnerable position. School based approaches need to normalise diversity, preferably through *a whole-of-school educational approach*.") (emphasis added).

[48] While it may seem that individual opt outs here or there would not significantly undermine the value of LGBTQ-inclusive curriculum, there is no way to know how many parents will utilize an opt out. From the limited data (*see* ECF No. 110-4, Appx 56, showing 47 students requested an opt out in the 2022-2023 school year), there is reason to believe this number could be significant. Thus, if this Court orders the District to offer opt outs in the future, opt out requests could deplete the critical mass needed for inclusive curriculum to achieve the District's compelling interest in reducing harassment and improving school climate for transgender students.

[49] *See* <u>Boyertown</u>, 897 F.3d at 530. *Amici* acknowledges that Plaintiffs raise a claim under § 4.4(d) of Pennsylvania's School Code. (ECF 1 at 42-43). The District's obligations under state law, however, are separate and apart from its obligations under the federal constitution. Given the District's compelling interest in fostering a safe environment for transgender students, the District is not constitutionally required to grant opt outs that would weaken its LGBTQ-inclusive curricula to the point of rendering it ineffective for this purpose. The District is not required to adopt a compromise position in the name of narrow tailoring that ultimately undermines the compelling interest it is trying to achieve. *See* <u>Boyertown</u>, 897 F.3d at 530. This Court can hold that the District is not obligated to offer an opt out under the federal constitution without reaching a state law question better addressed in the state courts or the administrative process. (*See* ECF 97 at 32–33 (arguing that Plaintiffs failed to exhaust their administrative remedies under state law before filing their complaint)).

[50] *Supra* note 7. Based on *Amici's* review of Third Circuit opinions, the Third Circuit has ruled in favor of protecting

an order also risks opening the floodgates to a sea of similar lawsuits challenging any school district decision with which a parent disagrees.[51]

      The research is clear that adopting an LGBTQ-inclusive curriculum reduces harm and improves outcomes not only for transgender students, but for all students,[52] and can be implemented in ways that are developmentally appropriate and aligned with educational standards.[53] Even if the Court finds that the District erred in the process it used to approve the instructional materials taught by Ms. Williams, it is not necessary for the Court to permit opt outs from instruction on gender identity to protect students and parents from similar procedural missteps in the future. The Court can recognize that the District has a right to implement an LGBTQ-inclusive curriculum, without opt outs, in order to achieve its compelling interest in protecting transgender students, with the expectation that, moving forward, the District will utilize its standard processes to develop, review, and implement this curriculum.[54]

---

trans rights in every case involving the rights and interests of transgender students which has come before it. In fact, it appears that the Third Circuit has *never* ruled against transgender rights on substantive grounds.

[51] We have already seen the beginning of such a trend. Just last month, an anti-trans law firm filed charges against Pine-Richland School District on the grounds that their policy regarding nondisclosure of a students' gender identity violates parents' fundamental rights, repeatedly citing to this Court's opinion on Motion to Dismiss. Doe v. Pine-Richland Sch. Dist., No. 2:24-cv-00051 (W.D. Pa. filed Jan. 12, 2024). At least three other plaintiffs who have brought anti-trans claims against school districts have also cited to this Court's opinion to support their claims. With utmost respect for this Court's legal reasoning, it is worth noting that the three courts who have considered this Court's earlier opinion in this case have departed from its reasoning, and have ultimately ruled against the parent plaintiffs and upheld transgender rights. *See* Doe No. 1, 2023 WL 5018511, at *24; Mahmoud, 2023 WL 5487218, at *21; Littlejohn, 647 F. Supp. 3d 1271, 1285.

[52] *See* Liben, *supra* note 17, at 290 ("[A]n inclusive curriculum that promotes respect for [gender and sexual orientation] diversity stands to benefit all youth along indices of psychological and social well-being."); Snapp, *supra* note 20, at 251 ("[W]hen schools teach LGBTQ-inclusive curriculum, all students, including *heterosexual* . . . students felt safer, experienced less victimization, reported hearing fewer homophobic slurs, and experienced greater peer acceptance" (emphasis added)); Proulx et al., *supra* note 18, at 611 ("[T]here was a 20% reduction in reported suicide plans for every 10% increase in schools teaching LGBTQ-inclusive sex education in a state. This finding supports past research indicating that inclusive school climates have positive implications for heterosexual youth as well as [sexual minority youth]."); *see also* Exhibit C ¶¶ 12; Exhibit D ¶¶ 6–7.

[53] *See supra* notes 17 and 33 for examples of developmentally appropriate LGBTQ-inclusive curricula.

[54] Requiring the District to use its standard processes for curriculum development would also provide parents who disagree with elements of the District's gender identity instruction to voice their concerns through traditional political channels, including by voting for different school board members or advocating at board meetings. This is precisely what the First Circuit recommended in Parker v. Hurley, 514 F.3d 87, 107 (1st Cir. 2008) ("If the school system has been insufficiently sensitive to [plaintiffs' beliefs about LGBTQ-inclusive curriculum], the plaintiffs

Thus, *Amici* encourages the Court to find that the Mt. Lebanon School District has a compelling interest in protecting transgender students and that adopting an LGBTQ-inclusive curriculum, without an opt out, is a narrowly tailored way to achieve this interest. Consequently, the District has not violated Plaintiffs' constitutional rights and can continue to provide students with instruction about gender identity without offering an opt out.

Dated: February 12, 2024

                                                        Respectfully submitted,

/s/ Jacqueline Perlow                          /s/ Daniel G. Vitek
Jacqueline Perlow                              Daniel G. Vitek
PaID 321594                                    PaID 209013
jperlow@womenslawproject.org                   dvitek@cpjlaw.org
Women's Law Project
239 Fourth Avenue, Suite 2108                  /s/ Anne Puluka
T (412) 281-2892                               Anne Puluka
                                               PaID 322652
                                               apuluka@cjplaw.org

                                               Community Justice Project
                                               100 Fifth Avenue, Suite 900
                                               Pittsburgh, PA 15222
                                               T (412) 434-6002

                                               Counsel for Lebo Pride

---

may seek recourse to the normal political processes for change in the town and state."). Based on previous rulings from this Court, there is reason to believe that political channels are not only the appropriate forum to raise such concerns, but, in fact, the *only* forum to do so. *See* <u>Save Our Saltsburg Sch. v. Blairsville-Saltsburg Sch. Dist.</u>, 2021 WL 2209294, at *6 (W.D. Pa. 2021) ("Only in the rarest circumstances should courts, especially federal courts, interject themselves into decisions made by school directors and only where the constitutional or other federal issue is clear and unavoidable. This makes sense—not every exercise of local governmental discretion implicates federal issues. Most do not. School leaders are directly and democratically accountable to their constituents and have a much deeper understanding of district-wide issues than unelected federal judges.").

**EXHIBIT A**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CARMILLA TATEL, *et al.*, | |
| Plaintiffs, | |
| | Civil Action No.: 2:22-cv-00837 |
| v. | |
| MT. LEBANON SCHOOL DISTRICT, *et al.*, | |
| | Hon. Joy Flowers Conti |
| Defendants. | |

## DECLARATION UNDER PENALTY OF PERJURY
## OF ALEXIS (LEXI) BYROM

I, Alexis (Lexi) Byrom (she/her), being of sound mind and over the age 18, hereby

declare and state as follows:

1. I am a 2023 graduate of Mt Lebanon High School. I spent all my schooling

   in the Mt. Lebanon School District, where I attended Washington

   Elementary School, Mellon Middle School, and the High School.

2. Starting in my junior year of High School I transitioned into a woman. My

   life improved drastically.

3. At a young age I understood that my gender identity didn't fit my assigned

   gender at birth, but I didn't really understand what that meant. The

   elementary and middle schools at the time didn't offer LGBTQ-inclusive

   education, so I never saw any representations of gender diversity, no one

1

that matched how I felt. What I did learn, unfortunately, was that it wasn't good to be like me.

4.  In elementary school, students commonly used homophobic slurs, like saying "that's so gay" to mean bad. By the 6th and 7th grades other students started targeting me with jokes and ridicule for their perception that I "looked" or "acted" gay. A frequent insult was to   insert    the word "gay" into my dead name.

5.  I tried to laugh off these comments. If I got defensive, I knew it would only encourage more comments. But I would go home and wonder why I was the way I was. I would get mad at myself for being that way. Without understanding gender beyond normative gender expectations, and without seeing positive representations of gender diversity and transgender people in the places I went and the lessons I learned, I thought my only option was to shut down my feelings of being a woman. I recognize now that I was depressed throughout middle school.

6.  My middle school experience did offer some hope, though. For the first time I met openly queer friends who didn't use homophobic slurs. Being with them and seeing them live openly and with pride, gave me a sense of peace with myself. But, I feared that being seen with these new friends would

DocuSign Envelope ID: 5F478D56-0893-45F2-99A7-8A4FEC62797A

make the teasing worse from the other students that I had grown up with all my life.

7.  In High School life started to improve. I began to educate myself more about diverse gender representations and learned what transgender meant. I found safety in my new friends. When I finally transitioned to a woman, it felt like a great weight had been lifted off my shoulders. I finally started to see representation of gender and sexual orientation diversity in the school's curriculum, including learning about the history of the Stonewall Riots in New York City and about different gender identities in sex education class my senior year. These learning opportunities were really meaningful to me and reinforced the happiness and acceptance I felt with my personal gender identity.

8.  Looking back on my education, I understand that children tease other children. I do not blame them for their comments. They were children and didn't understand how much harm their words and actions did to my wellbeing. They were never given a proper understanding of who gender diverse people are, or even that they exist in our community and schools.

9.  But, I wish that my experience had been different. I wish I could have back the years I spent detached from myself, full of internalized hate. I wish the

adults in charge of the school had better educated the other children, so they had a better understanding of gender diversity and saw it as less scary.

10. If the District had offered an LGBTQ-inclusive education from an early age, I wouldn't have wasted years floating through my life. I wouldn't have hated myself as much. Children are exposed to binary gender norms at a very early age, and if they are not exposed to more gender diversity, they fix in on those gender norms as the only acceptable form of gender expression. If provided with representation and given the words to understand gender diversity, including the existence and experiences of transgender people, not only will students like me be able to understand who they are, but other students will also be able to understand and respect who we are. They won't be afraid or see us as demonic. They would see us as normal kids, just like them, rather than outsiders that they need to fear or ridicule. Then they can understand that their "lighthearted" teasing and "casual" slurs can cause serious harm.

11. Allowing other students to get up and leave class during LGBTQ-inclusive education (or to "opt out") would be so hurtful. An opt out feels like a public statement that really invalidates my existence as a human being, like it's up for debate whether other students need to respect and recognize my very existence. And, those students who opt-out would never learn how to deal

4

DocuSign Envelope ID: 5F478D56-0893-45F2-89A7-8A4FE262797A

with transgender people in the real world, when they leave school, which they will have to do.

12. I'm now a freshman student at the University of Pittsburgh studying nursing. I'm happy with myself. I finally feel like a complete person.

13. I still worry about being a transgender woman in this world—not about how I feel internally—but about how other people will react to me. And I'm happy knowing that current students coming up through the Mt Lebanon School District who are like me will be able to see themselves in the curriculum. I believe that learning about gender diverse people and seeing their experiences reflected in the classroom will provide these students with a safer and more welcoming school environment, and will help them learn who they are and grow into the best versions of themselves – I know it would have done so for me.

14. And when I walk into their hospital room, I'm hopeful the students will welcome me as their nurse.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on _____2/10/2024_____, in Mt. Lebanon, Pennsylvania.

Signature: _____ Date: ___2/10/2024___
Alexis (Lexi) Byrom

5

DocuSign Envelope ID: 8BEB4448-3B11-45DC-B14B-BE8F4C79DF70

**EXHIBIT B**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CARMILLA TATEL, *et al.*, | |
| Plaintiffs, | |
| | Civil Action No.: 2:22-cv-00837 |
| v. | |
| MT. LEBANON SCHOOL DISTRICT, *et al*.**,** | |
| | Hon. Joy Flowers Conti |
| Defendants. | |

## <u>DECLARATION UNDER PENALTY OF PERJURY</u>
## <u>OF MICHELE NAPIERKOWSKI</u>

I, Michele Napierkowski (she/her), being of sound mind and over the age 18, hereby declare and state as follows:

1. I live in Mt. Lebanon Township, Pennsylvania.

2. As a parent of three children, each with disabilities and Individualized Education Programs (IEPs), our family's experiences highlight the stark contrast between inclusive and exclusionary educational practices. The journey of my oldest child, who is transgender, underscores the urgent need for robust Diversity, Equity, Inclusion, and Belonging initiatives in schools.

3. Middle school presented a myriad of challenges for my oldest child (they/them pronouns) that went beyond academics. By this age, they already recognized that their gender identity didn't fit their gender assigned at birth and that they were different from most of their peers in this respect.

4. Because of my child's non-conforming gender identity, the middle school environment was hostile. The pervasive use of casual derogatory language, including slurs and phrases like "that's so gay" to denote disdain, contributed to a hostile environment for my child. This language, which was normalized among students and in the school setting, underscored the absence of a curriculum that fostered respect for diversity and was inclusive of diverse gender identities.

5. A particularly difficult episode for my child during middle school was the "marriage project," an assignment highlighting the absence of LGBTQ-inclusive perspectives in the curriculum. Students were placed in heteronormative pairs and tasked with role-playing married life, culminating in a ceremonial photo session with boys donning top hats and girls wearing veils. This project not only reinforced gender binaries, but also placed my child in an exceedingly uncomfortable position, exacerbating their feelings of alienation and invisibility. This episode underscored a critically missed opportunity for the school district to implement inclusive education that was affirming to diverse identities and relationships. The result of this project, and of the middle-school curriculum's failure to provide LGBTQ-inclusive curriculum that mirrored their lived experience more generally, was that my child regularly experienced feelings of isolation and distress in school.

6. Our family's own efforts outside of the school environment to comfort my child and develop their happiness and confidence were not enough. At that age, the peer environment at school was a tremendous influence.

7. I watched my child suffer, listening to them come home and complain about feeling alienated and scared. Their emotional health suffered greatly; so did their schoolwork. During middle school my child had trouble passing the basic academic subjects. I attribute this in large part to the unaffirming environment they faced during middle school.

8. High School, where DEI initiatives were more actively embraced, represented a transformation in my child's life. DEI initiatives were more actively embraced by the larger, more diverse body of students and staff. Educational materials were much more representative of diverse gender identities and expressions, and my child was finally able to see themselves within the curriculum. My child joined the Gender Sexuality Alliance and engaged with supportive initiatives like Lebo Pride, communities which provided them with sanctuary and acceptance.

9. Thankfully, I witnessed a remarkable improvement in my child, which I attribute in large part to the more inclusive and actively affirming environment at the high school. They were more engaged and present with

us and their friends. They were more at peace with themselves and focused on living their life.

10. This inclusive educational approach led to tangible outcomes, including my child's achievement of a 4.5 GPA over the last 2.5 years of high school and the accumulation of over 150 hours of community service. This evolution from a child who was barely passing their classes in middle school to one that was excelling academically in high school showcases the profound benefits of inclusive education. An inclusive and welcoming school environment helped prepare my child for academic success, greatly improved their mental and emotional well-being, and set them up for active, empathetic participation in a diverse world.

11. My child's transition from battling derogatory language and exclusionary practices to thriving in a more accepting community highlights the invaluable role DEI initiatives play in fostering environments where all students can succeed. Ensuring all students see their identities represented and respected in the school curriculum is an important initiative school districts can implement to foster such environments.

12. Allowing parents to remove their children from DEI initiatives, like LGBTQ-inclusive curriculum, would undermine the crucial steps the Mt. Lebanon School District is taking toward inclusivity and acceptance. Such

4

DocuSign Envelope ID: 8BEB4448-3B11-45DC-B14B-BE8F4C79DE70

options would not only deprive students of the opportunity to learn and grow in a diverse environment, but would also reinforce the segregation and prejudice my child felt in middle school.

13. The journey of our family, especially my oldest child, from navigating exclusion to experiencing the transformative power of a curriculum that embraced inclusivity underscores the indispensable value of DEI initiatives.

14. I'm grateful that my oldest child had the opportunity to reclaim their pursuit of happiness. I hope other gender diverse children in the School District are given the same opportunity.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on _____2/9/2024_____, in Mt. Lebanon, Pennsylvania.


Signature: _____   Date: _____2/9/2024_____

Michele Napierkowski

5

## EXHIBIT C

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CARMILLA TATEL, *et al.*, | |
| Plaintiffs, | |
| | Civil Action No.: 2:22-cv-00837 |
| v. | |
| MT. LEBANON SCHOOL DISTRICT, *et al.*, | |
| | Hon. Joy Flowers Conti |
| Defendants. | |

## <u>DECLARATION UNDER PENALTY OF PERJURY</u>
## <u>OF ASTA KILL</u>

I, Asta Kill (she/her), being of sound mind and over the age 18, hereby declare and state as follows:

1. I live in Mt. Lebanon, Pennsylvania and have a middle school age child who is enrolled in the Mt. Lebanon School District.

2. I identify as a woman first, though I was assigned male at birth. I use she/her pronouns. I also identify as transgender. I am proud to be able to live as the most authentic version of myself. The fact that I can be open and free allows me to experience myself fully.

3. I am very fortunate that my kiddo is naturally inclusive and has had a strong sense of his own gender identity as early as kindergarten.

4. Unsurprisingly, the issue of gender identity has come up throughout his education.

1

5. It is important to me that my kiddo's peers see me and be around me so that they can better understand gender diversity. Starting in elementary school, I would often pick up my kiddo from school. I waited outside with other parents and as all the other students came out they saw me as the parent of one of their classmates. I showed up at school concerts and school events. I would take my kiddo to birthday parties and to extracurricular activities on school grounds that included many of his elementary school classmates. The more his peers were aware of and exposed to gender diversity, the more I felt confident my kiddo would be safe at school.

6. In early elementary school, many students noticed that my gender identity was not exactly the same as many of the other parents. One question I got from my kiddo's classmates early on was "Are you a boy or a girl?" I usually said that I am a girl but was born with a boy body. That was all it took most of the time for them to happily continue on their day and never ask that question again.

7. At that young age, many of his friends also didn't know whether to call me "Ms." Or "Mr." Kill. They got very inventive early on, finding wonderful ways to respectfully address me. They would say for example "[MY CHILD'S NAME]'s parent, may I have something to drink?"

2

DocuSign Envelope ID: 6B309602-F6C0-41EB-8E95-535EA22D6476

8.  While I think these students learned a lot through these small interactions, I wish that this learning was reinforced inside the classroom as well. The school curriculum, and representation of diverse gender identities and family structures, in particular, have been a challenge for us. I remember a grammar test in elementary school where students were asked to complete the pronouns. The sentence read something like "my dad is great. ____ takes me to the park". My kiddo used "she" pronouns and the teacher deducted points. This is one of many examples I could give to show how outdated curricula no longer reflect reality and how my kiddo was punished and singled out as a result of the District's outdated practice and inaccurate prejudices.

9.  Unfortunately, I have also encountered parents who hold some of the same outdated and inaccurate prejudices. I have seen an occasional parent make a face or gesture indicating the parent's utter disapproval of my existence and of my presence on school grounds. I know of a few parents who would not allow their children to join my kiddo for a play date or invite my kiddo to their child's birthday party because of my gender identity. Even though my kiddo identifies as cisgender and heterosexual, he was still impacted indirectly by the ignorance of some parents, and the trickle-down effect that ignorance had on their children.

10. In many ways I am fortunate as my job is to educate community members on LGBTQ+ inclusion, and I have the skills and the background to educate many parents and teachers.

11. Over the years, I have seen many kids feel empowered by witnessing the way I defy traditional gender roles. I believe that seeing LGBTQ+ representation in the community and in the school curriculum is a powerful tool to affirm children whose gender identities don't align with societal expectations.

12. I am comforted by the Mt. Lebanon School District's commitment to teaching an inclusive curriculum that represents LGBTQ+ people, as it creates the foundation for a safe environment for my kiddo when he walks out my door on his way to school.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on ___2/11/2024___, in Mt. Lebanon, Pennsylvania.


Signature: ___Asta Kill___        Date: ___2/11/2024___
            Asta Kill

4

**EXHIBIT D**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CARMILLA TATEL, *et al.*, | |
| Plaintiffs, | |
| | Civil Action No.: 2:22-cv-00837 |
| v. | |
| MT. LEBANON SCHOOL DISTRICT, *et al*.**,** | |
| | Hon. Joy Flowers Conti |
| Defendants. | |

## DECLARATION UNDER PENALTY OF PERJURY
## OF LINDSAY AND CHRISTIAN CASHMAN

We, Lindsay Cashman (she/her) and Christian Cashman (he/him), both being of

sound mind and over the age 18, hereby declare and state as follows:

1.  We are a married couple living in Mt. Lebanon Township, Pennsylvania

    where we are raising our two children who attend preschool and elementary

    school in Mt. Lebanon.

2.  We both grew up in Mt. Lebanon Township and attended K through 12 in

    the Mt. Lebanon School District, including attending Jefferson Elementary

    School. We graduated from high school in the early 2000s.

3.  While growing up in Mt. Lebanon, the School District notably lacked visible

    diversity, especially related to LGBTQ+ students and staff. Very few

    students publicly identified as non-heterosexual or non-cisgendered, even

    though many students privately identified as LGTBQ+. We observed

1

DocuSign Envelope ID: 01247ED5-894C-4BE4-9A18-705778F8D879

students who were perceived as gay get bullied incessantly. During our time as students in the District, we knew at least two students who were forced to leave the District because of the harassment they experienced at school. They couldn't even get through the halls without bullying. The District lacked inclusive education that was representative of gender diversity. We perceived the school environment as hostile to students who identified as or were perceived as being LGBTQ+.

4. When we decided to move back to Pittsburgh to begin raising our family, we did not want our children to experience the same hostile school environment in which we grew up. We considered not returning to our hometown or sending our children to private school. However, in researching the Mt. Lebanon School District, we found that in the years since we graduated it had worked to develop a more inclusive curriculum and was striving to create a safer and more accepting community for all students.

5. We greatly value a school environment that ensures our children and other students will be comfortable and safe expressing who they are as they grow and develop, including how they personally feel about their gender identity and expression. If our children are gender diverse, we do not want them to feel unsafe and unwelcome in their own schools.

DocuSign Envelope ID: 01247ED5-894C-4BEA-9A18-705778F8D879

6. Equally important is how our children will learn how to interact with other students and peers who are gender diverse. We are part of a community that encompasses the LGBTQ+ rainbow. Both of our children have friends who are transgender. We want our children to understand differences and be respectful and considerate to others. We want all children and adults to be safe and welcomed in our community and not forced out of the School District.

7. Our children have been aware of differences in gender identity and expression since they were in preschool. Children are perceptive, and gender is an unavoidable theme in our society and in our children's lives. Teaching our children acceptance of others, including of different gender identities and expressions, should begin at a young age since we've already witnessed our children grasping the gender differences among their peers and members of our community. We use books to help tell stories of inclusion as well as learning new skills.

8. At school board meetings, we've spoken out about our commitment to a safe and inclusive school environment for all students, and we have repeatedly gone to the ballot box to express our support. With all due respect, we are asking that our civil engagement be respected by this Honorable Court.

We declare under penalty of perjury that the foregoing is true and correct.

Executed on _____2/9/2024_____, in Mt. Lebanon, Pennsylvania.

Signature: _____  Date: _____2/9/2024_____
Linsday Cashman

Signature: _____  Date: _____2/9/2024_____
Christian Cashman