IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **CARMILLA TATEL, STACY DUNN and GRETCHEN MELTON,** individually and as parents and natural guardians of their children,<br><br>Plaintiffs,<br><br>v.<br><br>**MT. LEBANON SCHOOL DISTRICT, et al.,**<br><br>Defendants. | CIVIL ACTION NO.   22-837 |

## OPINION

### I.   Introduction

This case is about the extent of constitutional rights of parents of young children in a public elementary school to notice and the ability to opt their young children out of noncurricular instruction on transgender topics.  A first-grade teacher, without providing notice or opt outs, decided to observe Transgender Awareness Day by reading noncurricular books and presenting noncurricular gender identity topics to her students.  During that classroom presentation, the teacher told her students "parents make a guess about their children's – when children are born, parents make a guess whether they're a boy or a girl. Sometimes parents are wrong."  Ps' ¶ 99.  Some of the young children experienced confusion about how that topic personally affected them. Ps' ¶ 82.

Parents were not notified that transgender topics might be presented to first-graders.  The school district provides no guidelines about whether or when to provide notice and opt outs to

parents, but has a "de facto policy" that leaves those decisions to "teacher prerogative." (ECF No. 95-21 at 69-70). When some parents objected, the principal, assistant superintendent and superintendent backed the teacher's conduct, despite permitting notice and opt out rights for numerous other religious and secular topics.

Plaintiffs assert that their federal constitutional rights to Substantive Due Process, Procedural Due Process, Free Exercise of Religion, Equal Protection and familial privacy and their rights under the Pennsylvania School Code were violated. Defendants take the legal position that parents "do not have the right to notice and the ability to opt out from classroom instruction and that classroom instruction does not implicate fundamental parental liberty interests even when the Parents' religious beliefs are implicated." ECF No. 113 at 10.

It is undisputed that all children, including children that identify as transgender, must be treated with kindness, tolerance and respect. There is no evidence in this record of bullying, unkindness or disrespect toward transgender students in the elementary school attended by the children of Plaintiffs. This case involves different beliefs about gender identity. As the court explained in its memorandum opinion on the motion to dismiss:

> The Parents assert they have sincerely held religious and moral beliefs that "human beings are created male or female and that the natural created order regarding human sexuality cannot be changed regardless of individual feelings, beliefs, or discomfort with one's identity, and biological reality, as either male or female." Complaint ¶ 140. *See Genesis* 1:27 ("So God created mankind in his own image, in the image of God he created them; male and female he created them.").
>
> The transgender movement posits a distinctly different view of identity formation. In *Doe [v. Boyertown Area School District,* 897 F.3d 518 (3d Cir. 2018)], the court defined the applicable terminology:
>
>> "Sex" is defined as the "anatomical and physiological processes that lead to or denote male or female." Typically, sex is determined at birth based on the appearance of external genitalia.
>>
>> "Gender" is a "broader societal construct" that encompasses how a "society defines what male or female is within a certain cultural context." A

person's gender identity is their subjective, deep-core sense of self as being a particular gender. As suggested by the parenthetical in our opening paragraph, "cisgender" refers to a person who identifies with the sex that person was determined to have at birth. The term "transgender" refers to a person whose gender identity does not align with the sex that person was determined to have at birth.

*Doe*, 897 F.3d at 522.   "Transgender individuals may experience 'gender dysphoria,' which is characterized by significant and substantial distress as a result of their birth-determined sex being different from their gender identity." *Id.* "'Social gender transition' refers to steps that transgender individuals take to present themselves as being the gender they most strongly identify with." *Id.* "For transgender individuals, an important part of social gender transition is having others perceive them as being the gender the transgender individual most strongly identifies with." *Id.*

(ECF No. 38 at 30-31).

Here, the Parents assert the teacher, by reading noncurricular books and instructing their young children, without notice or the ability to opt out, that parents make guesses about their children's gender at birth and may be wrong violates their constitutional rights.  How to resolve whether the teacher's beliefs or the Parents' beliefs are correct would be beyond the ability of most first graders.

## II.   **Pending Motions**

The parties filed cross-motions for summary judgment: (a) the remaining Defendants  Mt. Lebanon School District (the "District"), first-grade teacher Megan Williams ("Williams"), Superintendent Dr. Timothy Steinhauer (Steinhauer"), Assistant superintendent Dr. Marybeth Irvin ("Irvin"), Principal Brett Bielewicz ("Bielewicz"), and school board president Jacob W. Wyland ("Wyland") (collectively, "Defendants") filed a motion for summary judgment (ECF No. 92); and (b) Plaintiffs Carmilla Tatel ("Tatel"), Stacy Dunn ("Dunn") and Gretchen Melton ("Melton") (collectively, "Plaintiffs" or the "Parents") filed a motion for summary judgment

(ECF No. 96).   The motions were thoroughly briefed and the parties submitted numerous exhibits and developed their respective concise statements of material facts ("CSMFs") (ECF Nos. 93-95, 97-116, 121-124, 127-129, 135-136).   Unless otherwise noted, the citations to the factual background will be taken from the parties' combined CSMF (ECF Nos. 135, 136).[1]  Also pending before the court is Plaintiffs' motion to strike certain paragraphs from Defendants' responsive CSMF (ECF No. 125), to which Defendants filed a response (ECF No. 139), which will be addressed by the court before the substantive issues raised in the summary judgment motions are discussed.   The motions are ripe for disposition.   Although the parties submitted certain documents under seal, the court determined that this opinion will not be filed under seal.

### III.    <u>Motion to strike (ECF No. 125)</u>

Plaintiffs argue that Defendants improperly responded to Plaintiffs' CSMF in an effort to create disputed issues of material fact where none exist.   Plaintiffs move to strike the responses to Ps' ¶¶ 1, 2, 16, 17, 24, 30b, 32, 33, 37, 43, 54-57, 78, 89, 98a, 106 and 166.   Defendants argue that their responses to each of these paragraphs were proper and complied with Local Rule 56.   Defendants explain that, where applicable, they acknowledged that Plaintiffs accurately quoted deposition testimony, but went on to explain why Defendants disputed the underlying fact or inference by citing to other evidence of record (ECF No. 139).

In *Lewis v. Delp Family Powder Coatings, Inc.*, No. CIV.A 08-1365, 2010 WL 3672240, (W.D. Pa. Sept. 15, 2010), the court summarized the requirements of Local Rule 56 for responding to a CSMF:

> With regard to a responsive concise statement, Local Rule 56 mandates that the opposing party: (1) admit or deny whether each fact contained in the moving

---

[1] The combined CSMF consists of a composite of the parties' various CSMFs and responses thereto.   The court will use the following citation conventions: (Ps' ¶; Ds' ¶; and Ps' Supp. ¶).

party's concise statement of material fact is undisputed and/or material; (2) set forth the basis for the denial if any fact in the moving party's concise statement is not admitted in its entirety; and (3) provide citation to the particular pleading, deposition, answer to interrogatory, admission on file, other part of the record that supports the opposing party's denial of any fact denied in whole or in part. LCvR 56.C.l.a & b. In addition, the party opposing summary judgment is required to set forth in separately numbered paragraphs any other material facts that are allegedly at issue and/or necessary for the court to rule on the motion for summary judgment. LCvR 56.C.1.e.

*Id.* at *1.   As relevant to the current motion to strike, the court in *Lewis* explained it is appropriate to admit that the witness so testified and separately admit or deny the factual substance of that testimony, although citation to specific evidence in the record supporting a denial is required.  *Id.* at *3.

The court in *Lewis* explained that the "purpose of a concise statement of material facts and responsive concise statement under Local Rule 56 is to provide a mechanism by which courts can expeditiously determine what, if any, material facts are in dispute" and chastised counsel who "seem[ed] to have lost sight of this purpose and instead have engaged in a war of semantics loaded with inappropriate comments."  *Id.* at *4.  The court commented that having to become involved in matters that should be resolved among counsel is an ineffective use of the court's resources.  *Id.*

The Third Circuit Court of Appeals acknowledges that "the District Court is in the best position to determine the extent of a party's noncompliance with Local Rule 56.1, as well as the appropriate sanction for such noncompliance."  *Weitzner v. Sanofi Pasteur Inc.*, 909 F.3d 604, 613 (3d Cir. 2018) (discussing Local Rule 56 of the Middle District of Pennsylvania).  The district court's decision is reviewed for an abuse of discretion.  *Id.*  The court will briefly address each disputed paragraph.

A.  Ps' ¶ 1

In Ps' ¶ 1, Plaintiffs asserted (citing their own deposition testimony) that they were not ready for their children to receive instruction on "gender identity."  Defendants disputed this assertion based on a text from Tatel to the effect that her children have known the difference between a boy and a girl forever.  Knowing the sex of a child is not the same as learning about gender, including transgender identity.  Defendants recognize that Plaintiffs did not want their first-grade children to be introduced to transgender topics by their teacher.  Defendants' response will not be stricken, but this issue should have been resolved by counsel without court intervention.  Paragraph 1 will be regarded as undisputed, with the understanding that Williams' instruction involved transgender identity.

B.  Ps' ¶¶ 2, 89

CSMF Ps' ¶¶ 2 and 89 involve Tatel's and Melton's sincere religious beliefs and Dunn's similar moral beliefs.  Ps' ¶ 2 states:

> Plaintiffs Tatel (Roman Catholic) and Melton (Church of Jesus Christ of Latter Day Saints) hold sincere religious and moral beliefs, inter alia, that human beings are created male or female and that the natural created order regarding human sexuality cannot be changed regardless of individual feelings, beliefs, or discomfort with one's identity and biological reality, as either male or female; although not founded in a particular religion, Plaintiff Dunn holds similar moral views.

Ps' ¶ 89 states:

> Plaintiffs' deeply rooted parental, moral and religious beliefs teach that parents do not select a child's gender – a child's gender is determined by God and (scientifically) by the child's X and Y chromosomes.

Defendants dispute whether Plaintiffs objected to Williams' instruction based on their religious/moral beliefs, rather than their scientific or political beliefs.  Defendants' position is not novel; courts have faced similar disputes in numerous cases involving objections to the Covid

vaccine.  There are two related inquiries: (1) whether a belief is religious in nature; and (2) whether it is sincerely held.

In *Bushra v. Main Line Health, Inc*., No. CV 23-1090, 2023 WL 9005584 (E.D. Pa. Dec. 28, 2023), the court observed that "[t]he Supreme Court and Court of Appeals for the Third Circuit have well-established guidelines for this inquiry."  *Id.* at *5.  Courts cannot consider the validity or plausibility of a person's belief.  *Id.* (citing *United States v. Seeger*, 380 U.S. 163, 184-85 (1965)).  On the other hand, courts can consider "whether there is a genuine dispute of material fact that [the plaintiff's] beliefs are religious in nature or 'essentially political, sociological, or philosophical.'"  *Id.* (citing *Africa v. Commw.*, 662 F.2d 1025, 1031 (3d Cir. 1981); and *Fallon v. Mercy Cath. Med. Ctr. of Se. Pa.*, 877 F.3d 487, 491 (3d Cir. 2017)).  In *Africa*, the court explained:  "while the 'truth' of a belief is not open to question, there remains the significant question whether it is 'truly held.'"  *Africa*, 662 F.2d at 1030 (quoting *Seeger*, 380 U.S. at 185).  A plaintiff must explain how her subjective belief is religious in nature and connect her objection to the defendants' conduct to that belief.  *Aliano v. Twp. of Maplewood*, No. 22CV5598, 2023 WL 4398493, at *10 (D.N.J. July 7, 2023) (explaining why some, but not all, employees stated cognizable religious objections to the Covid vaccine).

1. First prong – whether the beliefs are religious in Plaintiffs' subjective view of the world

The three "*Africa* factors" are considered in determining whether a belief is religious in nature: "'First, a religion addresses fundamental and ultimate questions having to do with deep and imponderable matters. Second, a religion is comprehensive in nature; it consists of a belief-system as opposed to an isolated teaching. Third, a religion often can be recognized by the presence of certain formal and external signs.'"  *Fallon*, 877 F.3d at 491 (quoting *Africa*, 662

F.2d at 1032).  Defendants do not contest that Plaintiffs' beliefs in this case are "religious" under the *Africa* factors.

On the facts presented, the court has no difficulty in concluding a reasonable jury could only find that Tatel's and Melton's beliefs about the gender identity of their children are religious in nature.  First, the nature of a child's identity addresses fundamental and ultimate questions having to do with deep and imponderable matters, e.g., why their child was created as a male or a female. Second, Tatel's and Melton's views about gender identity are comprehensive in nature, as opposed to an isolated teaching, and are part of a belief-system about the relationship between a creator and humans as created beings.  Third, Tatel's and Melton's beliefs are supported by the presence of certain formal and external signs, such as religious texts about the creation of males and females.  *See, e.g.,* Genesis 1:27 ("So God created mankind in his own image, in the image of God he created them; male and female he created them.").

2.  Second prong – whether the beliefs are sincerely held

The gravamen of Defendants' argument is that Plaintiffs' objections are political, rather than religious.  In *Seeger*, the Supreme Court explained that the threshold question of sincerity is a question of fact.  *Seeger*, 380 U.S. at 185 (noting the comprehensive rules for guiding draft boards in deciding the validity of claims to conscientious objector status); *Cf. Aliano*, 2023 WL 4398493, at *6 ("a court can, and must, ensure that a plaintiff's beliefs are religious, as opposed to being "essentially political, sociological, or philosophical.").

Based upon the record in this case, the court concludes that there is not a genuine dispute of fact about the sincerity of Plaintiffs' beliefs.  Defendants do not cite any evidence in the record from which a reasonable jury could conclude that Tatel's and Melton's religious beliefs are not "truly held."  Defendants point to a portion of Tatel's deposition in which she stated that

the book <u>Introducing Teddy</u> "itself" did not offend her religious beliefs "as a standalone." (ECF 100-9 at 66). In responding to the previous deposition question, however, Tatel testified: "I told you what my religious and moral beliefs are. Again, it's another gateway to have a discussion about things that offend my religious and moral beliefs." *Id.* Tatel also testified, in response to a question about whether passages from a book read by Williams offended her religious and moral beliefs:

> A.   Yeah, kids don't choose their sex. Right? Parents don't choose their kids' sex. I've already told you, I believe that God gives you the sex. God creates you male or female. This is implying that we -- both the child and the mother, they made a mistake about what God gave them.

(ECF No. 123-1 at 68); *see* ECF No. 95-1 at 27; ECF No. 95-2 at 10-11.

Defendants point to an email in which Tatel referred to Williams "pushing her left wing agenda all year," (ECF No. 100-10 at 3) and a text which referenced "leftist propaganda." (ECF No. 100-10 at 3). Defendants cite Melton's references that "social issues like this should not ever be allowed at this age"; Melton's plan to meet with Williams to explain that "the material is not suitable for kids that age"; Melton's political opposition to Diversity, Equity and Inclusion ("DEI") and Social and Emotional Learning and Melton's endorsement of conservative political commentators. (ECF No. 136, Ds' response to Ps' ¶ 2).

The cited references do not undercut or disprove the sincerity of Tatel's and Melton's religious beliefs about the identity of their children as being a male or female. At most, they show that Tatel and Melton also had overlapping political or philosophical objections to those and other aspects of Williams' instruction. Courts have held, in the Title VII context, that claims for religious discrimination are cognizable for topics which overlap both the religious and political spectrum, such as abortion, so long as the claims are based on a plaintiff's bona fide religious belief. *Gadling-Cole v. W. Chester Univ.*, 868 F. Supp. 2d 390, 397 (E.D. Pa. 2012)

(collecting decisions).  The *Gadling-Cole* decision involved a motion to dismiss, but the court noted that after the record was developed, the court would examine the relevant factors.  *Id.* Based on the record in this case, a reasonable factfinder could only conclude that the Free Exercise claims brought by Tatel and Melton with respect to transgender instruction are based on their sincerely held religious beliefs and those religious beliefs are connected to their objections to Defendants' conduct.

With respect to Dunn, the record is clear that her objections are <u>not</u> based on her religious beliefs.  Dunn testified that she does not have a religion and her opposition to Defendants' conduct is not based on a religious viewpoint.  (ECF No. 100-15 at 18).  Plaintiffs made that distinction between Dunn and Tatel and Melton in Ps' ¶ 2.

In sum, Defendants' responses to Ps' ¶¶ 2 and 89 will not be stricken, but those CSMFs will be regarded as undisputed.

C. Ps' ¶ 16

CSMF Ps' ¶ 16 is based on Steinhauer's testimony that "it's a long-standing practice in the school district" to provide notice and opt outs broader than required by the Pennsylvania School Code.  (ECF No. 95-21 at 69-70).  Defendants explain that their dispute about this paragraph is really a clarification that the notices are provided by teachers, not the District.  D's response to Ps' ¶ 16 ("It is undisputed that individual teachers, at their discretion, have provided advance parental notice and the opportunity to opt-out of instruction on topics other than for those that may be required by Pennsylvania statutes and regulations.").

Defendants' clarification is supported by the record.  In the same deposition testimony quoted by Plaintiffs, Steinhauer testified "I think it's always teacher prerogative" and explained that the District did not "have any specific guidelines for what you should notify parents about

and not notify parents about." *Id.*  Defendants' clarification will be accepted.

Defendants also assert that Ps' ¶ 16 (and numerous other CSMFs) are not material because the District permits parents to opt out of any instruction which conflicts with their religious beliefs.[2]  That assertion is globally improper.  As explained above, one of the three Plaintiffs in this case (Dunn) is not religious and her complaints about Defendants' conduct are not based on her religious beliefs.  It is material, therefore, whether a nonreligious parent has notice and opt out rights.

D. Ps' ¶ 17

CSMF Ps' 17 states that "certain" letters written to parents do not specify that opt outs must be based on religious objections.  Defendants explain that their dispute is really a clarification that two of the letters do not specify religious objections, but one letter does.

This "dispute" is a semantic quibble, which does not comply with the spirit or text of Local Rule 56.  Defense counsel should not have disputed Ps' ¶ 17, but Plaintiffs' counsel should not have filed a motion to strike the response.  Counsel could have resolved this "dispute" without court intervention.  Paragraph 17 will be regarded as undisputed.

E. Ps' ¶ 24

CSMF Ps' ¶ 24 states that the Mt. Lebanon School Board ("School Board") has not discussed adoption of a policy to give parents advance notice and opt out rights for gender identity instruction.  Defendants disputed Ps' ¶ 24, although they agreed that "the School Board has not discussed a policy for parent opt-out rights specific to gender identity instruction."  Defendants explain that they dispute "that parents lack opt-out rights from gender identity instruction."  (ECF No. 139 at 6).

---

[2] Parents' ability to opt out of instruction for religious reasons presupposes that they receive adequate notice of objectionable topics.  *See* discussion *infra* at 67.

Defendants' dispute is not proper.  Defendants' explanation is not responsive to Ps' ¶ 24, which relates to whether the School Board discussed adoption of a policy.  Defendants should admit Ps' ¶ 24 and, if necessary, include their explanation about opt out rights under other board policies and state law in a supplemental CSMF.  Paragraph 24 will be regarded as undisputed.

F. Ps' ¶ 30b

CSMF Ps' ¶ 30b describes an email sent by the District and asserts that the "Annual Notifications" tab "was not called out in any way in the body of the Newsletter."  (ECF No. 136 at 15-16).  Defendants disputed this paragraph by: (1) noting that the District sent another email on August 27, 2023; and (2) asserting that the Annual Notifications tab was "called out" because it was a hyperlink in bold at the top of the email.

Defendants' first dispute is really just an additional fact that does not undermine ¶ 30b. Defendants' second dispute is proper – reasonable factfinders could differ about whether the tab is "called out."

G. Ps' ¶¶ 32, 33

CSMF Ps' ¶¶ 32 and 33 relate to the process for accessing parental opt out rights on the District website.  Exhibit 95-32 contains screenshots of the various steps.  Defendants do not dispute the exhibits, but argue that Plaintiffs "exaggerate the difficulty" in locating the information and dispute the "implication" that it is difficult to locate.  Defendants purport to dispute the "implied fact" that the information is difficult to locate.

The "implied fact" about how difficult it is to access the information is not set forth in the CSMFs.  The documents speak for themselves and the inferences to be drawn from the documents should be addressed in the briefs, not the CSMF.  Paragraphs 32 and 33 will be regarded as undisputed.

H. Ps' ¶ 37

CSMF Ps' ¶ 37 involves the testimony of a person, who teaches in the District and is also a parent, that she was unaware of the opt-out language in the parental rights notification.

Defendants' dispute was proper.  Defendants' dispute is supported by a more extensive quotation of that testimony, which shows that the deponent's response was equivocal.  (ECF No. 95-4 at 23-24).  The court notes that Plaintiffs made numerous similar responses (backed by citations to the record) with respect to Defendants' proposed CSMFs, *see, e.g.*, Responses to Ds' ¶¶ 17, 18.

I.   Ps' ¶43

CSMF Ps' 43 states:  "No written procedure has been created instructing that, if topics of gender identity are to be taught, that parents should be given advance notice and the ability to opt out."  (ECF No. 136 at 20).  Defendants concede that no written policy has been created to instruct principals that parents should be given advance notice about gender identity instruction.  Defendants purport to dispute a different fact, i.e., whether the District has <u>any</u> written procedures for parental opt outs.  Defendants' response was not proper.  Ps' ¶ 43 will be regarded as undisputed.

J. Ps' ¶¶ 54-57, 106

Each of these CSMFs involve direct quotations from the record, to which Defendants lodged disputes.  Defendants admit the quotations are accurate, but purport to dispute underlying or anticipated facts or inferences.[3]

Defendants' response to Ps' ¶ 106 was proper.  Plaintiffs provided a partial quotation of Williams' testimony and Defendants cited to additional deposition testimony to reflect that Williams thought the testimony of aide Sharon Boss ("Boss") was hyperbolic.  (ECF No. 95-23

---

[3] Defendants' response (ECF No. 139) did not address Ps' ¶ 57.

at 14-15).   Williams did not express any specific disagreements with the substance of Boss' testimony.  *Id.*

Defendants should have admitted the remaining CSMFs and included their additional information in supplemental CSMFs.  These disputes should have been resolved by counsel without court intervention.

K. Ps' ¶ 78

CSMF Ps' ¶ 78 provides: "As of March 31, 2022, teachers were not permitted to bring their children to work on Take Your Child to Work Day which occurred on April 28, 2022." (ECF No. 136 at 31).  Defendants disputed this statement on the basis that during prior years, teachers were permitted to bring their children to work and no decision had yet been made for 2022.  Defendants also point out that it had not officially been prohibited.

The record does not support Defendants.  The only citation they provide is to ECF No. 115-66, which consists of an email chain.  Of particular relevance, ECF No. 115-66 provides:

(a) on February 24, 2022, Lorien Moyer found a 2021 email from Dr. Ronald Davis ("Davis"), the Assistant superintendent of Secondary Education, which stated: "Should a staff member inquire about bringing their child to your school for the day, it is not permitted this year."  (*Id.* at 2).  In the February 24, 2022 email, Lorien Moyer stated that Davis "indicated the same for this year particularly due to the overlap with testing" (*id.*); and

(b) on April 7, 2022, Sarah Shaw asked: "What are we doing this year about staff who want to bring their child to work?"  Christine Patti replied:  "I thought that was not permitted." (*Id.* at 14).

The record contains other exhibits confirming that staff would not be permitted to bring their

children in 2022.  On April 12, 2022, Irvin wrote to Steinhauer: "We are not allowing staff to bring their children to school with them." (ECF No. 100 Ex. 51).  On April 19, 2022 at 10:34 a.m., Bielewicz advised a teacher: "No employees are permitted to bring kiddos. Sorry." (ECF No. 100 Ex. 8).

In sum, teachers were not allowed to bring their children in 2021; on February 24, 2022, the same prohibition was renewed for 2022; and as of April 7 and 12 and the morning of April 19, 2022, various administrators understood that the prohibition remained in place.  The first date on which it was communicated that staff members were permitted to bring their children to work was an email sent by Davis in the afternoon of April 19, 2022.  (ECF No. 115-66).

Ps' ¶ 78 will be regarded as undisputed.

L. Ps' ¶98a

CSMF Ps' 98a involves a classroom aide's recollection about whether Williams referred to her own child during the discussion on March 31, 2022.  Plaintiffs cited generally to four pages of the aide's deposition.  Defendants disputed the characterization of that testimony by quoting one portion of it.

Defendants' dispute was proper.   The aide testified that she remembered Williams mentioning the name of Williams' child and that she "just remember[ed] the name coming up.  I don't have a lot of clear memory." (ECF No. 95-59 at 13).  Plaintiffs should have provided direct quotations to the relevant testimony, rather than attempting to recharacterize four pages of a deposition transcript into a single CSMF.  Paragraph 98a will be regarded as disputed.

M. Ps' ¶ 166

CSMF Ps' ¶ 166 states: "Irvin was aware that these teachers had read the books."  (ECF No. 136 at 48).  Defendants disputed this paragraph because it does not contain a time reference.

Defendants dispute any inference that the District administration was aware prior to March 31, 2022, that the books were being read to elementary students or that they knowingly acquiesced in such conduct.  Defendants' dispute and clarification is appropriate.

In sum, counsel on both sides could have discussed an amicable and reasonable way to resolve their concerns about the CSMFs, rather than indulging in semantic battles that required court intervention.  As described in detail above, some of Defendants' disputes were proper and some were either improper or should have been presented by way of supplemental CSMFs.  The motion to strike (ECF No. 125) will be denied, but certain facts will be deemed undisputed as set forth above.

## IV.    **Factual and procedural background**

A.  The parties

Plaintiffs Tatel, Melton and Dunn are the mothers of students who were in Williams' first-grade class in 2021-2022.  Tatel, who is Roman Catholic, and Melton, who is a member of the Church of Jesus Christ of Latter-Day Saints, hold sincere religious and moral beliefs that human beings are created male or female and that the natural created order regarding human sexuality, as either male or female, cannot be changed regardless of individual feelings, beliefs, or discomfort with one's identity and biological reality. Dunn does not have a religion, but holds similar views based on her moral beliefs.  Ps' ¶ 2.

Plaintiffs' deeply rooted religious (for Tatel and Melton) and moral beliefs "teach that parents do not select a child's gender – a child's gender is determined by God and (scientifically) by the child's X and Y chromosomes." Ps' ¶ 89.

Defendant Steinhauer, now retired, was the superintendent of the District during the

relevant time period.  As superintendent, Steinhauer had authority to create and implement written procedures for District administrators and teachers to follow.  Ps' ¶ 119.

Defendant Irvin, now retired, was the assistant superintendent in charge of elementary education in the District during the relevant time period.  In the area of elementary education, Irvin had the ability to establish procedures that would be District wide.  Ps' ¶ 127.

Defendant Wyland is president of the School Board. Ps' ¶ 115.

Defendant Bielewicz was the principal at Jefferson Elementary School during the relevant time.   From an administrative standpoint, school principals have immediate responsibility for their respective schools.  Ps' ¶ 163.

Defendant Williams is a first-grade teacher at Jefferson Elementary School in the District. Williams is the mother of a transgender child who, like the Plaintiffs' children, was in the first grade during the 2021-2022 school year.  Williams' child attended another elementary school in the District.

The District is a public school district organized under Pennsylvania law.  (ECF Nos. 1 and 49 ¶ 16).

B.  The 2021-2022 school year

For the 2021-2022 school year (and through the present), neither the Curriculum section of the District's website nor the information available to parents in Atlas[4] refers to teaching the subject of gender identity, i.e., transgender identity, to elementary students, including first-graders. Ps' ¶ 8.  The District has not adopted a formal DEI curriculum.  Ps' ¶ 11.

District Policy I(F) provides that: (a) parents and guardians should have access to information about the curriculum, including academic standards to be achieved, instructional

---

[4] Atlas is the District's electronic curriculum mapping and alignment system and can be accessed on the District's website.  https://www.mtlsd.org/uploaded/District/images/2018-2019/D01d_Mt-Lebanon-SD_Comprehensive_Plan_10-1-2018_(1).pdf.

materials, and assessment techniques; and (b) "[u]pon request, parents and guardians will be provided with copies of instructional materials (except for certain confidential exams) for courses in which their children are enrolled. Requests for copies may be written or oral and should be made directly to the teacher of the course." Ps' ¶ 13.

Under Policy I(F), parents may excuse a child from instruction based on a conflict with their religious beliefs; no other basis for opting out is contained in the Policy. Ps' ¶ 29. The District, however, provides advance parental notice and the ability to opt students out of instruction related to: in fifth and eighth grade, human development and sexuality; and in eleventh grade, HIV, sexuality, birth control/contraceptives, and sexually transmitted infections. Ps' ¶ 15. The advance notice and opt outs provided by the District cover topics that are broader than those topics for which advance notice and opt out is required by the Pennsylvania statutes and regulations. Ps' ¶ 16.

District representatives[5] also sent advance notice and the ability for parents to opt students out of participation in: (a) an assembly involving a therapy dog; (b) viewing certain movies to be shown in class (including The Bad Guys,[6] The Tiger Rising,[7] Invictus (which concerns Nelson Mandela and Apartheid), and The Giver[8]); (c) lunch group meetings with a school counselor; (d) PASS surveys[9]; (e) the Scripps Spelling Bee; (f) hearing stories related to

---

[5] It is unclear from the record (*see, e.g.*, the sample notices in ECF No. 95-22), whether notices about school-wide events, such as assemblies, were sent by individual teachers.

[6] A film about a gang of notorious animal criminals who pretend to be rehabilitated to avoid prison, only for their leader to realize that he genuinely wants to change his ways.
https://www.imdb.com/title/tt8115900/. *See Jones v. Twentieth Century Studios, Inc*., No. CV 21-5890 PA (SKX), 2021 WL 6752228, at *3 (C.D. Cal. Dec. 7, 2021) (taking judicial notice of the contents of a film as indisputably authentic).

[7] A film about a boy who finds a caged tiger in the woods. https://www.imdb.com/title/tt1596557/.

[8] A film about a seemingly perfect community without war, pain, suffering, differences or choices, in which a young boy is chosen to learn from an elderly man the true pain and pleasure of the "real" world. https://www.imdb.com/title/tt0435651/.

[9] The survey measures Pupil Attitudes to Self and School.  https://support.gl-education.com/knowledge-base/assessments/pass-support/general-information/about-pass

Chanukah, Christmas and Kwanzaa; (g) dissecting animals in biology; and (h) viewing video clips from a TV series that involves a homosexual character. Ps' ¶ 18.

During the course of the 2021-2022 school year, Williams sent group emails to the Parents of the students in her class. One email titled "Family Interest Inventory" advised parents, in advance, that the family of a student had expressed interest in sharing their Hanukkah traditions with the class. Ps' ¶ 22.

The District never sent a letter directly to elementary school parents advising them in advance of particular planned instruction on the subject of gender identity/transgender issues and providing the ability to opt their children out of that instruction. Ps' ¶ 20. The District did not send (and never sent) an email to parents, which in the body of the email notified parents that they can opt a student out of gender identity-related instruction. Ps' ¶ 36.

The District's curriculum should guide classroom instruction. Ps' ¶ 5. For the 2021-22 and 2022-23 school years, nothing in the "Parental Rights" notification on the District Website mentioned possible instruction on gender identity. Ps' ¶ 38.

On October 1, 2021, in response to information in the Jefferson Elementary School's newsletter about acknowledging LBGTQ month, a parent (not a party to this case) asked in an email to Bielewicz: "I was wondering if/how this is acknowledged in the first grade because I am not comfortable with my daughter learning about gender identity at this age." Ps' ¶ 64. Bielewicz responded, "[t]here is no formal introduction or lessons surrounding it at JES, especially in 1st grade. It's just merely an acknowledgment of inclusivity and awareness to our JES community." *Id.* The parent (L.R.) forwarded this response to Tatel. *Id.*

Some students in Williams' class knew Williams' child as a boy through youth sports (ECF No. 95-53). Williams' child started wearing dresses at age 5 and intermittently expressed

"I am a girl." (ECF No. 95-23 at 30-31). Williams informed her class that her child went as Elsa for Halloween. Ps' ¶ 67. In March 2022, Williams' child expressed a desire for a pronoun change, i.e., to be called "she" by teachers and classmates. (ECF No. 95-23 at 32). Williams informed her child's teacher about the desired pronoun change. *Id.*

Williams told Dunn's son, in substance, that he had similar interests to Williams' child including the same favorite color. Ps' ¶ 70. Williams denied the remaining "grooming" allegations set forth in the Complaint.[10] Ds' ¶ 70.

During the academic year 2021-22, no student at Jefferson Elementary School identified as transgender to the District. Ps' ¶ 65. The District received no complaints of transgender harassment or discrimination from a transgender student at Jefferson Elementary School during the 2021-22 school year. Ps' ¶ 66.

## C. The events in the days immediately prior to March 31, 2022

Williams' child changed to using female pronouns the same week that Williams read Aidan and Introducing Teddy to her first-grade class. Ps' ¶¶ 60-61.

On March 30, 2022, Williams sent a text to two fellow teachers, stating: "Tomorrow is international trans day of visibility. I'd like to read something." ECF 100-22. During the text exchange, the books When Aidan Became a Brother ("Aidan") and Introducing Teddy, a gentle story about gender and friendship ("Introducing Teddy") were discussed. Ps' ¶ 72. Williams asked: "Do you think it's good to read aloud in first?" (ECF No. 95-48). One of the other teachers planned to read the books and commented: "Now I may be pulled into the principal's office ... but that's okay with me." *Id.*

---

[10] In the complaint, Plaintiffs asserted that Williams instructed her students not to tell their parents about her discussions with them concerning transgender topics. The parents chose not to have their children deposed and presented no evidence of that assertion at the summary judgment stage.

D.  The events on March 31, 2022

1.  The morning

According to Boss, an aide in Williams' classroom, "morning work" was done by 9:00 a.m.  (ECF No. 95-52 at 31).  At the end of morning work on March 31, 2022, Williams "out of nowhere" began talking about bringing her child to Take Your Child to Work day.  *Id.* at 33. Some of the students stated that they knew Williams' child through sports and referred to the child as "him."  Williams stated to the students that her child was now a "she."  Ds' ¶ 46.

Boss testified that "right after" this discussion (i.e., soon after 9:00 a.m.), Williams showed the video of <u>Aidan</u>, but with the sound off, and read the words to the class herself.  ECF No. 95-52 at 36-37.  A print copy of <u>Aidan</u> is found at ECF No. 95-57.  The first line of the book is: "When Aidan was born, everyone thought he was a girl."  *Id.*  <u>Aidan</u> uses the term "transgender" on page 6 and, in referring to the child on page 18, contains the line: "When you were born, we [the Parents] didn't know you were going to be our son. We made some mistakes but you helped us fix them."  Ps' ¶ 94.  Neither the word "tolerance" nor the word "kindness" is contained in <u>Aidan</u>.  Ps' ¶ 92.  No character in <u>Aidan</u> was the subject of bullying or being picked on.  Ps' ¶ 93.

Defendants' contention that Melton's child was not present for Williams' instruction on March 31, 2022, is speculative because they have no information about when she left or returned. Melton's child typically left the classroom from 10:00 to 11:00 a.m. for special instruction.  The child regularly received instruction from Bridgette Watson from 10:00 to 10:30 a.m. and from Kim Salvador from 10:30 to 11:00 a.m., but Ms. Salvador was absent on March 31, 2022 (ECF No. 110-10 at 3).  *See* Melton Deposition (ECF No. 100-7 at 42-43) (her child returned from special instruction and caught the tail end of a book, but Melton did not ask whether this was in

21

the morning or afternoon).

The reading of the book caused confusion among the students.  Ps' ¶ 82.  As reflected in Boss' contemporaneous notes, a student commented: "I don't get it."  ECF No. 95-53.  Another student called out "Oh, I get it – she was a he" and Williams, as part of the discussion, said "yes, she was a he," referring to the character in the book. Ps' ¶ 83.

There was still some confusion. Several students asked, "who decides this" and Williams responded, "your parents do." Ps' ¶ 84; ECF No. 95-53. Williams then called for an unscheduled recess. Ps' ¶¶ 85-87.

Boss testified that as the class left, Williams said to Boss, "I hope you were ok with that lesson," to which Boss responded, "It doesn't matter what I think – it matters what they think and what their parents think." Ps' ¶ 88.

At 9:23 a.m. on March 31, 2022, Williams sent Bielewicz an email stating, "I was thinking of sharing these read alouds with colleagues, but I just wanted to run it by you first? They were both recommended to me by other teachers in the district." Ps' ¶ 74. Williams testified that, other than the email, she did not seek Bielewicz's prior approval in any way.  (ECF No. 100-20 at 61).

Bielewicz replied at 11:25 a.m., after he reviewed the links to two video illustrations of the books.  Bielewicz wrote: "I'm fine with it. It's their choice if they wish to incorporate or not." Ps' ¶ 74.  After watching the videos, Bielewicz testified that he "went about my day." Ps' ¶ 74a.  Bielewicz testified that he never told Williams it was okay to read the books/play the videos to her students; instead, he authorized her to share them with colleagues.  (ECF No. 95-18 at 23).

At 11:38 a.m. on March 31, 2022, Williams shared links to Aidan and Introducing Teddy

with the faculty and staff of Jefferson Elementary School via email; the email, among other things, indicated "[t]oday is Transgender Day of Visibility" and "[t]his is a topic close to my heart." Ps' ¶ 75.

2. The afternoon

There were two aides in Williams' classroom during the afternoon of March 31, 2022, Lisa Mathewson ("Mathewson") and Jackie Girman ("Girman"). That afternoon, Williams played/read to her students Introducing Teddy (ECF No. 95-58). The book contains the line: "In my heart, I've always known that I'm a girl teddy, not a boy teddy." *Id.* Teddy's name is changed to Tilly. *Id.* Neither the word "tolerance" nor the word "kindness" is contained in Introducing Teddy. Ps' ¶ 103. No character in Introducing Teddy was the subject of bullying or being picked on. Ps' ¶ 104.

Mathewson recalled that Williams played the video/read the book and had a five to ten minute discussion about it prior to the afternoon recess. ECF No. 95-59 at 13-14. In the discussion, Williams told the class her child would be coming for Take Your Child to Work Day and would be in a dress. Ps' ¶ 98b. Mathewson and Girman testified that, as part of the class discussion, Williams told her first-grade class "parents make a guess about their children's – when children are born, parents make a guess whether they're a boy or a girl. Sometimes parents are wrong." Ps' ¶ 99; ECF No. 95-59 at 13; ECF No. 95-60 at 13-14.

After Williams had the afternoon discussion, one child raised his hand and said: "But I'm a boy. I don't want to be a girl." ECF No. 95-60 at 14-15. Girman described the student as "upset." (ECF No. 100-28 at 19-20). Williams responded, "Yes you are. Talk with your parents about that." Ps' ¶ 178.

Parents were not provided any advance notice or the ability to opt their children out from

Williams' instruction on March 31, 2022. Ps' ¶ 21.

E.  Plaintiffs' and students' reactions

After school on March 31, 2022, Tatel's daughter asked Tatel "how do you know that I am a girl?" Ps' ¶ 108. Boss testified that the following day, Tatel's daughter was "upset" and brought up that "when you change a baby's diaper . . . you know if they're a boy or a girl." Ps' ¶ 109.

After school on March 31, 2022, Tatel and her spouse discussed with their daughter the topic of gender identity and explained their beliefs and "what we know to be true" about gender and "have gotten her straight." Ds' ¶ 74.  Tatel testified that she was not ready to have such a discussion with her child and Williams' instruction forced her to have it. Ds' ¶ 74.  Tatel was able to explain her beliefs with her daughter, but her child remained confused.  (ECF No. 110-3 at 147) ("[S]he was still confused.  Because why would her teacher tell her something wrong?").  Absent Williams' conduct, Tatel would not have discussed transgender identity with her child. (ECF No. 110-3 at 148.)

Melton's child told Melton she did not really understand what was happening because she came into class at the last part of the book.  Melton did not press the issue because she felt this was a topic her child was not old enough to truly understand.  (ECF No. 100-7 at 42).

On the evening of March 31, 2022, L.R.'s daughter questioned whether her pink stuffed bear, who she referred to as a boy, should really be a girl. Ps' ¶ 110.  Dunn's child approached Williams in class and asked whether Williams had ever changed her child's diaper because, if so, Williams would know whether her child was a boy or a girl.  (ECF No. 95-1 at 74).

Dunn testified that Williams' conduct caused Dunn "to have uncomfortable conversations with my first grader that I shouldn't have to have in the first place."  (ECF No. 123-2 at 66).  The

next day, on April 1, 2022, Dunn emailed Steinhauer, stating: "I am a parent of a first grader at Jefferson Elementary; and it has come to my attention that a teacher there is having adult teachings about transgender with children." Ds' ¶¶ 76, 77; ECF No. 95-66.  Dunn stated that she was not comfortable with having her child return to Williams' classroom and requested that the District provide her child with on-line asynchronous instruction for the remainder of the school year. Ds' ¶¶ 76, 77; ECF No. 95-66.

On April 4, 2022, Melton met with Williams concerning the books that were read on March 31, 2022, to the first-grade class.  Ds' ¶ 79.  Melton recounted her recollection about the substance of the meeting in a text message later that day and in her deposition.  ECF No. 100-1 at 119; ECF No. 110-9 at 80-88.  Williams disputed Melton's memory about the substance of the meeting.  ECF No. 100-20 at 79-81.

On April 5, 2022, Tatel met with Bielewicz to express her disagreement with Williams' conduct.  Bielewicz told Tatel there were various perspectives and Williams felt the instruction was appropriate.  (ECF No. 95-50 at 70).  Tatel testified that she asked Bielewicz to guarantee that Williams would not teach the transgender content again, and Bielewicz said he could not. (ECF No. 95-1 at 100).

F.   Defendants' reactions

1.   Williams

Due to her own child's gender transition, Williams felt that criticism that arose from the events in her own first-grade class on March 31, 2022 was "so f**king personal." Ps' ¶ 63. Williams exchanged numerous texts with friends and family in the days after March 31, 2022. On the evening of March 31, 2022, Williams stated:  "People are upset about the read alouds. One is 'representing' the group and asked to meet with Brett [Bielewicz] tomorrow.  I also told

my class today about [Williams' child], simply [because] it came up, we were talking about take your child to work and I told them. . . . Brett [Bielewicz] and MB [Irvin] have my back but I HATE THIS FEELING." (ECF No. 95-64). Later in the exchange, Williams stated: "I feel sick to my stomach about this. But I shouldn't. I'm in the right here!" *Id.*

On April 1, 2022, Williams stated: "Tim Steinhauer knows everything and I did nothing wrong. So I'm not in any professional trouble." *Id.* Later, Williams acknowledged: "Yeah, it was a much bigger reaction than I anticipated." *Id.* In another text string, Williams stated: "6 parents emailed Brett [Bielewicz] to complain about my read aloud yesterday" and one parent requested asynchronous learning for her child for the remainder of the year. (ECF No. 95-41).

On April 3, 2022, Williams texted, with respect to the parent complaints: "Brett [Bielewicz] seemed cool as a freaking cucumber about it all." (ECF No. 95-63). Later in the exchange, Williams stated: "Tim [Steinhauer] and MB [Irvin] know everything and I am backed by everyone. So I'm not in trouble professionally." (ECF No. 95-63).

2. Bielewicz

Six parents complained to Bielewicz about Williams' conduct on March 31, 2022. Bielewicz characterized the Parents' position as a "concern with the book." (ECF No. 95-50 at 19).

On April 1, 2022, Girman reported Williams' conduct to kindergarten teacher Casey Stewart ("Stewart"). Stewart sent an email to Bielewicz, to memorialize that Williams told the children, "**when you're born, your parents make a guess of what you are and sometimes they're right and sometimes they're not.**" Ps' ¶ 100; ECF No. 95-61 (bold in original). Bielewicz did not find it alarming and did not respond to the email or investigate the allegation. (ECF No. 95-17); ¶¶ 134, 135.

Bielewicz had no knowledge that Williams read one book in the morning and another in the afternoon on March 31, 2022. Ps' ¶ 147. Bielewicz did not know if Williams provided any introduction to her class before reading either book, mentioned her own transgender child, discussed potentially bringing her child to school, or engaged in any questions and answers with the class after she read either <u>Aidan</u> or <u>Introducing Teddy</u>. Ps' ¶ 148.

In a text exchange with a teacher who thanked him for his support of Williams, Bielewicz responded: "Having mb [Irvin] and tim [Steinhauer] support helps too." (ECF No. 95-65); Ps' ¶ 113. Regarding the text message, Bielewicz testified that, based on his conversations with Steinhauer and Irvin, they had no issue with Williams having read the books. Ps' ¶ 114. Bielewicz testified that he does not have any objection to the use of the books. Ps' ¶ 133.

On April 4, 2022, Bielewicz sent an email to Williams, stating: "You got tons of support from top down – trust me!" ECF 100, Ex. 23.

Tatel met with Bielewicz on April 5, 2022.  Bielewicz told Tatel that he approved Williams' instruction. Tatel testified:  "[Bielewicz] told me Mrs. Williams came in that morning, I believe he said before school, to show me the videos and I approved them." (ECF No. 95-1 at 100).  In the meeting with Tatel on April 5, 2022, Bielewicz said that Williams felt that reading <u>Aidan</u> and <u>Introducing Teddy</u> was an appropriate decision in her classroom and for her community of learners. Ps' ¶ 164.

On April 7, 2022, a parent emailed Jefferson Elementary School second-grade teacher Sarah Davis ("Davis"), asking that she be informed if "transgender" topics would be discussed in her classroom. Bielewicz recommended that Davis reply by stating that, in the event of any controversial subject, "moving forward, we will certainly inform parents ahead of time so that they may determine if they'd like their child to be present during the activity." Ds' ¶¶ 92, 93;

(ECF No. 100-18 at 49).   Following Williams' instruction on March 31, 2022, several elementary principals, including Bielewicz, communicated via email that parents would be notified of any instruction involving gender identity. Ds' response to Ps' ¶ 52.

Bielewicz assisted Williams with drafting an email to parents about bringing Williams' child to Take Your Child to Work Day.  ECF No. 95-50 at 62.

### 3.  Irvin

Irvin learned from Bielewicz on April 1, 2022 that: Williams read <u>Aidan</u> and <u>Introducing Teddy</u> to her students; parents reached out with questions; and Bielewicz was facilitating meetings to follow up.  (ECF No. 95-11 at 50).  Irvin's understanding, until the lawsuit was filed, was that Williams read the books to her class; one student said "I'm a boy"; Williams responded "you certainly are"; and that was the entirety of the conversation.  *Id.* at 53.

Irvin testified it is her position that "it's okay that [Williams] read those books.  I wish we would have provided parents notice."  (ECF No. 95-11 at 62).  Regarding the books, Irvin did not think there was anything wrong with what Williams did. Ps' ¶ 129.  At a public April 19, 2022 School Board DEI Committee meeting, Irvin expressed her opinion that it was okay for Williams to have read <u>Aidan</u>. Ps' ¶ 130.

The principal at Foster Elementary School, another school in the District, notified Irvin that two of his teachers had read the same books that Williams read. Ps' ¶ 131. Irvin did not ask the principal at Foster Elementary School to talk to either the students or parents of students who were in the respective classes. Ps' ¶ 131a.  Irvin did not talk to any of the aides in Williams' classroom about the events of March 31, 2022. Ps' ¶ 144.   No District administrator ever interviewed Boss, Mathewson, Girman, or Stewart. Ps' ¶ 143.

In the fall of 2022, a German teacher was doing some introductory instruction to a fifth-

grade class about family-related words in German.  In response to a comment/question by a student, the teacher allegedly made a statement to the effect that: "I understand biology, and there's always one mother and there's always one father." Ps' ¶ 153. After discussing this incident with Irvin, the school's principal interviewed every student in the class. Ps' ¶ 154.

Irvin testified that no policy had been adopted subsequent to Williams' conduct that would require parental notice.  (ECF No. 95-11 at 62).  Some time after May 5, 2022, however, a practice was orally communicated to the principals, and teachers were instructed, not to read any books on gender identity to their students while the lawsuit is pending.  *Id.* at 62-63; Ds' ¶ 113. Irvin testified Steinhauer and she agreed that instructing teachers not to read any books on gender identity "was going to be the best path **at this point**, not knowing the outcome of the lawsuit."  (ECF No. 110-1 at 63) (emphasis added).  Irvin explained this plan was adopted despite the fact that she did not think there was anything wrong with what Williams did.  *Id.*

### 4. Steinhauer

Steinhauer first became aware that Williams read the books <u>Aidan</u> and <u>Introducing Teddy</u> to her first-grade students by having been informed by Irvin that there were parental complaints about Williams reading those books to her classroom. Ds' ¶ 105. Upon being informed of the concerns expressed by parents, Steinhauer reviewed the books and concluded that it was appropriate for Williams to use the books in her classroom. Ds' ¶ 106.

Steinhauer did not respond to Dunn's email dated April 1, 2022, in which she requested asynchronous instruction for her child. Ps' ¶¶ 125, 125a.  Steinhauer did not undertake an investigation to determine what Williams said in the classroom on March 31, 2022. Instead, Steinhauer relied upon Irvin to ascertain what occurred in Williams' classroom on March 31, 2022. Ds' response to Ps' ¶ 142.

Steinhauer spoke about the books at a public School Board meeting on April 11, 2022 and indicated that he had seen the books and the underlying theme was about "kindness, empathy towards all and acceptance towards others" and, at his deposition, Steinhauer testified that he thought "it was appropriate that [Williams] used the books in her classroom." Ps' ¶ 123.

It is undisputed that the characters in <u>Aidan</u> and <u>Introducing Teddy</u> were not being bullied and the books do not contain the words "tolerance" or "kindness." Ps' ¶¶ 93, 103, 104. The books introduce the first-grade students to cute, lovable transgender characters, who make the decision that they are a different gender than their sex, are affirmed in that belief by the other characters and recognize that parents may make mistakes about their children's gender.

On May 5, 2022, Steinhauer met with the Parents of a student in Williams' class. During that meeting, Steinhauer expressed that the Parents should have been notified in advance of Williams reading the books on gender identity. Ds' ¶ 112. After the May 5, 2022 meeting, Steinhauer and Irvin directed elementary principals and teachers to ensure that parents would be provided notice and the opportunity to opt out of instruction involving "controversial subjects." Ds' ¶ 113. The directive was not put in writing. (ECF No. 100-43 at 65).

5.  Wyland

At a public School Board meeting on April 11, 2022, Wyland made comments that he testified were in favor of Williams' instruction. Ps' ¶ 116.

6.  The District

Williams and Bielewicz were not disciplined with regard to anything that occurred on March 31, 2022. Ps' ¶¶ 155, 156. No written procedure was created instructing that, if topics of gender identity are to be taught, parents should be given advance notice and the ability to opt their children out of that instruction. Ps' ¶ 43.

The School Board did not discuss the adoption of a policy whereby parents would be provided advance notice and opt-out rights for gender identity instruction and did not provide any directive prohibiting instruction on gender identity. Ps' ¶ 24.

Wyland, the School Board president, testified he was not aware of any written operational guideline (i.e., a written procedure implementing a School Board policy) from the District's administration telling principals and teachers to provide advance notice if the subject of gender identify is to be taught, or any written directive from the administration prohibiting the subject of gender identity from being taught. Ps' ¶ 25.

No written administrative practice or procedure requiring advance notice to parents of gender identity related instruction was created by the Administration. Ps' ¶ 26. The District's Elementary Curriculum available to parents via the District website and Atlas portal still does not reference gender identity or gender identity instruction. Ps' ¶ 53.

G.  Policies and Practices in effect as of March 31, 2022

District Policy I(J), ECF No. 95-16, covers selection of instructional materials. "Instructional materials" is defined broadly to refer:  "to **any material(s)** (whether acquired or locally produced) with instructional content or function that is used for formal **or informal** teaching/learning purposes.  These materials include, but are not limited to textbooks, **other books** or articles, supplementary reading and instructional materials, . . . audio and **video materials**, . . . ." *Id.* (emphasis added).  Policy I(J)(f) provides that instructional materials "shall be appropriate for the subject area and for the age, emotional development . . . and social development of the students for whom the materials are selected." *Id.*  The Policy states:  "It is the responsibility of the Administration to implement and enforce this policy, and to develop Administrative Procedures for implementation or enforcement where necessary." *Id.*

District Policy I(F), ECF No. 95-17, covers Curriculum and Parental Rights.   In the Policy, the School Board "recognizes that parents and guardians of students have the right to access and review information concerning the instruction, assessment and academic progress of their children."   *Id.*   The objective of Policy I(F) is to identify the processes for developing the curriculum and "to assure that parents and guardians of students can access and review information concerning the instruction, assessment and academic progress of their children."   *Id.* Policy I(F)(2) provides that curriculum development shall "comply with state and/or federal mandates," including parental rights to:

(a) access to information about the curriculum, including academic standards to be achieved, **instructional materials**, and assessment techniques;
(b) a process for the **review of instructional materials**; [and]
(c) the right to have their child(ren) excused from specific instruction which conflicts with their religious beliefs, . . .

*Id.* (Emphasis added).   Policy I(F)(3) reiterates:   "**Parents and guardians of students enrolled in the District have the right to access and review instructional materials** for courses in which their children are enrolled."   *Id.* (Emphasis added).   Policy I(F)(4) provides that requests for copies of instructional materials "may be written or oral and should be made directly to the teacher of the course." *Id.*

Policy I(F) states:   "It shall be the responsibility of the administration to develop the procedures necessary to implement this policy, including: (1) making available to parents . . . instructional materials." *Id.*

District Policy I(F) provides for opt outs for religious reasons.   Steinhauer testified that the Pennsylvania School Code regulations required opt outs only for religious reasons.  (ECF 95-21 at 67-69).   Steinhauer explained that the District provided broader opt outs, including for nonreligious reasons like therapy dogs, PG movies and sex ed topics.   *Id.*   Steinhauer testified the

broader opt outs were a long-standing practice in the District.  *Id.* at 70; ECF No. 95-9 at 72 (Irvin testifying that opt outs for growth and development were a long-standing practice).

Steinhauer explained that notice and opt outs were "always teacher prerogative."  (ECF 95-21 at 67-70).  He testified:  "We [i.e., the District] don't have any specific guidelines for what you should notify parents about and not notify parents about."  *Id.*  Steinhauer confirmed there were no written procedures about notice to parents.  *Id.*

Wyland testified he was not aware of any written operational guideline (i.e., a written procedure implementing a School Board policy) from the District's administration telling principals and teachers to provide advance notice if the subject of gender identify is to be taught, or any written directive from the administration prohibiting the subject of gender identity from being taught. Ps' ¶ 25.

H.  Settlement of the Preliminary Injunction

On June 16, 2022, Plaintiffs filed a motion for preliminary injunction ("PI") to prevent Defendants from presenting instruction on gender identity without notice and opt out rights for the Parents.  (ECF No. 5).  The parties amicably resolved the motion and on June 28, 2022, the court entered a stipulated order (ECF No. 12).

Defendants agreed to "provide, at a minimum, one (1) week written notice (by email) to Plaintiffs of the intention to provide instruction or information on the topics of gender identity or gender transitioning."  (ECF No. 12).  Defendants did not admit liability and the order specified it was "entered into for the purpose of obviating a request or need for preliminary injunctive relief pending the adjudication of those claims."  (ECF No. 12).

The agreement has been in place for approximately two years.  There is no evidence in

the record that the agreement is unworkable or imposes any burden on Defendants.[11]

I.   August 2022 written procedure for opt out requests

Effective August 29, 2022, Steinhauer and Irvin created a document entitled "Principal Responsibilities Regarding Parental Requests for Students Excusal from Instruction for Religious Objection." ("August 2022 written procedure")  (ECF No. 95-34).  After March 31, 2022, this is the only written procedure created by District representatives addressing how to handle parental opt out requests. Ps' ¶¶ 41-42.

The August 2022 written procedure does not provide for advance notice to parents of planned instruction topics so that they can decide whether or not to opt out their children.  Ps' ¶ 46.  The August 2022 written procedure only permits a parent to opt out a child if they have a religious objection. Ps' ¶ 48.  If the parental objection is nonreligious, the opt out should not be approved.  Ps' ¶¶ 49, 50.

In pertinent part, principals were instructed to ensure that opt out requests included all the following: (1) children names; (2) the exempted curriculum topics were clearly stated and understandable; and (3) a religious objection.  Principals were cautioned that if requests did not contain all the required information, those forms should not be signed, but instead be returned to parents.  In particular, if the request used a sample form circulating in the community that referenced the stipulated agreement to resolve the PI (discussed above), rather than stating a religious objection, the opt out request should be denied.

---

[11] As set forth above, on May 5, 2022, Steinhauer and Irvin verbally directed elementary principals and teachers to ensure that parents would be provided notice and the opportunity to opt out of instruction involving "controversial subjects." Ds' ¶ 113. There is no evidence that this directive imposed any burden on Defendants.

J.   The 2023-2024 "Disclaimer"

For the 2023-24 school year, the "Parental Rights" notification on the District website

contains a "Disclaimer" which indicates, in relevant part:

> [T]he District curriculum **may** include instruction or discussion on a wide array of
> topics including race, color, age, creed, religion, sex, gender, **gender identity**,
> sexual orientation, ancestry, national origin, familial status, language, genetic
> information, pregnancy, or handicap or disability, **even if such instruction is not
> specifically identified in the published Curriculum**. Parents/guardians who
> wish their child(ren) to be excused from specific instruction on these or any other
> topics because they conflict with their **religious beliefs** should notify their
> child(ren)'s principal in writing.

Ps' ¶ 39 (emphasis added).

For the 2023-24 school year, the published Curriculum for Elementary School that is

available to parents via the District website and Atlas portal still does not mention instruction on

gender identity. Ps' ¶ 40.  Steinhauer agreed that the Disclaimer puts the burden on parents to

object to something that is not in the curriculum.  (ECF No. 110-12 at 67) (Q: "The onus is on

the parent to tell the district I don't want x subject matter taught to my child?" A: "Yes.").

Steinhauer also agreed that parents can opt out only for religious reasons.  *Id.*


**V.   Summary judgment standard**

The standard for resolving cross-motions for summary judgment was set forth in *Arconic

Corp. v. Novelis Inc.,* No. CV 17-1434, 2023 WL 5510574, at *1–2 (W.D. Pa. Aug. 25, 2023):

> In *Wilczek v. Phillips 66 Co*., No. CV 19-17374, 2023 WL 3644652
> (D.N.J. May 25, 2023), the court recently reviewed the general summary
> judgment standard:
>
> > Federal Rule of Civil Procedure 56(a) provides that summary
> > judgment should be granted "if the movant shows that there is no genuine
> > dispute as to any material fact and the movant is entitled to judgment as a
> > matter of law." *See Kreschollek v. S. Stevedoring Co*., 223 F.3d 202, 204
> > (3d Cir. 2000); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986).

In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. Cnty. of Allegheny Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998) (citing *Peters v. Delaware River Port Auth. of Pa. & N.J.*, 16 F.3d 1346, 1349 (3d Cir. 1994)).

The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof ... the burden on the moving party may be discharged by 'showing' — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. Once the moving party has met that threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also* Fed. R. Civ. P. 56(c) (setting forth types of evidence on which nonmoving party must rely to support its assertion that genuine issues of material fact exist).

Unsupported allegations, subjective beliefs, or argument alone cannot forestall summary judgment. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1988) (nonmoving party may not successfully oppose summary judgment motion by simply replacing "conclusory allegations of the complaint or answer with conclusory allegations of an affidavit."); *see also Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326, 330 (3d Cir. 1995) ("[T]he nonmoving party creates a genuine issue of material fact if it provides sufficient evidence to allow a reasonable jury to find for him at trial."). Thus, if the nonmoving party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial ... there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co*., 972 F.2d 53, 55, n.5 (3d Cir. 1992) (quoting *Celotex,* 477 U.S. at 322-23*).

*Id.* at *1-2*.  In *Moore v. Walton*, 96 F.4th 616 (3d Cir. 2024), the Third Court of Appeals recently explained: "A genuine dispute exists when the evidence is such that a reasonable jury could return a verdict for the nonmoving party, and a fact is material if it might affect the outcome of the suit under the governing law." *Id.* at 622 (internal punctuation and citations omitted).

VI.  **Discussion**

A.  The remaining claims

The following claims remain in the case: (1) Substantive Due Process (parental rights) claims against all remaining Defendants (count I); (2) Procedural Due Process claims against all remaining Defendants (count II); (3) familial privacy claims against Williams and the District (count III); (4) First Amendment Free Exercise of Religion claims against all remaining Defendants (count IV); (5) Equal Protection claims against Steinhauer, Irvin, Wyland and the District (count IV); and (6) a request for declaratory judgment (count VI).[12]

Plaintiffs seek summary judgment on all claims, except the familial privacy claim. Plaintiffs seek only nominal monetary damages for the violations of their constitutional rights and declaratory relief to prevent future violations of their constitutional rights.  Defendants oppose Plaintiffs' entitlement to any relief and seek summary judgment in favor of all Defendants on all claims.  Both parties assert that summary judgment is appropriate because the material facts are not in dispute.  (ECF No. 127 at 5; ECF No. 93 at 23). The court will address each remaining claim, but first will address: (a) an overview of § 1983 claims; (b) the standards for municipal and supervisory liability; (c) the claims against Wyland; and (d) the standards for qualified immunity, which will need to be addressed for each claimed constitutional violation.

B.  Section 1983 Overview

Plaintiffs assert all their constitutional claims under § 1983, which provides a mechanism for enforcing individual rights secured by the Constitution. *Gonzaga Univ. v. Doe*, 536 U.S. 273, 285 (2002).  To prevail on a § 1983 claim, a plaintiff must plead: (1) a deprivation of a right, privilege or immunity secured by the Constitution or laws of the United States; and (2) the

---

[12] The children's right to privacy claim in count V was dismissed without prejudice.

conduct complained of was committed by a person acting under the color of state law.  42 U.S.C. § 1983.  In this case, Defendants do not dispute that they acted under the color of state law. Defendants vigorously assert, however, that they did not infringe the Parents' constitutional rights.

Plaintiffs assert violations of their rights under the Fourteenth Amendment to the United States Constitution with respect to Substantive Due Process, Procedural Due Process, familial privacy, and Equal Protection and under the First Amendment to the United States Constitution with respect to Free Exercise of Religion.  The Fourteenth Amendment provides, in relevant part:

> No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

U.S. Const. Amend. XIV.  The First Amendment provides, in relevant part:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof....

U.S. Const. Amend. I.

The protections in the Bill of Rights (including the Free Exercise clause) are made applicable to state actors through the incorporation doctrine under the Fourteenth Amendment. *See Timbs v. Indiana*, 586 U.S. 146, 150 (2019) ("With only 'a handful' of exceptions, this Court has held that the Fourteenth Amendment's Due Process Clause incorporates the protections contained in the Bill of Rights, rendering them applicable to the States.").  In *West Virginia Board of Education v. Barnette*, 319 U.S. 624 (1943), the Supreme Court noted the importance of distinguishing between the Due Process clause of the Fourteenth Amendment when "it is applied for its own sake" and when it serves as "an instrument for the First Amendment." *Id.* at 639.  States may restrict First Amendment rights raised by way of the Fourteenth Amendment

"only to prevent grave and immediate danger to interests which the state may lawfully protect." *Id.* Defendants did not articulate any grave or immediate danger to protected interests in this case.

### C. Municipal and supervisory liability/ ratification

#### 1. Municipal liability

The Supreme Court outlined the standards for municipal liability in *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978).  In *G.S. v. Penn-Trafford School District*, No. 20-3281, 2023 WL 4486667 at *3 (3d Cir. July 12, 2023) (reversing dismissal of a *Monell* claim against a school district), the Third Circuit Court of Appeals explained: "A school district may incur *Monell* liability under Section 1983 for a violation of an individual's constitutional rights when it implements an official policy or custom that results in a constitutional deprivation."  The court noted that if an official without policymaking authority violates a plaintiff's constitutional rights, a municipality can be held liable "if the final policymaker either acquiesced in the subordinate's decisions or delegated authority to him or her."  *Id.* at *4; *accord Kelly v. Borough of Carlisle*, 622 F.3d 248, 264 (3d Cir. 2010) (subordinate's decisions can only establish policy "if a municipal policymaker delegated power to the employee or ratified his decision.").

#### 2. Ratification

In *G.S.*, the court recognized: "the Supreme Court held in *City of St. Louis v. Praprotnik*, 485 U.S. 112, 142 (1988) that '[i]f the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final.'"  *G.S.,* 2023 WL 4486667 at *4 n. 34.  In *G.S.*, the court held that the parent-

plaintiff stated a claim "that the administrators' 'clear message' became policy when the School

District's superintendent reviewed and approved [her child's] suspension." *Id.* at *4.

In *Praprotnik*, the Court explained:

> When an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departures from them, are the act of the municipality. Similarly, when a subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with their policies. If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final.

*Praprotnik*, 485 U.S. at 127.

> A municipality "will be liable if an official with authority has ratified the unconstitutional actions of a subordinate, rendering such behavior official for liability purposes." *McGreevy v. Stroup*, 413 F.3d 359, 367 (3d Cir. 2005) (citing *Praprotnik*, 482 U.S. at 127). Ratification occurs "only 'when a subordinate's decision is subject to review by the municipality's authorized policymakers [because] they have retained the authority to measure the official's conduct for conformance with their policies.'" *Kelly v. Borough of Carlisle*, 622 F.3d 248, 264 (3d Cir. 2010) (citing *Praprotnik*, 485 U.S. at 127).

*Martin v. Harveys Lake Bor.*, No. 3:20CV330, 2024 WL 387685, at *6 (M.D. Pa. Jan. 31, 2024).

In *Starbuck v. Williamsburg James City County School Board*, 28 F.4th 529 (4th Cir. 2022), the

court explained:

> the entire concept of ratification liability presupposes that the initial complained-of conduct precedes involvement by the final policymaking authority. Accordingly, neither the Supreme Court nor this Court has ever held that initial involvement is required to hold officials with final policymaking authority liable as the "moving force" for ratification of the decisions of subordinates.

*Id.* at 535.

Ratification can occur if the subordinate's decision is "cast in the form of a policy

statement and expressly approved by the supervising policymaker." *Praprotnik*, 485 U.S. at

130. In that case, "the supervisor could realistically be deemed to have adopted a policy that

happened to have been formulated or initiated by a lower-ranking official." *Id.*

### 3. Supervisory liability

"Supervisory liability under § 1983 utilizes the same standard as municipal liability." *Richardson v. Clark*, No. 1:22-CV-00029, 2024 WL 1258653, at *6 (M.D. Pa. Mar. 25, 2024) (citing *Carter v. City of Philadelphia*, 181 F.3d 339, 356 (3d Cir. 1999)).  To be liable under § 1983, Plaintiffs must show the supervisor "participated in violating their rights, or that he directed others to violate them, or that he, as the person in charge [ ], had knowledge of and acquiesced in his subordinates' violations." *Baker v. Monroe Twp.*, 50 F.3d 1186, 1190–91 (3d Cir. 1995).

### D. Claims against school board member Wyland

Defendants argue that summary judgment should be granted in favor of Wyland on all claims against him.  They contend that as an individual school director, he had no supervisory or policy-making authority (ECF No. 113 at 18 n.4).  Plaintiffs did not respond to this argument.

The court agrees that Wyland is entitled to summary judgment on all claims against him. There is no evidence, on this record, that Wyland had any personal involvement in the alleged constitutional violations beyond expressing his personal opinions at public school board meetings.  As a single school director, Wyland did not exercise supervisory or policy-making authority.  As explained in *Deltondo v. School District of Pittsburgh*, No. CV 2:22-350, 2023 WL 2876812 (W.D. Pa. Jan. 30, 2023), report and recommendation adopted, No. 2:22-CV-350, 2023 WL 2534817 (W.D. Pa. Mar. 16, 2023):

> With respect to claims against the School Board members in their individual capacities, the Supreme Court has held that, "to establish personal liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right." *Melo v. Hafer*, 502 U.S. 21, 25 (1991)

> (citation omitted). However, individual School Board members cannot terminate a teacher's employment and can only do so by voting as a group. *See* 24 P.S. § 5-508 ("The affirmative vote of a majority of all the members of the board of school directors in every school district, duly recorded, showing how each member voted, shall be required in order to ... [d]ismiss a teacher after a hearing.") A single member of a governing body cannot be held liable for decisions that are made by the body as a whole.

*Id.* at *14.   In *LaVerdure v. County of Montgomery*, 324 F.3d 123, 125 (3d Cir. 2003) (addressing a similar situation involving one member of a three-member board), the court explained:

> only a majority of the three-member Board is authorized to establish policy on behalf of the County. 16 Pa. Cons. Stat. § 504. Therefore, whatever the contents of Marino's statements, because he was only one member of the Board, those comments do not constitute County policy. *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 123, 108 S. Ct. 915, 99 L.Ed.2d 107 (1988) ("[O]nly those municipal officials who have 'final policymaking authority' may by their actions subject the government to § 1983 liability.").

Under Pennsylvania law, "[t]he affirmative vote of a majority of all the members of the board of school directors in every school district, duly recorded, showing how each member voted, shall be required in order to take action on the following subjects: . . . Appointing or dismissing district superintendents, assistant district superintendents, associate superintendents, principals, and teachers; . . . Adopting courses of study . . . ." 24 Pa. Cons. Stat. § 5-508.

Here, there is no evidence that Wyland knew about Williams' in-class conduct in advance.  There is no evidence that the School Board delegated Wyland to act on its behalf. Developing policies, adopting courses of study and supervising the actions of the superintendent were roles for the board as a whole, and Wyland had only one vote.  Accordingly, viewing the evidence in the light most favorable to Plaintiffs, no reasonable jury could render a verdict in favor of Plaintiffs on their claims against Wyland and summary judgment must be entered in favor of Wyland and against Plaintiffs on all claims against Wyland in his individual capacity.

E. Standards for Qualified Immunity

Qualified immunity is an affirmative defense, which a defendant has the burden to establish by a preponderance of the evidence. *Halsey v. Pfeiffer*, 750 F.3d 273, 288 (3d Cir. 2014) ("we follow the general rule of placing the burden of persuasion at a summary judgment proceeding on the party asserting the affirmative defense of qualified immunity."). Whether qualified immunity exists is a question of law for the court, although when qualified immunity depends on disputed issues of fact, those issues must be determined by the jury. *Monteiro v. City of Elizabeth*, 436 F.3d 397, 405 (3d Cir. 2006). In this case, the parties did not point to any material disputes of fact about qualified immunity.

The doctrine of qualified immunity "shields governmental officials from suit and from liability if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mack v. Yost*, 63 F.4th 211, 221 (3d Cir. 2023) (quoting *Peroza-Benitez v. Smith*, 994 F.3d 157, 164-65 (3d Cir. 2021). The doctrine balances two interests: (1) holding public officials accountable when they exercise power irresponsibly; and (2) shielding "officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.*

In *Gruenke v. Seip*, 225 F.3d 290 (3d Cir. 2000), the court explained that the test for determining whether an allegedly violated right is clearly established "is not whether the current precedents protect the specific right alleged but whether the contours of current law put a reasonable defendant on notice that his conduct would infringe on the plaintiff's asserted right." *Id.* at 302. In *Clark v. Coupe*, 55 F.4th 167 (3d Cir. 2022), the court explained: "The dispositive question is whether the violative nature of the *particular* conduct is clearly established." *Id.* at 182 (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)) (emphasis in original).

The individual Defendants requested qualified immunity at the motion to dismiss stage, which the court denied without prejudice. The individual Defendants renew that request at the summary judgment stage and the court will address that request with respect to each pertinent claim.

Municipal entities, such as the District, "do not enjoy qualified immunity from suit for damages under § 1983." *Barna v. Bd. of Sch. Directors of Panther Valley Sch. Dist.*, 877 F.3d 136, 145 (3d Cir. 2017). In *Barna*, the court explained:

> Although not subject to respondeat superior liability, municipalities may be held directly liable under *Monell* if they adopt a custom or policy that is unconstitutional or that is the "moving force" behind any constitutional violation. *See Monell*, 436 U.S. at 694, 98 S.Ct. 2018; *Thomas v. Cumberland Cty.*, 749 F.3d 217, 222 (3d Cir. 2014). Municipalities can be held liable regardless of whether it was clear at the time of the policy's adoption that such conduct would violate a plaintiff's constitutional rights. *Owen*, 445 U.S. at 656–57, 100 S.Ct. 1398. Because liability may be imposed on a municipality separate and apart from the liability imposed on an individual officer, "[t]he precedent in our circuit requires the district court to review the plaintiffs' municipal liability claims independently of the section 1983 claims against the individual ... officers." *Kneipp v. Tedder*, 95 F.3d 1199, 1213 (3d Cir. 1996); *see also Fagan v. City of Vineland*, 22 F.3d 1283, 1292 (3d Cir. 1994) ("A finding of municipal liability does not depend automatically or necessarily on the liability of a police officer.").

*Barna*, 877 F.3d at 145 n.6.

### F. Constitutional claims

#### 1. Substantive due process (parental rights) (Count I)

Parents have a fundamental right to control the upbringing of their children. This parental right is protected under the Fourteenth Amendment to the United States Constitution by the Substantive Due Process doctrine. In *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228, 2242 (2022), the Supreme Court explained that the Due Process Clause "guarantee[s] some rights that are not mentioned in the Constitution, but any such right must be

'deeply rooted in this Nation's history and tradition' and 'implicit in the concept of ordered liberty.'" *Id.* at 2242 (quoting *Glucksberg*, 521 U.S. at 721).

The parental right to custody, control and nurture of their children is deeply rooted and implicit in the United States' concept of ordered liberty.   The Supreme Court repeatedly emphasized the fundamental nature of that parental right. *See* ECF No. 38 at 19-23 (quoting numerous Supreme Court decisions); *see*, *e.g., Pierce v. Society of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 535 (1925) ("The child is not the mere creature of the state; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations."); *Prince v. Massachusetts*, 321 U.S. 158 (1944) ("It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder .... And it is in recognition of this that these decisions have respected the private realm of family life which the state cannot enter."); *Wisconsin v. Yoder*, 406 U.S. 205 (1972) ("The history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children. This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition.").   In *Troxel v. Granville*, 530 U.S. 57, 65 (2000), the Supreme Court stated:   "[T]he interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court."   As this court observed in its earlier opinion:

> These repeated pronouncements from the Supreme Court are not simply platitudes or mere surplusage, which may be given lip service and brushed aside.   The Supreme Court clearly recognized that the right of parents to control the upbringing and education of their children is fundamental.   This right is deeply rooted in the nation's history and implicit in the concept of ordered liberty.

ECF No. 38 at 23.

This case involves the assertion of parental rights in the context of a public school. In

*Edwards v. Aguillard*, 482 U.S. 578 (1987), the Supreme Court summarized the social contract

between parents and public schools:

> Families entrust public schools with the education of their children, but condition their trust on the understanding that the classroom will not purposely be used to advance religious views that may conflict with the private beliefs of the student and his or her family. Students in such institutions are impressionable and their attendance is involuntary. *See, e.g., Grand Rapids School Dist. v. Ball*, 473 U.S. 373, 383, 105 S.Ct. 3216, 3222, 87 L.Ed.2d 267 (1985); *Wallace v. Jaffree*, 472 U.S. 38, 60, n. 51, 105 S.Ct. 2479, 2492, n. 51, 86 L.Ed.2d 29 (1985); *Meek v. Pittenger*, 421 U.S. 349, 369, 95 S.Ct. 1753, 1765, 44 L.Ed.2d 217 (1975); *Abington School Dist. v. Schempp*, 374 U.S. 203, 252–253, 83 S.Ct. 1560, 1587– 1588, 10 L.Ed.2d 844 (1963) (Brennan, J., concurring). The State exerts great authority and coercive power through mandatory attendance requirements, and because of the students' emulation of teachers as role models and the children's susceptibility to peer pressure.

*Id.* at 584.

The fundamental parental right is distinct from the First Amendment right to Free

Exercise of Religion, although many of the decisions involving education of children implicate

both rights.[13] Defendants argue, citing the Pennsylvania School Code, 22 Pa. Code § 4.4, that a

school is required to provide opt out rights only for religious reasons. (ECF No. 127 at 17-18).

The scope of federal constitutional rights, however, "is defined by the Constitution and may not

be restricted by a state legislature or by state education officials." *C.N.*, 430 F.3d at 178. In

*Fairchild v. Liberty Indep. Sch. Dist.*, No. 1:06-CV-92, 2008 WL 11446526, (E.D. Tex. Feb. 11,

2008), the court explained: "It is important to remember that even if the [state statute]

sanctioned the Board's policies and actions, Constitutional guarantees would still trump the

---

[13] The Third Circuit Court of Appeals has rejected the "hybrid rights" theory. *See Combs v. Homer-Center Sch. Dist.*, 540 F.3d 231, 247 (3d Cir. 2008) ("Until the Supreme Court provides direction, we believe the hybrid-rights theory to be dicta").

statute." *Id.* at *11.  In this case, all Plaintiffs (including Dunn) have cognizable rights under the Substantive Due Process doctrine because the policy burdens their fundamental parental rights. The state regulation and District Policy I(F) are underinclusive because they do not recognize the fundamental parental rights of nonreligious parents.  Put another way, both parents with religious beliefs (like Tatel and Melton) and parents who do not assert religious beliefs (like Dunn) possess fundamental parental rights under the Substantive Due Process doctrine.

The extent of parents' substantive due process rights under the United States Constitution is a legal question for the court.  *Marbury v. Madison*, 5 U.S. 137, 177 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is.").  In *C.N. v. Ridgewood Board of Education*, 430 F.3d 159 (3d Cir. 2005) ("*C.N.*") [14], the court recognized that "[t]he Supreme Court has never been called upon to define the precise boundaries of a parent's right to control a child's upbringing and education." *Id.* at 182.

The Third Circuit Court of Appeals recognizes and respects parental rights as primary and fundamental, but those rights are not absolute or unlimited.  In *Gruenke*, the court commented:

> Notwithstanding these near-absolutist pronouncements, the [Supreme] Court has also recognized that for some portions of the day, children are in the compulsory custody of state-operated school systems. In that setting, the state's power is "custodial and tutelary, permitting a degree of supervision and control that could not be exercised over free adults." *Vernonia Sch. Dist. v. Acton*, 515 U.S. 646, 655, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995).

*Gruenke*, 225 F.3d at 304.  "Thus, there may be circumstances in which school authorities, in order to maintain order and a proper educational atmosphere in the exercise of police power, may impose standards of conduct on students that differ from those approved by some parents." *Id.* [15]

---

[14] In the initial motion to dismiss opinion, this decision was referred to as "*Ridgewood,*" but in this opinion and hereafter, it will be referred to as "*C.N.*"

[15] There is no evidence in this record that Williams' instruction was necessary to maintain order and a

In *Combs* (involving a challenge to home schooling regulations), the court explained that parents "do not have a constitutional right to control **each and every** aspect of their children's education and oust the state's authority over that subject."  540 F.3d at 248 (emphasis added).

If government action infringes on a fundamental right, courts apply strict scrutiny. *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997) ("the Fourteenth Amendment 'forbids the government to infringe ... 'fundamental' liberty interests *at all*, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest.'") (citation omitted, emphasis in original). In this case, Defendants argue that the Parents' asserted rights are not fundamental, and therefore, only rational basis review[16] applies.  Defendants contend that the Parents' beliefs are not relevant because the Parents' rights stop at the schoolhouse door.  That argument was specifically rejected by the Third Circuit Court of Appeals in *C.N.*:

> [W]e do not hold, as did the panel in *Fields v. Palmdale School District*, 427 F.3d 1197 (9th Cir. 2005), that the right of parents under the *Meyer–Pierce* rubric "does not extend beyond the threshold of the school door." *Id.* at 1207. Nor do we endorse the categorical approach to this right taken by the *Fields* court, wherein it appears that a claim grounded in *Meyer–Pierce* will now trigger only an inquiry into whether or not the parent chose to send their child to public school and if so, then the claim will fail.

*C.N.*, 430 F.3d at 185 n.26.

Defendants' continued reliance on decisions from other circuits is misplaced. As explained in the court's previous opinions in this case (ECF Nos. 38, 55), there is a circuit split between the Court of Appeals for the Third Circuit's respect for the primacy of parental rights and the school-primacy approach taken in other circuits.[17]

---

proper educational atmosphere.
[16] Under rational basis review, the state action will be upheld if it is rationally related to any legitimate state interest.  *See infra* at 76.
[17] As this court previously observed:

Third Circuit Court of Appeals' precedent recognizes that when conflicts occur between parents and public schools on matters of the greatest importance, the Parents' rights prevail unless the public school can demonstrate a compelling interest for its actions. *C.N.*, 430 F.3d at 184; *Gruenke*, 225 F.3d at 305. The Third Circuit Court of Appeals reminded public schools that:

> [p]ublic schools must not forget that 'in loco parentis' does not mean 'displace parents.' **It is not educators, but parents who have primary rights** in the upbringing of children. School officials have only a secondary responsibility and **must respect** these rights. **State deference to parental control over children** is underscored by the [Supreme] Court's admonitions that the child is not the mere creature of the State, and that **it is the Parents' responsibility to inculcate moral standards, religious beliefs, and elements of good citizenship**.

*C.N.*, 430 F.3d at 183 (quoting *Gruenke*, 225 F.3d at 304, 307) (emphasis added).[18]

---

The holding in *Parker [v. Hurley*, 514 F.3d 87 (1st Cir. 2008)] and *Fields [v. Palmdale School District*, 427 F.3d 1197 (9th Cir. 2005), underlined on denial of rehearing, 447 F.3d 1187 (9th Cir. 2006),] that parents forfeit their rights at the schoolhouse door and retain only the right to decide whether or not to send their children to public school may be fundamentally unfair to parents who in reality do not have that choice. Many people cannot afford to pay for private school for their children and may be working parents or may not be educationally or otherwise able to home school their children. For many, particularly those of limited means or education, public school is effectively mandatory. *Edwards*, 482 U.S. at 584. Constitutional rights should not be analyzed in a way that benefits only socially and economically advantaged persons. In sum, the court in *Parker* did not persuasively apply Supreme Court precedent about the fundamental nature of the parental rights at issue and how to balance those rights with the interests of a public school in a pluralistic society. *See Kennedy [v. Bremerton School District*, 597 U.S. 507 (2022)], 142 S. Ct. at 2431 (rule suppressing religious expression "would undermine a long constitutional tradition under which learning how to tolerate diverse expressive activities has always been 'part of learning how to live in a pluralistic society.'").

ECF No. 38 at 38.

[18] Defendants' reliance on *McCurdy v. Dodd*, 352 F.3d 820 (3d Cir. 2003), is misplaced. That decision did not involve the parental right to control the education and upbringing of a minor child. In *McCurdy*, a father asserted a parental rights claim arising from a police shooting of his adult son. The father was in jail at the time of the incident, did not provide any meaningful financial support for his son or list his son as a dependent on his income tax returns. It was unclear whether he ever resided with his biological son or performed any parental duties. *Id.* at 823. The court held: "we hold that the fundamental guarantees of the Due Process Clause do not extend to a parent's interest in the companionship of his **independent adult** child." *Id.* at 830 (emphasis added). There is no evidence adduced in the pending motions that

Within the Third Circuit, courts (and school officials) must distinguish "between actions that strike at the heart of parental decision-making authority on matters of the greatest importance and other actions that, although perhaps unwise and offensive, are not of constitutional dimension." *C.N.*, 430 F.3d at 184.  In *J.S. ex rel. Snyder v. Blue Mountain School District*, 650 F.3d 915 (3d Cir. 2011), the court emphasized that "the threshold for finding a conflict will not be as high when the school district's actions "strike at the heart of parental decision-making authority on matters of the greatest importance."  *Id.* at 933-34.

If a conflict occurs on a matter of greatest importance, the school must recognize and respect the primacy of the parental rights:

> It is not unforeseeable, therefore, that a school's policies might come into conflict with the fundamental right of parents to raise and nurture their child. But when such collisions occur, the primacy of the Parents' authority must be recognized and should yield only where the school's action is tied to a compelling interest.

*Gruenke*, 225 F.3d at 305.

In *C.N.*, in discussing an issue related to a survey given to middle school and high school students, the court recognized that "introducing a child to sensitive topics before a parent might have done so herself can complicate and even undermine parental authority."  430 F.3d at 183. In other words, the burden is on the school – not the Parents – to foresee areas in which the school's policies might conflict with parents' fundamental rights.  In the event of a conflict, the school must either: (1) recognize the primacy of parents' authority; or (2) articulate a compelling interest for the school's action.  *Gruenke*, 225 F.3d at 305.

---

Plaintiffs were similarly uninvolved with their dependent young children.  In any event, *McCurdy* could not overrule *Gruenke*.  *See* Third Circuit IOP 9.1 ("no subsequent panel overrules the holding in a precedential opinion of a previous panel").

In this case, the parties agree that "what occurred in Williams' classroom on March 31, 2022 is well established by the evidentiary record." ECF No. 113 at 8. It is undisputed that neither the curriculum section of the District's website nor the information available to parents in the relevant period referred to teaching transgender topics to elementary students. Ps' ¶ 8. It is also undisputed that Williams gave Parents no notice or opportunity to opt their children out of her instruction about transgender topics. Plaintiffs are not trying to control each and every aspect of their children's education – only noncurricular teaching to their young children about a sensitive topic. The Parents only seek relief related to their children and recognize other parents may choose not to opt their children out of instruction about sensitive topics, like transgender issues. In other words, the Parents seek only to have effective prior notice and the ability to opt their own young children out of that kind of instruction.

The court applies Third Circuit Court of Appeals' precedent to the undisputed facts. The court considers whether: (1) there are conflicts; (2) they rise to constitutional dimension, i.e., strike at the heart of parental decision-making authority on matters of the greatest importance; and (3) if so, the school's action is tied to a compelling interest. *C.N.*, 430 F.3d at 184; *Gruenke*, 225 F.3d at 305 (if a school's policies come into conflict with the fundamental right of parents to raise and nurture their child, "the primacy of the Parents' authority must be recognized and should yield only where the school's action is tied to a compelling interest."). Defendants recognize that their conduct conflicts with Plaintiffs' beliefs. Defendants argue, however, that the conflicts do not implicate the Constitution because parents' rights stop at the schoolhouse door.

    a. The school's actions conflict with the Parents' beliefs

There are several conflicts between the Parents and Defendants. The court will discuss

three disagreements asserted by the Parents: (1) Williams' statements that "he is now a she"; (2) Williams' statement that "when children are born, parents make a guess whether they're a boy or a girl.  Sometimes parents are wrong," Ps' ¶ 99; and (3) Williams' unilateral decision to introduce these topics to her first-grade students.

> i. "He is now a she"

The Parents object to Williams' instruction that a boy can choose to become a girl, or vice versa.  The Parents disagree that gender is a subjective, individual choice.  They assert that gender is objective, immutable and determined by God and biology.

Tatel testified:  "I believe that God created us in his image.  He created man and woman and body and soul are the same.  So I don't think that it's possible to have a boy brain and a girl body or a boy body and girl brain. . . . I think to do something to your body to change what God created you as would be a sin."  (ECF No. 95-1 at 27).  Tatel stated:  "I don't think that there is any way that someone who is born male, with male chromosomes, could ever become a female."  *Id.*  Tatel testified:

> Yeah, kids don't choose their sex. Right? Parents don't choose their kids' sex. I've already told you, I believe that God gives you the sex. God creates you male or female. This is implying that we -- both the child and the mother, they made a mistake about what God gave them.

(ECF No. 123-1 at 68).

Melton testified:  "I believe that God created men and women.  When he created us, he created our bodies and spirits.  Both are either male or female.  I do not believe that God created a male body with a female spirit in it.  I believe that those two match and that is who we are.  That is the gender that you are when you are born."  (ECF No. 95-2 at 10).  Melton stated:  "I personally don't believe that a man can become a woman or a woman can become a man."  *Id.* at 11.

Dunn succinctly explained her moral beliefs about gender:  "You're born what you're born when you come into this world, and that's that."  (ECF No. 95-3 at 20).

Williams' statement to her first-grade students that "he is now a she" is directly contrary to Plaintiffs' beliefs about gender.

ii.   Parents guess and sometimes are wrong about a child's gender

Plaintiffs object to Williams' instruction that "when children are born, parents make a guess whether they're a boy or a girl. Sometimes parents are wrong." Ps' ¶ 99.  Williams read to the first-grade students the books <u>Aidan</u> and <u>Introducing Teddy</u>, which presented gender as the child's or transgender character's choice, about which parents can be mistaken.  *See, e.g.*, Ps' ¶ 94 ("we [the Parents] didn't know you were going to be our son. We made some mistakes but you helped us fix them."); Ps' ¶ 99; ECF No. 95-59 at 13; ECF No. 95-60 at 13-14.   Williams reinforced that presentation in her comments to the students described above.  This conflict implicates the dynamics of the Parents' relationship with their children.[19]

Plaintiffs assert that a young child's gender is a parental decision, based upon the Parents' religious or moral beliefs, not a young child's decision.  Plaintiffs dispute the idea that a child the age of the characters in <u>Aidan</u> and <u>Introducing Teddy</u> has the maturity to understand that the teacher's statements conflict with the Parents' religious and moral beliefs and that the teacher could be wrong in instructing that a child determines the child's own gender.

Plaintiffs testified they believed it was their role, as parents, to make decisions about gender identity on behalf of their children until the children have enough maturity to make that kind of decision for themselves.  *See* Melton Deposition (ECF No. 110-9 at 70) ("I don't think children – they don't have the maturity.  That's why they're our children and that's why they

---

[19] As discussed above, the Parents dispute that gender is a "guess" and assert it is an objective reality.

have parents, to help them learn and grow and experience the world, because they can't do it on their own."); Tatel Deposition (ECF No. 123-1 at 70) (" As a parent, it's my job to keep the guide rails in place, to keep her safe, to make sure she stays on the right path both morally and as a human being, a citizen.").

Melton testified:  "We believe that God sent those kids to us to raise them, to instill morals and values and teach them how to be good people and to help them create a value system and morality system for their life. . . . When a teacher steps in and starts teaching things that are contrary to the value system that I believe, that's an – it infringes upon my right as a parent to teach that to my own child."  (ECF No. 95-2 at 15-16).

Williams' instruction that a parent may be wrong about a young child's gender conflicts with the Parents' beliefs about their role as parents to make decisions about their young children.

### iii.   What age to introduce transgender topics

Plaintiffs object to Williams' unilateral decision to present transgender topics to their first-grade children without their permission.  Melton testified:  "I am responsible for introducing topics at appropriate times for my children when I know that they're ready and capable of understanding those topics."  (ECF No. 95-2 at 16).

As Dunn testified, Williams' conduct caused Dunn "to have uncomfortable conversations with my first grader that I shouldn't have to have in the first place."  (ECF No. 123-2 at 66). Tatel was able to explain her beliefs with her daughter, but her child remained confused.  (ECF No. 110-3 at 147).  Absent Williams' conduct, Tatel would not have discussed gender identity with her child.  (ECF No. 110-3 at 148.)

Williams' decision to introduce transgender topics to her first-grade students was in conflict with the Parents' belief that their children were too young to discuss gender identity

issues.

        b.   An important matter of parental decision-making

The crux of this case is whether the conflicts implicate the Parents' constitutional rights.

Defendants posit that Williams' conduct consisted merely of reading two books and having two

short discussions on March 31, 2022.  Defendants argue that her conduct was "perhaps unwise

and offensive, [but was] not of constitutional dimension."  *C.N.*, 430 F.3d at 184.  Plaintiffs

contend that the issues in this case "strike at the heart of parental decision-making authority on

matters of the greatest importance."  *Id.*

The court must consider the young age of the children and the nature of the conflicts

discussed above about: (1) forming the children's core identity; (2) the Parents' role and

authority in forming their young children's gender identity (i.e., suggesting parents make a guess

and children can fix parents' mistakes about whether their own child is a boy or girl); and (3) the

Parents' authority to decide when to discuss transgender topics with their children.

        i.     Plaintiffs' children were in first-grade

In *Busch v. Marple Newtown School District*, 567 F.3d 89 (3d Cir. 2009), the Third

Circuit Court of Appeals recognized that the age of the children being instructed is an important

factor in evaluating parental constitutional rights:

> "While secondary school students are mature enough and are likely to understand
> that a school does not endorse or support speech that it merely permits on a
> nondiscriminatory basis, kindergartners and **first graders are different**." *Id.* at
> 277 (internal quotation marks and citation omitted). **For elementary school
> students, "the line between school-endorsed speech and merely allowable
> speech is blurred, not only for the young, impressionable students but also
> for their parents who trust the school** to confine organized activities to
> legitimate and pedagogically-based goals." *Id.*

*Id.* at 96 (quoting *Walz ex rel. Walz v. Egg Harbor Twp. Bd. of Educ.*, 342 F.3d 271 (3d Cir.

2003)) (emphasis added).  In *Walz*, which upheld restrictions on an elementary student's ability

to pass out candy canes[20] and pencils with religious messages, the court noted that "the age of the students bears an important inverse relationship to the degree of control a school may exercise: as a general matter, the younger the students, the more control a school may exercise." 342 F.3d at 276 (citing *Sch. Dist. of Abington Twp., Pa. v. Schempp*, 374 U.S. 203, 290–91 n. 69 (1963) (Brennan, J., concurring) ("[T]he susceptibility of school children to prestige suggestion and social influence within the school environment varies inversely with the age, grade level, and consequent degree of sophistication of the child.").

In *Busch*, the court held that a school could prevent a mother from reading a Psalm as part of a "show and tell" activity.  The court explained that, for young children, speech by a student's parent "blurs 'the line between school-endorsed speech and merely allowable speech.'" 567 F.3d at 98 (quoting *Walz*); *cf. C.N.*, 430 F.3d at 187 (recognizing that public schools may require older students to state the arguments that could be made on both sides, to encourage critical thinking).

Here, the conduct at issue involves speech by a teacher that was part of noncurricular classroom instruction.  The concern that young students will believe an adult's statements to be endorsed by the school applies much more forcefully when the speaker is the child's teacher.  Young students respect their teacher as a role model and would trust that her messages were endorsed by the school.  *See Edwards*, 482 U.S. at 584 (public schools wield great power "because of the students' emulation of teachers as role models").  Parents of first-graders "trust the school to confine organized activities to legitimate and pedagogically-based goals." *Busch*, 567 F.3d at 96.

The court observed in *Busch*: "Parents of public school kindergarten students may

---

[20] The school prevented the student from passing out the candy canes during a class party, but allowed him to pass out the candy canes in the hallway and during recess. *Walz*, 342 F.3d at 280.

reasonably expect their children will not become captive audiences to an adult's reading of religious texts." *Id.* at 99.   That understanding would likewise apply when a teacher like Williams, absent a compelling governmental interest, speaks or reads books aloud[21] during first-grade classroom instruction about noncurricular matters Williams believes are correct, but are contrary to the Parents' religious and moral beliefs.

The conduct in this case, including noncurricular instruction by a first-grade teacher during classroom instructional time that "he is now a she" and "parents make a guess whether [their child is] a boy or a girl. Sometimes parents are wrong," Ps' ¶ 99, is more significant to the parent-child relationship and the child's identity than the conduct restricted in *Walz* (a child passing out candy canes and pencils with a religious message) or *Busch* (a parent reading a Psalm during "show and tell").[22]   In sum, the young age of the children amplifies concerns about infringements on Plaintiffs' fundamental parental rights.

ii.     The topic of transgender identity

Transgender identity is a controversial topic on which many people have strong, deeply-held and contradictory views.   *See, e.g., Doe by & through Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 522 (3d Cir. 2018) (gender identity implicates a person's "deep-core sense of self").   First-graders are unlikely to think critically about the differences between the competing views of gender identity.[23]   Who decides how to determine a young child's gender identity goes to the heart of parental decision-making authority on a matter of greatest importance.

---

[21] Williams could have played the videos of the books, but chose to show the video without sound while she read the books aloud.   Her conduct reinforced the teacher's role in the instruction.

[22] In this case, Williams provided notice to the parents of her students when the family of a student expressed interest in sharing their Hanukkah traditions with the class. Ps' ¶ 22.

[23] The District's curriculum defers "sex ed" instruction until fifth, eighth and eleventh grades (and provides explicit prior notice and opt out rights).   Steinhauer Deposition, ECF No. 95-21 at 69.

### iii.     Parents' authority over their young children

A teacher instructing first-graders and reading books to show that their parents' beliefs about their children's gender identity may be wrong directly repudiates parental authority. Williams' conduct struck at the heart of Plaintiffs' own families and their relationship with their own young children.  The books read and Williams' instruction to her first-grade students taught that gender is determined by the child – not, in accordance with the Parents' beliefs, by God or biological reality.   In <u>Aidan</u>, the parents admit they "made some mistakes" about whether their child was a boy or a girl, but the child "helped [the parents] fix them." Ps' ¶ 94.  As explained above, Plaintiffs believe they have a parental duty to make those kinds of decisions for their young children.

This case, unlike *Parker*, 514 F.3d at 87, involves not merely instruction to influence tolerance of <u>other</u> children or families, but efforts to inculcate a teacher's beliefs about transgender topics in Plaintiffs' <u>own</u> children.   Williams' conduct caused actual confusion among the children. Telling the students to talk to their parents about the child's gender – after telling the first-graders their parents might be wrong – did not eliminate the students' confusion in this case (Ps' ¶¶ 109-110, ECF No. 110-3 at 147) ("[S]he was still confused.  Because why would her teacher tell her something wrong?").

Concerns about undercutting parental authority are heightened when the children are in first grade and the person trying to influence them is their teacher.  *See Edwards*, 482 U.S. at 584 (public schools wield great power "because of the students' emulation of teachers as role models"); *Busch*, 567 F.3d at 96 (parents of first-graders "trust the school to confine organized activities to legitimate and pedagogically-based goals.").   The students' confusion in this case illustrates how difficult it is for a first-grader when a teacher's instruction conflicts with their

Parents' religious and moral beliefs. The heart of parental authority on matters of the greatest importance within their own family is undermined when a teacher tells first-graders their parents may be wrong about whether the student is a boy or a girl.

          iv.    Parental authority over when to discuss transgender topics

In *C.N.*, the court specifically recognized that parents' ability to decide when to raise sensitive topics with their children can be undermined when the topic is raised by a state actor before the parents make that decision. *C.N.*, 430 F.3d at 183 ("introducing a child to sensitive topics before a parent might have done so herself can complicate and even undermine parental authority."). In this case, Williams undermined parental authority by unilaterally deciding, without notice to the Parents, to read books and discuss with her young students that a "he is now a she" and that parents may be wrong about their child's identity.

The Parents being able to discuss with their children after the fact that they were not wrong about their children's identity cannot undo the infringement on their fundamental parental right to decide when to discuss sensitive topics that go to the heart of their relationship with their young children. The continuing effects of the infringement are demonstrated by the confusion Williams caused, e.g., a child asking the parent why the teacher would tell her something wrong. (ECF No. 110-3 at 147). In sum, the court concludes, based upon the record, a reasonable jury could only find that the undisputed conduct at issue "strike[s] at the heart of parental decision-making authority on matters of the greatest importance." *C.N.*, 430 F.3d at 184.

          c.  Compelling interest

The Third Circuit Court of Appeals instructed that strict scrutiny review applies to infringements on fundamental parental rights. *See Gruenke*, 225 F.3d at 305 (parental authority "should yield **only** where the school's action is tied to a **compelling interest**") (emphasis added).

Defendants' contention that only rational basis review applies (ECF No. 101 at 11-12) is directly contrary to precedential authority.

The government may not infringe on a fundamental right unless the infringement is narrowly tailored to serve a compelling state interest. *Washington*, 521 U.S. at 721. There is no evidence in the record to demonstrate a compelling interest for Williams to introduce transgender topics to first-graders outside the curriculum. There is no evidence that Williams' instruction was narrowly tailored to achieve a compelling interest.

As an initial matter, Defendants articulated no reason why that instruction was not disclosed in the curriculum. It is undisputed that the District's curriculum should guide classroom instruction, Ps' ¶ 5, and that for the 2021-22 and 2022-23 school years, nothing in the "Parental Rights" notification on the District website mentioned possible instruction on gender identity. Ps' ¶ 38.

There is no evidence in the record of a compelling interest to introduce transgender topics to first-graders or to tell the young students that their parents may be wrong about their identity. There is no evidence that transgender children were being bullied or discriminated against by any students in Williams' class (let alone by Plaintiffs' children). As of March 31, 2022, there was no reasonable expectation that Williams (or any other teacher) would be permitted to bring the teacher's child to her classroom for Take Your Child to Work Day.

> d.   Summary of Substantive Due Process claims against Williams

In this case, there are several complicating factors that implicate fundamental parental rights, including: (1) the young age of the children; (2) the topic that parents may be wrong about their children's identity, which strikes at the heart of parents' role in forming their young

children's identity; (3) the instruction not being disclosed in the curriculum; (4) the teacher's determined decision to broach the topic; and (5) the lack of notice to parents.

A reasonable jury could only conclude, based upon the evidence presented, that: (a) Williams did not defer to the primacy of the Parents' fundamental right to raise their young children;  instead, she made a conscious, intentional decision to observe Transgender Awareness Day by reading books to and discussing with her first-grade students that "he is now a she" and parents may be wrong about their children's gender identity, ECF 100-22; (b) Williams' instruction was not in the curriculum and was not an unanticipated, organic discussion prompted by a student question. Ps' ¶ 8, ECF Nos. 95-52, 95-59, 95-60.  Williams simply decided to celebrate Transgender Awareness Day by reading books which referred to parents making a mistake about their child's gender identity and reinforcing that statement by instructing the first-graders that "parents make a guess about their children's – when children are born, parents make a guess whether they're a boy or a girl. Sometimes parents are wrong."  Ps' ¶ 99.  Williams did not provide the Parents prior notice and an opportunity for them to opt their children out of that instruction, Ps' ¶ 21.  If the contrary had occurred in the classroom with Williams' child, i.e., a teacher instructed that a "he cannot become a she" and parents believing in transgender identity may be wrong, Williams' parental rights likewise would have been impacted.

Williams believed "I'm in the right here!" (ECF No. 95-64) and that she was free to instruct the young, captive students in her class in accordance with her beliefs without giving parents prior notice or an opportunity to opt their children out of that instruction.[24]  That conduct showed intolerance and disrespect for the religious or moral beliefs and authority of the Parents. A reasonable jury could only find that conduct, without a compelling governmental interest

---

[24] Plaintiffs' also firmly believe they are "in the right here."  If the roles were reversed, and one of the Plaintiffs was the first-grade teacher and proclaimed in the classroom her beliefs about gender identity to Williams' child, Williams would likely be upset.

being shown, in the elementary school violated the Parents' fundamental constitutional rights to control the upbringing of their young children.

e.   Municipal and supervisory liability -- ratification

In *Doe v. Southeast Delco School District*, 140 F. Supp. 3d 396 (E.D. Pa. 2015), the court explained that under Pennsylvania law a school superintendent is the final policymaker for overseeing teachers' conduct in school:

> [I]t is within the superintendent's statutory authority "to note the courses and methods of instruction and branches taught, [and] to give such directions in the art and methods of teaching in each school as he deems expedient and necessary." 24 P.S. § 10–1081. Pennsylvania law further recognizes that superintendents have the authority to monitor, investigate, and direct teachers' conduct in school.

*Id.* at 401.  In this case, it is undisputed that, as superintendent, Steinhauer had authority to create and implement written procedures for District administrators and teachers to follow.  Ps' ¶ 119. It is undisputed that Irvin, as the assistant superintendent in charge of elementary education in the District, had the ability to make procedures for elementary schools that would be districtwide.  Ps' ¶ 127.  Bielewicz, as principal, was Williams' direct supervisor.  Ps' ¶ 163.

The District recognizes its responsibility to develop a curriculum and control the information that is presented to the children entrusted to its care.  Policy I(J).  A public school teacher does not have a constitutional right to depart from the school's curriculum.  *See Mayer v. Monroe Cnty. Cmty. Sch. Corp.*, 474 F.3d 477, 480 (7th Cir. 2007) (holding that "the first amendment does not entitle primary and secondary teachers, when conducting the education of captive audiences, to cover topics, or advocate viewpoints, that depart from the curriculum adopted by the school system.").  Given the young age of the children, it was incumbent on the District to ensure that they did not become captive to Williams' noncurricular agenda.  *Busch*, 567 F.3d at 96, 98-99.

The record is undisputed that Bielewicz, Irvin and Steinhauer gave comprehensive support to Williams.  *See* (ECF No. 95-63) ("Tim [Steinhauer] and MB [Irvin] know everything and I am backed by everyone.  So I'm not in trouble professionally."); (ECF No. 95-64) ("Brett and MB have my back").  On April 4, 2022, Bielewicz sent an email to Williams, stating: "You got tons of support from top down – trust me!"  ECF 100, Ex. 23.  Williams and Bielewicz did not face any discipline.  Ps' ¶¶ 155, 156.

There was no vigorous investigation of the Parents' complaints.  Bielewicz characterized the Parents' position as merely objecting to Williams' reading books.  Bielewicz failed to investigate or respond to a teacher's email that Williams told the first-graders: "**when you're born, your parents make a guess of what you are and sometimes they're right and sometimes they're not.**" Ps' ¶ 100; ECF No. 95-61 (bold in original).  The adult aides in Williams' classroom were not interviewed or consulted at all. The lack of investigation contrasts sharply with the investigation of the German teacher's statement to fifth-graders "there's always one mother and there's always one father," which led to interviews of every student in the class. Ps' ¶¶ 153-54.  The administrators made public statements of support of Williams. As explained in *G.S.,* "the administrators' clear message became policy" when they approved Williams' conduct.  *G.S.*, 2023 WL 4486667 at *4.

Ratification by supervising policymakers occurred here.  Steinhauer and Irvin were the District's final policymakers responsible to develop and implement policies and practices to protect parental rights.  Policy I(J), I(F).  The District provided no guidance and instead had a de facto policy to defer to "teacher prerogative."  ECF No. 95-21 at 67-70.  Williams, a nonpolicymaking official, following the de facto policy, decided that she would observe Transgender Awareness Day by reading noncurricular books and instructing her first-grade

students that "he is now a she" and parents may be mistaken about their children's gender. Neither the books nor the instruction was in the curriculum and Williams did not provide notice to the Parents, ECF No. 100-22, Ps' ¶ 21. When Plaintiffs lodged objections, Williams' supervisors, including the District's final policymakers, ratified and approved that de facto policy. *See* ECF 100, Ex. 23 ("You got tons of support from top down – trust me!").

Steinhauer acknowledged that he reviewed the books, which presented a child and a transgender character making the decision about their gender and parents making mistakes about the child's gender. Ds' ¶ 106. While he testified he was not aware of Williams' verbal instruction, Steinhauer knew the content of the books and determined it was appropriate for Williams to teach from the books. *Id.* Steinhauer acknowledged the de facto policy that it was a teacher's prerogative to use noncurricular instructional materials and to determine whether or not notice and opt out rights would be provided to parents.[25] Irvin and Bielewicz also approved use of the noncurricular books and Williams' instruction. Ps' ¶ 130; Ps' ¶ 164.

Viewing the record in favor of Defendants, a reasonable jury could only conclude, based on the record, that Steinhauer, Irvin and Bielewicz[26] ratified Williams' conduct, and therefore, are subject to supervisory liability. Because those individuals included the final policymakers for the District, the District is subject to municipal liability on the basis of ratification.

---

[25] That conduct in affirming the de facto policy, by the District's final policymaker, can be regarded as delegating responsibility to individual teachers to determine the noncurricular topics for which parental notice and opt out rights will be provided. This delegation can be viewed as another basis for liability. *See LaVerdure*, 324 F.3d at 125-26 (even if individual lacks final policymaking authority, municipality may be liable if it delegated to the individual the authority to act or if it acquiesced to the conduct). The risk of an erroneous deprivation of fundamental parental rights under the District's de facto policy was obvious and Defendants consciously disregarded that risk. Indeed, a parent asked in an email to Bielewicz whether gender identity topics would be presented to her first-grade student and Bielewicz responded, "[t]here is no formal introduction or lessons surrounding it at JES, especially in 1st grade." Ps' ¶ 64.

[26] The court disagrees with Plaintiffs' contention that Bielewicz is liable on a failure to intervene theory. (ECF No. 93 at 20 & n. 10). Viewing the record in the light most favorable to Bielewicz, Williams' morning instruction occurred before she sent an email to Bielewicz and Bielewicz authorized Williams only to share the books with colleagues, not read them to students.

f.      Qualified immunity

The individual Defendants (Williams, Steinhauer, Irvin and Bielewicz) assert that they are entitled to qualified immunity. Based on the evidentiary record, as explained above, the Substantive Due Process parental rights at issue are fundamental, long-recognized and clearly established. All individual Defendants had fair warning from numerous Supreme Court and Third Circuit Court of Appeals decisions that Williams' classroom conduct violated parental interests of the greatest importance, i.e., forming the identity of their young children. *See, e.g., C.N.* and *Gruenke*. Officials can receive fair warning that their conduct is violative even in novel factual circumstances. *Mack,* 63 F.4th at 234; *Clark*, 55 F.4th at 182. Indeed, one of the teachers on the text thread dated March 30, 2022, recognized that reading the books would get her in trouble (ECF No. 95-48). The teachers made a conscious decision to proceed. A reasonable teacher would have known that her personal desire to observe Transgender Visibility Day was not a compelling governmental interest and that discussing with first-grade students that parents may be wrong about their children's identity was not narrowly tailored to achieve a compelling governmental interest. In other words, it is obvious that a teacher reading books to teach first-grade students that their parents may be wrong about whether they are a boy or a girl would violate fundamental parental rights.

Summary judgment will be entered in favor of all Plaintiffs and against Williams on count I. Summary judgment will be entered in favor of all Plaintiffs and against Steinhauer, Irvin and Bielewicz on count I on the basis of supervisory liability and against the District on municipal liability, for the reasons set forth above.

2.   Procedural Due Process (Count II)

The Fourteenth Amendment to the United States Constitution provides, in relevant part, that no state shall "deprive any person of life, liberty, or property, without due process of law." Procedural Due Process implicates a flexible level of scrutiny that evaluates "such procedural protections as the particular situation demands." *Mathews v. Eldridge*, 424 U.S. 319, 334-35 (1976).  The factors for a court to consider are: (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of that interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.  *Id.*

First, the private interests affected in this case implicate Plaintiffs' fundamental parental rights, as explained above, and the religious rights of Tatel and Melton, as described below. Second, the risk of erroneous deprivation strikes at the heart of parents' role in forming their young children's identities.  The procedures used here, i.e., no notice and unguided deference to teacher prerogative, did not protect those interests.  The Parents' rights could be procedurally protected by notice and the opportunity to opt their young children out of instruction which is contrary to their moral and religious beliefs.  Third, Defendants did not articulate any administrative burdens. The District provides notice and opt outs for numerous other sensitive topics and failed to articulate any burden associated with providing notice and opt outs to Plaintiffs for the kind of noncurricular instruction provided by Williams.  In May 2022, the District directed the principals to ensure that parents are given notice and opt out rights for controversial topics.  Ds' ¶ 113.  In June 2022, to resolve the PI motion, Defendants agreed to provide notice and opt out rights to Plaintiffs for transgender topics.  The court observes that

agreement has been in place for two years now.  There is no evidence that providing notice and opt outs to Plaintiffs to resolve the preliminary injunction imposed any burden on Defendants. The factors, based on the record in this case, all favor Plaintiffs.

As explained above, Plaintiffs of young children have a fundamental parental right to not have their young children be provided noncurricular instruction by their teacher about parents making mistakes and being wrong about a child's gender, absent a compelling governmental interest.   Procedural safeguards such as parents being given realistic advance notice when sensitive topics will be presented in the school by a teacher would avoid the risk of an erroneous deprivation.  *See C.N.*, 430 F.3d at 176 ("A jury could reasonably think it unrealistic in this age of busy, working parents and busy, scheduled children that a letter warning of a survey on a date uncertain would be sufficient to allow a parent to act on an objection.").  Williams provided **no** notice[27] to Plaintiffs before Williams introduced and instructed her first-grade students about noncurricular transgender topics and the other policymaking individual Defendants ratified that conduct, making the District also liable.

For essentially the same reasons that establish a Substantive Due Process violation, there was also a Procedural Due Process violation, which was clearly established so that the individual Defendants are not entitled to qualified immunity.   A reasonable school official would have known that introducing transgender topics to first-graders and reading books to teach the students their parents may be wrong about whether they are a boy or girl, with no notice or opt out rights, would violate Plaintiffs' constitutional rights.  *See, e.g., C.N.* and *Gruenke*.   A reasonable jury could not render a verdict in favor of Defendants on this claim.   Summary

---

[27] Defendants argue that Plaintiffs did not avail themselves of the opt out process in District Policy I(F) and the Pennsylvania School Code (ECF No. 101 at 24).  That argument is misplaced because Williams' instruction was not in the curriculum and Plaintiffs had no notice or ability to opt their children out of the instruction, or avail themselves of other avenues of relief, prior to the deprivation of their rights.

judgment will be granted in favor of Plaintiffs and against Williams on the Procedural Due Process claim in Count II.  The other supervisory Defendants ratified Williams' conduct, as explained above.  Summary judgment will be granted in favor of Plaintiffs and against the District (on municipal liability) and Steinhauer, Irvin and Bielewicz (on supervisory liability) on Count II, for the reasons set forth above.

### 3.  First Amendment -- Free Exercise of Religion (Count IV)

Public schools must perform their duties within the bounds of the Constitution.  *Board of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 864 (1982) ("the discretion of the States and local school boards in matters of education must be exercised in a manner that comports with the transcendent imperatives of the First Amendment").  The Free Exercise Clause is made applicable to the states through incorporation into the Fourteenth Amendment.  *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940).  In *Edwards*, the Supreme Court summarized the social contract between parents and public schools as follows:  "Families entrust public schools with the education of their children, but condition their trust on the understanding that the classroom will not purposely be used to advance religious views that may conflict with the private beliefs of the student and his or her family."  482 U.S. at 584.

#### a. Dunn

As an initial matter, the court must distinguish the religious beliefs of Tatel and Melton from the moral, nonreligious beliefs of Dunn.  "Only beliefs rooted in religion are protected by the Free Exercise Clause, which, by its terms, gives special protection to the exercise of religion."  *Thomas v. Rev. Bd. of Indiana Emp. Sec. Div.*, 450 U.S. 707, 713 (1981). *Accord Frazee v. Illinois Dep't of Emp. Sec.*, 489 U.S. 829, 833 (1989) (citations and punctuation

omitted) ("There is no doubt that only beliefs rooted in religion are protected by the Free Exercise Clause.  Purely secular views do not suffice.").  In *Yoder*, the Supreme Court explained that a philosophical objection would not be protected under the Free Exercise clause: "Thoreau's choice was philosophical and personal rather than religious, and such belief does not rise to the demands of the Religion Clauses."  406 U.S. at 216.

Plaintiffs' citation to *Welsh v. United States*, 398 U.S. 333, 340-43 (1970), is unpersuasive.  In that decision, the Supreme Court determined that conscientious objector status under the Universal Military Training and Service Act, 50 U.S.C. § 462(j), could be based on nonreligious ethical and moral beliefs.  The Court specifically noted that it reached its decision "without passing upon the constitutional arguments that have been raised."  *Id.* at 335.  In *United States v. Meyers*, 906 F. Supp. 1494 (D. Wyo. 1995), aff'd, 95 F.3d 1475 (10th Cir. 1996), the court observed: "the functional definition of 'religion' adumbrated in *Seeger* and *Welsh* is, at least for First Amendment purposes, dead."  *Id.* at 1500 (citing *Yoder*).  Based on the undisputed facts, Defendants as a matter of law are entitled to summary judgment against Dunn on the Free Exercise claim.[28]

### b.  Tatel and Melton

Tatel's and Melton's Free Exercise claims are intertwined and overlap with their Due Process claims because the Parents' objections to Williams' instruction on gender identity and on parents' role in forming the gender identity of their children are based on their religious beliefs. Tatel and Melton contend that Defendants deliberately supplanted the Parents' role to control the instruction of their young children about gender identity in accordance with the Parents' religious values.

---

[28] As explained above, Dunn (like other nonreligious parents) has protected fundamental parental rights under the Substantive Due Process doctrine.

Tatel's and Melton's Free Exercise claims are also intertwined with the Equal Protection claims in this case because they are based on a similar legal theory; namely, that Defendants treated their religious requests for notice and opt out rights from Williams' transgender instruction differently than requests for notice and opt out rights on other sensitive topics. The Free Exercise and Equal Protection claims are both pleaded in count IV of the complaint (ECF No. 1 at ¶¶ 137-149).

In *Kennedy v. Bremerton School District*, 597 U.S.  507 (2022), the Supreme Court explained "a plaintiff may carry the burden of proving a free exercise violation in various ways, including by showing that a government entity has burdened his sincere religious practice pursuant to a policy that is not neutral or generally applicable." *Id.* at 525.[29]  In *Fulton v. City of Philadelphia*, 593 U.S. 522 (2021), the Supreme Court explained that a law "lacks general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Id.* at 533; *accord Ricard v. USD 475 Geary Cnty., KS Sch. Bd.,* No. 522CV04015, 2022 WL 1471372 at *5 (D. Kan. May 9, 2022) (school district policy not generally applicable where it exempts conduct for secular reasons, but is unwilling to exempt plaintiff for religious reasons).

In *Spivack v. City of Philadelphia*, 109 F.4[th] 158, 166 (3d Cir. 2024) (involving a Free Exercise challenge to a Covid vaccine mandate), the Third Circuit Court of Appeals recently explained that strict scrutiny and rational basis scrutiny provide "sharply divergent standards." Which level of scrutiny applies is "based on whether a law or policy is neutral and generally applicable." *Id.*

The court explained:

A government policy is neutral if it does not "restrict[ ] practices because of their

---

[29] *Kennedy* did not require coercion as an element of a Free Exercise claim.

> religious nature" or evince "intoleran[ce] of religious beliefs." *Fulton v. City of Philadelphia*, 593 U.S. 522, 533, 141 S.Ct. 1868, 210 L.Ed.2d 137 (2021). And a policy is generally applicable so long as it does not either "provid[e] a mechanism for individualized exemptions" or "prohibit[ ] religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Id.* at 533–34, 141 S.Ct. 1868 (cleaned up).

*Id.* at 167. A government "fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Id.* "Even 'subtle departures' from religious neutrality are forbidden." *Id.*

Strict scrutiny applies where "no criteria meaningfully cabin[ ] an official's discretion." *Id.* at 172. The court noted: "What *does* trigger strict scrutiny, however, is a policy of individualized, discretionary exemptions in which a government official may unilaterally evaluate 'the particular reasons for a person's conduct.'" *Id.* at 172 n.8 (citing *Fulton*, 593 U.S. at 533) (emphasis in original).

The District's de facto notice and opt out policy during the relevant timeframe, which extended to secular and religious instruction, was not "generally applicable" because it did not provide teachers any guidance on the topics for which notice and opt out rights should be provided to parents – i.e., there were "no criteria meaningfully cabining" the teacher's discretion. Steinhauer testified that the District provided no specific guidelines and instead deferred to "teacher prerogative." ECF No. 95-21 at 70; Ps' ¶ 16 and Ds' clarification thereto. In other words, teachers make individualized decisions about the kinds of topics for which notice and opt out rights are provided.

The District's de facto policy is also not neutral. The District, during the relevant time period, did not provide Plaintiffs notice and opt out rights for transgender instruction based on their religious objections, but permitted notice and opt out rights for secular and religious topics that "undermine[] the government's asserted interests in a similar way." *Fulton*, 593 U.S. at 33-

34.    Defendants provided notice and opt out rights to other parents of older students for numerous secular or religious topics like instruction about apartheid, Chanukah, Christmas, Kwanzaa, and a TV series that involves a homosexual character.  Steinhauer cited tolerance and inclusivity when ratifying Williams' conduct in instructing first-grade students about transgender topics.  Defendants did not articulate how Plaintiffs' religious objections to Williams' instruction would undermine their interests in a different way than objections to instruction on these other matters, which involved racial differences, religious differences and homosexuality.  Those other matters implicate similar concerns about kindness, tolerance and inclusivity toward children of different races, religions and sexual orientations.  There is no principled difference between allowing notice and opt outs on those topics and the topics at issue in this case.  By permitting notice and an ability to opt out of instruction on the movie Invictus, the District clearly did not believe it was endorsing apartheid or marginalizing students of African descent; permitting notice and opt outs of instruction showing a homosexual character must not be viewed by the District as endorsing homophobia or marginalizing homosexual students; and permitting notice and opt outs of instruction about Chanukah, Christmas and Kwanzaa is not viewed by the District as endorsing antisemitism, anti-Christianity or racism or marginalizing persons who adhere to those religious traditions.  Permitting notice and opt outs for those kinds of instruction was not viewed by the District as intolerant, unkind or noninclusive.

The District points to its August 2022 procedure to illustrate that it does provide notice and opt out rights for religious reasons.  The 2022 procedure (adopted after the lawsuit was filed) imposed more onerous requirements on parents asserting religious objections (i.e., written notice to the principal, containing all required information) compared with parents asserting nonreligious objections (i.e., written or oral requests to a teacher).  *Compare* ECF Nos. 95-17

and 95-34; ECF No. 95-21 at 67-70; Ps. ¶¶ 48-50.  As a factual matter, Tatel and Melton <u>did</u> assert religious reasons, albeit after-the-fact because they received no notice of Williams' instruction.  As noted above, parents must have reasonable advance notice of planned instruction to effectuate their religious opt out rights.

In any event, the District's reliance on the 2022 procedure is misplaced because the District provides notice and opt outs for nonreligious reasons.  Defendants did not provide a compelling justification or even a rational basis for failing to treat Plaintiffs' notice and opt out requests for transgender topics the same as other sensitive secular or religious topics and for failing to set any criteria to meaningfully cabin teachers' discretion to provide parental notice and opt out rights.  The burdening of some religious rights, while not similarly burdening secular or other religious objections, is a clear violation of the Free Exercise Clause.  No reasonable jury could otherwise find.

As explained above, Defendants failed to provide Tatel and Melton notice and the ability to opt their children out of Williams' transgender agenda, even though Tatel's and Melton's objections to the instruction were based on their religious beliefs.  Defendants ratified the lack of parental notice and opt out rights, while providing parental notice and the ability to opt out for numerous other secular or religious reasons. Ps' ¶ 18.  There is no evidence in the record about Defendants' compelling interests in refusing to provide notice and opt outs on transgender topics and there is no evidence that Tatel's or Melton's religiously-motivated requests for notice and opt out rights from Williams' transgender instruction would undermine Defendants' asserted interests in a dissimilar way from the notice and opt out rights provided for other secular and religious reasons.  Defendants did not establish a compelling basis for refusing to provide notice and opt out rights for parents of first-graders affected by Williams' transgender instruction.

Viewing the evidence in the light most favorable to Defendants, a reasonable jury could only find that Tatel's and Melton's First Amendment rights were violated. The Free Exercise rights were clearly established and intertwined with the Substantive Due Process claims so that the individual Defendants are not entitled to qualified immunity. A reasonable school official would have known that refusal to respect the religious objections of Tatel and Melton would violate their Free Exercise rights. For the reasons set forth above, the District, Bielewicz, Irvin and Steinhauer ratified the violation of Tatel's and Melton's First Amendment rights by giving her "tons of support from the top down." ECF 100, Ex. 23. Under those circumstances, summary judgment will be entered in favor of Tatel and Melton against Williams, against the District on the basis of municipal liability, and against Bielewicz, Irvin and Steinhauer on the basis of supervisory liability with respect to the Free Exercise claim.

Dunn was not exercising any religious rights. Summary judgment will therefore be entered in favor of all Defendants and against Dunn on the Free Exercise claim.

### 4.  Equal Protection (Count IV)

#### a. General

The Fourteenth Amendment provides, in relevant part, that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV. The Equal Protection claim challenges the parental notice and opt out policy implemented by the District and its policymaking officials, Steinhauer and Irvin (the superintendent and assistant superintendent), who were directly responsible for that policy.[30] As explained in *Nordlinger v. Hahn*, 505 U.S. 1 (1992): "The Equal Protection Clause does not forbid classifications. It simply keeps governmental decisionmakers from treating differently persons who are in all relevant

---

[30] Williams and Bielewicz are not named as Defendants in the Equal Protection claim.

respects alike." *Id.* at 10.

The parties agree on the legal standard for the Equal Protection claim. (ECF No. 93 at 41; ECF No. 113 at 38). The elements of an Equal Protection "class of one" claim are: (1) a public entity treated the plaintiff differently than others similarly situated; (2) the entity did so intentionally; and (3) there was no rational basis for the difference. *Hill v. Borough of Kutztown*, 455 F.3d 225, 239 (3d Cir. 2006). To establish a selective enforcement Equal Protection claim, Plaintiffs must demonstrate that they were (1) treated differently from other, similarly situated persons; and (2) this treatment was based on an unjustifiable standard, such as race, or religion, or some other arbitrary factor or to prevent the exercise of a fundamental right). *Harvard v. Cesnalis*, 973 F.3d 190, 205 (3d Cir. 2020).

To be similarly situated, persons must be alike in all relevant respects, but need not be identically situated. *Harvard*, 973 F.3d at 205. Here, the Parents are similarly situated to other parents in the District who receive broader notice and opt out rights on sensitive topics. Defendants do not contest that Plaintiffs are similarly situated.

In count IV, Plaintiffs assert that the District, Steinhauer, Irvin and Wyland violated their constitutional rights under the Equal Protection Clause of the Fourteenth Amendment by refusing to allow them to have notice and the ability to opt their children out of Williams' instruction on transgender topics while permitting similarly-situated parents to opt out of instruction on numerous other topics:

> District representatives have sent advance notice and the ability for parents to opt students out of participation in an assembly involving a therapy dog; for certain movies to be shown in class (including The Bad Guys, The Tiger Rising, Invictus (which concerns Nelson Mandela and Apartheid), and The Giver); for lunch group meetings with a school counselor; for PASS surveys; for the Scripps Spelling Bee; for stories related to Chanukah, Christmas and Kwanzaa; dissection of animals in biology; and video clips from a TV series that involves a homosexual character.

Ps' ¶ 18.  Defendants contend that rational basis scrutiny applies and argue there is no proof of

intentional discrimination in the record.  (ECF No. 113 at 38-39).

> b.  Level of scrutiny

The first step in the analysis is to determine the level of scrutiny.  As the court explained

in its opinion on the motion to dismiss:

> When a court analyzes a constitutional challenge to government action, it must
> determine the level of scrutiny to be applied; typically, strict scrutiny,
> intermediate scrutiny, or rational basis. *Doe v. Pennsylvania Bd. of Probation and
> Parole*, 513 F.3d 95, 107 (3d Cir. 2008).  Under the strict scrutiny standard, the
> action will be sustained only if it is narrowly tailored to serve a compelling state
> interest. *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985).
> Intermediate scrutiny requires that a classification be "substantially related to an
> important governmental objective." *Clark v. Jeter*, 486 U.S. 456, 461 (1988).  In
> the Equal Protection context, intermediate scrutiny applies to quasi-suspect
> classes like gender and illegitimacy. *Id.*; *See Lutz v. City of York, Pa.*, 899 F.2d
> 255, 270 (3d Cir. 1990) (applying intermediate scrutiny to Due Process challenge
> to cruising ordinance).  Rational basis review is a deferential standard which "is
> not a license for courts to judge the wisdom, fairness, or logic of legislative
> choices." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993).  Under
> rational basis review, the state action will be upheld if it is rationally related to
> any legitimate state interest.  *City of Cleburne*, 473 U.S. at 440.

ECF No. 38 at 15.

For Equal Protection claims, as explained in *Stepien v. Murphy*, 574 F. Supp.3d 229

(D.N.J. 2021):

> Strict scrutiny is appropriate if the challenged regulation targets a suspect class or
> burdens the exercise of a fundamental right. *Plyler v. Doe*, 457 U.S. 202, 216–17,
> 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982); *Artway v. Att'y Gen. of State of N.J.*, 81
> F.3d 1235, 1267 (3d Cir. 1996).
>
> In other cases, rational-basis scrutiny is appropriate; the challenged regulation
> "need only be rationally related to a legitimate government goal." *Artway*, 81 F.3d
> at 1267.

*Id.* at 237.

In this case, strict scrutiny applies.  As explained above, the de facto policy at issue

burdens all Plaintiffs' Substantive Due Process fundamental parental rights and Tatel's and Melton's Free Exercise rights while providing notice and opt out rights to similarly-situated parents for other secular and religious reasons.  The de facto notice and opt out policy is not "generally applicable" because there are "no criteria meaningfully cabining" the teacher's decision to teach about sensitive topics and to provide notice and opt outs for that instruction. *Spivack*, 2024 WL 3561365 at *11.

Steinhauer and Irvin were the District's final policymakers responsible to develop and implement policies and practices to protect parental and religious rights.  Policy I(J), I(F). Steinhauer testified that the District provided no specific guidelines and instead deferred to "teacher prerogative."  ECF No. 95-21 at 70; Ps' ¶ 16 and Ds' clarification thereto.  As explained above, Steinhauer, Irvin and the District ratified Williams' decision to not provide notice and opt out rights to Plaintiffs.

The de facto policy about providing parental notice and opt outs in this case fails to survive any level of scrutiny.  Far from demonstrating that the policy is narrowly tailored to achieving a compelling interest, Defendants did not establish even a rational basis for refusing to allow Plaintiffs to opt their first-graders out of Williams' transgender instruction. To the extent that Defendants argue that their interests were kindness, tolerance and respect and to prevent marginalization, *see, e.g.*, ECF No. 127 at 20, they failed to explain how being intolerant of Plaintiffs' requests[31] advanced those interests, while still providing notice and opt out rights for other topics that implicate those same interests.

There is no evidence that Plaintiffs' children were unkind, intolerant or disrespectful toward transgender children.  During the academic year 2021-22, no student at Jefferson

---

[31] Defendants describe Plaintiffs' requests as "nothing more than a personal, partisan demand."  (ECF No. 113 at 41).

Elementary School identified as transgender to the District. Ps' ¶ 65. The District received no complaints of transgender harassment or discrimination from a transgender student at Jefferson Elementary School during the 2021-22 school year. Ps' ¶ 66.  There is no evidence that providing notice and opt outs to Plaintiffs' (to resolve the preliminary injunction) imposed any burden on Defendants or caused any unkind, intolerant or disrespectful conduct toward transgender children.

The District denied Plaintiffs' the opportunity to have notice and opt out rights based on their religious and parental objections "while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton*, 593 U.S. at 33-34.  Defendants refused to recognize the religious, moral and parental objections asserted by Plaintiffs, even though they provided notice and opt out rights for other topics that affect kindness, tolerance, respect and marginalized persons, i.e., instruction about Nelson Mandela and apartheid, Chanukah, Christmas and Kwanzaa, and a TV series that involves a homosexual character. Ps' ¶ 18.

The District's Equity Statement "recognizes and celebrates the diverse identities of all members of our school community."  Ds' ¶ 3.  The District permits notice and opt outs of instruction on sensitive or controversial topics and the District is not asserting that conduct should reasonably be viewed as an endorsement by the school of a particular position on those topics.  For example, permitting parents to opt their student out of instruction on the movie Invictus does not mean that the school is endorsing (or opposing) apartheid.  Similarly, permitting parents to opt their student out of instruction on a TV show with a homosexual character does not mean that the school endorses (or opposes) homophobia.  If those opt outs are provided, permitting parents to opt their student out of instruction on transgender topics that are

not in the curriculum in elementary school would be neutral and would respect the diverse decisions of the Parents in the community, like it does for other sensitive religious and secular topics.

c.  Intentional disparate treatment

Defendants argue there was no intentional discrimination in this case.  There is a distinction between intent and motive.  *Hassan v. City of New York*, 804 F.3d 277, 298 (3d Cir. 2015), <u>as amended</u> (Feb. 2, 2016).  "While the absence of a legitimate motive may bear on whether the challenged surveillance survives the appropriate level of equal-protection scrutiny, 'intentional discrimination' need not be motivated by 'ill will, enmity, or hostility' to contravene the Equal Protection Clause."  *Id.*  "All you need is that the state actor *meant* to single out a plaintiff because of the *protected characteristic* itself."  *Id.* (emphasis in original).

The refusal to provide notice and opt out rights to Plaintiffs was intentional.  Defendants meant to single out Plaintiffs' requests for notice and opt outs because of Plaintiffs' religious, moral and parental beliefs about Williams' instruction. Plaintiffs were treated differently because of those protected characteristics, i.e., Defendants' viewed Plaintiffs' beliefs as "a personal, partisan demand," (ECF No. 113 at 41), that could be hurtful to and marginalize transgender students.  (ECF No. 127 at 20).  When Plaintiffs raised objections to their lack of notice and opt out rights, the de facto policy was ratified by Steinhauer and Irvin, the District's final policymakers.  The August 2022 written policy continued to single out the objections at issue in this litigation for disparate treatment, instructing that principals deny parental requests using a sample form circulating in the community that referenced the stipulated agreement to resolve the PI.  ECF 95-34.

In sum, refusing to provide opt outs for parents who assert religious and fundamental

parental rights objections to transgender instruction to young children, while providing notice and opt out rights for other sensitive secular and religious topics, constitutes disparate treatment and violates the Equal Protection clause.  Viewing the evidence and drawing all reasonable inferences in their favor, a reasonable jury could not find in favor of the District, Steinhauer and Irvin on the Equal Protection claim.[32]

### d.  Qualified immunity

The individual Defendants are not entitled to qualified immunity because Plaintiffs' Equal Protection rights were clearly established and intertwined with Plaintiffs' Substantive Due Process and Free Exercise claims.  The District had a published policy, District Policy I(F), and the de facto policy, which recognized parental notice and opt out rights.  Reasonable school officials should have known that to allow notice and opt out rights on numerous topics, but deny them to parents who object to instructing their young children about transgender topics in a manner contrary to the Parents' religious and moral beliefs, would be a violation of their Equal Protection rights provided under the Constitution.  *See Danielson v. Chester Twp.*, No. CIV.A. 13-5427, 2014 WL 3362435, at *10 (D.N.J. July 9, 2014) (denying qualified immunity because it was "clearly established on the date in question that an individual's rights under the Equal Protection clause are violated when 'he has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.'") (quoting *Hill*, 455 F.3d at 239).

### e.  Summary

Summary judgment will be entered in favor of Plaintiffs and against Steinhauer and Irvin, as explained above.  Summary judgment will be entered in favor of Plaintiffs and against the District based on municipal liability because Steinhauer and Irvin were its final policymakers.

---

[32] Wyland is not liable, as separately discussed.

5.   Familial privacy (Count III)

The familial privacy claim in count III, like the parental rights claim in count I, asserts a fundamental liberty interest protected by the Fourteenth Amendment.  The court has struggled to discern how the contours of a familial privacy claim differ from the fundamental parental rights claim discussed above.  *See Gruenke*, 225 F.3d at 306 (observing that the privacy deprivation claim "overlaps with and is largely inseparable from that of familial rights").

After *Dobbs*, the court must identify a liberty interest that is "deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty."  *Dobbs*, 597 U.S. at 231.  In *C.N.*, the court explained that the constitutional right to privacy protects two strands of privacy interests: (1) "the individual interest in avoiding disclosure of personal matters"; and (2) "the interest in independence in making certain kinds of important decisions."  *C.N.*, 430 F.3d at 178.   Those important decisions involve "matters relating to marriage, procreation, contraception, family relationships, and child rearing and education."  *Id.* (citation omitted). The court in *C.N.* was applying a pre-*Dobbs* kind of analysis.  After *Dobbs*, it is important to address the nature of the fundamental parental rights.  *See* discussion *supra* at 44-46.  Neither party briefed the issue of how a familial privacy claim is constitutionally distinct from the fundamental parental rights Substantive Due Process claim.

In this case, the court is unable to identify a familial privacy claim that is separate and distinct from the parental rights claim. The court concludes Count I is the same claim asserted in Count I and will be governed by the same analysis.[33]

---

[33] The summary judgment record with respect to the familial privacy claim is largely duplicative of the Substantive Due Process parental rights claim.  The only factual addition asserted by Plaintiffs in the familial privacy claim is the alleged adoptive admission, which occurred during a "listening conference" early in the school year in which Dunn told Williams her son was upset because Williams told him he

In summary, Count I will be dismissed without prejudice because it is subsumed into Count III.

### 6.   Declaratory Judgment (Count VI)

In count VI, Plaintiffs seek: (a) a declaration that Defendants' conduct violates 22 Pa. Code § 4.4; and (b) declaratory relief with respect to their federal constitutional claims. *See* ECF No. 93 at 42.[34]  Defendants contend that they are entitled to summary judgment on the state law portion of Count VI because District policies are consistent with 22 Pa. Code § 4.4.  Defendants also point out that state regulations provide an administrative remedy per 22 Pa. Code § 4.81. Defendants argue that a declaration based on the federal claims would fail for the same reasons they articulated with respect to the substantive claims (as addressed above).

### a. State law claim

The court concludes that Defendants are entitled to summary judgment on the state law portion of count VI because the Pennsylvania School Code does not provide a private right of action.  The School Code, on its face, requires the Secretary of Education to take action; it does not provide a private right of action for a parent to seek redress.  *See* 22 Pa. Code § 4.81(a) ("The **Secretary** will receive and investigate allegations of curriculum deficiencies") (emphasis added). The Pennsylvania School Code does not provide for relief in state or federal court; instead, it provides that the general rules of administrative practice and procedure apply to activities and

---

could wear dresses and a fairy costume and have long hair like his mom.  Ps' Supp. ¶ 10.  Williams denies having discussed the topics claimed by Dunn at the conference and denies having made the alleged statements to Dunn's child.  Ds' Response to Ps' Supp. ¶ 12.  Dunn testified that at the conference, Williams stated "they were having a class discussion and maybe he heard wrong."  *Id.*  In any event, to the extent a jury would credit Dunn's testimony, it would just be supplemental evidence against Williams to support the claim in Count I.

[34] Plaintiffs did not address the state law portion of Count VI in their initial summary judgment brief. (ECF No. 93 at 42).

proceedings before the Board of Education and Department of Education.  22 Pa. Code §§ 1.5,

1.6 (citing 1 Pa. Code § 31.1 & 1 Pa. Code Part II).

Courts have consistently held that there is no private right of action under the

Pennsylvania School Code.  As explained in *Snyder v. Millersville University*, No. CV 07-1660,

2008 WL 11511898 (E.D. Pa. Jan. 31, 2008):

> [T]he Pennsylvania Public School Code includes neither express nor implied
> private rights of action. *See Coreia v. Schuylkill County Area Vocational-Tech.
> Sch. Auth.*, No. 4:CV-04-2425, 2006 WL 1310879 (M.D. Pa. 2006)
> (noncompliance with the Pennsylvania School Code does not trigger a private
> cause of action); *Whipple ex rel. Whipple v. Warren County Sch. Dist.*, 133
> F.Supp.2d 381, 383 (W.D. Pa. 2000) (no cause of action necessary under the
> regulations of the Pennsylvania Code where plaintiff had other remedies available
> to address alleged regulations breach). That Plaintiff seeks only injunctive relief
> under the Public School Code does not provide her with a private right of action
> that does not otherwise exist.

*Id.* at \*5; *see Issa v. School Dist. of Lancaster*, 847 F.3d 121, 141 (3d Cir. 2017) (indicating that

there is no express cause of action under the Public School Code and any implied right of action

may, at a minimum, require exhaustion of administrative remedies).[35]  In *Allen v. Dumaresq*, No.

474 M.D. 2014, 2015 WL 5446488, at \*8 (Pa. Commw. Ct. June 19, 2015) (involving a suit by

parents seeking to force the Secretary of Education to take action), the court explained:

> Contrary to Petitioners' assertions, the Secretary is not required to acknowledge
> receipt or provide notice to the persons making the allegation. *See* 22 Pa. Code §
> 4.81. Furthermore, the Secretary is not required to notify them of the status or
> outcome of the allegations received.

*Id.* at \*8.

The court agrees with the analysis in these decisions and concludes that there is no

private right of action for a violation of the Pennsylvania School Code.  Summary judgment will

be granted in favor of Defendants on the state law claim in count VI.

---

[35] There is no evidence that Plaintiffs exhausted their administrative remedies.

b.      Declaratory relief

i.      Relief sought

In their summary judgment motion, as declaratory relief, Plaintiffs seek an order that:

(1)      Defendants are precluded from providing instruction related to gender identity without providing direct advance notice to parents and the ability to opt out of such instruction;

(2)      prior to any such instruction, all instructional materials will be made available to parents for review through appropriate technological means (i.e., parent portal) reasonably in advance of any instruction; and

(3)      Defendants are precluded from providing instruction related to gender identity without placing references to such instruction in the District's published Curriculum.

ECF No. 92-1.[36]   Plaintiffs apparently no longer seek entry of a permanent injunction.[37] *See*

*Minard Run Oil Co. v. U.S. Forest Serv.*, 894 F. Supp. 2d 642, 664 (W.D. Pa. 2012), aff'd, 549 F.

App'x 93 (3d Cir. 2013) (citations omitted) (court concluded that entry of a permanent injunction

was not necessary where declaratory relief provided an adequate remedy).

---

[36] Plaintiffs explain that they seek only nominal monetary damages for past violations. *Id.*; ECF No. 93 at 42 & n. 22.

[37] Plaintiffs sought the following injunctive and declaratory relief in the Complaint:

1.   Preliminary and Permanent injunctive relief in the form of an injunction, inter alia, prohibiting the District from conducting instruction on gender dysphoria and transgender transitioning and/or, in the alternative, requiring the District to provide parental notice and opt out rights if the subjects of gender dysphoria and transgender transitioning or topics related thereto are to be taught in the District, including in elementary school; that, if taught, these topics be taught only by qualified and trained professionals based on qualifications made available to the public by the District; and that all materials to be used in any such instruction be provided and/or accessible in advance to parents through appropriate technological means (i.e., parent portal) reasonably in advance of any instruction so as to make the notice and opt out rights meaningful.

2.   A Declaratory Judgment as provided for in Count VI including a declaration that "In order to adhere to the Pennsylvania School Code and to avoid violating Plaintiffs' Constitutional rights in the future, the District is prohibited from conducting instruction on gender dysphoria and transgender transitioning and/or, in the alternative, the District is required to provide parental notice and opt out rights if the subjects of gender dysphoria and transgender transitioning or topics related thereto are to be taught in the District, including in elementary school."

(ECF No. 1 at 44).

ii.     Applicable standard

Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201: "any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such." In *Samuels v. Mackell*, 401 U.S. 66 (1971), the Supreme Court observed that "the propriety of declaratory and injunctive relief should be judged by essentially the same standards." *Id.* at 72. The Court explained that under the Declaratory Judgment Act, § 2202, declaratory relief can be the basis for a future injunction and, at least in terms of interference with a state proceeding, "declaratory relief alone has virtually the same practical impact as a formal injunction would." *Id.*

In *Steffel v. Thompson*, 415 U.S. 452 (1974), however, the Supreme Court explained that declaratory relief is a "less harsh and abrasive remedy" than injunctive relief and noted that principles of equity, comity, and federalism have little force where no state proceeding exists. *Id.* at 462-63.[38] In *Steffel*, the Court explained that although a "declaratory judgment has 'the force and effect of a final judgment,' 28 U.S.C. § 2201, it is a much milder form of relief than an injunction." *Id.* at 471. Although a declaratory judgment "may be persuasive, it is not ultimately coercive; noncompliance with it may be inappropriate, but is not contempt." *Id.* The traditional equitable prerequisites to the issuance of an injunction need not be satisfied prior to the issuance of a declaratory judgment. *Id.* Further relief is available if the Declaratory Judgment is violated. 28 U.S.C. § 2202.

iii.     Application to this case

---

[38] There is no state court proceeding related to this case.

Defendants do not contest that the declaratory judgment claim is justiciable. Plaintiffs'

claims related to Williams' conduct on March 31, 2022, have been resolved (for the reasons set

forth at length above) and no further declaratory relief with respect to those claims is necessary.

Declaratory relief remains an issue, however, with respect to the various changes to the District's

policies initiated after this lawsuit was initiated.

### x. Not moot

Defendants' actions since 2022 did not moot the dispute. In *DeJohn v. Temple*

*University*, 537 F.3d 301 (3d Cir. 2008) (imposing injunctive relief)[39], the court explained:

> [A]s a general rule, "voluntary cessation of allegedly illegal conduct does not
> deprive the tribunal of power to hear and determine the case, i.e., does not make
> the case moot." But jurisdiction, properly acquired, may abate if the case becomes
> moot because (1) it can be said with assurance that "there is no reasonable
> expectation ..." that the alleged violation will recur, and (2) interim relief or
> events have completely and irrevocably eradicated the effects of the alleged
> violation. When both conditions are satisfied it may be said that the case is moot
> because neither party has a legally cognizable interest in the final determination of
> the underlying questions of fact and law.

*Id.* at 309 (quoting *Los Angeles County v. Davis*, 440 U.S. 625, 631, 99 S.Ct. 1379, 59 L.Ed.2d

642 (1979)).

The court concludes that declaratory relief is appropriate to clarify the rights of the

Parents and the obligations of the District to recognize and protect Equal Protection, First

Amendment and fundamental parental rights to control the upbringing of their children and to

provide reasonable notice of instruction that may strike at the heart of parental decision-making

authority on matters of the greatest importance. *See Ungar v. Dunkin' Donuts of Am., Inc.*, 68

F.R.D. 65, 145 n. 102 (E.D. Pa. 1975), rev'd on other grounds, 531 F.2d 1211 (3d Cir. 1976)

("The granting of declaratory relief is proper where the judgment will serve a useful purpose in

---

[39] The same voluntary cessation principles apply to declaratory relief. *See Sutton v. Rasheed*, 323 F.3d
236, 248 (3d Cir. 2003).

clarifying and settling the legal relations at issue, or when it will terminate and afford relief from uncertainty, insecurity and controversy giving rise to the proceedings.").  In this case, neither prong of the voluntary cessation test is met.

y.  Expectation that the violation will recur

There is a reasonable expectation the violations may recur.  There is no assurance that the District will continue to provide parental notice and opt out rights for transgender topics after the litigation ends.  Williams believes she is "in the right here."  ECF No. 95-64.  Bielewicz told Tatel that Williams might teach about gender identity topics again.  (ECF No. 110-3 at 100).  Defendants refuse to adopt the notice and opt out policy requested by Plaintiffs.  (ECF No. 127 at 20).  For the 2023-2024 school year, the District adopted a "Disclaimer" that places the burden on parents to opt out of numerous topics, including gender identity, that are not part of the curriculum, but **may** or may not be included in instruction.

Although Defendants agreed to provide notice and opt out rights to Plaintiffs to settle the PI motion, Defendants continue to maintain they did nothing wrong.  The current notice is simply a pragmatic litigation decision for an interim period of time, i.e., during this lawsuit.  Irvin testified Steinhauer and she agreed that instructing teachers not to read any books on gender identity "was going to be the best path **at this point, not knowing the outcome of the lawsuit**."  (ECF No. 110-1 at 63) (emphasis added).  Irvin explained this plan was implemented despite the fact that she did not think there was anything wrong with what Williams did.  *Id.*

Throughout this litigation, Defendants have taken the position that in a public school, parents have **no** constitutional right to notice or to opt their children out of any kind of instruction, regardless of the content of that instruction, the age of the children, or whether the instruction is part of the published school curriculum.  *See* ECF No. 42 at 8 ("Parents have no

constitutional right to exempt their children from classroom lessons, including those on transgender issues"); ECF No. 113 at 10 (parents "do not have the right to notice and the ability to opt out from classroom instruction and that classroom instruction does not implicate fundamental parental liberty interests even when the Parents' religious beliefs are implicated"). In other words, the Defendants continue to take the position that parents simply have no constitutional right to notice or to object to <u>any</u> information a public school may present to their children, even if the District provides notice and opt out rights for other sensitive secular or religious topics. That is simply not the law within the Third Circuit.

### z.   Interim events have not irrevocably eradicated the effects

The steps taken by the District since March 31, 2022, do not irrevocably eradicate the violations. There is no existing policy in effect to ensure equal protection for Plaintiffs (i.e., the District will treat Plaintiffs' moral and religious objections to teaching transgender topics to their young children the same as objections to other topics) or to protect Plaintiffs' fundamental parental rights. Steinhauer confirmed there were no written procedures in place. (ECF No. 95-21 at 69-70) ("We [i.e., the District] don't have any specific guidelines for what you should notify parents about and not notify parents about.") In effect, the District continues to defer notice and opt out policy to the uncabined discretion of individual teachers.

The oral directive by Steinhauer in May 2022 to ensure that parents would be provided notice and the opportunity to opt out of instruction involving "controversial subjects," Ds' ¶ 113, was a step forward, but continued to defer all policymaking about when to provide notice and opt outs to the uncabined decisions of individual teachers. The settlement of the PI motion in June 2022 was a pragmatic litigation decision during the pendency of this lawsuit.

The August 2022 written policy instructed principals to ensure that opt out religious-

based requests were in writing, addressed to the principal, and included all the following: (1) children names; (2) the exempted curriculum topics were clearly stated and understandable; and (3) a religious objection.  Principals were cautioned that if requests did not contain all the required information, those forms should not be signed, but instead be returned to parents.  The policy places more burdens on parents seeking a religious opt out (requiring a written request, with all details demanded by the District, *see* ECF 95-34) than are placed on parents seeking nonreligious opt outs on other topics (such as PG movies).  In addition, the August 2022 written policy is underinclusive because it does not allow opt out requests based on fundamental parental rights.   As explained above, Substantive Due Process rights apply to both religious and nonreligious parents.

The 2023-2024 "Disclaimer," on its face, fails to provide reasonable notice to parents. The Disclaimer wrongly puts the burden on parents to object to something that is <u>not</u> in the curriculum.  (ECF No. 110-12 at 67) ("The onus is on the parent to tell the district I don't want x subject matter taught to my child.").   No reasonable factfinder could conclude that vague references in the curriculum to instruction on "the universal attributes of respect, honesty, love, justice, courage, loyalty and hope" and learning objectives to "identify the characteristics of students who are bullied," *see* ECF No. 136 Ds' ¶ 25, or the 2023-2024 Disclaimer, Ps' ¶ 39, would give parents realistic or effective notice that transgender topics will be presented to young children.

Defendants' protestations that they allow religion-based opt outs ring hollow because Defendants do not provide reasonable advance notice to parents of young children about noncurricular instruction on transgender topics under the Disclaimer.  The Parents' ability to opt out their children from that instruction, therefore, is unrealistic and ineffective. *C.N.*, 430 F.3d at

176.

iv.    Scope of declaratory relief

The court should narrowly tailor declaratory relief to resolve the dispute before it and avoid sweeping constitutional mandates. *See Communist Party of Indiana v. Whitcomb*, 414 U.S. 441, 452 n.1 (1974) ("the appropriate exercise of judicial power requires that important constitutional issues not be decided unnecessarily where narrower grounds exist for according relief."). Here, the court need not address any constitutional issues that may arise if the teacher's instruction: (1) occurs spontaneously in response to a student question; (2) involves middle school or high school students; or (3) is part of the school curriculum.

The court concludes that some narrowly-tailored declaratory relief is necessary and appropriate to clarify and protect the Parents' constitutional rights going forward. *See Steffel*, 415 U.S. at 472-73 (recognizing the paramount role Congress, in enacting the Declaratory Judgment Act, assigned to the federal courts to protect constitutional rights).

The court must evaluate the limited relief requested by Plaintiffs (i.e., notice and opt out rights for a parent's own children for religious and fundamental parental rights reasons) against the school's interest. *See Fulton*, 593 U.S at 541 (involving a First Amendment challenge to foster care regulations) ("Rather than rely on 'broadly formulated interests,' courts must scrutinize [ ] the asserted harm of granting specific exemptions to particular religious claimants."). Plaintiffs are not seeking a declaration that the transgender view of identity is wrong. Plaintiffs are not trying to change the curriculum or prevent the District from presenting transgender topics to other students. Plaintiffs seek the ability to exempt their young children from such instruction. Plaintiffs assert they are not trying to impose their religious or moral views on others, but want to prevent Williams from abusing her position as a role model to

impose the teacher's views upon the Parents' children that contradict the Parents' religious or moral views.

Defendants assert that to adopt an official policy that provides notice of instruction on transgender topics "could be hurtful of and marginalize transgender students." (ECF No. 127 at 20). Defendants point out that not all members of the community agree about transgender identity issues. Defendants describe Plaintiffs' requests as "nothing more than a personal, partisan demand." (ECF No. 113 at 41).

There are many controversial topics in society. In elementary school, it is constitutionally impermissible for a school to provide teachers with the unbridled discretion to determine to teach about a noncurriculur topic -- transgender identity -- and not to provide notice and opt out rights based on parents' moral and religious beliefs about transgender instruction, while providing notice and opt out rights for other sensitive secular and religious topics. *See Masterpiece Cakeshop, Ltd. v. Colorado C.R. Comm'n*, 584 U.S. 617, 638 (2018) ("it is not, as the Court has repeatedly held, the role of the State or its officials to prescribe what shall be offensive."); *Fulton*, 593 U.S. at 533 ("Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature."); *Barnette*, 319 U.S. at 637 ("That they are educating the young for citizenship is reason for scrupulous protection of Constitutional freedoms of the individual, if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes.").

The District's Equity Statement "recognizes and celebrates the diverse identities of all members of our school community." Ds' ¶ 3. When the elementary school provides notice and opt out rights for sensitive religious and secular topics, but not for transgender topics, the school

is not neutral.

Refusing to allow notice and opt outs for religious and fundamental parental rights objections to transgender topics, i.e., forcing young children to be exposed to particular instruction over the objections of unwilling parents, while permitting notice and opt outs for other sensitive topics – is not neutral and constitutes an improper use of governmental authority. *See Kennedy*, 142 S. Ct. at 2431 (rule suppressing religious expression "would undermine a long constitutional tradition under which learning how to tolerate diverse expressive activities has always been 'part of learning how to live in a pluralistic society.'").

Some of the declaratory relief sought in paragraphs 1 and 2 will be awarded. The court concludes that Plaintiffs are constitutionally entitled to a declaration that failure to provide adequate notice and the ability to opt their elementary-age children out of instruction on transgender topics that is not part of the school curriculum violates their constitutional rights. The notice provided to parents must be reasonable to enable the practical exercise of their ability to opt out their children.

The court will not grant all the declaratory relief requested by Plaintiffs. Proposed ¶ 1 is framed in injunctive language (i.e., "is precluded"), rather than declaratory language. Some of the relief sought in ¶ 2 does not require a declaration of rights, but involves details about how reasonable notice might be provided.

The declaratory relief sought in ¶ 3 (involving the curriculum) is not directly related to Plaintiffs' constitutionally-protected interests that are implicated in this case. Williams' transgender instruction was not part of the curriculum. The court need not determine, therefore, whether putting the transgender topics in the published curriculum would avoid the constitutional violations presented here. If this sensitive topic is included in the curriculum, rather than being

an ad hoc decision by a teacher that is ratified by the District, there may be other issues raised that would require different evidence or need expert analysis.

There is no need to issue declaratory relief against Steinhauer or Irvin because both of them are retired. They, therefore, no longer exercise supervisory or policy-making authority in the District. *See Cook v. Corbett*, No. CIV.A. 14-5895, 2015 WL 4111692, at *12 (E.D. Pa. July 8, 2015) (claim seeking injunctive relief against former Governor was moot because he left office).

The following declaratory relief will be awarded in favor of Plaintiffs and against the District, Williams and Bielewicz:

> Absent a compelling governmental interest, parents have a constitutional right to reasonable and realistic advance notice and the ability to opt their elementary-age children out of noncurricular instruction on transgender topics and to not have requirements for notice and opting out for those topics that are more stringent than those for other sensitive topics.

## IV. <u>Conclusion</u>

In summary, for the reasons set forth above, Plaintiffs' motion to strike responses to the CSMF (ECF No. 125) will be DENIED, although certain facts will be deemed undisputed.

Defendants' summary judgment motion (ECF No. 92) will be granted in part and denied in part as follows: (1) summary judgment will be granted in favor of Wyland on all claims; (2) summary judgment will be granted in favor of all Defendants and against Dunn on the Free Exercise claim in Count IV; (3) the familial privacy claim in Count III is subsumed into Count I and therefore is dismissed; (4) summary judgment will be granted in favor of Defendants with respect to the state law claim in Count VI because the Pennsylvania School Code does not provide a private right of action; and (5) the motion will be denied in all other respects.

Plaintiffs' summary judgment motion (ECF No. 96) will be granted in part and denied in

part as follows: (1) summary judgment will be granted in favor of Plaintiffs and against the District, Williams, Bielewicz, Irvin and Steinhauer on the Substantive Due Process claim in Count I, which subsumes the familial privacy claim in Count III; (2) summary judgment will be granted in favor of Plaintiffs and against the District, Williams, Bielewicz, Irvin and Steinhauer on the Procedural Due Process claim in Count II; (3) summary judgment will be granted in favor of Plaintiffs and against the District, Irvin and Steinhauer on the Equal Protection claim in Count IV; (4) summary judgment will be granted in favor of Tatel and Melton and against the District, Williams, Bielewicz, Irvin and Steinhauer on the Free Exercise claim in Count IV; and (5) summary judgment will be granted in part in favor of Plaintiffs with respect to the request for declaratory relief in Count VI.

The following declaratory relief will be awarded in favor of Plaintiffs and against the District, Williams and Bielewicz:

> Absent a compelling governmental interest, parents have a constitutional right to reasonable and realistic advance notice and the ability to opt their elementary-age children out of noncurricular instruction on transgender topics and to not have requirements for notice and opting out for those topics that are more stringent than those for other sensitive topics.

Nominal damages of $1.00 will be awarded in favor of each Plaintiff and against each of the District, Williams, Bielewicz, Steinhauer and Irvin ($1.00 from each Defendant to each Plaintiff, for a total of $15.00). *See Alexander v. Riga*, 208 F.3d 419, 429 (3d Cir. 2000) ("even absent proof of actual injury, nominal damages are to be awarded to recognize violation of a constitutional right") (citing *Carey v. Piphus*, 435 U.S. 247, 266–67 (1978)).

An appropriate Order follows.

Dated: September 30, 2024                    BY THE COURT:
                                             s/ Joy Flowers Conti
                                             Joy Flowers Conti
                                             Senior United States District Judge